IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,          )
                                   )
              Petitioner           )
                                   )
        -VS-                        ) Civil No. 07-12058
                                   ) Pages 1 - 110
JOEL WETMORE,                      )
                                   )
            Respondent             )


BENCH TRIAL - DAY ONE


BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
July 22, 2010, 9:15 a.m.


LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S:

2         EVE A. PIEMONTE-STACEY, ESQ. and RACHAEL S. ROLLINS, ESQ.,
     Assistant United States Attorneys, Office of the United States
3    Attorney, 1 Courthouse Way, Boston, Massachusetts, 02210, for
     the Petitioner.
4
          HARRY L. MILES, ESQ., Green, Miles, Lipton, White &
5    Fitz-Gibbon, 77 Pleasant Street, Northamptom, Massachusetts,
     01061-0210, for the Respondent.
6
     ALSO PRESENT:  Ian Gold, Esq., Federal Defender Office.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         I N D E X

2

   OPENING STATEMENTS                    PAGE
3
   By Ms. Rollins:                        4
4
   By Mr. Miles:                         13
5

6

7  WITNESS                  DIRECT   CROSS   REDIRECT   RECROSS

8

   ROBERT PRENTKY
9
      By Ms. Piemonte-Stacey:    31
10

11

12 EXHIBITS                  RECEIVED IN EVIDENCE

13 Government

14 1-4                             30

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2          THE CLERK:  The case of the United States v. Joel
 3   Wetmore, Civil Action No. 07-12058, will now be heard before
 4   this Court.  Will counsel please identify themselves for the
 5   record.
 6          MS. PIEMONTE-STACEY:  Good morning, your Honor.  Eve
 7   Piemonte-Stacey and Rachael Rollins for the United States.
 8          MR. MILES:  Good morning, your Honor.  Harry Miles for
 9   the respondent, and Mr. Wetmore is seated to my left.
10          THE COURT:  Yes.  Do you want to do opening
11   statements?
12          MS. ROLLINS:  Yes, your Honor.
13          THE COURT:  Okay.  How long is your opening?
14          MS. ROLLINS:  Probably about fifteen minutes, if that.
15          THE COURT:  And is your first witness here?  I know he
16   wasn't here before.
17          MS. PIEMONTE-STACEY:  I was just checking, your Honor.
18   I'm being informed he's in the elevator.
19          THE COURT:  Okay, all right.
20   OPENING STATEMENT BY MS. ROLLINS:
21          MS. ROLLINS:  Good morning, your Honor.  Over the last
22   forty-three years, there have been three constants in Joel
23   Wetmore's life:  He has either been, one, physically sexually
24   victimizing boys between the age of ten and fifteen; two,
25   reinforcing that behavior by chronically viewing and
```

1   masturbating to his collection of thousands of images of child

2   pornography; or, three, incarcerated and presumptively unable

3   to do either.  I say "presumptively" because the evidence will

4   show that Mr. Wetmore's urges to engage sexually with young

5   boys are so strong that during his most recent incarceration,

6   he created boys.  Specifically, Mr. Wetmore stockpiled

7   magazines, found nonsexual pictures of young boys, and

8   sexualized them by affixing makeshift penises to the images or

9   manipulating the cutout photographs of the boys into sexual

10  positions with each other.

11          The evidence will show, your Honor, that Mr. Wetmore's

12  four-decade history has demonstrated that, to him, the pleasure

13  of sexually victimizing young boys simply outweighs all other

14  considerations.  A nine-year prison term for gross sexual

15  misconduct against a twelve-year-old boy did not deter him from

16  reoffending, nor did conditions of release and a lurking

17  additional four-year prison term.  Mr. Wetmore's sexual

18  behavior and preferences are ingrained, and the evidence in

19  this case will prove clearly and convincingly that Mr. Wetmore

20  is dangerous and should be civilly committed under the Adam

21  Walsh Act.

22          There are three questions for the Court in this case,

23  your Honor.  The first is, has Mr. Wetmore engaged in sexually

24  violent conduct in the past?  That's easy.  The parties have

25  stipulated to three past acts and to the introduction of the

1    certified court records detailing the sexually violent conduct

2    involved in each of those three past acts.  Further,

3    Mr. Wetmore himself has admitted to sexually molesting between

4    eleven and thirty-five boys in his preferred age range of ten

5    to fifteen years old.

6          The second question for the Court, your Honor, is,

7    does Mr. Wetmore suffer from a serious mental illness,

8    abnormality, or disorder?  Your Honor, you will only hear from

9    two psychologists during this trial.  Dr. Prentky, the

10   court-appointed examiner, and Dr. Phenix, the government's

11   expert, both agree that the answer to the second question is

12   "yes."

13         The court-appointed examiner, Dr. Prentky, will

14   testify that there is overwhelming behavioral evidence

15   supporting a classification of same-sex pedophilia, and at this

16   point in Mr. Wetmore's life, the more precise diagnostic

17   characterization of Mr. Wetmore would be hebephilia, or

18   hebephilia, depending on how you pronounce that, the sexual

19   preference of postpubescent males, typically young adolescents.

20         The government's expert, Dr. Phenix, who is a leader

21   in the field of sex offender evaluation with decades of

22   experience, will also testify that Mr. Wetmore meets diagnostic

23   criteria for pedophilia.  Each of these overlapping diagnoses

24   are mental illnesses, abnormalities, or disorders recognized by

25   psychologists that evaluate sex offenders, and each of the

1   testifying psychologists in this case agree that the other's

2   diagnosis is a serious mental illness, abnormality, or

3   disorder.

4        Before discussing the third and final question for the

5   Court, I will give a brief overview of Mr. Wetmore's forty-plus

6   years of sexually violent conduct, as it is telling.

7        Mr. Wetmore's first longstanding relationship occurred

8   when he was fifteen years old.  The other boy, Clifford, was

9   twelve.  The evidence will show that the two dated for upwards

10  of ten years, and during those ten years Mr. Wetmore, as he got

11  older, he would have Clifford bring younger and younger boys to

12  a place called "the camp."

13       Now, the camp, your Honor, is a cabin located on

14  Mr. Wetmore's parents' property in Maine.  While at the camp,

15  Mr. Wetmore would go swimming and fishing with the younger boys

16  and have sex with them.  When Mr. Wetmore was seventeen or

17  eighteen years old, he had sex with two boys named Richard and

18  Randy.  Those boys were each fourteen years old.  When

19  Mr. Wetmore was twenty-one or twenty-two, he fondled and had

20  oral sex with an eleven-year-old boy named Willy.  You will

21  hear testimony that this was Mr. Wetmore's first long-term

22  pedophilic relationship, and it lasted for several years.

23       Mr. Wetmore's next pedophilic relationship was with a

24  twelve-year-old boy named Mark.  Mr. Wetmore was twenty-four

25  years old at the time.  This relationship resulted in the first

1   of Mr. Wetmore's three criminal convictions for sexual crimes

2   involving minors.  The evidence will show that Mr. Wetmore

3   invited Mark to the camp, rubbed his back, and then reached

4   under Mark's clothing and touched Mark's genitals.  Certified

5   court records from the Houlton District Court in Maine will

6   establish that on August 5, 1981, Mr. Wetmore pled guilty to

7   unlawful sexual conduct for this behavior with then

8   twelve-year-old Mark.  Mr. Wetmore was sentenced to 30 days in

9   county jail, but that sentence was suspended.  He also received

10  six months of probation with a condition that he undergo

11  psychiatric treatment.

12         Mr. Wetmore then moved to Texas and volunteered with a

13  religious group.  He requested that the probation for his

14  unlawful sexual conduct conviction be transferred to Texas, and

15  he did in fact meet with a therapist.  The evidence will show,

16  however, that Mr. Wetmore lied to the therapist, stating that

17  the incident with Mark was a mistake and a onetime thing.

18         In 1986, when Mr. Wetmore is thirty years old, he

19  moves back to Maine and reconnects with the same religious

20  group he had volunteered with in Texas.  This is where

21  Mr. Wetmore met another eleven-year-old boy named Willy, which

22  ultimately resulted in Mr. Wetmore's second criminal

23  conviction.  You will hear testimony that Mr. Wetmore described

24  Willy as a good friend, and that he began sexually molesting

25  Willy within a year of meeting him, and Willy was twelve at

1   that time.

2          Certified court records from the Houlton District

3   Court in Maine will establish that on May 29, 1987, Mr. Wetmore

4   was convicted of gross sexual misconduct; specifically, direct

5   physical contact between his genitals and the anus and mouth of

6   Willy, who Mr. Wetmore states was twelve years old at the time.

7   For this conviction, Mr. Wetmore was sentenced to eighteen

8   years, to serve fourteen with four years suspended.  He was

9   also ordered to be on parole for six years.

10         From 1987 to 1995, Mr. Wetmore was incarcerated at the

11  Down East Correctional Facility in Maine.  The evidence will

12  show that it was there that Mr. Wetmore first learned about the

13  Internet and child pornography.  The evidence will show that

14  Mr. Wetmore set up strict rules for himself regarding his

15  release from prison.  He would only download children's

16  pornography, he would never send or produce it, and, most

17  importantly, he would physically avoid places with children.

18  You will hear testimony that Mr. Wetmore thought that this was

19  a way that he could satisfy his incredibly strong sexual urges

20  toward boys without actually touching any and reoffending.

21         The evidence will also show that Mr. Wetmore grossly

22  underestimated the power of his sexual urges.  When he is

23  released from prison in 1995, Mr. Wetmore leaned heavily on

24  child pornography to try to curb his exceptionally strong

25  sexual urges towards ten- to fifteen year-old boys.  At times,

1  Mr. Wetmore admits that during this period he masturbated to

2  images of child pornography on his computer multiple times

3  daily, several hours per day.

4       The evidence will show that Mr. Wetmore had one

5  condition of his probation for his gross sexual conduct

6  conviction:  no unsupervised conduct or contact with children

7  under sixteen.  On October 22, 1999, Mr. Wetmore was arrested

8  by his probation officer for being unsupervised with multiple

9  boys under the age of sixteen.  Certified court records will

10 show that on October 14, 2000, Mr. Wetmore's probation is

11 terminated, and he's returned to prison to serve the remainder

12 of his eighteen-year sentence.

13      During the course of the police speaking with the

14 underaged boys, they learned that Mr. Wetmore had child

15 pornography on his computer.  The police conducted an

16 investigation surrounding the child pornography allegations,

17 and on October 23, 1999, they seized Mr. Wetmore's computer,

18 finding over 2,000 images of child pornography.  The evidence

19 will show that the pornographic material depicted prepubescent

20 minors, or minors under the age of twelve, as well as material

21 portraying sadistic or masochistic conduct or other depictions

22 of violence against children.  The vast majority of the images

23 included adolescent boys, some appearing as young as seven

24 years old.

25      The evidence will show that on July 10, 2000,

1  Mr. Wetmore pled guilty to one count of receipt of child

2  pornography and one count of possession of child pornography.

3  He was sentenced to 87 months of imprisonment to run

4  concurrently with his state sentence.

5          Mr. Wetmore was scheduled to be released from federal

6  custody, your Honor, in November of 2006, but the Bureau of

7  Prisons certified him as sexually dangerous, and that's where

8  we start our proceedings today here.

9          Finally, your Honor, you will hear evidence regarding

10  the third and final element the government must prove.  That

11  is, as a result of the serious mental illness, abnormality, or

12  disorder, Mr. Wetmore would have serious difficulty refraining

13  from sexually violent conduct if he were released.  Both of the

14  testifying psychologists in this case agree that Mr. Wetmore

15  meets this element as well.  Both Dr. Prentky and Dr. Phenix

16  use the Static-99 to establish the base rate of risk of

17  reoffense for Mr. Wetmore, and both rated Mr. Wetmore's risk of

18  reoffense as high.

19          In addition to the Static-99, Dr. Phenix used four

20  additional actuarial risk assessment instruments.  You will

21  hear testimony that each of the actuarial instruments used in

22  this case have been tested on sex offenders, subjected to peer

23  review, have known error rates, and have gained general

24  acceptance in the psychological community.  Each psychologist

25  will testify that after establishing Mr. Wetmore's base rate of

1  risk, they considered other factors to determine Mr. Wetmore's

2  risk of reoffense if released into the community.

3      Also relevant in the psychologists' risk of reoffense

4  assessment was Mr. Wetmore's history.  The evidence will show

5  that Mr. Wetmore has had no meaningful sex offender treatment.

6  During the treatment he received in 1980 for his unlawful

7  sexual conduct conviction, Mr. Wetmore lied to the therapist

8  and did not take responsibility for his actions.  He was also

9  convicted of two additional sex crimes against children after

10  meeting with that therapist and admitted to molesting at least

11  a dozen additional young victims after that time.  You will

12  hear testimony that during the nine-year prison term

13  Mr. Wetmore served for his gross sexual misconduct conviction,

14  he received approximately three years of sex offender

15  counseling.

16      Next of relevance is that on April 15, 2005,

17  Mr. Wetmore entered the sexual offender treatment program in

18  Butner, North Carolina.  The evidence will show that within two

19  months of entering that program, Mr. Wetmore was expelled from

20  the program for performing oral sex and other sex acts with or

21  for two other inmates.  Additionally, Mr. Wetmore refused to

22  take responsibility for those actions.

23      Further, on September 11, 2008, a sweep of

24  Mr. Wetmore's cell at Devens uncovered pictures of young boys

25  that Mr. Wetmore had manipulated and altered to be pornographic

1    in nature.  Finally, of note is the fact that Mr. Wetmore has

2    been housed at Devens since 2006, and has never enrolled in a

3    sex offender treatment program there.

4         In closing, your Honor, the government will prove

5    clearly and convincingly that Mr. Wetmore has a complete and

6    utter inability to control the constant and powerful sexual

7    urges that he feels exclusively toward his preferred age group

8    of boys, ten to fifteen years old, even in the face of all he

9    has lost resulting from that addiction.

10        For all of these reasons, the evidence will show that

11   Mr. Wetmore will have serious difficulty in refraining from

12   either sexually violent conduct or child molestation if

13   released, and the government respectfully requests that after

14   hearing all of the evidence, the Court enter a judgment

15   consistent with that evidence, that Mr. Wetmore is a sexually

16   dangerous person.

17        Thank you, your Honor.

18        THE COURT:  Thank you.  Mr. Miles?

19   OPENING STATEMENT BY MR. MILES:

20        MR. MILES:  Good morning, your Honor.  Allow me to

21   highlight a couple of issues which may come up during the trial

22   and then respond, if I can, to the government's opening.  First

23   of all, a very minor issue.  You see Mr. Wetmore seated here to

24   my left essentially in jail clothes.  He had other clothes but

25   apparently was not permitted to wear them to court because this

1   was a bench trial.

2           THE COURT:  Is that true?

3           THE MARSHAL:  I have no knowledge of that, your Honor.

4           THE COURT:  So I wish someone -- where are the

5   clothes?

6           MR. MILES:  Talk to me.

7           (Discussion between defense counsel and the

8   respondent.)

9           MR. MILES:  Wyatt kept them in the van, according to

10  Mr. Wetmore, your Honor.

11          THE RESPONDENT:  They brought them here.

12          THE COURT:  Yes?

13          THE MARSHAL:  They're in the cellblock.  They're not

14  like a suit.  It's more like jeans which you can get from

15  Devens.

16          THE COURT:  Well, if he wants to dress in civilian

17  clothes, he can do that.  It's a trial.  I don't think it's

18  worth taking the time now.  Do you want to do it at the break

19  or just wait till tomorrow?

20          MR. MILES:  I would wait till tomorrow, your Honor.  I

21  just wanted the Court to be aware that Mr. Wetmore is

22  attempting to show respect to the Court and was prevented.

23          THE COURT:  Thank you.

24          MR. MILES:  Number two, your Honor, one issue that

25  will arise during the trial is whether Mr. Wetmore was in the

1   lawful custody of the United States at the time that he was

2   first brought in for a commitment proceeding.  The respondent's

3   position is going to be that the government owes him

4   approximately 149 days of credit for confinement because he was

5   held by the Marshals Service from February of 2000 through

6   October of 2000 and not credited with those days.  The Marshals

7   Service document, which we expect to --

8           THE COURT:  So that was up in Maine?  Is that before

9   he was convicted on the child pornography charges?

10          MR. MILES:  Yes, your Honor.  He was being held.  In

11  other words, he was taken into custody on the child pornography

12  charges somewhere late February, early March of 2000.  He was

13  held pending arraignment and then pending disposition and

14  sentencing.  He did not receive credit for approximately

15  149 days.

16          THE COURT:  Did you just discover this or --

17          MR. MILES:  I discovered it very late, your Honor, and

18  part of it is my fault and part of it is as a result of just

19  the enormous amount of documents that I had in this case.  It

20  took me a while to ferret it out, and, frankly, I was trying to

21  figure out whether it was a real issue or not.  I have alerted

22  the government to that issue previously but I admit late.

23          The third issue that will arise, although not as part

24  of the evidence in this case but at the end of the case, will

25  be whether the statute can be applied when all of the acts in

1    question and the sentences which resulted in the confinement,

2    which was the foundation for the commitment petition and

3    certification, occurred before 2006 when the Adam Walsh statute

4    first came into effect.

5            THE COURT:  Those are all legal questions.

6            MR. MILES:  Yes, your Honor.  Yes, the only factual

7    question on the sentencing would be, what was the reason for

8    him being held at the time?  And I would expect that

9    Mr. Wetmore will testify at this trial and will testify to

10   those issues.

11           Let me talk a little bit about what the government

12   said --

13           THE COURT:  Can I ask you one other housekeeping

14   matter?

15           MR. MILES:  Yes, your Honor.

16           THE COURT:  I have this debate going back and forth

17   regarding the availability of Mr. Swarm?

18           MR. MILES:  Yes.

19           THE COURT:  Is that something I need to resolve?

20           MR. MILES:  Your Honor, we have been conferring

21   constantly about that issue.  We have been cooperating.  I've

22   designated portions of Mr. Swarm's deposition.  I understand

23   that Attorney Piemonte-Stacey has been preparing her case and

24   has not responded yet to my designations, but she tells me she

25   will, so I expect we'll resolve --

1        THE COURT:  Well, why don't we just do this by

2    designations.

3        MS. PIEMONTE-STACEY:  Well, that's it.  Either we can

4    do it by designation or by video appearance at Devens, and I'm

5    agreeable --

6        THE COURT:  Well, can I ask you this.  I'm trying to

7    remember back.  Is he the one who you claim framed?

8        MS. PIEMONTE-STACEY:  No.

9        MR. MILES:  No, your Honor.

10       THE COURT:  So what does he say?

11       MR. MILES:  Both he and Mr. Rankin were in the cell at

12   the time that the search was carried out.  Their testimony will

13   contradict some of the expected testimony of the correctional

14   officer who performed the search and will also support

15   Mr. Wetmore's position.

16       THE COURT:  But on what fact?  I mean, do I need to

17   actually see him to assess credibility, or is this something

18   everyone agrees on?

19       MS. PIEMONTE-STACEY:  Your Honor, I think that you

20   don't need to see him to assess credibility.  I think we can

21   submit by designation.  There may be a couple of substantive

22   objections where it's a hearsay objection, but other than that,

23   it's a very short depo, and I think I can resolve it.

24       THE COURT:  Okay, so you're going to try and resolve

25   that.

1    MR. MILES:  Yes, your Honor.

2    THE COURT:  But here's the issue, which is, I think

3    Mr. Watkins --

4    MR. GOLD:  Ian Gold for Mr. Watkins.  I'm just here on

5    his behalf, but he's filed a motion requesting --

6    THE COURT:  I know, but here's the issue:  I can't not

7    give him a witness he needs because Mr. Watkins is at a

8    conference.  I would just readjust the date to be able to

9    accommodate scheduling.

10    And then there's the second issue of him being ill,

11    which I'm sympathetic to, but if I need to have him, I need to

12    have him.  But if they can work it out through a deposition,

13    they will.

14    MS. PIEMONTE-STACEY:  And I said I would respond to

15    the designations this afternoon, your Honor, so --

16    MR. GOLD:  What I think Mr. Watkins wanted me to do, I

17    suppose, is to see if the Court could, given that it looks like

18    it's working to a resolution, cancel the habe for tomorrow so

19    that he's not brought in unnecessarily.

20    THE COURT:  Yes, that's why I thought we needed to

21    deal with it today.  I agree with you that you have to figure

22    out whether it's resolvable today.

23    MS. PIEMONTE-STACEY:  But as I've informed all

24    counsel, I informed Bureau of Prisons legal that this was

25    happening and we were trying to resolve it, and he shouldn't be

1    moved.

2          THE COURT:  Does everyone agree that the subpoena

3    should be quashed for tomorrow?

4          MS. PIEMONTE-STACEY:  It's your subpoena.

5          MR. MILES:  Your Honor, since this is a bench trial,

6    I'm assuming -- and please correct me if my assumption is

7    unfounded -- that if I need him physically, we'll make that

8    arrangement sometime later.

9          THE COURT:  Yes.

10         MR. MILES:  Then I have no problem quashing the

11   subpoena.

12         THE COURT:  Because it's not going to just be

13   organized around this conference that counsel has to go to.  I

14   would certainly accommodate his schedule and we'd do it at

15   another time, but I'm not going to say he can't get the person.

16         Now, he also says that he has some sort of disease

17   that makes transfer -- I couldn't tell whether it was

18   impossible or just painful, but --

19         MR. GOLD:  Mr. Swarm has diabetes.  They're simply not

20   able to kind of provide the level of care that he requires to

21   be minimally comfortable at Wyatt.  The trip is very difficult

22   for him.

23         THE COURT:  Where is he housed now?

24         MR. GOLD:  He's at Devens.

25         THE COURT:  I must say, I don't totally understand why

1    two hours' or an hour worth of testimony is going to be such a

2    big deal, so I'm not as sympathetic to that; but if I can

3    accomplish it through a deposition or I can do it through video

4    conferencing -- it's not like I'm transferring him across the

5    country.  I'm just transferring him here.  Lots of people have

6    diabetes unfortunately.  I hope it's cured someday.  But if I

7    can do it without the deposition and without the video

8    conferencing, I will do it -- excuse me -- if I can do it with

9    those other options.  If I can't, I will accommodate counsel's

10   schedule, okay?  All right.

11           MR. GOLD:  Thank you.  So have we quashed the one for

12   tomorrow?

13           THE COURT:  Yes, we've quashed it for tomorrow.  So

14   who do we need to let know about that?

15           MS. PIEMONTE-STACEY:  Your Honor, I'll take care of

16   that.  I believe there may be some representatives in the

17   courtroom who by hearing this will know, but I can take care of

18   that this afternoon.

19           THE COURT:  Good.  But I'm not making any promises

20   about whether he needs to be a witness or not.  I don't even

21   know what he's going to say, so I don't know if it's important

22   or not.

23           Okay, I'm sorry.  Now should we jump past the

24   housekeeping -- not the housekeeping but the threshold issues

25   and --

1          MR. MILES:  Yes, your Honor.

2          MS. PIEMONTE-STACEY:  Your Honor, did you want a

3   response as to the sentencing issue now or later?

4          THE COURT:  No.  He needs to do his opening.

5          MS. PIEMONTE-STACEY:  Okay.

6          MR. MILES:  Your Honor, let me move up the

7   government's opening statement backwards, if I may.  Let me

8   start with the bottom question or the last question that was

9   posed to the Court under the Act.

10          The government expects to prove that Mr. Wetmore has

11   serious difficulty in refraining from sexually violent conduct.

12   And if you'll remember the opening, all of the references

13   during the opening were to sexually violent conduct.  The

14   evidence in this case will not support a claim of sexually

15   violent conduct.  There is no evidence whatsoever that

16   Mr. Wetmore ever used force or threat against any of the

17   individuals with whom he had sexual relations.  Therefore, the

18   government's case must be focused on Mr. Wetmore's serious

19   difficulty, if any, in refraining from sexual offenses against

20   children or child molestation, and I think that's where this

21   case really is.

22          As you may remember the government's opening, all of

23   the evidence they adverted to, much of which I think may not

24   actually come in but assuming it does, the evidence to which

25   they adverted was all surrounding his relationship with younger

1    males.  So let's talk about that one for a second.

2         The second question the government asked was whether

3    Mr. Wetmore had a serious mental illness, and the government is

4    going to try to establish that through the testimony of

5    Dr. Prentky and Dr. Phenix.  I expect that Dr. Prentky will

6    tell the Court that the respondent really had no focus or

7    fantasy life around prepubescent children; that his focus was

8    on pubescent children, young pubescent children, and I expect

9    Dr. Prentky to tell the Court that that is not deviant

10   behavior.  It may be criminal behavior, and it may be criminal

11   behavior in different states based upon different criteria.

12   For example, in some states, sexual behavior with a person

13   under the age of twenty-one might be criminal, eighteen might

14   be criminal.  In Massachusetts sixteen is criminal, and in

15   other states fourteen is criminal.  So that we have a situation

16   where the conduct, the sexual attention of an older person

17   toward a younger person of either gender is perhaps criminal

18   but not deviant.  And therefore the question arises whether

19   there is a serious mental illness which then results in a

20   serious difficulty refraining from sexual --

21        THE COURT:  So you're saying that he doesn't suffer

22   from pedophilia.

23        MR. MILES:  That's correct, and that will be an issue

24   of contention, I believe, between myself and Dr. Phenix, less

25   so with Dr. Prentky.

1          I would also submit to the Court that there will be no

2     evidence of recent fantasy or sexual urges or expressions of

3     sexual urges with respect to prepubescent children.  Even

4     assuming the Court were to find as the government wishes that

5     during his confinement, Mr. Wetmore manipulated photographs

6     from a publicly sold and distributed magazine of young children

7     and created erotic montages from those, those are all, as the

8     Court will see, postpubescent adolescent or closely

9     post-adolescent men, and therefore the --

10          THE COURT:  How do you know?

11          MR. MILES:  I looked.

12          THE COURT:  I mean, it's the difference between eleven

13     and thirteen, I mean --

14          MR. MILES:  Right, but I think when you look at the

15     photos, your Honor, you'll see what I'm talking about.  I mean,

16     they're photos from a magazine.  They were cut up.  Mr. Wetmore

17     submits that they were planted on him, in his bunk by another

18     inmate who didn't like him because of his homosexual

19     orientation, and therefore he disclaims any connection with

20     them.  But assuming for the sake of argument that the Court

21     finds a connection, then I'm submitting that they're not

22     deviant photographs.  They're simply photographs that show an

23     interest in younger males.

24          Now, to the extent hebephilia has been found to be a

25     serious mental condition or abnormality -- and that's been

1    upheld by the First Circuit -- I understand that; but the

2    underlying facts that you will hear and opinions that you will

3    hear is that hebephilia is not in essence a deviant

4    characteristic.  So the Court will have to decide whether in

5    this case the condition rises --

6            THE COURT:  What did you say the First Circuit held?

7            MR. MILES:  That hebephilia was a recognized mental

8    abnormality and serious enough to -- I believe it was the

9    Carter case, if I'm not mistaken.

10           THE COURT:  Is that the one that was just remanded to

11   me?

12           MS. PIEMONTE-STACEY:  Yes, your Honor.

13           MR. MILES:  I didn't mean to step on somebody else's

14   toes, your Honor.

15           THE COURT:  I was hoping this was my last of the

16   trials till that got remanded, so, all right.

17           MR. MILES:  In any event, your Honor, we have some

18   questions about serious difficulty in refraining, and there

19   will be a contention about serious mental illness or condition

20   causing the any serious difficulty in refraining from further

21   sexual offending.

22           THE COURT:  What exactly did the First Circuit hold?

23   Didn't they say that it could be?

24           MR. MILES:  It could be.

25           THE COURT:  It could be a mental defect?

fe6c7078-588f-4707-8d93-25f85cda7c96

1          MR. MILES:  Yes.  In other words, it would be

2     erroneous for the Court to find as a matter of law that

3     hebephilia was not a serious mental illness.

4          THE COURT:  Because it qualified under the DSM as

5     paraphilia NOS?  Is that the line of cases?

6          MS. PIEMONTE-STACEY:  That's the essence of it, yes.

7          THE COURT:  All right, all right.

8          MR. MILES:  And that's another discussion we'll have

9     with the experts, your Honor, about whether in fact it is a

10    paraphilia NOS.

11         Now we move to the government's contention that

12    Mr. Wetmore is a pedophile.  On that issue, we will discuss the

13    Diagnostic and Statistical Manual 4th Edition TR and its focus

14    on fantasies or action with prepubescent children.  The manual

15    says generally under the age of thirteen, but I expect you'll

16    hear from Mr. Wetmore that his focus was on pubescent children

17    who were displaying secondary sexual characteristics and not on

18    prepubescent children that would fall within the definition of

19    pedophilia.

20         More importantly, I would submit to the Court, is that

21    none of these conditions is a snapshot; and as we move through

22    this case, I would ask the Court to listen closely to the

23    testimony of the experts and the testimony of the witnesses

24    because the Court will hear that as Mr. Wetmore aged, his

25    focus, his focus on sexual objects aged as well.  So that as he

1    aged, in general, his sexual objects became older and older.

2    As a result of that, we will contend that Mr. Wetmore does not

3    have a serious mental illness which causes him to focus on

4    prepubescent children.

5            (Discussion off the record.)

6            MR. MILES:  So the position will be that in this case,

7    the Court should look at the behavior, the conduct, and the

8    mental condition of Mr. Wetmore as it is now, not as it was in

9    1986 or in 1990 or even 1999.  And if that were to happen, then

10   I would submit that the contention will be that Mr. Wetmore

11   simply has outgrown his tendencies which would have led him to

12   offend against young children below the age of consent.

13           The age issue is going to come up in another way, your

14   Honor, and that is, the experts will testify and tell you that

15   as a person ages, the probability of recidivism in a sexual way

16   goes down.  That's a fairly broad statement.  The experts I'm

17   sure will refine it and nuance it, but the probability --

18           THE COURT:  How old is he?

19           MR. MILES:  Mr. Wetmore is now fifty-four.  And in

20   conjunction with that, we will be pointing out that Mr. Wetmore

21   has a five-year period of supervised release once he is

22   released into the community, and as a result of that, if he

23   were to be released, he would still be under supervision, and

24   that supervision would terminate when he was about sixty, and I

25   expect the experts to comment on sixty being kind of a line

1   which really eliminates a significant probability of

2   recidivism.  So that the protective measures which will guide

3   and compel Mr. Wetmore, if he's released, I submit will be

4   important for the Court to consider during this trial.

5           THE COURT:  So as far as witnesses, you're going to

6   have Mr. Wetmore and two fact witnesses?

7           MR. MILES:  I'm going to have Mr. Wetmore; Probation

8   Officer Dan Kelly who will come tomorrow, and we've agreed to

9   take him out of order, if necessary, and with the Court's

10  permission; Mr. Wetmore's mother, Mr. Wetmore's brother.

11          THE COURT:  I'm just trying to work around timing so I

12  don't have to have people come back.  As you know, I've cleared

13  the day for tomorrow.

14          MR. MILES:  Yes.

15          THE COURT:  And hopefully we can finish most of it.

16  Unfortunately, I'm sorry I had to start a day late, I had a

17  funeral I had to go to.  So I'd like to finish up as much as we

18  can tomorrow, and I'll work around people's schedules.  So are

19  there any other scheduling issues?

20          MR. MILES:  I may have one, your Honor.  Yesterday

21  morning a friend and colleague of mine had a massive heart

22  attack and died right outside his office, and I'm hoping the

23  calling hours will be this afternoon or this evening so I can

24  make them.  If they're not, I may ask the Court to give me some

25  time tomorrow.

1            THE COURT:  I'm sorry about that.

2            MR. MILES:  It was a shock.  He was only fifty-six,

3    and from my present vantage point, that's very scary, if

4    nothing else.

5            THE COURT:  So we'll plan to go today till 1:00, and

6    then tomorrow I blocked off at least till 4:00.  At some point

7    we all get tired.  And if we don't finish, we'll just -- we'll

8    be done with most of it, right?

9            MS. PIEMONTE-STACEY:  Yes.

10           MR. MILES:  I would expect, your Honor.  There may be

11   one possible holdover.  I don't intend to call Mr. Quiles,

12   who's a correctional office at the FMC Devens, but he may

13   become necessary, depending on the testimony of another

14   witness, and I'll know that --

15           THE COURT:  Well it's bench, so I have some

16   flexibility than if I'm dealing with a jury.  Okay, thank you.

17           MR. MILES:  In conclusion, your Honor, I would submit

18   that the evidence will not show clearly and convincingly that

19   Mr. Wetmore at this time suffers from a serious difficulty of

20   refraining from committing sexual offenses, that he does not

21   suffer from a serious mental illness or condition, that his

22   mental illness or condition does not cause him difficulty in

23   refraining from sexual misconduct, and that therefore he should

24   be released into the community.

25           The evidence of that will be consistent with the fact

1   that he has been released into the community or had been

2   released into the community just before he was certified and

3   taken back into custody and had no problems.

4          With that, your Honor, I'd be ready to proceed.

5          THE COURT:  Thank you.

6          MS. PIEMONTE-STACEY:  Your Honor, before we call

7   Dr. Prentky, if I could submit into evidence the agreed-upon

8   exhibits concerning Mr. Wetmore's past acts.  The government

9   would offer as Exhibit --

10         THE COURT:  I don't want to take a lot of time doing

11  this.  Should we --

12         MS. PIEMONTE-STACEY:  Would you like me to call him

13  first and do this at the end of the day?

14         THE COURT:  Is it just housekeeping?  Everyone's

15  agreed on them?

16         MR. MILES:  Yes, your Honor.

17         MS. PIEMONTE-STACEY:  Yes.

18         THE COURT:  Right, or you can just give a list to

19  Mr. Alba.

20         MS. PIEMONTE-STACEY:  Okay, that's excellent.

21         THE COURT:  And do you have copies for me and that

22  sort of thing?

23         MS. PIEMONTE-STACEY:  I do have copies.

24         THE COURT:  Okay, why don't you just hand them all up.

25  Oh, but they're not marked at all.

1        THE CLERK:  Those are her copies.  She has the

2   originals.

3        THE COURT:  No, but it doesn't even say Exhibit 1, 2,

4   3.  All right, call your first witness.

5        MS. PIEMONTE-STACEY:  Your Honor, the United States

6   calls Dr. Robert Prentky.

7        THE COURT:  Is there any dispute as to Mr. Prentky's

8   qualifications?

9        MR. MILES:  No, your Honor.

10        THE COURT:  I don't know that you need to go into

11   that.

12        MS. PIEMONTE-STACEY:  Okay.  His CV is also an

13   agreed-upon exhibit, and again we need to mark them, but I'll

14   hand that up to Mr. Alba, and we can do that at the end of the

15   day.

16        THE COURT:  Well, let's just make that No. 3.

17        MS. PIEMONTE-STACEY:  I believe it would be 4, your

18   Honor.

19        THE COURT:  All right.

20        (Government Exhibits 1-4 received in evidence.)

21                ROBERT ALLEN PRENTKY

22   having been first duly sworn, was examined and testified as

23   follows:

24        THE CLERK:  Would you please state your name and spell

25   it for the record.

1       THE WITNESS:  Robert Allen Prentky, P-r-e-n-t-k-y.

2       THE COURT:  Dr. Prentky, before you came in, both

3  sides stipulated to your qualifications, and I have your

4  curriculum vitae in the record.

5       THE WITNESS:  Thank you.

6       THE COURT:  Thank you.

7  DIRECT EXAMINATION BY MS. PIEMONTE-STACEY:

8  Q.   Dr. Prentky, just quick preliminary questions.  What is

9  your occupation?

10  A.   Psychologist.

11  Q.   And you're a licensed psychologist?

12  A.   Yes.

13  Q.   And in which states?

14  A.   In -- I'm hesitating for a moment.  I have been licensed

15  in three states.  I am presently licensed in New Jersey.

16  Q.   And, Dr. Prentky, you were appointed as a court examiner

17  in this case?

18  A.   Correct.

19  Q.   And what is your understanding of the purpose of your

20  appointment as a court examiner?

21  A.   To provide an independent opinion to the Court regarding

22  Mr. Wetmore's appropriateness for civil commitment under the

23  federal guidelines for such a commitment.

24  Q.   And did you do that evaluation?

25  A.   Yes, I did.

1    Q.    Have you evaluated sex offenders before?

2    A.    Yes.

3    Q.    How many times?

4    A.    Several thousand times over the last thirty years.

5    Q.    And when you evaluated Mr. Wetmore, what did you do?

6    A.    The method that I employ is not always the same.  In this

7    particular case, I simply perused all of the discovery that was

8    made available to me.  I took notes prior to seeing Mr. Wetmore, I

9    visited with him at Devens.  I conducted an interview.  I went

10   back, continued to peruse the documents, and eventually

11   prepared a report.

12   Q.    And how long did you interview Mr. Wetmore for?

13   A.    I don't actually have my report in front of me, but I was

14   there for approximately three or four hours.

15         THE COURT:  Do you want to get your report?

16         THE WITNESS:  If you have an extra copy.

17   Q.    So, Dr. Prentky, I'd like to direct your attention to

18   Page 1 of your report under "Conduct of evaluation and sources

19   of information."  Do you see that section?

20   A.    Yes.

21   Q.    And looking at the first section of the report, does that

22   refresh your recollection about how long you interviewed

23   Mr. Wetmore for?

24   A.    Six hours.

25   Q.    And you indicated that you also reviewed discovery in this

1   matter; is that correct?

2   A.   Correct.

3   Q.   What discovery did you review generally?

4   A.   I tried to list most of it in the report.  It of course

5   was all the discovery that was made available to me through

6   your office.  It covered for the most part Mr. Wetmore's

7   lengthy history, including all of the psychological reports and

8   progress reports that have been done over the course of many

9   years, as well as the course of all of his criminal history.

10  Q.   Did you review anything else in this case?

11  A.   I reviewed the depositions, of course, the deposition that

12  was conducted on Mr. Wetmore, the -- let me see -- all the

13  documents pertaining to disciplinary hearings, the PSIs,

14  numerous miscellaneous federal prison documents, including all

15  manner of things such as inmate control monitoring reviews,

16  administration and orientation program list, personal property

17  records, medical records, work assignments, visiting lists, and

18  so forth.

19           THE COURT:  Does it make sense to just mark the

20  report.

21           MR. MILES:  I would object to that, your Honor.  The

22  report contains a fair amount of information I'd try to keep

23  out.

24           MS. PIEMONTE-STACEY:  That's why I'm doing this, your

25  Honor.  I tried to work that out.

1      THE COURT:  I know, but maybe just pick it up a

2  little.

3  Q.   Did you prior to interviewing Mr. Wetmore, did you give

4  him informed consent?

5  A.   Yes.

6  Q.   Did you offer him informed consent?

7  A.   Yes, of course.

8  Q.   And what was the nature of that?

9  A.   I begin by asking the individual what their understanding

10  is of my presence, the purpose of my visit, and their own role

11  in continuing to participate in this evaluation, should they

12  choose to do so.  I emphasize that they're not required to be

13  interviewed by me.  I alert them that our interview is not

14  confidential and should not be so considered.  I usually tell

15  them that obviously they have every right to refuse, if they

16  choose, to answer any particular questions; they're not

17  compelled to answer all my questions; and indeed they're not

18  even compelled to remain in the room with me.  And at the end I

19  ask them to briefly restate in their own words what I just

20  said, and, for the most part, the vast majority of instances,

21  individuals are quite competent to recapture what it is that I

22  conveyed.

23  Q.   And did you follow that procedure with Mr. Wetmore?

24  A.   Yes.

25  Q.   And did Mr. Wetmore indicate whether he understood --

1    A.   Sure, absolutely.

2         THE COURT:  You're so soft-spoken, I'm wondering if

3    you can bring the mike in just a little bit just to make sure I

4    hear you.

5         THE WITNESS:  Actually, I'll try to speak up.  I

6    pushed it away a little because I didn't want to hit it.

7    Q.   And going through the informed consent, did you then go on

8    to proceed with the interview of Mr. Wetmore?

9    A.   Yes.

10   Q.   And were you confident about whether Mr. Wetmore

11   understood the nonconfidentiality of the information he gave

12   you?

13   A.   I'm absolutely confident that he fully understood.

14   Q.   Now, looking at your report, did you conduct an overview

15   of the developmental, psychosocial, and medical history of

16   Mr. Wetmore?

17   A.   Yes.

18   Q.   And why did you do that?

19   A.   Occasionally I find that the developmental history can

20   offer some insight into an individual's outcome, and it helps

21   me formulate not only a final opinion but a more comprehensive

22   understanding of what motivated the behavior.  That is not

23   always the case, but that is why in general I will ask the

24   individual to begin with their earliest memories and give me a

25   brief overview of their life leading up to the present

1    incarceration.

2    Q.    And was Mr. Wetmore able to offer you insight in this

3    portion of your evaluation with him?

4    A.    Mr. Wetmore was able to answer direct questions, if that's

5    what you're asking me.

6    Q.    What did you learn from your evaluation of this history of

7    Mr. Wetmore's?

8             MR. MILES:  Objection.  Narrative, your Honor.

9             THE COURT:  Overruled.

10   A.    If you could be a little more specific, Counsel.

11   Q.    Did you explore the nature of Mr. Wetmore's family

12   relationship?

13   A.    Yes, of course.

14   Q.    And what did you learn?

15   A.    I learned, somewhat paradoxically, that Mr. Wetmore was

16   reared in a rather normal home.  His childhood and development

17   were remarkably uneventful.  He reported no history of abuse.

18   He reported no history of family chaos or dysfunctionality.  He

19   reported no history of being bullied as a child, or, for that

20   matter, bullying others.  He reported no history of fighting or

21   delinquency.  He reported no history of academic failure.  He

22   reported no history of drug abuse.  He reported four siblings,

23   all of whom seemed to be quite normal and at the present time

24   had stable married lives.  They were all law-abiding.  And yet

25   I say paradoxical because he also talked --

1        MR. MILES:  Objection.  I don't believe that question

2    is before him, your Honor.

3        THE COURT:  Yes, why don't you ask another question.

4    Q.   Why do you say "paradoxical," Dr. Prentky?

5    A.   I believe I mentioned at the very outset that I thought it

6    was somewhat paradoxical, in that he also discussed emotional

7    problems, non-specific emotional problems.  He reported

8    repeating the second grade.  He reported taking special ed

9    classes for a number of years, two to three years in the

10   seventh, eighth, and ninth grades.  He reported, most notably

11   for me, being enuretic to the age of twelve.  He reported a

12   diagnosis of dyslexia.  That was a self-diagnosis.  I saw no

13   indication in the records that he was in fact dyslexic.

14       When I asked him from whence derived those troubles, given

15   everything else that he told me about his childhood, he really

16   had no ideas, no thoughts about his emotional problems, what

17   they were, how to characterize them, or why he seemed to be

18   having some academic difficulties, and indeed, more

19   importantly, why he was enuretic up until the age of twelve.

20   Q.   And for the lay people in the room, what does enuretic

21   mean, Dr. Prentky?

22   A.   Uncontrolled or poorly controlled urination.

23   Q.   And did you explore with Mr. Wetmore whether his siblings

24   had children?

25       THE COURT:  Excuse me.  Does it mean like bed-wetting?

1      THE WITNESS:  Correct, bed-wetting.

2      THE COURT:  Bed-wetting.

3      THE WITNESS:  Not restricted necessarily to bed,

4  nighttime.  Often at nighttime, but it could be at other times

5  during the day.  But it's generally evidenced at nighttime.

6  Q.   And he reported being enuretic until age twelve; is that

7  correct?

8  A.   Indeed.  When children are enuretic up to that age --

9  we're talking about young adolescents now -- it's often

10  associated with emotional problems.  Clearly, a twelve year-old

11  should be able to adequately control their bladder.

12  Q.   And did you explore whether Mr. Wetmore's siblings had any

13  children?

14  A.   Yes.

15  Q.   And why did you do that?

16  A.   In the natural course of asking him about his family, I

17  asked, "Tell me a little bit about your siblings."  Obviously I

18  was interested to know whether any of his siblings had problems

19  similar to his own.

20  Q.   And what did you learn?

21  A.   He reported quite positively of all of his siblings.  He

22  spoke highly of them.  He seemed to be attached to all of them,

23  although in varying degrees, as certainly one would expect.  He

24  indicated that all of his sibs were married, indeed had been

25  married for some time.  They had stable marriages.

fe6c7078-588f-4707-8d93-25f85cda7c96

1    In the normal course of discussing his siblings, I asked

2    about their offspring, and he shared with me that not one of

3    his siblings had a child, either naturally birthed or adopted.

4    They were effectively zero for four.  I was rather surprised,

5    and in my experience, I don't know what the actual statistics

6    are, but it seems to me that's a rather statistical rarity for

7    four sibs from the same nuclear family with stable marriages to

8    have no children at all.  And when I asked him about that, he

9    said, to quote him, "My parents find it unusual, but they're

10   amused by it."  I asked him, "Amused?"  And he said -- I said,

11   "Isn't there anything more that you can share with me other

12   than amused?  What are your thoughts, your personal thoughts?"

13   And his only comment was, "In our family, we all have a sense

14   of humor."

15   Q.   And was that significant to you as a psychologist, that

16   response?

17   A.   That's why I said it was perplexing.  I'm not sure how

18   terribly significant at this point, but it was perplexing.  I

19   wasn't sure at this point whether I was being stonewalled or

20   whether Mr. Wetmore was extraordinarily naive, just profoundly

21   nonreflective.  I couldn't really understand it at all.

22   Q.   And did you explore with Mr. Wetmore Mr. Wetmore's

23   longstanding attraction to children?

24   A.   Indeed.

25   Q.   And what, if anything, did you learn from that?

1   A.   I was most curious about the age of onset, and the age of

2   onset is quite young.  He told me eleven.  It appears elsewhere

3   in the records age twelve.

4       I asked him how he became sexually involved at such a

5   young age, and again his comments were perplexing.  He said --

6          MR. MILES:  Objection, move to strike.

7          THE COURT:  Overruled.

8   A.   Again to quote him, "I was good to kids.  I was told by

9   Ms. Moore, who owned a camp, that I was always being a

10  baby-sitter for younger children.  I liked taking care of kids.

11  It was well known."

12      And again I asked Mr. Wetmore to kindly elaborate.  I

13  said, "I don't understand, because you liked kids and were an

14  eager baby-sitter, how that translates into sexual activity

15  with them."

16      Once again Mr. Wetmore could not reflect upon that, or at

17  least chose not if he could, to share any of his thoughts with

18  me.  And once again I concluded that either it reflects an

19  extraordinary naivete, an extraordinary lack of insight, or

20  perhaps simply an unwillingness to disclose his thoughts.  In

21  any event, I regarded it as nonresponsive to my question.

22  Q.   And you testified earlier that you explored Mr. Wetmore's

23  substance abuse history; is that correct?

24  A.   Yes.

25  Q.   And I believe you testified that Mr. Wetmore denied having

1  substance abuse problems.  Is that accurate?

2  A.   Anything appreciable, anything noteworthy.

3  Q.   What is it that you learned from Mr. Wetmore about his

4  drug and alcohol abuse?

5  A.   Frankly, very, very little.  We often find that children,

6  and certainly adolescents, will self-medicate to help them cope

7  with several adverse child and life experiences.  In

8  Mr. Wetmore's case, I would have expected that, particularly

9  with a relatively early onset of sexual activity and having

10  reported to me that he had emotional problems; but I wasn't

11  hearing that he was relying on drugs or alcohol as a coping

12  mechanism.

13  Q.   And were there any records that you reviewed that either

14  supported or contradicted Mr. Wetmore's substance history with

15  you?  Was that a particularly bad question?  Let me rephrase.

16  When you asked Mr. Wetmore about his substance abuse problems,

17  what did you learn?

18  A.   I learned for the most part what I just shared with you;

19  that his substance abuse was relatively mild compared to what I

20  have experienced with other men in his situation in the past

21  and compared to what I might have expected.

22  Q.   Did he indicate how often he may have used drugs or

23  consumed alcohol when you spoke to him?

24  A.   I don't recall precisely, Counsel.  If it's indicated in

25  my report, I can go back and look.

1    Q.   If I could refer you to Page 4 of your report, the first

2    paragraph.  Looking at the first paragraph at the top of

3    Page 4, does that refresh your recollection about Mr. Wetmore's

4    substance abuse problems?

5    A.   It's essentially what I have already shared with the

6    Court.  Essentially he denied any serious abuse or use of

7    either alcohol or drugs.  He made some comment about

8    occasionally smoking marijuana, and insofar as alcohol intake,

9    he characterized himself as a social drinker.

10   Q.   And what about records that you reviewed as part of your

11   evaluation, did they either confirm or deny what Mr. Wetmore

12   told you?

13            MR. MILES:  Objection.

14            THE COURT:  Overruled.

15   A.   The records, again, I found somewhat unclear, in that he

16   obviously has reported in the past --

17            MR. MILES:  Objection to the contents of the records,

18   your Honor.

19            THE COURT:  Overruled.  I don't understand.  He's an

20   expert.  He's allowed to look at the records and rely on them,

21   and so if you want that to be a -- unless there's something

22   particularly unreliable about the records.

23            MR. MILES:  Under Rule 703, your Honor, if I may

24   respectfully direct the Court's attention to that, the expert

25   may rely on hearsay information even though the information

1    itself is not admissible.  The expert may not testify to the

2    contents of the hearsay.  In other words, the expert is not a

3    backdoor conduit for the admission of hearsay, and that's what

4    I'm objecting to.

5           MS. PIEMONTE-STACEY:  Your Honor, this is

6    Mr. Wetmore's self-report, not what someone else said

7    Mr. Wetmore said.

8           THE COURT:  Well, let me just say, what are you

9    relying on?

10          THE WITNESS:  Your Honor, I reported in my report what

11   I have observed in the record.

12          THE COURT:  You've got to understand, I don't have

13   your report.  They've objected to it, so I need to hear from

14   you.  And he's objecting.  He's saying you're relying on

15   something that's impermissible hearsay, so I need to understand

16   what you're relying on.

17          THE WITNESS:  I relied on --

18          THE COURT:  And if you bring this in just a little bit

19   just so I can hear you.  You're so soft-spoken, and we all in

20   the room need to hear you.  You relied on?

21          THE WITNESS:  I relied on what I read from the reports

22   from the discovery as well as, of course, what Mr. Wetmore told

23   me directly.  I relied on both.  When I interviewed him, I had

24   already observed comments in the record.

25          THE COURT:  So but what's the issue right now just to

1   get to it, whether he used alcohol or drugs?

2            MS. PIEMONTE-STACEY:  Yes.

3            THE COURT:  Right, so did you see something in the

4   records that would refute his claim that he didn't.

5            THE WITNESS:  The only comment in the records, and I

6   didn't view it as significant --

7            THE COURT:  Overruled.  You know, I've got to hear

8   this.  It's a bench trial.  Then we'll deal with it.  So what

9   in the records did you see that would refute that, anything?

10           THE WITNESS:  There's comments in the records that he

11  used what is referred to as a nickel bag of marijuana.  That's

12  $5 worth of marijuana.  I'm not sure how much that purchases,

13  but he used a nickel bag of marijuana each weekend through most

14  of his life.  I read that in the same way that I would

15  understand what I would regard as social drinking.  He used

16  marijuana rather than alcohol to relax on the weekend.  That

17  does not strike me, based on my experience, as a remarkable use

18  of drugs.

19  Q.   Dr. Prentky, did you also review Mr. Wetmore's sexual

20  history?

21  A.   Yes.

22  Q.   And why did you do that?

23  A.   Mr. Wetmore's sexual history obviously either goes to or

24  can go to the heart of what it is that I'm trying to determine

25  in the course of this evaluation.

1   Q.   And did you learn any information about whether Mr. Wetmore

2   had any peer-aged relationships?

3   A.   He reported to me and discussed two peer-age relationships.

4   Q.   And what were those relationships?

5   A.   Neither one of those two was a sustained relationship.

6   The first one that he identified as Kathy he described as an

7   individual that he had asked out to dinner initially, and they

8   went back after dinner to her apartment.  And, as he

9   characterized it, she came on to him, and they ended up in bed,

10  but he wasn't able to perform.  He wasn't aroused.

11      He said to me that he knew, as he put it, "inside of me

12  that I didn't have it in me at that time."

13  Q.   And how old was Mr. Wetmore at the time?

14  A.   He was in his early twenties because his second -- or

15  perhaps mid-twenties, rather, because his second and last adult

16  relationship was roughly at the age of twenty-seven.  He wasn't

17  certain.  He said that he was either twenty-seven or

18  twenty-eight, and she was twenty-nine years old.

19      In that relationship, he found that the woman had many

20  interests that were compatible with his own, and the

21  relationship was buoyed initially by those issues of

22  compatibility.  They both enjoyed the outdoors, and they went

23  on long hikes together, and they essentially established a

24  friendship without sex.  And the relationship went on for a

25  little while -- I'm not sure how long -- before she eventually

1  once again came on, as it were, to Mr. Wetmore.  She suggested

2  that he spend the night.  And he said it was, as he put it,

3  "sort of like the first time," but on this instance he was able

4  to have intercourse for a few minutes before losing his

5  erection.  He said that they broke up shortly after that, and

6  he felt badly.  He followed up with cards or letters to her but

7  never heard back from her.

8  Q.   And you testified earlier about Mr. Wetmore's first sexual

9  experience at age eleven.  Did you explore that experience with

10  him during this interview?

11  A.   Yes, of course.

12  Q.   And what did you learn?

13  A.   The first sexual experience that he had at age eleven was

14  with a ten-year-old boy, and it was one of those sort of "I'll

15  show you if you'll show me" childlike kind of games.  He

16  indicated that it was his idea.  He indicated that he had asked

17  the boy if he'd ever had any experiences like this before, and

18  there was some brief sexual contact between the two of them.

19      In response to my question whether he, meaning

20  Mr. Wetmore, had ever had sexual contact with an adult prior to

21  this initial experience with the ten-year-old, he said "no,"

22  and, to the best of our understanding, Mr. Wetmore never had

23  sexual contact with an adult as a child.

24      He said that he was not aware that his family friend, who

25  he identified and spoke briefly about that spent some time with

1    him, was ever sexual with him, but he isn't quite sure.

2    Suffice it to say, at least as far as I'm concerned, if he

3    isn't quite sure, it wasn't a particularly significant

4    life-altering experience for him.

5        He did comment that he has a memory that he shared with me

6    of a neighborhood boy named Mike, and he saw Mike with two

7    naked bodies rubbing together.  These were two younger boys.

8    Mike was younger.  He was perhaps eight at the time.  I'm

9    sorry, the boys would have been about eight at the time.  Mike

10   was sixteen or seventeen at the time.  And Mr. Wetmore

11   indicates that the memory is quite clear to him, and indeed he

12   can picture exactly where in the town of Houlton, Maine, he saw

13   them, but he characterized the entire experience today as

14   something like a dream.

15   Q.   And did you learn about Mr. Wetmore's first longstanding

16   relationship?

17   A.   That was probably Clifford.

18   Q.   And how old was Clifford?

19   A.   Clifford was twelve.

20   Q.   And how old was Mr. Wetmore?

21   A.   Fifteen.

22   Q.   And what is it that you learned?

23   A.   Clifford's father had suicided.  Clifford was an obviously

24   emotionally needy child.  I don't know if he was needy in

25   general, but he was certainly needy at that time.  Mr. Wetmore

1    befriended him.  The boy's mother -- that is, Clifford's

2    mother -- asked Mr. Wetmore to step in and befriend her son,

3    hoping that this relationship might act as, if not a surrogate

4    for the lost father, at least some male attachment that would

5    be helpful for her son.

6        He, meaning Mr. Wetmore, would take the boy swimming.  He

7    became sexually interested in the boy.  He described that the

8    boy was already gay.  I'm not sure how that came about, how he

9    knew that, but that's what he said to me.  And the two of them

10   had an on-again-off-again sexual relationship that lasted

11   roughly ten years from when Clifford, as I said, was twelve

12   roughly until Clifford was twenty-one, twenty-two years old.

13   Q.   And over those years, did Clifford introduce Mr. Wetmore

14   to anyone?

15   A.   Yes.

16   Q.   Who?

17   A.   He introduced Clifford to a variety of other youngsters.

18   He mentioned several.  Certainly Randy and another boy that his

19   name is Richard, I believe.  And by this point Mr. Wetmore was

20   a late teenager, seventeen, eighteen years old, and by and

21   large, these boys were all around the age of fourteen.  And

22   they would all get together and play games that usually

23   eventuated in some kind of sexual activity, such as strip

24   poker, and on occasion a group of them would all get together

25   and have sex.

1  Q.    When was Mr. Wetmore's first pedophilic relationship?

2  A.    The first relationship that I guess one would characterize

3  as pedophilic was probably at the age of twenty-one,

4  twenty-two.

5  Q.    And how old was the boy?

6  A.    Eleven.

7  Q.    And what did you learn about this relationship?

8  A.    This particular youngster, Willy by name -- that's a

9  different Willy from the victim of his 1986 offense -- became a

10  friend, or, rather, I should say Mr. Wetmore befriended Willy,

11  and they remained friends for three to four years.  So that

12  would have been an age range for Willy of roughly until Willy

13  was, say, fourteen or fifteen years old.  And Mr. Wetmore

14  characterized it as "gradual grooming."  They would get

15  together on occasions and fondle one another and have oral sex.

16  Q.    What does gradual grooming mean?

17  A.    "Grooming" is a word that seems to be peculiarly used for

18  sex offenders, and it simply refers to setting up a potential

19  victim, setting up a child for potential victimization by very

20  gradually coming on to the child, taking the child's

21  temperature to see how averse the child is to those overtures.

22  You try to make sort of arrangements where you will be alone

23  with the child, all of this leading up to eventual sexual

24  contact.

25  Q.    And I'm sorry, Dr. Prentky.  Going back to your testimony

fe6c7078-588f-4707-8d93-25f85cda7c96

1   about Mr. Wetmore's sexual encounters with Clifford, Richard,

2   and Randy, where did these sexual encounters occur?

3   A.   Usually at the camp.

4   Q.   And what is the camp?

5   A.   The camp was a location by a lake near where he lived, and

6   there was ample opportunity not only for being alone, isolated,

7   but providing opportunities for swimming, boating, fishing, a

8   lot of activities that children would enjoy.

9   Q.   And do you know who owned the camp?

10   A.   I do not.

11   Q.   Now, you've described the relationship with Willy who's

12   not the victim of the 1986 offense.  What was Mr. Wetmore's

13   next pedophilic relationship?

14   A.   The sequence was somewhat unclear to me, but I indicated

15   in my report that it appeared to be Mark.

16   Q.   And who was Mark?

17   A.   Mark was notable, in that he was the victim of

18   Mr. Wetmore's first offense in 1980.  He was -- that is,

19   Mr. Wetmore -- was twenty-four years old at the time and Mark

20   was twelve.

21   Q.   And do you have any knowledge of how Mr. Wetmore knew

22   Mark?

23   A.   Mark was simply a youngster who lived in the neighborhood,

24   and on one particular occasion Mr. Wetmore was going to the

25   camp, and he invited Mark to come along with him.

1   Q.   And what happened?

2   A.   He said that he fondled Mark, and Mark said, "I don't like

3   that," and he told his parents.

4   Q.   As a result, what happened?

5   A.   Mr. Wetmore was guilty, found guilty of unlawful sexual

6   acts of touching a minor male, and he was given a 30-day

7   suspended sentence in the Aroostook County jail and six months

8   probation, the intention of which was that he would undergo

9   psychiatric treatment.

10  Q.   And did he?

11  A.   He said that he volunteered for a year at a religious

12  group down in Texas, Snyder, Texas.  At the time he said that

13  he was preparing to move to Texas anyway, so his probation

14  officer was willing to transfer him to Texas.  He was set up

15  with a therapist in Snyder.  He told the therapist that it was

16  a onetime thing and it was not a problem.  According to

17  Mr. Wetmore, the therapist then said to him, "There's nothing I

18  can do for you."

19  Q.   Now, as a psychologist with your training, education, and

20  experience, would you consider that report sex offender

21  treatment?

22  A.   I'm sorry, Counsel?

23  Q.   As a psychologist in the field, would you consider the

24  treatment that Mr. Wetmore reported, would you consider that to

25  be sex offender treatment?

1  A.   From Mr. Wetmore's report to me, I wouldn't consider it

2  treatment at all.  I mean, it didn't sound to me as though he

3  was afforded any treatment.  That was my impression.

4  Q.   And during the time in Mr. Wetmore's life when he was

5  fifteen to age twenty-four, did you learn anything about his

6  sexual history at that time?

7  A.   It seemed to be a rather sort of prolific period, that

8  nine-year interval during which, from Mr. Wetmore's report to

9  me, he was actively recruiting young adolescents in the age

10  range of twelve to fourteen to go to the camp to go fishing and

11  swimming.

12       THE COURT:  So what time period was this?  From when

13  to when?

14       THE WITNESS:  From his age of fifteen to twenty-four,

15  a nine-year period when he was a mid-adolescent, fifteen, until

16  he was about age twenty-four.

17  Q.   And you testified he was recruiting adolescents at the age

18  range of twelve to fourteen years old to accompany him to the

19  camp; is that right?

20  A.   Correct.

21  Q.   And what was the purpose of his going to the camp with

22  them?

23  A.   Well, the ultimate purpose, of course, was to have sex,

24  but he would entice them to come to the camp with the

25  understanding that they could go fishing and swimming.

fe6c7078-588f-4707-8d93-25f85cda7c96

1  Q.   And did you learn information about a boy named Roland who

2  was eleven that Mr. Wetmore left?

3  A.   There was Roland Willy, I believe.

4  Q.   And what is it that you learned?

5            THE COURT:  What's his name?

6            THE WITNESS:  Roland Willy.

7            THE COURT:  Willy is the last name?

8            THE WITNESS:  Right, the surname, right.

9  A.   That's an offense that he committed in 1986.  That's why I

10  commented before that that's a different Willy from the earlier

11  one that I had referred to where Willy was the first name.

12  This Willy is the last name.

13            THE COURT:  The earlier Willy was eleven?

14            THE WITNESS:  That was a first name.  This is Roland

15  Willy who's --

16            THE COURT:  Who's also what age?  Also eleven?

17            THE WITNESS:  Roland Willy was, I believe, fourteen.

18  Q.   Dr. Prentky, let me direct your attention to Page 5 of

19  your report, the second paragraph under "Sexual offense and

20  institutional history" when you're discussing Mr. Wetmore's

21  transfer from Texas to Maine and his meeting Roland at a

22  religious group.

23  A.   Yes, right.

24  Q.   How old was Roland?

25  A.   It was my recollection, I thought that he was fourteen,

1    but I may be mistaken.

2    Q.   If I could just ask you to look at the second paragraph on

3    Page 5 of your report.

4          (Witness examining document.)

5    Q.   Does that refresh your recollection as to Roland's age?

6          (Witness examining document.)

7    A.   I see.  In the prior paragraph, Counsel -- I was looking

8    at the last paragraph -- in a prior paragraph, it indicates

9    that he was eleven at the time.

10   Q.   At the time.  And what was the nature of Mr. Wetmore's

11   relationship with Roland who was eleven?

12   A.   Again, it was primarily sexual, if that's what you're

13   asking me, Counsel.

14   Q.   Did he indicate to you whether they had become friends?

15   A.   You know, as you indicated before, they met at this

16   religious group.  They obviously became friends.  They were

17   connected, they were attached.  In fact, he even characterized

18   their relationship as good, good friends.  He indicated that he

19   didn't start molesting Roland at the very beginning.  It was

20   about a year after they met that they became sexual.  And he

21   commented that it was by 1986 when Mr. Wetmore turned thirty

22   years old that, as he put it, "everything got muddled up."

23   That was referring to his court involvement at that time.

24   Q.   And in 1986, Mr. Wetmore was convicted of gross sexual

25   misconduct for assaulting Roland Willy; is that correct?

fe6c7078-588f-4707-8d93-25f85cda7c96

1  A.   Correct.

2  Q.   And was he sentenced?

3  A.   He was sentenced to eighteen years, with fourteen

4  suspended, four to serve, and six years probation.

5       THE COURT:  All right, so just back me up.  So he

6  started having sexual contact with Roland Willy --

7       THE WITNESS:  When Roland was roughly twelve.

8       THE COURT:  So the beginning of the sexual conduct was

9  when Roland was twelve.

10      THE WITNESS:  Correct.  I believe that when they met

11 Roland was about eleven, but sex didn't -- according to

12 Mr. Wetmore, he wasn't sexual with Roland until Roland was

13 about twelve.

14      THE COURT:  And at that point, was he pre- or

15 postpubescent?

16      THE WITNESS:  I don't recall asking Mr. Wetmore

17 whether the boy was pubescent at that point, your Honor.

18      THE COURT:  Did Mr. Wetmore say whether he was

19 attracted to him when he was eleven?

20      THE WITNESS:  I'm sure he was attracted to him, and

21 that's why I would imagine that they set up a relationship.

22      MR. MILES:  Objection, move to strike.

23      THE COURT:  Overruled.  What leads you to come to that

24 conclusion?

25      THE WITNESS:  The way he characterized the

1   relationship.  I mean, if he --

2        THE COURT:  Right from the get-go?

3        THE WITNESS:  From the get-go.  I mean, Mr. Wetmore

4   had indicated to me that he would frequently groom these

5   children, groom them for sexual activity.  Well, grooming takes

6   some period of time, and he might have felt that it took that

7   amount of time to get this youngster to be sexual with him.

8        We also don't know, of course, when we say that Roland

9   was eleven at the time, how close to twelve he was.  I mean, he

10  may have been twelve a month or two later, but I don't know how

11  long the time span was between when they actually met when he

12  was eleven and when he actually became sexually involved.

13       THE COURT:  When you say "sexually involved," what

14  does that mean?

15       THE WITNESS:  Fondling.  We find that for most of

16  Mr. Wetmore's sexual experiences with children, they fall into

17  two or three types of sexual activities:  fondling, touching,

18  and oral sex.  Most of what Mr. Wetmore has done with children

19  would be characterized by those activities.

20       THE COURT:  Not actual penetration?

21       THE WITNESS:  No, not penetration.

22  Q.   Do you have any memory of whether Mr. Wetmore engaged in

23  anal sex with Roland Willy?

24  A.   I believe that he attempted to on one occasion, but that

25  was, by Mr. Wetmore's report, very unusual.  That is not what

1   he customarily did with these children.

2   Q.   Now, back to his conviction in 1986 of gross sexual

3   misconduct, you testified that Mr. Wetmore was incarcerated; is

4   that correct?

5   A.   Yes.  He was incarcerated after that offense, the 1986

6   offense, he was incarcerated from 1987 until 1995.

7   Q.   And during that time in prison, what, if anything, did his

8   prison time do in terms of educating Mr. Wetmore --

9           THE COURT:  So he was in jail from 1987 to 1995?

10          THE WITNESS:  Correct.

11          THE COURT:  So just so I can understand it, he was

12  sentenced to eighteen years, fourteen years --

13          THE WITNESS:  Suspended.

14          THE COURT:  So he only spent four years in jail?

15          THE WITNESS:  Four years and six years probation.

16          MS. PIEMONTE-STACEY:  Your Honor, I believe the

17  exhibits will say all but fourteen years were spent.

18          MR. MILES:  Right, I'll stipulate that he spent

19  fourteen years in.

20          THE COURT:  All but fourteen?

21          MS. PIEMONTE-STACEY:  All but fourteen years.

22          MR. MILES:  Right.

23          THE COURT:  Thank you.

24          As a matter of law, do you happen to know whether oral

25  sex is considered rape under Maine law?  Or is that the gross

1    and lascivious?  Do you know?

2          THE WITNESS:  I don't know, your Honor.  I didn't --

3          THE COURT:  Whether he was convicted, in other words,

4    of the touching or of a rape?

5          THE WITNESS:  I believe he was -- he was -- well, he

6    was convicted of gross sexual misconduct, but given the time

7    that he received, I would certainly imagine that's a felony.  I

8    don't imagine that he would have gotten an eighteen-year

9    sentence for a misdemeanor.

10          THE COURT:  Well, I understand, but I'm just trying to

11   figure out, was he convicted of the oral sex?

12          MS. PIEMONTE-STACEY:  Yes, your Honor.  Wetmore was

13   found guilty by a jury of the gross sexual conduct.  I will

14   verify with the records that have been submitted.  Count 2 was

15   dismissed, and Count 3, he was not guilty on the unlawful

16   sexual conduct.  So I will check the records now.

17          THE COURT:  You'll find our during the break --

18          MS. PIEMONTE-STACEY:  Yes, and it's in the evidence.

19          THE COURT:  -- what he was actually convicted of.

20   Thank you.  But at least he told you that he had oral sex with

21   him?

22          THE WITNESS:  Correct.

23          MS. PIEMONTE-STACEY:  I've got it right here.

24   Count 1 -- your Honor, I'm referring to an exhibit that's in

25   evidence.  I believe it's Exhibit 2.  It will be Exhibit 2, the

fe6c7078-588f-4707-8d93-25f85cda7c96

1    1986.  Count 1, the gross sexual misconduct is written that "He

2    engaged in sexual acts with Child A, not his spouse, who had

3    not then attained his 14th birthday, which sexual acts involved

4    direct physical contact between the genitals of Joel K. Wetmore

5    and the anus and mouth of Child A, and the mouth of Joel K.

6    Wetmore and the genitals of Child A."

7            That's the gross sexual misconduct Class A, Count 1.

8            THE COURT:  And that's what the conviction was?

9            MS. PIEMONTE-STACEY:  And that's the conviction.

10           THE COURT:  Count 2 was dismissed, is that it?

11           MS. PIEMONTE-STACEY:  It was dismissed.

12           THE COURT:  And Count 3 was?

13           MS. PIEMONTE-STACEY:  Not guilty.

14           THE COURT:  And that's a third child, not this Roland

15   Willy?

16           MS. PIEMONTE-STACEY:  That's right.

17           THE COURT:  All right, okay.

18   Q.   Did Mr. Wetmore learn about the Internet and what he may

19   get from the Internet while he was in prison?

20   A.   Yes.

21   Q.   What is it that you learned about his time in prison and

22   his education about the Internet?

23   A.   Well, the first thing that we can take from Mr. Wetmore's

24   experience during this long period of imprisonment is that it

25   did not appear to be terribly punitive for him because he

1   referred to the facility as very small, very safe.  He didn't

2   seem to characterize it as an overly sort of onerous

3   experience.  He apparently met while he was there other inmates

4   who had been out and had already discovered for themselves

5   child pornography on the Internet, and there were many

6   discussions among the inmates about the newfound world of child

7   pornography that would be available to him once he too returned

8   to the street.

9   Q.   As a result, did Mr. Wetmore set up rules for himself

10  about Internet child porn?

11  A.   I'm not sure I'd characterize it as rules, Counsel.

12  Mr. Wetmore took comfort from hearing that there would be ways

13  in which he could gratify his sexual needs without ever hurting

14  another child.

15  Q.   Did Mr. Wetmore report to you, quote, "I set up rules for

16  myself"?  And I'm referring to Page 5 at the bottom of your

17  report.

18  A.   He did characterize it that way.

19  Q.   And what were not your rules, but what were Mr. Wetmore's

20  rules about child pornography?

21  A.   He would do -- and again I could look at the report if you

22  wish, or I can paraphrase -- that he would do whatever he could

23  to keep himself safe; that he was not going to certainly

24  manufacture or transmit child pornography; that he was

25  intending only to use it for his own purposes.  And I guess,

1   most importantly, that he had made a commitment to himself that

2   he would never again assault another child, and he would be

3   able to use the available pornography that he had access to as

4   a way of gratifying his needs without having to actually find

5   another child.

6   Q.    And when Mr. Wetmore was released from prison, was

7   treatment ordered?

8   A.    I'm sorry, Counsel.  I was just looking at the bottom to

9   see if I had left anything out regarding these rules.  The only

10  thing that I didn't mention that he spoke about is that he

11  would not pay for child pornography.

12  Q.    And he also made a promise to himself to avoid any places

13  where there were children; isn't that correct?

14  A.    That's correct.

15  Q.    Now, when Mr. Wetmore was released from prison, was he

16  ordered to go to treatment?

17  A.    No, he wasn't.  Remarkably, he commented to me that in

18  that one respect, the system had failed him, and I would

19  certainly concur.

20  Q.    Did Mr. Wetmore seek out treatment on his own?

21  A.    He commented that there were a number of points in his

22  life, that starting at age twenty-four, that he should have

23  realized that there was a significant problem, and that he

24  needed to, as he put it, get his life in order; that going to

25  prison was, again, as he characterized it, "a kick in the butt."

1  But whatever that intervention was, the intervention of going

2  to prison, it was not adequate.  He was simply placed on

3  probation and simply assigned to a therapist, who, according to

4  Mr. Wetmore, said he could be of no help.

5  Q.   And --

6  A.   That was of course the first time around.

7  Q.   And that's the state system in Maine; is that right?

8  A.   That's correct.  And then the second time around he was

9  released with -- placed on probation with no treatment at all.

10 Q.   Okay.  And that is also from the state of Maine; is that

11 correct?

12 A.   Correct.

13 Q.   And do you recall how long his probation was?

14 A.   I believe it was six years.

15 Q.   The next incident that you learned about or the next

16 relationship that you learned about in your interview with

17 Mr. Wetmore was a 1999 relationship with a person named Jesse.

18 Do you recall that?

19 A.   That's correct.

20 Q.   What did you learn about that relationship?

21 A.   Well, Jesse was certainly an age-appropriate relationship.

22 Jesse was twenty-four years old, and he was an employee of the

23 auto repair shop that Mr. Wetmore owned, ran.  And they would

24 get together quite occasionally, sometimes on weekends.

25 Mr. Wetmore characterized it as not a true relationship, but it

fe6c7078-588f-4707-8d93-25f85cda7c96

1   was as close -- I believe the way he again characterized it, it

2   was as close as he's ever come to a legal relationship.   I

3   believe that's what he referred to it as.

4   Q.   Now, in 1999, was Mr. Wetmore approximately forty-three

5   years old?

6   A.   He would have been about, yes, forty-three.

7   Q.   Okay.  And at the same time period that he was involved

8   with this relationship with Jesse who was twenty-four, was he

9   involved with anyone else?

10  A.   We know that he became involved with at least one other

11  juvenile.  This was, I believe, Ryan, Ryan Fox.

12  Q.   And how old was Ryan?

13  A.   Fifteen.

14  Q.   And how did Mr. Wetmore meet Ryan?

15  A.   Again, Ryan worked at the auto repair shop, and Ryan

16  reported on June 5, 1999, that Mr. Wetmore had performed oral

17  sex on him, and a second juvenile male reported to the police

18  that he had seen child pornography.

19        MR. MILES:  Excuse me, your Honor.  Again, unless this

20  is information he got from Mr. Wetmore, I would object on

21  hearsay grounds.

22        THE COURT:  He got it from Mr. Wetmore?

23        MR. MILES:  Unless Mr. Wetmore reported these details

24  to him, I would object on hearsay grounds.

25        THE COURT:  Well, was he convicted on this offense?

1          MS. PIEMONTE-STACEY:  This is his conviction in 2000.

2          THE COURT:  Overruled, if he was convicted of it.

3          THE WITNESS:  This was the conviction that was based

4    on the 2,000 images of child pornography that the police found

5    when they confiscated his computer.

6          THE COURT:  Well, now I'm confused.

7    Q.   So in 1999, Mr. Wetmore --

8          THE COURT:  So was he convicted of performing oral sex

9    on the fifteen-year-old?

10         MS. PIEMONTE-STACEY:  No.

11         THE COURT:  No.

12         THE WITNESS:  No.

13         THE COURT:  This is a conviction of child pornography.

14         THE WITNESS:  To the best of my knowledge, your Honor,

15   he was never convicted.  The fifteen-year-old reported it.

16   Mr. Wetmore reported to me that this Ryan reported it, but --

17         THE COURT:  Did Wetmore say he did it?

18         THE WITNESS:  Yes.

19         THE COURT:  So by "it," I'm meaning oral sex on the

20   fifteen-year-old.

21         THE WITNESS:  Yes.

22         THE COURT:  Let me ask you this.  We're now at 11:00,

23   which is typically when I take a break.  We got going in the

24   vicinity of 9:15.  How much longer do you think you have?

25         MS. PIEMONTE-STACEY:  I think it's not more than an

1    hour.  Looking at the numbered pages --

2         THE COURT:  All right, all right, I'm not going to

3    wait till the break till you finish.  If it was ten minutes,

4    I'd finish the direct.

5         MS. PIEMONTE-STACEY:  No.

6         THE COURT:  Fine.  We'll take our morning break, and

7    I'll see you at 11:30.  And let me see counsel on scheduling.

8    SIDE-BAR CONFERENCE:

9         THE COURT:  Do you want to have the clothes

10   downstairs, or are you okay with it now?

11        MR. MILES:  I'm okay with it now, your Honor.

12        THE COURT:  I think they probably misunderstood.  Let

13   me ask you this.  Let me assume for a minute, if you go an

14   hour, 11:30 to 12:30, will you finish him today?

15        MR. MILES:  No.

16        THE COURT:  He is so --

17        MS. PIEMONTE-STACEY:  Seinfeld would call him a "slow

18   talker."

19        THE COURT:  A slow talker.  I don't know what to do

20   with that, but it completely throws off the schedule.

21        MR. MILES:  Four years of high school debate training,

22   your Honor, but other than that, your Honor, I can't think of a

23   remedy.

24        THE COURT:  He's just -- it's not just -- I've gotten

25   past the soft-spoken, but he's just very measured in how he

fe6c7078-588f-4707-8d93-25f85cda7c96

1    speaks, shall we say, and everything takes three times longer

2    than maybe any of us in this room would say it.  I'm worrying

3    hugely about the schedule.  And who else do you have here?

4          MS. PIEMONTE-STACEY:  The two BOP witnesses are short.

5          MS. ROLLINS:  Very quick, maybe ten minutes each.

6          THE COURT:  Can I make a suggestion?  Why don't we

7    just -- do you have any fact witnesses sitting outside?

8          MR. MILES:  No, I do not.  Mine are all scheduled for

9    tomorrow.

10          THE COURT:  All right.  So how about just throwing the

11    two BOP witnesses on and off, get them out of here.  And who do

12    you have tomorrow that you need to get on and off?

13          MR. MILES:  Mr. Kelley, the probation officer from

14    Maine.  We promised him we'd do him tomorrow.  If I can e-mail

15    Mr. Wetmore's brother and mother, I can hopefully head them

16    off.  They've come down from Bangor, Maine, which is a major

17    trip for them.

18          THE COURT:  Because it's bench, I'll accommodate

19    everyone that needs to be in and out of here.  My concern with

20    him, unless you pick up the pace, I mean --

21          MS. PIEMONTE-STACEY:  I don't know what else.  I'm

22    trying to do that.  I hope it's not an hour.  I worry about his

23    flight out.  That's the problem.

24          THE COURT:  When's his flight?

25          MS. PIEMONTE-STACEY:  I need to check and see.  Is it

1    tomorrow?

2            MS. ROLLINS:  It's tomorrow.  I will confirm that.

3            THE COURT:  If you could just suggest to just pick up

4    the pace a little bit.

5            MS. PIEMONTE-STACEY:  I can't speak to him because

6    he's the court examiner.  We've had no ex parte communication,

7    that's all, because he's the court examiner.

8            THE COURT:  I've never ordered that on this --

9            MS. PIEMONTE-STACEY:  It's just a rule we followed in

10   the Shields case and in the other cases.

11           MR. MILES:  For the record, your Honor, I have no

12   problem with nonsubstantive --

13           THE COURT:  Just try to get together with him on the

14   timing and the --

15           MS. PIEMONTE-STACEY:  Okay, I will try.

16           THE COURT:  Okay.  When's your psychiatrist?

17           MS. ROLLINS:  Dr. Phenix is here.  She's leaving

18   tomorrow at 6:00.

19           MS. PIEMONTE-STACEY:  She's fast.

20           MS. ROLLINS:  And she'll be --

21           THE COURT:  I have to leave here tomorrow.  I cannot

22   stay till 5:00.  I need to leave at -- I forget what time it

23   is.

24           MS. ROLLINS:  We will make sure that I'm done with her

25   within 45 minutes.

1          THE COURT:  I'm worried here.

2          MS. PIEMONTE-STACEY:  I don't think she will go as

3      long as Dr. Prentky.

4          MR. MILES:  No.

5          THE COURT:  You don't have an expert, right?

6          MR. MILES:  I do not.

7          THE COURT:  So I don't have to worry about another

8      expert.  Do I need to have a government expert on this?

9          MS. ROLLINS:  We do, unfortunately.

10         THE COURT:  Well, I'm just not seeing us finishing.

11     Let me just say what it is.

12         (Discussion off the record.)

13         MR. MILES:  I expect Mr. Wetmore to testify.  His

14     examination will be lengthy.

15         THE COURT:  I agree.  We're not finishing.  It's just

16     quite clear.  And I have another trial, a criminal trial.  I've

17     been at this all summer.  I've been flat out.  I had three

18     trials this week alone.  So let me just say this:  I think

19     we're not going to finish tomorrow, and I can't roll it over

20     until Monday, so I think you all need to talk seriously about

21     scheduling.  How long do you think you might have on cross?

22         MR. MILES:  On Dr. Prentky?

23         THE COURT:  Yes.

24         MR. MILES:  Probably two, two and a half hours.

25         THE COURT:  See, we've got a problem.  He's the key

1    person.  He's the court-appointed expert.

2              MS. PIEMONTE-STACEY:  Right.

3              THE COURT:  So I'm happy to, but I think you all need

4    to really sort of talk among yourselves.  And, also, you're

5    coming in from Western Mass.  Next time around we'll just do a

6    sequence in the morning, just set it up like a regular trial,

7    because I think we have another three or four days of trial.

8    That's what I'm seeing.

9              MS. PIEMONTE-STACEY:  Our original estimate, you know,

10   was five.

11             THE COURT:  I think that's right on.

12             MS. PIEMONTE-STACEY:  I'll try.  That's all I can say.

13             THE COURT:  But when you reestimated that maybe we'd

14   be done within these two days, I think no way.

15             MS. PIEMONTE-STACEY:  Yes, had he moved, I think we

16   could have.

17             THE COURT:  All right.

18             (End of side-bar conference.)

19             (A recess was taken, 11:05 a.m..)

20             (Resumed, 11:45 a.m.)

21             THE COURT:  Come on up, Dr. Prentky.

22             MS. PIEMONTE-STACEY:  May I begin, your Honor?

23             THE COURT:  Yes.

24   BY MS. PIEMONTE-STACEY:

25   Q.   Dr. Prentky, where we last left for the break, you had

1    testify about the 2,000 images of child pornography that were

2    found on Mr. Wetmore's computer.  Do you recall that?

3    A.   Yes.

4    Q.   And what did you learn about the types of images that were

5    on his computer?

6              MR. MILES:  Objection unless it's by self-report.

7              THE COURT:  Overruled.

8    A.   The 2,000 images of child pornography were found on the

9    computer, is that what you're asking me?

10   Q.   Yes.  And what did they depict?

11             MR. MILES:  Objection.

12             THE COURT:  Overruled.

13   A.   I'm sorry, Counsel, I'm not exactly sure what your --

14             THE COURT:  Are they pictures of children?

15             THE WITNESS:  Yes, absolutely.

16             THE COURT:  So did you see them?

17             THE WITNESS:  I saw some of them, your Honor.  Some of

18   them were copied, and I glanced at them.

19             THE COURT:  Copied by you or --

20             THE WITNESS:  No.

21             THE COURT:  Were they in the criminal record?

22             THE WITNESS:  They were in the criminal record.  They

23   were sent to me.

24   Q.   Did the images include pictures of minor males?

25   A.   The images that I glanced at were rather varied.  About

1    half of them were images of minor males.  I mean, of course,

2    it's hard, very hard to tell what the ages are.

3           THE COURT:  Were they little children?

4           THE WITNESS:  No.  No, they looked like young teenage

5    boys.

6           THE COURT:  So you couldn't tell if they were pre- or

7    postpubescent?

8           THE WITNESS:  No.  Very difficult to tell.  But, as I

9    said, there are a wide range of different kinds of images.  The

10   quality was quite poor, so it was hard to get a clear sense of

11   what the original image looked like.  These were, you know,

12   photocopies, and I don't know what it was photocopied from,

13   but --

14          THE COURT:  Were these pictures, to your knowledge,

15   that were in Mr. Wetmore's possession or ones that the criminal

16   investigators had printed out from the computer?

17          THE WITNESS:  I could not tell.  I surmised that they

18   were --

19          THE COURT:  No, no.

20          THE WITNESS:  Okay.

21          THE COURT:  Don't surmise.

22          THE WITNESS:  I have those images.  I brought all of

23   the discovery with me, so I have the images that were shared

24   with me.

25   Q.   Dr. Prentky, directing your attention to Page 6 of your

1   report, at the end of the second full paragraph where you

2   describe the images that were found on Mr. Wetmore's computer,

3   do you see that, the sentence begins "On October 23, 1999"?

4   A.   Which page, Counsel?

5   Q.   Page 6, second full paragraph.

6   A.   My Page 6, the second paragraph is "In 1999."

7   Q.   That's right.  If you go toward the end of it, the

8   sentence begins "On October 23, 1999 --"

9   A.   "-- the police confiscated his computer and found 2,000

10  images of child pornography."

11          MR. MILES:  Please note my objection and move to

12  strike.

13          THE COURT:  Overruled.

14  Q.   You then described the type of child pornography that was

15  on his computer, correct?

16  A.   Correct.

17  Q.   What type of child pornography was on his computer, to

18  your knowledge?

19  A.   Well, there were both videos and stills of minor males

20  having sex, depicting exhibitionism, prepubescent males

21  engaging in sex --

22          MR. MILES:  Objection.

23          THE COURT:  Overruled.

24  A.   -- and images depicting sadomasochism.

25  Q.   And after, as a result of --

1          THE COURT:  How do you know that?

2          THE WITNESS:  That is what I learned from the

3     discovery, your Honor.  That is what I read in the discovery.

4          THE COURT:  So that means -- I just want to be very

5     precise.  Was that in a presentence report?  Was that in a --

6     do you remember where that was derived from?

7          THE WITNESS:  I believe it was in the police report,

8     your Honor.  I can try to find it, but I believe it was from

9     the police report when his computer was confiscated.

10          MS. PIEMONTE-STACEY:  Your Honor, if I may clarify for

11     the record, at Bates 00017, for the benefit of counsel, it's in

12     Paragraph 4 of the presentence report.

13          THE COURT:  Was it objected to?

14          MS. PIEMONTE-STACEY:  It was, your Honor.  Give me a

15     moment.

16          The objection by the defendant has no objections to

17     the PSR.

18          THE COURT:  I will accept that.

19     Q.   So the child pornography images, that was the subject of

20     his 2000 conviction; is that right?

21     A.   Correct.

22     Q.   And after he was convicted in 2000, he was sent to the

23     Down East Correctional Facility, correct?

24     A.   Yes.

25     Q.   And did he enroll in sex offender treatment there?

1   A.   That essentially was the first time that he actually was

2   in sex offender treatment.

3   Q.   Okay.  To your knowledge, has he been in sex offender

4   treatment since?

5   A.   No.  I believe it was just that time period, the three

6   years that he spent at Down East before he was transferred out

7   to Raybrook, that he was in treatment.

8   Q.   And at some point Mr. Wetmore was transferred to FCI

9   Butner; is that correct?

10  A.   That's correct.

11  Q.   And when he was at Butner, did Mr. Wetmore enroll -- was

12  he enrolled in sex offender treatment, participated in sex

13  offender treatment?

14  A.   He was at Butner for a total of about nine months, but

15  during the time that he was there, he did enroll in treatment.

16  Q.   And did he complete treatment at Butner?

17  A.   He was in treatment for, I believe, two weeks.

18  Q.   And do you know why his treatment at Butner ended?

19  A.   That gets into an area that Mr. Wetmore was reluctant to

20  discuss with me.

21  Q.   And were records able to shed light on the reason that

22  Mr. Wetmore was expelled from the sex offender treatment

23  program?

24        MR. MILES:  Objection.

25        THE COURT:  Overruled.

fe6c7078-588f-4707-8d93-25f85cda7c96

1  A.    I believe it was a contractual --

2        MR. MILES:  The question calls for a --

3  A.    -- issue.

4        MR. MILES:  Objection.

5        THE COURT:  Excuse me.  First of all, let me back up.

6  Do the records say that he was expelled as opposed to he

7  resigned?

8        THE WITNESS:  Expelled.

9        THE COURT:  And when you say "records," these are the

10 prison records?

11       THE WITNESS:  These are the Butner records, that's

12 correct.

13       THE COURT:  Are they maintained as a result of a

14 disciplinary proceeding or just sort of a notation in a medical

15 record?

16       THE WITNESS:  No, it was not a disciplinary issue.  It

17 had to do with Mr. Wetmore's willingness to adhere to the

18 contractual obligation that is connected to the Butner

19 treatment program.  I'm hesitating a little bit because I'm not

20 sure how much to say.  The program at Butner requires all

21 inmates to sign a document declaring that everything, of

22 course, that they disclose may be subject to documentation and

23 report.  There is an expectation that they will agree to

24 complete a questionnaire, a sexual history questionnaire.

25 There is an expectation, I believe explicit, that in the course

1  of treatment they will uncover additional information about

2  victims, and that this will be disclosed on each of these

3  periodic surveys, reports that they have to fill out.  There

4  are --

5          THE COURT:  So what was the contractual breach?

6          THE WITNESS:  It wasn't a breach.  It was

7  Mr. Wetmore's unwillingness to do this.

8          THE COURT:  He wouldn't sign the contract?

9          THE WITNESS:  I believe that that was the issue.

10         THE COURT:  All right, so he wouldn't sign their

11  terms.  All right, what's the next question?

12  Q.  Dr. Prentky, directing your attention to Page 8 of your

13  report under "Institutional Chronology" dated 5/13/05, do you

14  see that?

15  A.  Yes.

16  Q.  Does that refresh your recollection as to the reason

17  Mr. Wetmore was not in the sex offender treatment?

18  A.  Well, again, I'm not sure, Counsel, that that entirely was

19  the issue that he was discharged from the program.  He was

20  written up simply for engaging in sexual activity with a couple

21  of other inmates, but at this point I am answering your

22  question in part from Mr. Wetmore's discussion with me; and his

23  experiences at Butner were, how shall I say, varied and by no

24  means limited to that disciplinary action regarding his sexual

25  activity with two other inmates.

1   Q.   Dr. Prentky, in your evaluation of Mr. Wetmore, did you

2   come to a conclusion to a reasonable degree of professional or

3   scientific certainty about a diagnosis for Mr. Wetmore?

4   A.   The only diagnosis that I believe is defensible that also

5   is consistent with the Diagnostic and Statistics Manual would

6   be a paraphilia NOS or not otherwise specified diagnosis of

7   hebephilia.

8   Q.   And what is that?  What is hebephilia, Dr. Prentky?

9   A.   Hebephilia is a pattern of intense, recurrent, erotic

10  attraction to pubescent adolescents.

11  Q.   Is that a recognized mental illness, abnormality, or

12  disorder in the field of psychology?

13  A.   There is very little literature per se on hebephilia.

14  There are approximately 75 or 80 paraphilias that have been

15  identified and cataloged, the vast majority of which, if

16  observed by an examiner, would have to fall into the NOS

17  category, assuming that they were legitimate paraphilias.  The

18  DSM itself only lists eight, I believe, so all other

19  paraphilias would fall into this NOS category.

20          THE COURT:  So a paraphilia means what?

21          THE WITNESS:  Para refers to beyond.  Para is beyond;

22  philia is love.  It could be thought of simply as any kind of

23  intense recurrent pattern of erotic interest that goes beyond

24  normal sexual activity.  I believe the easiest way to think

25  about a paraphilia is simply in base rate terms, which is to

1    say incidents.  If the incidents of a particular sexual act in

2    the general population is understood to be very low, then it

3    would be regarded as beyond normal sexual activity, or a

4    paraphilia.  So I don't know that we have good incidents

5    figures on most paraphilias, but all paraphilias would be

6    regarded as relatively rare in the general population.

7         There are some paraphilias that are more commonly

8    discussed and researched, such as exhibitionism, transvestitism,

9    voyeurism, sadism, and masochism.  For that reason, those

10   paraphilias are listed in the DSM.  They are all activities, as

11   I said, that would be understood to be relatively rare in the

12   general population.

13        THE COURT:  Well, is it rare in the general population

14   to be attracted to a postpubescent male?

15        THE WITNESS:  It's an excellent question, and I'd like

16   to respond in one of two ways.  Actually, two ways.  The first

17   answer is, no, that in general, for adults, adult males to

18   respond to a psychosexually mature young adolescent girl with

19   the physical sexual characteristics of an adult woman would not

20   be regarded as abnormal or unusual.  The same would be true for

21   a similar aged male.  And those images are used all the time in

22   advertising and marketing because it's understood that a

23   sexually appealing adolescent is just that, sexually appealing.

24        A problem comes in when we understand a great gap in

25   age concordance, or shall I say age discordance.  So for a

fe6c7078-588f-4707-8d93-25f85cda7c96

1   seventeen-year-old to sexualize a fifteen-year-old would be

2   regarded as highly normal; for a forty-seven-year-old to

3   sexualize a fifteen-year-old would not.  And it would raise

4   numerous questions about the level and degree of adult

5   adaptation across multiple domains for that individual.  It

6   would call into question the level of adaptation in domains

7   such as education, acquisition of social and interpersonal

8   skills, vocational skills.  It would be difficult for most

9   forty-seven-year-olds to sustain a relationship with a

10  fifteen-year-old.  No matter how sexually appealing the

11  fifteen-year-old was, most of them wouldn't go there.

12          THE COURT:  So there's a low incidence of older adults

13  feeling sexually attracted to young adolescents?

14          THE WITNESS:  Yes, and I believe the issue is

15  exclusivity, or we can think of it as sexual preference.  For a

16  forty-seven-year-old to have a sexual preference for a

17  fifteen-year-old is different from asking the question, does

18  that forty-seven-year-old find the fifteen-year-old attractive

19  in principle?

20          THE COURT:  How do you know this?  Is this based on

21  your -- are there studies of this that when you're eighteen,

22  it's normal to be attracted to a fifteen-year-old, but when

23  you're in your forties, it is not normal to have that as a

24  sexual preference, within common sense and what you experience?

25  Are there studies?

1          THE WITNESS:  I believe, your Honor, I would say all

2     three.  There is research, and to some extent it's common

3     sense, simply because we see teenage models being used all the

4     time in the marketing and advertising industry; and the only

5     reason they're used is because they're highly appealing and

6     they're effective in eliciting the interest and attention of

7     adults.  If it didn't work, then the marketing industry

8     wouldn't use them.

9          But to go beyond that, I can say as an example that if

10    I were to administer something like the Abel Assessment of

11    Sexual Preference, it's called a VRT or visual reaction time

12    procedure, in which you observe on the computer 160 images of

13    models ranging in age from very, very, very, very young

14    children all the way to adults; and the clock inside the

15    computer simply monitors how long you observe the image,

16    although your task is to assess how appealing the image is to

17    you, but what we're particularly interested in is how long you

18    spend looking at that image.  The one who developed this test,

19    Dr. Abel, has made it clear that profiles from the Abel that

20    include an apparent sexual preference for adolescent models is

21    to be considered normal in the presence of preference for also

22    adult models.  So what Abel is saying, I believe, is that it's

23    not unusual to find people with a normal sexual preference with

24    a longer time frame observing adult models also observing

25    adolescent models.

1          I know whenever I observe that, after having

2     administered an Abel, I'm very careful to note that it should

3     be regarded as a normal sexual preference, unless, of course --

4          THE COURT:  But how do you know when -- are there

5     studies about when it changes over into abnormal?

6          THE WITNESS:  There are, again, two ways, I think, of

7     thinking about this.  I believe it becomes abnormal when the

8     interest becomes dysfunctional --

9          MR. MILES:  Objection.  Move to strike, not responsive

10    to your question, your Honor.

11         THE COURT:  I'm going to hear him out.  Go ahead.

12    When what?  I'm sorry.

13         THE WITNESS:  -- when the relationship becomes

14    dysfunctional, and that goes back to my comment earlier about

15    the age discordance between the preferred object, fifteen years

16    old, and your age.  If you're now a thirty-year-old and you're

17    trying to establish a relationship with a fifteen-year-old, the

18    gap, the maturational gap is so wide that it would be very

19    difficult, if not near impossible, to develop a stable, mature

20    relationship with that fifteen-year-old.  So there's a

21    dysfunctionality to it in terms of the relationship itself.

22         THE COURT:  Now, is this based on your experience or

23    based on studies?

24         THE WITNESS:  Both.  There are studies, obviously,

25    that have looked at this, but I also make reference to the

1   language in the DSM which talks about the extent to which a

2   particular nosology, a particular disorder impacts the normal,

3   healthy, age-appropriate outcome for that individual.  If the

4   disorder undermines that normal adaptation across many domains

5   of development, then it's more likely considered not only

6   disruptive but a legitimate disorder.

7        THE COURT:  So as I understand it, seventeen on

8   fifteen would be normal.  Someone much older, in their forties,

9   fifties on a fifteen-year-old would be abnormal.  So what do we

10  do with the twenty-year-old, someone in their twenties?

11       THE WITNESS:  There is quite admittedly an enormous

12  amount of slippage here, a lot of ambiguity in the research.

13  The latest recommendation that I heard -- I can't even surmise

14  whether it will be accepted by the DSM V, the next iteration of

15  the DSM -- was made by one of the scholars in the area of pedo

16  and hebephilia, a Dr. Blanchard; and Dr. Blanchard recommended

17  for the DSM V a new category called "pedohebephilia," one

18  category that embraces both pedophilia and attraction to young

19  adolescents.  Dr. Blanchard recommends going up to the age of

20  fourteen.

21       Admittedly, this is rather arbitrary.  These lines in

22  the sand can be drawn at virtually any place in adolescence,

23  and you will have different researchers and different

24  clinicians recommending where we draw the line in the sand.  In

25  part, it's difficult because the maturity of adolescents will

1  differ substantially.  There may be fifteen-year-olds that are

2  mature enough to be able to consent to sexual activity,

3  although the age is generally sixteen in most states.  By

4  contrast, there may be sixteen-year-olds that are very

5  immature, far more immature than some fourteen-year-olds.  So

6  where we draw these bright lines is very difficult, but I'm

7  simply sharing with you the latest thinking from Dr. Blanchard

8  that pedophilia be extended to embrace those individuals who

9  sexualize children up to the age of fourteen.

10       Why does he recommend that?  For two reasons:  One,

11  because in his professional experience and his research, those

12  men who sexualize young adolescents are very, very similar in

13  principle to pedophiles, that the children that they're

14  sexualizing tend to be very young and immature, even if they

15  are thirteen, fourteen years old, and that they are attracted

16  to those thirteen- and fourteen-year-old children for very

17  similar reasons that pedophiles are attracted to prepubescent

18  children.

19       THE COURT:  Has his recommendation gained general

20  acceptance in the psychiatric community?

21       THE WITNESS:  Dr. Blanchard is certainly an esteemed

22  scholar and very, very well known.  The extent to which his

23  particular thoughts about this have gained acceptance, I really

24  honestly don't know.  I suppose we'll see to the extent to

25  which his recommendations to the American Psychiatric

1    Association are accepted.

2            THE COURT:  Have they been rejected in this last

3    go-around?  Were they rejected?

4            THE WITNESS:  Oh, no, they haven't --

5            THE COURT:  They just haven't been considered?

6            THE WITNESS:  All of the Paraphilia Subcommittee

7    recommendations are tabled.  They're being presently under

8    scrutiny.

9            THE COURT:  I understand.

10           THE WITNESS:  These decisions haven't been made yet.

11           THE COURT:  Has he published in the peer-reviewed

12   literature?

13           THE WITNESS:  Extensively.

14           THE COURT:  Blanchard has?

15           THE WITNESS:  Correct.  I want to also comment that

16   the other point that Blanchard makes is that if you move away

17   from the DSM as your standard for classification and use the

18   World Health Organization's International Classification of

19   Diseases, the most recent ICD-10, I believe it is, published by

20   the World Health Organization, that is their standard.

21           THE COURT:  Up to fourteen?

22           THE WITNESS:  Correct.  So he's trying to draw the DSM

23   into comparability with the ICD.

24           THE COURT:  I'm sorry, I don't know.  World Health

25   Organization -- I should know -- is that part of the U.N.?

1          THE WITNESS:  Yes.

2          THE COURT:  All right.  And is that adopted based on

3     scientific advisory boards?  Do you know?

4          THE WITNESS:  It's a nosology for the classification

5     of diseases that's used internationally.  Generally the DSM is

6     what's relied upon in the United States.  If you go over to

7     Europe, then I don't know if it's true to say you're more

8     likely to see the ICD, but I would gather that that would

9     probably be the case.

10         THE COURT:  And, finally, my question is, do you agree

11    with Dr. Blanchard's recommendation that it should be

12    considered a mental disease or defect to be attracted to

13    someone up to the age of fourteen?

14         THE WITNESS:  I believe, your Honor, that what we are

15    calling hebephilia is a legitimate disorder, that it is a

16    legitimate paraphilia when it is legitimately diagnosed in a

17    man of the age of Mr. Wetmore; that there is a readily

18    documentable level of dysfunction in the life of a man who

19    cannot sustain, by his own experience, by his own admission,

20    cannot sustain a stable relationship that is perhaps not even

21    age-appropriate but age-legal.

22         MR. MILES:  Objection, move to strike.  Nonresponsive

23    and assumes facts not in evidence.

24         THE COURT:  Overruled.  You can cross on it.

25         MR. MILES:  And hearsay, if I can just get out the

1    entire objection, your Honor.

2         THE COURT:  All right, all right.

3         THE WITNESS:  Mr. Wetmore shared with me his comment

4    that his last relationship when he was back out in the

5    community with this twenty-four-year-old young man, as he put

6    it, came the closest that he's ever had to a legal

7    relationship, and yet he also characterized it really as not a

8    relationship at all.  You know, they met occasionally on

9    weekends.  That is fairly dysfunctional.  In fact, I wouldn't

10   even characterize it -- I would characterize it as a

11   friendship.  It's certainly not a relationship.

12        So what he's confronted with is an insurmountable

13   problem that either he has no stable relationships, or he has

14   to resign himself to either going afoul of the law and

15   establishing relationships with kids that are underage, or

16   gratifying his needs in other ways.  But even then, he's only

17   gratifying his sexual needs.  He certainly can't gratify his

18   emotional needs.

19        THE COURT:  You mean like with child pornography?

20        THE WITNESS:  Sure, yes.  I mean, you can masturbate

21   to it, but it's certainly not going to gratify any emotional

22   needs that you have.

23        THE COURT:  Well, let me ask you this.  I understand

24   child pornography is illegal as well.  I know that all too

25   well, but are people who are attracted to child pornography,

1   are there any studies about whether they're more or less likely

2   to go out and touch?  In other words, does it stop people from

3   touching because they gratify it through looking, or does it

4   get you excited so you go out and look for someone?

5           THE WITNESS:  It's an interesting question.  I can

6   share with you the gist of what the research suggests,

7   including my own research on that question.  It's very much an

8   area of recent research, say within the last five to ten years,

9   concurrent with the recent laws, both federal and state laws

10  that are now locking up large numbers of people that have been

11  caught with child pornography.  And the obvious question then

12  is, who among them either have committed hands-on offenses

13  against children or are at risk to do so?  And the prevailing

14  view at this point from the research literature, and it also is

15  strongly supported by my own research on this question, would

16  be that the divining rod here has to do with antisocial

17  behavior; that if you compare Internet sex offenders with no

18  known history of a battery offense involving a child with

19  samples of known child molesters, the most glaring difference

20  between those groups is the presence of antisociality among the

21  child molesters.  And the presence of antisocial behavior goes

22  all the way back even to childhood.  You'll see a fairly stable

23  track record of conduct-disordered behavior, delinquent

24  behavior, and other manner of antisocial behavior in adulthood

25  among these child molesters that you don't observe, at least

1    certainly not at the same level of magnitude, among

2    Internet-only offenders.

3         THE COURT:  So you need to look at their -- to

4    understand whether child pornography is all someone is likely

5    to do as opposed to whether it's going to fuel more illegal

6    contacts, you just look at their past record?  That's your

7    divining rod, what have they actually done?

8         THE WITNESS:  That is the divining rod.  In the most

9    recent study that we've done, we actually provide a table of

10   conditional probabilities, indicating the likelihood that an

11   individual is a child molester depending on the score that they

12   get on this scale that we developed for antisocial behavior.

13   And the higher the score, the higher the probability that the

14   individual is a child molester or is a risk prone to commit a

15   battery offense against a child.

16        THE COURT:  I'm sure you'll take us there.  Did you

17   apply that here?

18        THE WITNESS:  No, I did not, in part because what I'm

19   talking about is research that literally in our case has only

20   been conducted and completed for a final technical report and a

21   federal grant right now.

22        THE COURT:  All right, so this is not part of your

23   report, is that right?

24        THE WITNESS:  That's correct, it's not.

25        THE COURT:  All right, so I probably took you afield,

1    and I'm sorry.  I'll send it back to you.

2         MS. PIEMONTE-STACEY:  Thank you, your Honor.

3    Q.   Dr. Prentky, I'd like to show you the DSM-IV, Elements of

4    Diagnostic Features of a Paraphilia.  Can you see that on your

5    screen?  When you talked about paraphilia NOS or hebephilia,

6    paraphilia NOS, is that an accepted diagnosis in the medical

7    community?

8    A.   The term "paraphilia"?

9    Q.   Yes.

10   A.   Yes, of course.

11   Q.   And what about the category of paraphilia NOS as it

12   appears in the DSM, is that recognized in the medical

13   community?

14   A.   Almost all of the categories, if not all of them, have a

15   "not otherwise specified" option.

16   Q.   And the DSM, is that a publication that's used by

17   psychologists and others in the medical community?

18   A.   It's developed by the American Psychiatric Association, so

19   it's used primarily by psychiatrists, but, yes, of course, it's

20   also used by psychologists.

21   Q.   And when you testified in response to the Court's question

22   about the attraction, the attraction alone is not the sole

23   factor for diagnosis of paraphilia NOS or hebephilia, is it?

24   A.   The sole criterion for purposes of rendering the

25   diagnosis?

1   Q.   That's right.

2   A.   No.  No, not at all.  To be diagnosed with a paraphilia,

3   in addition to having these recurrent intense sexual urges,

4   fantasies, behaviors, there has to be some minimally defensible

5   period of time during which this condition has existed, and

6   that period of time is six months.  And the DSM somewhat

7   ambiguously also refers to different areas in which these

8   paraphilias can occur.  They can be what are referred to as

9   unusual objects or activities or situations.  And, again, the

10  definition, again somewhat ambiguously, is that this paraphilia

11  is supposed to cause clinically significant distress or

12  impairment in social, occupational, or other important areas of

13  functioning.  It's that problem that I was alluding to before.

14  And, incidentally, my recollection is from Dr. Blanchard's

15  writings on this that he takes exception to that entire issue

16  of "clinically significant distress or impairment," since it

17  would seem to rule out all those individuals that have

18  paraphilias but are perfectly happy with them.  That is, the

19  paraphilia is egosyntonic.  They're not uncomfortable with it.

20  They're not in distress.  They don't feel impaired.  And I

21  believe Blanchard actually recommends separating out two

22  separate conditions to solve this problem:  to refer to people

23  that really are impaired as having a paraphilic disorder, and

24  then referring to all these other people who are quite happy to

25  be paraphilics, thank you, as simply paraphilics without a

1   disorder.

2   Q.   And let me refer you also to Section 302.9 of the DSM,

3   "Paraphilia Not Otherwise Specified."  That's at Page 576.  Is

4   that the category you described previously in your testimony

5   when you talked about examples of paraphilias that were not

6   otherwise specified?

7   A.   Right.  I mean, in the case of paraphilias, the DSM, as an

8   example, offers klismaphilia as a "not otherwise specified"

9   paraphilia.  So if you presented with that as an area of erotic

10  interest, then the only way to diagnose it would be to say

11  paraphilia NOS, klismaphilia.

12  Q.   But the category for paraphilia not otherwise specified,

13  or NOS, it's included for coding paraphilias that don't meet

14  the criteria for any of the specific categories that are listed

15  in the DSM; is that right?

16       MR. MILES:  Objection to the form of the question.

17       THE COURT:  Overruled.

18  A.   Yes.  As I said, I believe that there are eight actual

19  examples that the DSM provides.  So if you happen to have one

20  of these paraphilias other than these eight, there would need

21  to be this wastebasket category called "NOS."

22  Q.   Now, Dr. Prentky, when you assessed Mr. Wetmore's risk

23  during your evaluation of him as to whether he's a sexually

24  dangerous person, did you perform an actuarial assessment on

25  Mr. Wetmore?

1    A.    I completed, as I routinely do, the Static-99, if that's

2    what you're asking me.

3    Q.    And what is the Static-99?

4    A.    The Static-99 was an actuarial risk assessment scale

5    developed, as the name implies, in 1999 by Drs. Hanson and

6    Thornton, and has been the subject of much empirical as well as

7    legal scrutiny ever since.

8    Q.    Has the Static-99 been used in the evaluation of sex

9    offenders?

10   A.    It is the instrument that is routinely used for all of

11   these civil commitments of sex offenders.

12   Q.    Has the Static-99 been validated or subjected to peer

13   review?

14   A.    Extensively.

15   Q.    Does the Static-99 have known error rates?

16   A.    Yes.

17   Q.    Has the Static-99 gained general acceptance in the

18   psychological or psychiatric community?

19   A.    Yes.

20   Q.    And in Mr. Wetmore's case, what was Mr. Wetmore's score on

21   the Static-99?

22   A.    Mr. Wetmore's score is -- I scored him a 6.

23   Q.    And what is the significance of a score of 6?

24   A.    Frankly, it's not entirely clear what the significance is.

25   The bin that 6 falls within is referred to as high-risk, if

fe6c7078-588f-4707-8d93-25f85cda7c96

1    that's what you're asking me.

2             MR. MILES:  Objection, move to strike.

3             THE COURT:  Why?

4             MR. MILES:  It wasn't what he was being asked, your

5    Honor.  It wasn't responsive to the question.

6             THE COURT: Overruled.

7             MS. PIEMONTE-STACEY:  It was both of those things.

8             THE COURT:  Overruled.

9             MS. PIEMONTE-STACEY:  He was being asked, and it's

10   responsive, your Honor.

11            THE COURT:  Where are we now?

12   Q.   So a score of 6 puts Mr. Wetmore in the high-risk

13   category.  What does that mean?

14   A.   Well, if I had the life tables in front of me, I would

15   tell you a little bit more about what it would potentially

16   mean.  To the extent that these scales are actuarial, what we

17   understand is that they are -- there are life tables associated

18   with them.  That means that there are probabilistic estimates

19   based on the prior experience of other individuals who fall

20   into the same bin or the same category.  Translated, if you

21   have a very large number of offenders, all of whom have a score

22   of 6 on this scale, and you followed them for some protracted

23   period, at least fifteen years, and you gather reoffense

24   information on these 6s, then you can offer an estimate based

25   on the experiences of those individuals in your reference

1    group; that if you observe that of all of your 6s,

2    hypothetically, 20 percent of them reoffend within five years,

3    30 percent of them reoffend within ten years, and 37 percent of

4    them reoffend within fifteen years, then you can offer that as

5    a probabilistic estimate of the way that your client might

6    respond if he is a member of that group because he also has a

7    6.

8            THE COURT:  Were you saying that for example, or those

9    are the statistics?

10           THE WITNESS:  No.  I intentionally said "example"

11   because I don't have the life tables in front of me.

12   Q.   Did you perform a probabilistic estimate for Mr. Wetmore?

13   And I can direct your attention to the bottom of Page 10 of

14   your report.

15   A.   I said that whereas the average base rates for offenders

16   with a score of 6 in the original reference groups were as

17   reported above, 45 percent over ten years, the base rates from

18   the new study, the more recent base rates for a score of 6

19   would be about 35 percent.

20           THE COURT:  So for Mr. Wetmore, there's a 35 percent

21   chance he'll reoffend, given his characteristics?  Is that --

22           THE WITNESS:  I wouldn't be so bold as to word it that

23   way, your Honor.  I would say, to be more cautious, that

24   Mr. Wetmore falls into a group of individuals who have a life

25   experience of roughly 35 percent sexual recidivism, roughly a

1  little over one-third of that group recidivating with another

2  sexual offense.

3        THE COURT:  What does the scale go up to?  What's the

4  highest score you can get?

5        THE WITNESS:  Fourteen, I believe?

6        THE COURT:  So he's midpoint?

7        THE WITNESS:  Well, he's a midpoint numerically, but

8  he's not at the midpoint statistically, meaning that there are

9  almost no individuals that have scores above a 7 or 8.  I don't

10  think that I've ever personally scored a Static-99 on an

11  individual with a score of 8 -- perhaps 8 but not a 9.  I have

12  never seen anyone with a score that high.

13  Q.   Is the statistical estimate of static risk, is that the

14  only thing you took into account when evaluating Mr. Wetmore?

15  A.   I didn't actually pay a great deal of attention to the

16  Static-99 in a case like this because, as the name of the scale

17  implies, it is static.  Static means that with the exception of

18  the age variable, all of the other variables are fixed, they

19  can't change.  The score that Mr. Wetmore receives today will

20  be the same score that he would have received years ago, with

21  the exception of the age variable; and in the old Static-99,

22  since the cutoff was twenty-five, he hasn't been twenty-five

23  for a long time, so whatever his score was would remain

24  essentially the same.

25  Q.   As a result of your evaluation of Mr. Wetmore, did you

1   determine to a reasonable degree of psychological certainty

2   whether he would have serious difficulty refraining from

3   sexually violent conduct or acts of child molestation if he

4   were released?

5   A.   Yes.

6   Q.   And what was your conclusion?

7   A.   I concluded, to a reasonable degree of professional and

8   medical certainty, that Mr. Wetmore would have serious

9   difficulty refraining from further acts, sexual acts involving

10  children.

11  Q.   And on what do you base that conclusion, Dr. Prentky?

12  A.   There are very clear risk factors in Mr. Wetmore's case

13  that I would like to delineate before I speak more specifically

14  to the issue of serious difficulty.  The first risk factor that

15  I want to comment upon is simply duration.  The duration of his

16  sexualized interest in children extends from roughly the age of

17  eleven, that he shared with me, to the present.  That is

18  roughly forty years, forty-plus years.

19      What has happened over the past four decades is an

20  extraordinary amount of reinforcement of his fantasies and his

21  urges via masturbation.  He has an unclear number of children

22  with whom he has been sexual.  He mentioned eleven to me.  That

23  is by his estimated count, but an even more unclear number of

24  sexual encounters with children.  All of those incidents, in

25  addition to the perhaps hundreds of times over the past forty

1    years that he's masturbated to images involving children, is

2    extraordinarily reinforcing, so duration is one risk factor for

3    me.

4         THE COURT:  When you say children, you mean this

5    eleven- to fifteen-year-old group?

6         THE WITNESS:  That's correct.

7         THE COURT:  A second risk factor for me is his very

8    high sexual drive.  Mr. Wetmore has spoken candidly about

9    masturbating to images of children or child pornography every

10   night.  He has said --

11        THE COURT:  Still?  Still?

12        THE WITNESS:  I'm sorry?

13        THE COURT:  Still as he got older as well?

14        THE WITNESS:  He reported that in his deposition.  I

15   have not seen Mr. Wetmore now for quite a while.  It's been

16   about a year and a half or so since I interviewed him.  I

17   really don't know what his frequency of masturbation is today.

18   I'm sure, I would imagine that it's certainly -- there's a

19   downward gradient -- that it has decayed somewhat, the

20   frequency.

21        THE COURT:  But at least as of a year and a half ago,

22   you're saying every day, every night?

23        THE WITNESS:  Well, that's what he reported when I saw

24   him, and that's what he reported in the deposition.  And to be

25   very specific here, the issue of every night was during the

1   time period that he was out on the street trying to contain

2   himself from reoffending when he was using those 2,000 images

3   of child pornography after he was released from prison.  He

4   would say that every day or every evening he would come home

5   and look at the pornography and masturbate.  He did not say

6   that he was masturbating every night, certainly during the time

7   that he's been at Devens.

8          He did say, again, both to me and in the context of

9   his deposition, he said, "Oh, yes, I do have a higher sexual

10  drive."  He recognizes that.  I don't think there's any

11  question about that.

12         A third risk factor, of course, is the fact that all

13  of his victims are male.  That is, again, a statistical risk

14  factor.  Most studies, not all, but most studies have suggested

15  that same-sex child molesters -- that is, child molesters with

16  same-sex victims -- have the highest reoffense rates; and

17  opposite-sex child molesters, those with girl victims, have the

18  lowest reoffense rates; and those with mixed-gender victims

19  fall somewhere in the middle.

20         And, finally, I would comment that there is remarkable

21  stability to his sexual preferences in boys of roughly the same

22  age and roughly the same kind of sexual acts, and that

23  stability has extended throughout most of his lifetime, and it

24  suggests to me, once again, that it is a real and genuine

25  sexual preference.

1  Q.   Dr. Prentky, going to Page 11 of your report where you lay

2  out seven considerations upon which you based your conclusion

3  that Mr. Wetmore was a sexually dangerous person under the Act,

4  you've testified to the act of reinforcement of sexual urges

5  and desires for young adolescent boys for close to forty years.

6  What are the other considerations that you based your

7  conclusion on?

8  A.   The analysis speaks directly to the question of serious

9  difficulty.  Serious difficulty is a problematic judgment,

10  since we are offered no guidance by the case law, statutory

11  guidance.  It's not defined or operationalized.

12      In my particular case, I came to this conclusion about

13  serious difficulty in the following way:  I observed that, to

14  begin with, point number one, that he spent roughly nine years

15  in prison.  Point number two, during the time that he was in

16  prison, he learns about the world of child pornography on the

17  Internet.  We spoke about that earlier.  He reported to me that

18  he felt that he had found a safe way to gratify his sexual

19  needs without committing another offense against a child.  He

20  said quite clearly that "I thought that this was a way I could

21  satisfy my urges without touching anyone."  He made a promise

22  to himself.  He said, "All I need is porn.  I can masturbate to

23  my heart's content, and I won't have to touch another child."

24  So he actually made sort of a contract with himself, a promise

25  that he would be able to go out and rely on pornography, and

1    thereby actually avoid committing another offense.

2       He's released to the community, and he follows through

3    with this plan.  He collects roughly 2,000 images of child

4    pornography, and he says that around this time he's

5    masturbating every night, according to his report.  So I

6    conclude that despite nine years of imprisonment, a promise to

7    himself not to reoffend, 2,000 images of child pornography on

8    his computer, and daily masturbation, he still is attracted to

9    teenage boys.  He still brings them into his shop, his garage,

10   which even in and of itself would be highly inappropriate for

11   any relapse plan; and, as we spoke about earlier, one of those

12   boys reported that there was a sexual act involving that boy.

13          MR. MILES:  Objection.  Move to strike that last

14   sentence.

15          THE COURT:  Overruled.  Is that the one he confirmed?

16          THE WITNESS:  Yes.

17          THE COURT:  That was while he was collecting the child

18   pornography?

19          THE WITNESS:  Yes, that's correct.

20          THE COURT:  Do you remember what year that was?

21          THE WITNESS:  That was '99, I believe.

22          THE COURT:  Do you remember?  You told me, and I'm

23   sorry, I'm getting confused.  What kind of touching was that?

24          THE WITNESS:  Oral sex.

25   Q.   And what was the third, Dr. Prentky, what was the third

1    consideration that you based your opinion that Mr. Wetmore

2    would have serious difficulty in refraining if released?

3    A.    Sorry, Counsel.  I was just looking for the date.

4              THE COURT:  What was his age?

5              MS. PIEMONTE-STACEY:  Your Honor, this is the one

6    that's in as Government Exhibit 3.  It's the 2000 conviction.

7              THE COURT:  But the conviction is for the pornography.

8    It doesn't have the age of the victim, right?

9              MS. PIEMONTE-STACEY:  Dr. Prentky testified to that

10   earlier, if you'll just give me one moment.

11             THE COURT:  Is that the fifteen-year-old, Ryan?

12             THE WITNESS:  Yes, your Honor.

13             THE COURT:  Okay.  Are you done?

14             THE WITNESS:  It was sometime in 1999 because the

15   police confiscated his computer on October 23 of 1999.

16   Q.    It's the fifteen-year-old boy you named, Ryan; is that

17   right?

18   A.    That's right, Ryan Fox.

19             THE COURT:  Why don't we strike that out of this

20   record and just call him Ryan.

21   Q.    Going back to your conclusion that Mr. Wetmore would have

22   serious difficulty managing his hebephilic urges, what was the

23   third consideration that you stated in your expert report?

24             THE COURT:  How many considerations do we have?

25             MS. PIEMONTE-STACEY:  Seven.

1          THE COURT:  Then are you done?

2          MS. PIEMONTE-STACEY:  Yes.

3          THE COURT:  All right.  So we'll try and get through

4     the seven by 1:00 o'clock, if we could.

5     A.   I indicated that Mr. Wetmore had reported to me that

6     during the four years that he was in the community, from 1995

7     to 1999, he had to, quote, "look the other way to override the

8     natural urges to act out," and he leaned, again his word,

9     "leaned on the Internet" and masturbated on average twice a day

10    to pornography of gay and child images to keep from

11    reoffending.

12    Q.   And, Dr. Prentky, what was the fourth consideration that

13    you based your conclusion on?

14    A.   As recently as September 11, 2008, numerous pictures of

15    small boys scantily clothed in sexually provocative positions

16    were confiscated from his cell.  According to the incident

17    report, some of the boys had, quote, "makeshift penises

18    attached near their genitals which appear to be pornographic in

19    nature."  If the pictures removed from his cell were in fact

20    his -- and I'm aware that he maintains that they were planted,

21    they did not belong to him -- they would reflect not only poor

22    judgment but the intensity of his urges.

23    Q.   And what was the fifth consideration upon which you based

24    your conclusion?

25    A.   Despite obviously strong libidinal urges, a high sexual

1   drive, and a high total sexual outlet, he has never been placed

2   on appropriate antiandrogen medication.

3   Q.   What was the sixth consideration, Dr. Prentky?

4   A.   His exposure to sex-offender-specific treatment is minimal

5   and unlikely to mitigate risk.  The treatment that he has had

6   never included behavior therapy, which is to say aversion or

7   covert sensitization.  That would have been recommended to

8   diminish his deviant arousal.

9   Q.   And what was the last consideration that you used in

10  coming to your conclusion?

11  A.   Although age clearly is a risk-mitigating factor for most

12  criminals, including rapists, the evidence is less conclusive

13  for extrafamilial child molesters.  Mr. Wetmore turned

14  fifty-three this past March.  With Mr. Wetmore's lengthy

15  offense history, I'm not inclined to believe that his age alone

16  at this point is a significant mitigating factor.

17          THE COURT:  Now, what's an antiandrogen?

18          THE WITNESS:  An antiandrogen is a medication that

19  lowers the level of serum testosterone.  It is either

20  progesterone, as in the case of Depo-Provera, which is

21  medroxyprogesterone, or it is Lupron, a different type of drug,

22  which is a gonad atropine releasing hormone agonist.  Both of

23  these medications are intended to lower the level of

24  testosterone in the bloodstream, thereby diminishing sexual

25  drive, sexual urges, sexual appetite, in Dr. Berlin's words.

1    The medications can be quite helpful, quite a significant

2    adjunct to talk therapy, and, in my estimation, they should

3    have been a critical part of Mr. Wetmore's treatment going way

4    back, certainly back to Butner or before then.

5            THE COURT:  And is that commonly known as chemical

6    castration, or is that something else?

7            THE WITNESS:  It's a lay terminology for the same

8    thing, yes, that's correct.

9            THE COURT:  And would that likely work with

10   Mr. Wetmore?

11           THE WITNESS:  It's hard to know, but I would suspect

12   that it would dramatically reduce his sexual urges.  Lupron is

13   particularly effective in driving testosterone down to castrate

14   level, so it is a drug that can essentially create what amounts

15   to castration but is nothing more than a drug, so it's easily

16   reversible.  The down --

17           THE COURT:  I know I'm jumping, I'm beyond liability

18   into the next phase, but if I found he was sexually dangerous,

19   would the Lupron itself be enough, or do you need to do that in

20   conjunction with behavioral therapy?

21           THE WITNESS:  Your Honor, if I were asked to design an

22   appropriate management program for Mr. Wetmore's release, I

23   would have wanted him to be in a safe living environment.  I

24   would have wanted him to be on medication followed by a

25   psychiatrist who was familiar with scripting an antiandrogen.

1  Not all psychiatrists are.  I would want him to be followed

2  both in therapy and some kind of surveillance in the form of

3  probation, which I believe he still has six years probation.

4  I'm not certain.  To answer the question specifically about

5  therapy, I believe that therapy can be very useful when the

6  provider is someone that is highly skilled and seasoned in

7  treating sex offenders.

8       THE COURT:  In my lay terms, I guess what I'm asking

9  is, if I were to release him tomorrow but require him to take

10  Lupron, would he be safe?

11      MR. MILES:  If I may object to that question, your

12  Honor --

13      THE COURT:  Thank you.

14      MR. MILES:  -- as an incomplete hypothetical.

15      THE COURT:  It may be.  I'm sure he'll tell me about

16  it, or you will.

17      THE WITNESS:  Well, obviously my answer is to a

18  hypothetical.  If all that Mr. Wetmore had was an order for

19  medication --

20      THE COURT:  And the supervision to make sure he took

21  it.

22      THE WITNESS:  Then I was about to say compliance

23  becomes an issue, so there would have to be supervision to

24  insure that he actually took the medication, and at the very,

25  very least, I would want to insure that where he was living was

1    safe, that he was not living alone by himself, that obviously

2    he was not living in a place that exposed him to the lure of

3    society with respect to availability of sexual stimuli.  What

4    am I saying?  There are innumerable ways when one has full

5    liberty out in society of availing themselves of sexual-

6    gratifying imagery.  And that's something that I think that the

7    focus of therapy would be on.  So it doesn't necessarily have

8    to be a therapist, but if it is to be a probation officer, then

9    I would want it to be a probation officer that was trained to

10   follow and supervise and manage sex offenders; and there are

11   many, many states now that do have special units of probation

12   officers that are trained.

13        THE COURT:  I know you've worked extensively with

14   states in the thousand cases.  We're new at this in the federal

15   government.  So do you know whether the Bureau of Prisons has

16   worked with these chemical castration approaches?

17        THE WITNESS:  Again, I have very, very little

18   familiarity with what the Bureau of Prisons is doing, but I

19   would guess that just as these cases are relatively unfamiliar

20   to the Federal Court, they are relatively unfamiliar to the

21   Bureau of Prisons as well.  And although I simply don't know

22   how frequently antiandrogens are prescribed within the Federal

23   Bureau of Prisons, I would hazard a guess that it's relatively

24   unusual.  Particularly since the men are in prison, there

25   wouldn't be a perception that it was critical to keep someone

1    on medication like this while they're in prison.

2           THE COURT:  Has it become the standard of care in the

3    state systems?

4           THE WITNESS:  No, I don't believe so.

5           THE COURT:  Why?

6           THE WITNESS:  By the state system, you mean the state

7    prison system?

8           THE COURT:  Well, as I understand it, over half of the

9    states right now have sex offender commitments, so has it

10   become a standard of care in these states as to how to treat

11   people who are sex offenders?

12          THE WITNESS:  It is a standard of care when sex

13   offenders have been discharged to the community.  It's not at

14   all unusual when sex offenders have returned to the community

15   that they are put in therapy and they are recommended for a

16   psychiatric evaluation.  I do not have the experience

17   personally of hearing about sex offenders who are still in

18   prison in the state system receiving Depo-Provera.  I recall

19   one sex offender that comes to mind in the Massachusetts state

20   system who had been on Depo-Provera when he was in the

21   community, but I don't recall offhand any sex offenders that

22   were within the system that were taking Depo-Provera.

23          THE COURT:  So they don't try it out first while

24   they're civilly committed, and then, if it works, release them?

25          THE WITNESS:  No, not typically, no.

1      THE COURT:  Anything else here as part of direct?

2      MS. PIEMONTE-STACEY:  Just two follow-ups.

3  Q.   What's your understanding of Mr. Wetmore's release plan?

4  A.   My understanding at this point -- and, Counsel, as I

5  indicated, I have not seen Mr. Wetmore for quite a while -- but

6  based on my last exposure to Mr. Wetmore, he said that he was

7  planning to live in Portland, Maine.  I asked him, I said, "If

8  you are released from prison, where do you intend to reside?"

9  He said "Portland, Maine."  I said, "Will you be alone?"  He

10  said, "As far as I know, yes, I plan to be alone.  I'll be in

11  Portland alone."

12      He expected that he would be able to find a halfway house

13  that accepted sex offenders.  There was also some dialogue

14  around Dr. Saleh and an unnamed psychologist.  He had no idea,

15  at least at that time, who the psychologist was that would be

16  treating him.  He had no idea where he would be other than some

17  vague notion that there were boarding houses or halfway houses

18  in the Portland area that did accept sex offenders.  There were

19  no specifics; there were no arrangements.

20      He mentioned treatment by Dr. Saleh, but again was

21  reluctant to discuss what that treatment would be with me.  He

22  referred to "because of the unique aspects of my case."  I

23  didn't understand then, I don't understand now, what that was

24  about.  Overall, what I just shared with you is not a release

25  plan.

1  Q.   Last question, Dr. Prentky:  Based on your review of the

2  evidence, and I'm referring to the conclusion of your report,

3  can you conclude to a reasonable degree of professional and

4  scientific certainty whether Mr. Wetmore meets the legal

5  standard to be considered a sexually dangerous person?

6           MR. MILES:  Objection.

7           THE COURT:  Overruled.

8  A.   To repeat what I believe I said earlier, based on my

9  review of the evidence, I concluded to a reasonable degree of

10  professional and scientific certainty that Mr. Wetmore met the

11  legal standard to be considered a sexually dangerous person.

12           MS. PIEMONTE-STACEY:  Thank you, Dr. Prentky.  Nothing

13  further.

14           THE COURT:  Thank you.  So we will get going tomorrow

15  morning at 9:00 o'clock.  What time is your flight?

16           MS. PIEMONTE-STACEY:  3:45 today.

17           THE COURT:  Oh, you didn't tell me that.

18           MS. PIEMONTE-STACEY:  We're changing, we're changing

19  his plans.

20           THE COURT:  It essentially took the entire morning, so

21  how long do you have with him, you think, tomorrow?

22           MR. MILES:  As I indicated, your Honor, I would expect

23  approximately two to two and a half hours.

24           THE COURT:  So if he made a flight around noon, or I

25  guess it would have to be 1:00 o'clock to get you to the

fe6c7078-588f-4707-8d93-25f85cda7c96

1   airport.

2         THE WITNESS:  I'm sorry, your Honor.  You mean going

3   back to New Jersey tonight and then coming back?

4         THE COURT:  No, no.  Stay here.  Is that a problem?

5   Because there's no way --

6         THE WITNESS:  I'm sorry?

7         THE COURT:  I think he's going to need two to two and

8   a half hours, so we think it's going to take most of tomorrow

9   morning, but you'll be done and be on a plane.  Is it possible

10  for you to -- you're going to put him up tonight, right?

11        MS. PIEMONTE-STACEY:  Absolutely, your Honor.

12        THE COURT:  Yes, so, I mean, I assume, right?

13        MS. ROLLINS:  Not at my house.

14        THE COURT:  Had you told Dr. Prentky that that was a

15  chance that it could go over?

16        MS. PIEMONTE-STACEY:  Yes, your Honor.  We had

17  originally booked two nights, but it was Wednesday and Thursday

18  as opposed to Thursday and Friday.

19        THE COURT:  Well, that's what I'm asking.  Is there a

20  personal problem with that?  We could break here and then bring

21  you back, or would you rather get it over with tomorrow?

22        THE WITNESS:  Not insurmountable, your Honor.  I mean,

23  I'm very, very, very busy, but it's not insurmountable.

24        THE COURT:  Okay, see you tomorrow morning.  Thank

25  you.

1           MR. MILES:  May I, your Honor?

2           THE COURT:  Yes.

3           MR. MILES:  May I advise my witnesses from Maine not

4    to come down tomorrow?

5           THE COURT:  I leave this up to all of you.  I'd like

6    to use the time because I've got it set aside, but I don't want

7    to make anyone come down here for nothing.

8           MR. MILES:  Right, that's my fear.

9           THE COURT:  So I leave it up to all of you to schedule

10   just so that we use the time.

11          MR. MILES:  Okay, then if I may, your Honor, I will

12   inform the Court that I will excuse them tomorrow.  One of them

13   is an elderly woman.

14          THE COURT:  Okay, absolutely.

15          MR. MILES:  Thank you very much.

16          THE COURT:  All right.  Thank you.

17          (Adjourned, 1:05 p.m.)

18

19

20

21

22

23

24

25              C E R T I F I C A T E

Page 112

1

2

UNITED STATES DISTRICT COURT )
3   DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON                )

4

5

6          I, Lee A. Marzilli, Official Federal Court Reporter,

7   do hereby certify that the foregoing transcript, Pages 1

8   through 111 inclusive, was recorded by me stenographically at

9   the time and place aforesaid in Civil Action No. 07-12058-PBS,

10   United States of America v. Joel Wetmore, and thereafter by me

11   reduced to typewriting and is a true and accurate record of the

12   proceedings.

13      In witness whereof I have hereunto set my hand this 18th

14   day of August, 2010.

15

16

17

18

19          /s/ Lee A. Marzilli
                    _____
20          LEE A. MARZILLI, CRR
            OFFICIAL COURT REPORTER
21

22

23

24

25