2-1

```
             IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,        )
                                 )
              Petitioner         )
                                 )
        -VS-                     ) Civil No. 07-12058
                                 ) Pages 2-1 - 2-201
JOEL WETMORE,                    )
                                 )
              Respondent          )


              BENCH TRIAL - DAY TWO


      BEFORE THE HONORABLE PATTI B. SARIS
         UNITED STATES DISTRICT JUDGE
```

```
                    United States District Court
                    1 Courthouse Way, Courtroom 19
                    Boston, Massachusetts
                    July 23, 2010, 9:17 a.m.
```

```
              LEE A. MARZILLI
          OFFICIAL COURT REPORTER
        United States District Court
       1 Courthouse Way, Room 7200
          Boston, MA  02210
             (617)345-6787
```

cbf41b26-66b6-457b-880e-c778035e1b52

Page 2

1    A P P E A R A N C E S:

2        EVE A. PIEMONTE-STACEY, ESQ. and RACHAEL S. ROLLINS, ESQ.,
     Assistant United States Attorneys, Office of the United States
3    Attorney, 1 Courthouse Way, Boston, Massachusetts, 02210, for
     the Petitioner.

4
         HARRY L. MILES, ESQ., Green, Miles, Lipton, White &
5    Fitz-Gibbon, 77 Pleasant Street, Northamptom, Massachusetts,
     01061-0210, for the Respondent.

6
     ALSO PRESENT:  Ian Gold, Esq., Federal Defender Office.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1                              I N D E X

2

   WITNESS                    DIRECT    CROSS    REDIRECT    RECROSS
3

4  ROBERT PRENTKY
      By Mr. Miles:                     2-4       2-67       2-69
5                                                 2-70
   DANIEL P. KELLY
6     By Mr. Miles:           2-72
      By Ms. Piemonte-Stacey:           2-76
7
   THOMAS J. RUSSELL
8     By Ms. Piemonte-Stacey:  2-77
      By Mr. Miles:                     2-91
9
   CHERYL A. RENAUD
10    By Ms. Rollins:          2-94
      By Mr. Miles:                     2-115
11    By Ms. Rollins:                             2-116
      By Mr. Miles:                                          2-118
12
   CARLOS QUILES
13    By Mr. Miles:            2-120
      By Ms. Piemonte-Stacey:           2-140
14
   AMY PHENIX
15    By Ms. Rollin:           2-144

16 JOHN RANKIN
      By Mr. Miles:            2-152
17    By Ms. Rollins:                   2-160
      By Mr. Miles:                               2-172
18
   AMY PHENIX (Continued)
19    By Ms. Rollins:          2-177

20
   EXHIBITS                         PAGE
21
   Government
22
   5                              2-86
23 6                              2-114
   7, 8                           2-144
24 9 for ID                       2-177

25

1                    P R O C E E D I N G S

2          THE COURT:  Good morning.  Sorry for the delay, but my

3    computer crashed yesterday, but I think it's now all fixed so

4    we can keep going.  Okay, cross-examination?

5          MR. MILES:  Your Honor, if I may question from here so

6    that I can --

7          THE COURT:  Absolutely.  And I notice that Mr. Wetmore

8    is in his civilian clothes, so thank you to the Marshals

9    Service.  Thank you.

10                    ROBERT ALLEN PRENTKY

11   having been first previously duly sworn, was examined and

12   testified further as follows:

13   CROSS-EXAMINATION BY MR. MILES:

14   Q.   Good morning, Dr. Prentky.

15   A.   Good morning.

16   Q.   Dr. Prentky, if I may ask you some preliminary questions

17   first about diagnostic methodology.  Can we focus on that?

18   First of all, you are aware of the Diagnostic and Statistical

19   Manual Fourth Edition TR?

20   A.   Yes.

21   Q.   Can you explain to the Court what that book is.

22   A.   It's a compendium of classification of mental disorders

23   adopted by the American Psychiatric Association.  It is both a

24   clinical as well as an empirical instrument, in that the

25   members of the psychiatric and psychological community

Page 5

1    contribute to the empirical research that updates the criteria

2    that are used for assigning individuals to the various

3    categories within the DSM, and it is the principal reference

4    point that is used for classification of mental disorders in

5    the United States.

6    Q.   What was the reason for the publication or creation of the

7    compendium?

8    A.   Are you asking, what is the reason for classification?

9    Q.   No.  Why is there a book that contains a compilation of

10   the diagnostic terms and codes that are used generally by

11   psychologists and psychiatrists?

12   A.   I suppose the reason for the book is that it's a reference

13   manual.

14   Q.   And what is the need for a reference manual of that type?

15   A.   It provides standardization.  I'm not sure what it is that

16   you're asking.

17   Q.   That's exactly what I was asking.  And why is it important

18   for the art or science of psychology and psychiatry to have

19   standardization in its diagnostic terms?

20   A.   It speaks directly to the question of reliability.

21   Q.   How does it speak directly to the question of reliability?

22   A.   If we as practitioners or users of this manual take it

23   upon ourselves to make assignments based on our whim, based on

24   our own personal predilection about who we think should or

25   shouldn't fall into a particular category, then there will be

1    virtually no agreement among us, the result of which, of

2    course, is that the resulting assignments to that category

3    become meaningless, since those individuals that are put into

4    that category will not look alike.

5    Q.    Does this failure to have persons put into a particular

6    category not looking alike have consequences in terms of

7    psychological diagnosis and treatment for the patient?

8    A.    Of course.

9    Q.    What are those?

10   A.    The assumption is that if you classify someone as, for

11   instance, a pedophile, that all the constituent members of that

12   group called "pedophiles" will be homogeneous with respect to

13   the various attributes that you assign to that group, such as

14   etiology, some understanding of where the behavior derives

15   from.  The nature of the offending behavior is expected to look

16   alike.  Perhaps the nature of the outcome, which is to say the

17   risk posed by those individuals, would be expected to look

18   alike.  The commonly understood ways of treating the members of

19   that group would be similar.

20   Q.    Were you involved in the actual creation of any of the

21   iterations of the Diagnostic and Statistical Manual?

22   A.    No, I was not.

23   Q.    And how many iterations have there been?

24   A.    We are on what is referred to as IV Revised, and we are in

25   the process of developing DSM-V, so V, of course, would be the

1    fourth iteration but the fifth volume.

2    Q.    Is V expected to come out sometime in 2013?

3    A.    2012, 2013.  That was my reading of it.

4    Q.    And over what period of time have these iterations

5    occurred from I to IV?

6    A.    IV was the year 2000.  A fairly lengthy period of time.

7    Q.    Would it be fair to say that the iterations started

8    sometime in the '70s?

9    A.    It depends whether you're talking about the DSM-I or II.

10   I believe DSM-I goes back earlier than that, perhaps to the

11   late '50s.

12   Q.    So, in any event, we've got somewhere around fifty to

13   sixty years of compendia; is that accurate?

14   A.    Correct.

15   Q.    And the purpose of these compendia is to standardize the

16   terminology used in your art or science of psychology; is that

17   correct?

18   A.    Correct.

19   Q.    In the series of compendia from DSM-I through DSM-IV-TR --

20   I'm sorry, let me go back.  DSM-IV-TR stands for a text

21   revision of the Fourth Edition of the DSM?

22   A.    Yes.

23   Q.    From DSM-I through DSM-IV-TR, has the term "hebephilia"

24   ever been included in the compendium?

25   A.    No.

Page 8

1   Q.   Is there some discussion now in psychiatric and

2   psychological circles about including the term "hebephilia" in

3   the next compendium?

4   A.   I believe I mentioned yesterday that the suggestion would

5   not be to include hebephilia as a standalone paraphilia, but to

6   combine it with pedophilia into this hybrid category referred

7   to as pedohebephilia.

8   Q.   I understand what your testimony was yesterday, Doctor,

9   but let me ask it this way:  Is there discussion in the

10  community of psychologists about, number one, should hebephilia

11  be included as a term at all, whether combined or not combined

12  with some other diagnosis?

13  A.   I'm sure among some individuals there's discussion about

14  whether hebephilia should be introduced as a separate category,

15  if that's what you're asking me.

16  Q.   Yes.  In other words, there are some people who oppose its

17  inclusion in the DSM-V; is that correct?

18  A.   Yes, of course.

19  Q.   And with respect to those individuals, is one of them

20  Dr. Karen Franklin?

21  A.   I'm trying to recall offhand the last thing that I read

22  from Dr. Franklin.  I can't speak authoritatively about

23  Dr. Franklin's writings.  I haven't read anything by her

24  recently.

25  Q.   Did you read an article published by her in the

1   Behavioral Sciences and the Law Journal in 2010 entitled,

2   research article, "Hebephilia:  Quintessence of Diagnostic

3   Pretextuality"?

4   A.   No.  No, I did not see that.

5   Q.   Do you read the Archives of Sexual Behavior?

6   A.   Yes, I do.

7   Q.   Are you familiar with an article by Karen Franklin

8   entitled "The Public Policy Implications of Hebephilia:  A

9   Response to Blanchard, et al"?

10  A.   Yes.

11  Q.   And are you aware that Dr. Franklin opposes the inclusion

12  of the diagnostic category of hebephilia in the DSM−V?

13  A.   As I indicated, she's only one of a number of individuals

14  that for a variety of reasons oppose the inclusion of this

15  term.

16  Q.   Were you aware of --

17          THE COURT:  Because?

18          MR. MILES:  I'm sorry, your Honor, I didn't hear you.

19          THE COURT:  Because why?

20          THE WITNESS:  Principally because there is ambiguity

21  around the either normalization of the sexual attraction to an

22  adolescent or whether it should be seen as a true disorder.  In

23  a sense, the problem is where you draw the line in adolescence:

24  When is it a disorder, and when is it simply normal sexual

25  attraction?  And that ambiguity causes considerable concern

Page 10

1   among some scholars who believe that it will lead to the

2   criminalization of normal behavior.

3        THE COURT:  So would you describe it right now as a

4   lot of reasonable disagreement in your field about whether it

5   constitutes a defect or not?

6        THE WITNESS:  Yes, your Honor.  There is disagreement,

7   but, frankly, in the field of sexual abuse and sexual violence,

8   I think it's fair to say that there is consistently a high

9   level of discourse and debate and disagreement about matters

10  both of research and policy.  And that would be expected, I

11  suppose, and I don't regard the discussions around this issue

12  of hebephilia as anything more or less than that.

13       THE COURT:  Would Dr. Franklin agree with your earlier

14  statement that consistent sexual attraction to young

15  adolescents by older people, let's say in their forties and

16  fifties, is aberrant?

17       THE WITNESS:  I believe that she would want to know

18  more concretely where we were drawing the line.  And I would

19  offer, your Honor, the observation from everything that I've

20  read that the line should probably be drawn at the age of

21  fourteen.  That's everything that I can bring to bear at the

22  moment in terms of what I have read; that most scholars,

23  including Ray Blanchard who I referred to yesterday, would

24  probably draw this imaginary developmental line in the sand

25  around age fourteen.  And that attraction to mid to late

Page 11

1  teenagers, age fifteen, sixteen, up to eighteen, nineteen,

2  would generally be regarded as normative and not to be labeled

3  as a disorder.

4          THE COURT:  Thank you.

5          MR. MILES:  Thank you, your Honor.

6  Q.   Pursuing that line of inquiry just a little bit further,

7  Doctor, were you aware of a response to Dr. Blanchard's article

8  by Thomas K. Zander published in 2009 in the Archives of Sexual

9  Behavior entitled "Adult Sexual Attraction to Early-Age

10  Adolescents - Phallometry Doesn't Equal Pathology"?

11  A.   Yes, I'm aware of Tom's paper.

12  Q.   And you refer to him as Tom, so I gather you have some

13  social relationship with him?

14  A.   No, Counsel.  I certainly know Dr. Zander.

15          THE COURT:  You know, you all are referencing all

16  these articles.  Are you both going to submit them, Blanchard

17  and Franklin?

18          MR. MILES:  I had not intended to, your Honor.

19          MS. PIEMONTE-STACEY:  I had not intended to either

20  under the learned treatise doctrine, or basically points are

21  read in as opposed to the article being submitted.  I mean, to

22  the extent that --

23          THE COURT:  It's just a little hard for me to catch on

24  the fly, you know.  I don't know.  I've never read them.  I

25  don't see them.

1          MS. PIEMONTE-STACEY:  I think the issue, your Honor,

2     is, for every one article that says one thing, there's another

3     article that says something else, and you may be receiving a

4     volume of them as we reference them.  I'm happy to submit them

5     if the Court wants it.

6          THE COURT:  I leave it up to you all.  It's just I

7     don't have them, and I imagine this is going to be a point of

8     controversy.

9          MR. MILES:  If I may, your Honor, take a couple of

10    seconds to perhaps explain my reasoning and then see where we

11    all go with it.  My intention is simply to show the Court that

12    there is a division in the scientific community about a

13    particular diagnostic category.  If the Court is interested in

14    the substance of the disagreement, I would be more than happy

15    to stipulate with Attorney Piemonte-Stacey with respect to the

16    articles to be submitted so that we don't overwhelm the Court.

17    But they would be submitted as an example, and essentially what

18    I'm trying to do now is create a summary of voluminous

19    evidence.

20         THE COURT:  Well, maybe we'll decide.  We're not going

21    to be finishing today anyway.

22         MR. MILES:  Yes, that's correct, your Honor.

23         THE COURT:  Okay.

24    Q.   Let me get back to Dr. Zander's response to Dr. Blanchard.

25    What is phallometric?

Page 13

1   A.    Is that the end of your question?

2   Q.    Yes, what is phallometric?

3   A.    What does the word "phallometric" mean?

4   Q.    Yes.

5   A.    Phallometric is a psychophysiological procedure for

6   assessing sexual preference.  There are a variety of different

7   ways of doing it.  The standard procedure in the United States

8   is to employ a transducer, which looks like a rubber band, and

9   it's placed around the penis, and it monitors sexual arousal in

10  response to stimuli.

11  Q.    So if I interpret Dr. Zander's title, he's saying adult

12  sexual attraction to early stage adolescents, phallometry --

13  that is, measured sexual arousal -- to early stage adolescents

14  does not equal pathology.  Is that a fair translation?

15  A.    That's correct.

16  Q.    And while we're on the topic, when you talk about using a

17  transducer to measure arousal, are we talking about an

18  instrument known as a penile plethysmograph?

19  A.    That's correct.

20  Q.    And is that a standard testing methodology available in

21  your art or science to determine arousal to particular stimuli?

22  A.    Yes.

23  Q.    Are the particular stimuli to which arousal is determined

24  generally pictures of various types of erotic -- of an erotic

25  nature?

Page 14

1   A.    No.

2   Q.    What are the stimuli?

3   A.    They tend more to be auditory.

4   Q.    And when you say "auditory," what do you mean?

5   A.    A three-minute vignette describing a sexual encounter that

6   the individual is exposed to via headphones.

7   Q.    And then how are these stimuli organized so that one can

8   determine a result?

9   A.    They're intended to be organized at random.  I don't know

10  how everyone does it.  When I used to administer the PPG, I

11  would organize these vignettes randomly.  Are you asking me

12  procedurally --

13  Q.    Let me ask the next question.  What do these vignettes

14  focus on?

15  A.    The vignettes ask the individual to imagine himself being

16  part of a particular explicitly described sexual encounter.

17  The ages are inferred; they're not stated.  When the target is

18  an adult, it's fairly clear that the individual that you're to

19  be sexual with in your imagination is an adult.  When the

20  target is a child, the language is something along the lines of

21  "a child of the age that you like best."

22  Q.    And the purpose of subjecting appear individual to these

23  vignettes and measuring their reaction is what, Doctor?

24  A.    The theory being that whatever you are sufficiently

25  sexually aroused to, defined as a minimum of 25 percent

cbf41b26-66b6-457b-880e-c778035e1b52

Page 15

1    erection or greater, will determine what it is that you find

2    erotic.

3    Q.    So if I can sum up what you've been saying, there is a

4    method in your art or science to objectively measure an

5    individual's arousal to sex objects of different ages?  Is that

6    accurate?

7    A.    It's one of the two procedures that is commonly employed.

8    Q.    What is the other procedure?

9    A.    Visual reaction time.

10   Q.    To pictures?

11   A.    Correct.

12   Q.    And how is that administered?

13   A.    It is not invasive, in that the individual simply sits at

14   a computer and watches 160 images and is asked to rate each of

15   those images with respect to how sexually appealing that

16   individual is.  All individuals are clothed.  There's no

17   nudity.  The models range in age from very, very, very young

18   children to adults.  Half are Caucasian models and half are

19   African-American models.  What the computer is in fact doing is

20   measuring the amount of time that the individual spends looking

21   at the model.  So from depression of return button to

22   depression of return button, we have a fairly accurate

23   estimation of how long the individual spent looking at that

24   model, visual reaction time.

25   Q.    What inferences can you draw in the art or science of

1   psychology based upon your knowledge of the individual's

2   reaction time?

3   A.   The reasonable conclusion, that we are much more likely to

4   spend more time looking at those individuals that we find

5   attractive than those individuals that we have no particular

6   attraction to at all.

7   Q.   And from that, does the administrator of the examination

8   infer any diagnosis?

9   A.   There is not a direct diagnosis from the Abel Assessment.

10  That would be inappropriate.  The Abel Assessment, like the

11  PPG, is simply one part of a comprehensive examination.

12  Q.   So to get concrete about it, if the visual return time is

13  lengthy and the person is looking at a very young child, that

14  would be a piece in a diagnosis of potential pedophilia?

15  A.   Correct.

16  Q.   Potential diagnosis of pedophilia?

17  A.   Yes.

18  Q.   And, similarly, if the individual were administered a PPG

19  and given an oral vignette of sex involving an obviously very

20  young child, that would also be or could be a piece in a

21  potential diagnosis of pedophilia; is that correct?

22  A.   Correct.

23  Q.   Have these instruments been validated with respect to

24  determining whether an individual suffers from hebephilia?

25  A.   That's a complex question, Counsel.

cbf41b26-66b6-457b-880e-c778035e1b52

Page 17

1  Q.   I understand, but if you could help us out, I'd appreciate

2  it.

3  A.   With regard to the Abel Assessment, the instructions are

4  fairly clear that the models referred to as adolescent are all

5  in the age range of mid to late adolescence.

6  Q.   Which would be what, please?

7  A.   I believe it is from fifteen to eighteen.  We are

8  instructed not to interpret that as anything other than normal

9  when it is coincident with an equivalent attraction to the

10 adult models.  In other words, the message is that if someone

11 is attracted to an adult, it would not be unusual to find that

12 they're also attracted to physically developed younger men or

13 women in the age range of fifteen to eighteen.

14      However, interpretation becomes more ambiguous when we

15 find that an individual appears to have an attraction to mid to

16 late adolescents as well as children.  I can simply share with

17 you that in my personal experience of administering the Abel

18 Assessment, I don't recall ever seeing that.  I often see

19 individuals being attracted both to adults and to mid to late

20 adolescents.  It's very rare.  In fact, I don't recall an

21 instance where I've seen an individual attracted to mid to late

22 adolescents and to children.

23 Q.   Does the Abel Assessment contain stimuli in the age range

24 of eleven to fourteen?

25 A.   Yes.

Page 18

1   Q.   And are they considered adolescents, or are they

2   considered children?

3   A.   Children.

4   Q.   Are they chosen for lack of secondary sex characteristics

5   or not?

6   A.   Let me qualify.  When I say the Abel doesn't use the word

7   "child," there are discrete categories.  When I answered you, I

8   was referring to the guidelines offered about what would be

9   regarded as normal, and attraction to models in that age range

10  would not, according to the Abel, be regarded as normal.

11  Q.   And what I asked you is, do the vignettes include

12  explicitly subjects between the ages of eleven and fourteen?

13  A.   These are not vignettes.  You mean images.

14  Q.   I'm sorry, the images, yes.

15          THE COURT:  So could we start again.  What's the

16  question?

17          MR. MILES:  Yes, I'm sorry, your Honor.

18  Q.   Do the images administered as part of the Abel Assessment

19  include images of individuals between the ages of eleven to

20  fourteen?

21  A.   Yes.

22  Q.   And are those included with individuals who are younger,

23  or are they a discrete group?

24  A.   All of the images -- and, as I indicated, there are, I

25  believe, 160 images -- are randomly presented.

Page 19

1  Q.   Now, we've been talking about ages, but is it accurate to

2  say that a real interest is in determining what characteristics

3  the stimuli the subjects have when the person being tested is

4  aroused to them?

5  A.   In other words, whether they're physically developed?

6  Q.   Yes.

7  A.   That would be a reasonable assumption.

8  Q.   So, in other words, there could be very well-developed

9  eleven-year-olds and poorly developed fifteen-year-olds?  Is

10 that fair?

11 A.   In the real world, that is certainly possible.  In the

12 case of the Abel, of course, that individual would be

13 sufficiently ambiguous that that individual would never be used

14 as an example.

15 Q.   Okay, all right.  So there is some selection in terms of

16 the imagery used in the Abel to make sure that physical

17 characteristics --

18 A.   Are consistent --

19 Q.   -- are consistent?

20 A.   -- with the developmental stage that would be attributed

21 to the age of that individual.

22 Q.   Now, with respect to Mr. Wetmore, are you aware through

23 your reading of the records and your interview with Mr. Wetmore

24 whether he was ever administered a PPG?

25 A.   I don't recall offhand seeing a PPG.  He may have been.  I

1   don't recall.

2   Q.   As far as you're aware right now today under oath, he was

3   not administered a PPG?

4   A.   I didn't say not.  I said that I don't recall offhand

5   without taking recourse to going back and looking at the

6   voluminous records whether he was.

7   Q.   In other words, if there were a PPG, you didn't regard it

8   as so significant that you remember it; is that correct?

9   A.   It certainly would have been significant had I seen it.

10  I'm saying, again, I don't recall seeing a PPG.  So had it been

11  administered, I'm sure that I would have paid attention to it,

12  in particular if the record had been provided.  What we often

13  see in the records is simply a notation in a report about a

14  PPG, and that, to me, is relatively uninformative.

15  Q.   Do you recall whether you did anything to determine if

16  there were records of any PPG examination administered to

17  Mr. Wetmore?

18  A.   I'm not sure what you're asking me.

19  Q.   Did you ask anybody who treated him, who had control of

20  his records or custody of him, whether a PPG had been

21  administered to him?

22  A.   I did not, Counsel.

23  Q.   With respect to the Abel Assessment, did you administer an

24  Abel Assessment to Mr. Wetmore?

25  A.   I did not, and there are reasons for both.

Page 21

1  Q.   I understand, and although I think it violates the first

2  rule of cross-examination, I'll ask you to explain to the Court

3  what those reasons were.

4            THE COURT:  Never ask the "why" question.

5            MR. MILES:  Absolutely, your Honor.  I confess.

6            THE COURT:  But I would have, so fair enough.

7  Q.   So if you could explain to the Court your reason for not

8  administering either the Abel or the PPG.

9  A.   I only -- well, first of all, I can't administer the PPG

10 in a prison, so I could have administered the Abel.  I only use

11 the Abel Assessment when in my estimation there is a high level

12 of ambiguity with respect to the sexual preference of the

13 individual, whether, for instance, the individual has had a

14 number of successful stable relationships with adults but has

15 also violated a child or two.  In those instances where the

16 sexual preference appears to me to be highly stable, of long

17 duration, and eminently clear, I would see no reason to

18 administer the Abel.

19 Q.   In this case, Doctor, were you aware when you reviewed

20 Mr. Wetmore's records and interviewed him that there was a

21 question of whether or not he was a pedophile?

22 A.   Again if you could be so kind as to clarify.  When you

23 said a question as to whether he's a pedophile, you mean

24 whether he is attracted to children under the age of twelve?

25 Q.   Or children with undeveloped secondary sex characteristics,

cbf41b26-66b6-457b-880e-c778035e1b52

1   however you prefer to define it.

2   A.   It would not surprise me in the least.  That would not be

3   an unusual question at all to raise with someone like

4   Mr. Wetmore.

5   Q.   And would the Abel Assessment have aided you in

6   determining whether Mr. Wetmore was attracted to younger

7   children who had not developed secondary sex characteristics?

8   A.   Not insofar as the present evaluation is concerned because

9   in both instances, whether he's attracted to prepubescent

10  children or postpubescent in the ages of twelve, thirteen,

11  fourteen years old, it is, I believe, illegal.

12  Q.   Now, of course, we come to a juncture that we need to talk

13  about for just a second.  Up to this point we have been talking

14  about abnormal, as in something that can be diagnosed and

15  perhaps included in the compendium of diagnoses known as the

16  Diagnostic and Statistical Manual Fourth Edition.  We've not

17  been talking about illegal, so let me move to that side of the

18  equation.  Is all illegal conduct abnormal?

19  A.   As you well know, Counsel, "abnormal" is a lay term.  It

20  does not have clear and specific meaning in psychiatric or

21  psychological nosology.  It typically refers to psychopathology

22  that's rather nonspecific.  I'm not sure how to answer your

23  question because I'm not sure what the boundaries are for

24  abnormal behavior.

25  Q.   Let me perhaps phrase it a little more specifically.  With

1  respect to the art or science of psychology, can one engage in

2  sexual behavior that is illegal and yet not be diagnosed as

3  suffering from a mental disorder contained within the

4  Diagnostic and Statistical Manual Fourth Edition?

5  A.   To classify sexual behavior using the DSM, we are

6  essentially restricted to the paraphilias.  I'm sure there are

7  a lot of individuals who engage in illegal sexual activity who

8  might also be classified using other Axis I disorders.  They

9  might also be depressed.  They might also be bipolar.  But if

10 you're talking about a classification for their sexual

11 behavior, then we have to return back to that one category

12 called "paraphilias."

13 Q.   Let me perhaps give you a specific example.  A college

14 student with no prior history of any psychological disorder

15 whatsoever gets drunk one night and has nonconsensual sex with

16 a young lady who reports it, and the individual is convicted of

17 forcible rape and never has any other incident of that nature

18 in that person's life, is that categorized as a mental

19 disorder?

20        MS. PIEMONTE-STACEY:  Objection.

21        THE COURT:  Sustained.  That's so far off the

22 reservation here.

23        MR. MILES:  Okay.

24 Q.   Take an individual who has one sexual encounter with a

25 prepubescent child and never has any other sexual encounters

Page 24

1   with prepubescent children, is that person diagnosed as a

2   pedophile?

3           MS. PIEMONTE-STACEY:  Objection.

4           THE COURT:  Overruled.

5   A.   The obvious question that I must ask is the age of that

6   individual when he engaged in that one isolated behavior.

7   Q.   Let's assume the individual is forty, has never had any

8   evidence of fantasies or other interest in young children, has

9   one sexual encounter with a young child, never has any other

10  sexual encounters with young children, is that person

11  diagnosable as a pedophile?

12  A.   I have two answers to your question, Counsel.  The first

13  is that I wouldn't believe it, and the second is, no, he

14  couldn't be a pedophile unless you demonstrated it was six

15  months or longer that he had those interests.

16  Q.   Thank you.  And the conduct, of course, would be illegal?

17  A.   Of course.

18  Q.   Right.  So with respect, again, to Mr. Wetmore, would the

19  Abel Assessment have allowed you or given you evidence of

20  Mr. Wetmore's preferences with respect to the development of

21  his sex objects?

22  A.   As I said before, Counsel, my laser focus in the context

23  of this evaluation was to determine whether he has serious

24  difficulty managing known behavior.  He has a very long track

25  record of a particular kind of interest.  Whether it was

Page 25

1   evident in the course of doing an Abel that he was also

2   interested in adolescents, I'm not sure how that would have

3   impacted one way or another my determination of whether he has

4   serious difficulty.

5   Q.   Well, perhaps you misspoke yourself, but you said the Abel

6   might tell whether he has an interest in adolescents.  Don't we

7   know that he has an interest or had an interest in adolescents?

8   A.   I'm talking about mid to late adolescents.

9   Q.   I see.  Would it have also shown whether he had an

10  interest in children who had not developed secondary sex

11  characteristics?

12  A.   Yes.

13  Q.   In any event, neither the Abel nor the PPG were

14  administered; is that correct?

15  A.   I did not administer the Abel.  I do not recall seeing

16  that anyone has administered the Abel.

17  Q.   Now, in carrying out your evaluation, did you perform any

18  independent investigation to determine the truth of statements

19  that you saw in Mr. Wetmore's records?

20  A.   Independent in terms of making phone calls to inquire of

21  family, aspects of his upbringing?  I'm not sure what you're

22  referring to.

23  Q.   Inquiries of family, inquiries of prior treating either

24  physicians or psychologists, calls to correctional officials,

25  things of that nature, did you do any of that kind of

cbf41b26-66b6-457b-880e-c778035e1b52

Page 26

1   investigation?

2   A.   Again, Counsel, I would answer the same way that I did a

3   moment ago, that in performing the duties of this particular

4   evaluation, if there was some area of ambiguity around which I

5   was concerned, then I might very well have followed up.  There

6   are areas that I alluded to yesterday that I found perplexing.

7   However, they didn't go to the final judgment or opinion about

8   serious difficulty.  The answer is "no," I didn't make any

9   external or collateral contacts.

10  Q.   Okay, now, let me just take you back for a second to the

11  discussion we're having about hebephilia.  If I recall

12  correctly, and tell me if I'm wrong, you said that

13  Dr. Blanchard was proposing a joint or condensed diagnosis of

14  pedohebephilia; is that correct?

15  A.   Yes.

16  Q.   Is there also discussion in your field about a diagnosis

17  of pedophilia and then a separate diagnosis of hebephilia?

18  A.   I, frankly, have not read of anyone who is recommending a

19  separate standalone diagnosis of hebephilia to be listed as one

20  of the eight, nine, ten examples of paraphilia.  There simply

21  are far, far too many paraphilias to list them.  So I'm not

22  really sure what you're asking, Counsel.

23  Q.   Well, I'm trying to figure out where the discussion is in

24  the scientific community.  Apparently there are those who

25  oppose any extension of pedophilia to age fourteen or a

1    separate diagnosis of hebephilia and those who support having a

2    diagnosis of pedohebephilia included in the DSM.  Is that an

3    accurate description of what's going on in your field?

4    A.    There is that controversy, but I would also comment that

5    there is enormous controversy around pedophilia as well.  So

6    this controversy of which you speak is not limited to

7    hebephilia.

8    Q.    What is the controversy then around pedophilia?

9    A.    Oh, my goodness.  It's extensive.  There are dozens and

10   dozens of commentators and articles, some of which purport to

11   suggest that even pedophilia might not be a disorder.  There

12   are others who suggest that, yes, it's a disorder, but it is

13   diagnosed unreliably.  There was two seminal papers published

14   in, I believe, the year 2002 in the Archives of Sexual Behavior,

15   one by Green, the other by Schmidt, both eminent scholars in

16   the field, and there must have been 25 or 30 commentaries that

17   the journal published.  Everyone had a different take, and the

18   whole focus of that entire issue was whether or not pedophilia

19   is a legitimate diagnosis.

20   Q.    Okay.  So there's controversy about whether or not

21   pedophilia is a legitimate diagnosis, even though it's listed

22   as one of the paraphilias in the Diagnostic and Statistical

23   Manual Fourth Edition?

24   A.    Correct.

25   Q.    And it would be fair to say that there is controversy over

Page 28

1  whether hebephilia is a legitimate diagnosis, and it is not

2  listed in the compendium; is that correct?

3  A.   The fact that -- it is correct, but the fact that it's not

4  listed means to me next to nothing because, as I said, there is

5  something like 75 paraphilias.

6  Q.   I understand that, Doctor, but just for the purposes of

7  this proceeding, it is accurate to say that there is

8  controversy in the scientific community about the validity of

9  the diagnosis of hebephilia, and which is not listed in the

10  compendium, the Diagnostic and Statistical Manual Fourth

11  Edition TR?

12  A.   Correct.

13  Q.   Now, you were engaged, as I understand it, Doctor, to do

14  three things, and let me just summarize them for you, and

15  please tell me if you disagree.  One, you were engaged to

16  determine whether Mr. Wetmore suffered a serious mental

17  disorder; is that correct?

18  A.   Yes.

19  Q.   You were engaged to determine whether Mr. Wetmore had

20  serious difficulty in refraining from further sexual

21  misconduct; is that correct?

22  A.   Yes.

23  Q.   You were engaged to determine whether a serious mental

24  disorder caused Mr. Wetmore to have serious difficulty in

25  refraining from further sexual misconduct; is that correct?

Page 29

1    A.   Correct.

2    Q.   And in the course of that, you were to arrive at an

3    opinion whether Mr. Wetmore was a sexually dangerous person

4    under the Adam Walsh Act; is that correct?

5    A.   Yes.

6    Q.   Now, let's go a little bit further with your examination

7    of Mr. Wetmore and talk about how you did each of those --

8    well, let me ask you this:  Did you do each of those three

9    things?

10   A.   Yes.

11   Q.   Now, we've been talking around the issue of serious mental

12   disorder when we've been talking about hebephilia, so let me

13   ask you this:  Your conclusion is that he suffers from a

14   paraphilia NOS with a hebephilia specifier?

15   A.   Yes.

16   Q.   You don't diagnose him as a pedophile; is that correct?

17   A.   Correct.

18   Q.   And how do you define serious mental disorder?

19   A.   Are you asking, Counsel, how I define "serious"?

20   Q.   No.  I was asking --

21   A.   Or how I define "serious mental disorder"?

22        THE COURT:  Can I just go back on the pedophilia thing

23   for a minute.  He was convicted of looking at pictures of

24   children.

25        THE WITNESS:  Yes.

Page 30

1      THE COURT:  I don't have them, but those were

2  children, right, not adolescents?  Or was it hard to tell?

3      THE WITNESS:  It's very hard to tell, your Honor.  I

4  would imagine that when you're talking about several thousand

5  images, you have many images of prepubescent children along

6  with many images of postpubescent children, and some images of

7  late adolescents and even adults.  I don't know.  But when it

8  refers to child pornography, it's sort of a mixed bag.  It's a

9  collection of --

10     THE COURT:  So, just hypothetically, if you had

11 someone who only touched postpubescent adolescents, or at least

12 people right on the cusp, eleven or twelve, but looks at

13 pictures of little children, what does that tell you

14 diagnostically?

15     THE WITNESS:  You're actually asking about one of the

16 very principles that was articulated by Ray Blanchard, wherein

17 he had claimed in his argument that support for this sort of a

18 hybrid diagnosis was that in all of his many, many, many years

19 of experience, there is a very distinct similarity between

20 those individuals who we think of as hebephiles and

21 pedophiles, that many individuals that he's seen who profess a

22 preference for young adolescents also have an interest in

23 preadolescents.

24     THE COURT:  But at least from what's the standard in

25 the field right now, you don't feel as if you have enough to

Page 31

1    call him a pedophile?

2           THE WITNESS:  I didn't, your Honor, for one very

3    specific reason; that if I try to come up with what I regard,

4    given all data that were available to me, the best

5    approximation of this man's sexual preference, it would be an

6    interest in boys in the age range of eleven to fourteen.  I

7    believe that is what Mr. Wetmore has said to me in no uncertain

8    terms that that is his interest, and I believe that the

9    behavior effectively speaks for itself.

10          THE COURT:  But some of the boys at the eleven end of

11   the range would still be, am I right, considered prepubescent?

12          THE WITNESS:  Oh, of course.

13          THE COURT:  In fact most, right?

14          THE WITNESS:  If you're asking about -- the average

15   age of menarche for American Caucasian females is eleven.  It

16   turns out that the average age for the earliest onset of

17   puberty, even in American boys, is around age eleven.  So age

18   eleven is generally at this point in time the earliest age of

19   signs of puberty, both in boys and girls.

20          THE COURT:  And what would be the average age?  Eleven

21   is the earliest.  Or is it the average?

22          THE WITNESS:  I am sure that there are some children

23   who even at the age of ten will begin showing signs of puberty,

24   and in fact we have a new phenomenon in this field referred to

25   as "precocious puberty," wherein clearly preadolescent children

cbf41b26-66b6-457b-880e-c778035e1b52

Page 32

1    as young as seven years old are already evidencing signs of

2    puberty.  So those are an extreme, and that's considered an

3    anomaly, but --

4              THE COURT:  So that's why you didn't -- because age

5    eleven is a common age for males to reach puberty, is that why

6    you decided this wasn't really pedophilia?

7              THE WITNESS:  That's correct.

8    Q.   Let me pursue the Judge's line of questioning a little bit

9    further, if I could, with you.  Did you actually examine any of

10   the pornographic images that Mr. Wetmore had on his computer?

11   A.   I examined, which is to say I glanced at, photocopies of

12   perhaps 20 or 30 images of children.  I understood that those

13   were taken from the computer when it was confiscated.  I don't

14   know that for a fact.  There was simply, you know, a large pile

15   of discovery.  The images were very difficult to make out.

16   Some of them clearly were of adolescent or young adolescent

17   girls and young adolescent and adolescent boys.

18   Q.   In your experience in the field -- and, by the way, did

19   you also perform services for the Commonwealth of Massachusetts

20   in the area of risk assessment of sex offenders at some point

21   in your career?

22   A.   Yes.

23   Q.   And you were affiliated with the program at the

24   Massachusetts Treatment Center?

25   A.   Yes.

1    Q.   In your experience in this area, have you come across

2    situations where pornography was downloaded to a computer and

3    may have resided on a computer, but the individual focused on a

4    particular segment of it or a particular type of it?

5    A.   Yes.

6    Q.   Tell the Court about those experiences, please.

7    A.   Once you open the gateway to pornography, and assuming

8    that you leave your computer on all the time, all manner of

9    pornography may be downloaded onto your hard drive, some of

10   which you did not intentionally download.  I have certainly

11   evaluated individuals who claim that that was the case,

12   individuals whose interest was in adult pornography but were

13   caught on their hard drives having child pornography.  Those

14   are not individuals that would be, incidentally, at the

15   treatment center.  Those are individuals that I have been asked

16   on other occasions to evaluate.

17   Q.   So, in other words, the pornography can be on the computer

18   but not of interest to the individual who downloaded it?

19        THE COURT:  Is it automatically downloaded, or do you

20   have to actually click to get it?

21        THE WITNESS:  No, no.  Automatically.

22        THE COURT:  So the 2,000 images, if he went onto some

23   site --

24        THE WITNESS:  Correct.

25        THE COURT:   -- he could have been looking at half a

Page 34

1   dozen, leaves it on, and the 2,000 spill in?  Is that it?

2           THE WITNESS:  It's conceivable.

3           THE COURT:  Is it likely?

4           THE WITNESS:  I didn't discuss with Mr. Wetmore how he

5   organized and ran his computer, what software he was using,

6   what sites he was on.  I didn't go into the more sort of

7   technical aspect of it, but I certainly have been involved in a

8   number of cases that were much more clear; an individual who,

9   with a number of friends, a thirty-five-year-old man who with a

10  bunch of friends downloaded some adult pornography that

11  everyone had to pay for, and over the next couple of weeks

12  discovered large amounts of child pornography streaming onto

13  his computer which he deleted, but of course it still leaves a

14  footprint, a signature on the hard drive.  And when his

15  computer was audited by the company that he worked for, they

16  saw these images of past child pornography, and he was

17  arrested, and he claims that he really had nothing to do with

18  it.

19          THE COURT:  Well, did you ask Mr. Wetmore whether he

20  was deliberately downloading this stuff?

21          THE WITNESS:  We certainly talked about his intent

22  when he was in prison to go out and make himself available to

23  child pornography.  He shared with me that clearly that was his

24  plan.  It was a therapeutic plan, if you will, in that he had

25  hoped that it would avoid any contact with children; that after

cbf41b26-66b6-457b-880e-c778035e1b52

1    he got out to the community, he in effect put his plan into

2    action.  He obtained a computer, got access to the Internet,

3    and that he was coming home on average every night and

4    masturbating at least once, maybe twice.  So I believe the

5    answer to your question is "yes," we had a fairly lengthy

6    conversation about that.

7    Q.   Did the conversation include the focus of his downloads,

8    whether he was interested in adolescents or interested in

9    undeveloped children?

10   A.   No, I did not go there, Counsel.

11   Q.   Now, let's talk about another aspect of the diagnosis of

12   Mr. -- I'm sorry, let's go back to my original question.  How

13   do you define serious mental disorder?

14   A.   Like all of the other terms that we are compelled to deal

15   with, Counsel, "serious" obviously is not defined for us.  I

16   have looked both online and in dictionaries for a meaningful

17   definition of the word and found at the end of the day that it

18   was actually a rather poor choice of adjectives.  I don't

19   believe that it really gets us where the drafters of this

20   language thought it would.  The only language that I have found

21   that even remotely comes close to something that is meaningful

22   in this context is that something which is serious implies a

23   concern for what really matters.  That seemed to me relatively

24   on target, in that a concern for what really matters seems like

25   the closest meaning to something that I can conceptualize in

Page 36

1    this case.  The mental illness, as you stated before, is a

2    causal agent according to the statute.  Whatever this disorder

3    or illness is, it must lead to serious difficulty.  The

4    language "as a result of which" seems to imply that in my mind.

5    Q.   So, in other words -- I'm sorry, I didn't mean to

6    interrupt you.

7    A.   So as a result of the mental illness or disorder, the

8    individual has serious difficulty refraining, yes, I think that

9    that's a literal interpretation.  Now, if I interpose the word

10   "paraphilia" or "hebephilia," as a result of the paraphilia or

11   as a result of hebephilia, the individual, Mr. Wetmore, has

12   serious difficulty refraining.  So what causes serious

13   difficulty really matters.  That's how I get back to the

14   original definition.  What causes the serious difficulty is

15   what matters.

16   Q.   So if I understand you correctly, you have incorporated

17   the third element, serious difficulty, into your definition of

18   the first element, a serious mental illness?

19   A.   I believe the statute does that, Counsel.  It says "as a

20   result of which," as a result of which.  To me, it implies that

21   this disorder is a causal agent.  It produces the outcome, as a

22   result of which the individual has serious difficulty.

23   Q.   Is there any publication, decision, or conference

24   presentation which supports your definition of serious mental

25   illness?

1    A.   No, Counsel.  Like all the other terminology, we do not

2    have guidance, either from case law, from the statute; and this

3    is not the kind of thing that would be the subject of scholarly

4    discourse.

5    Q.   I think I know some English professors who might disagree

6    with you, but --

7              THE COURT:  About what?

8              MR. MILES:  I'm sorry, your Honor?

9              THE COURT:  About?

10             MR. MILES:  About whether it would be the subject of

11   serious scientific discourse.

12   Q.   Let me ask it this way:  Without considering the cause and

13   effect of a mental disorder, can you determine whether or not

14   it is a serious mental illness or disorder?

15   A.   I mean, assuming if we disconnect the two?

16   Q.   Yes.

17   A.   So they're not linked?

18   Q.   That's correct.

19   A.   The only association I have to that -- and I hasten to

20   add, I really am not here to free associate -- but my free

21   association to your question is what psychologists and

22   psychiatrists refer to as "major mental disorders."  We don't

23   refer to "serious mental disorders," but we do refer to "major

24   mental disorders."  Those are generally disorders such as

25   schizophrenia and bipolar illness.

cbf41b26-66b6-457b-880e-c778035e1b52

Page 38

1   Q.    Is hebephilia a major mental disorder?

2   A.    Absolutely not, nor is pedophilia for that matter.

3   Q.    My next question, is pedophilia a major mental disorder?

4   A.    Paraphilias in general would not be considered a major

5   mental disorder.

6   Q.    Thank you.  Let's go to the second area of causal

7   relationship between the mental disorder, whether serious or

8   not, and the result, the action or behavior of the individual.

9   Can we focus on that for a few minutes?  Are you familiar with

10  the term "volitional impairment"?

11  A.    Yes.

12  Q.    Okay.  And you say that with a sigh because I know we've

13  discussed this before.  What is your understanding of that

14  term?

15  A.    Volitional impairment refers to incapacity.  It refers to

16  problems with self-control, simply stated.

17  Q.    In the course of your evaluation of Mr. Wetmore, did you

18  attempt to determine whether he was volitionally impaired?

19  A.    I did.

20  Q.    What was your determination?

21  A.    That he is.

22  Q.    And is volitional impairment part of any diagnosis in the

23  Diagnostic and Statistical Manual Fourth Edition TR?

24  A.    No.

25  Q.    Is there a particular reason for that that you're aware

1    of?

2    A.   The particular reason is stated very clearly by the DSM

3    itself.

4    Q.   And the reason is?

5    A.   In the preface, the DSM makes it eminently clear that

6    there is no disorder listed in the DSM, even disorders that are

7    defined by poor self-control or poor self-restraint or

8    impulsivity, no disorder that should be implied to suggest that

9    the individual could not control himself or herself if he chose

10   to do so.

11   Q.   In other words, under the construct of the Diagnostic and

12   Statistical Manual Fourth Edition TR, the fact that someone may

13   suffer from a mental disorder does not speak to whether the

14   individual can control the behavior resulting from it?

15   A.   Correct.

16   Q.   So is it fair to say that based upon the diagnosis of

17   paraphilia NOS, the diagnosis itself does not speak to whether

18   or not Mr. Wetmore can control his behavior?

19   A.   Absolutely.

20   Q.   Therefore, may I conclude that if Mr. Wetmore could

21   control his behavior, he could choose not to commit acts of

22   criminal sexual misconduct?

23   A.   Mr. Wetmore is with us today, your Honor, only because he

24   has chosen not to control his behavior.

25   Q.   That's exactly what I'm asking you, Doctor.  We know in

Page 40

1    the past he has chosen not to control his behavior; is that

2    correct?

3    A.    Correct.

4    Q.    As far as you're concerned, he has the ability to choose;

5    is that correct?

6    A.    Absolutely.

7    Q.    In the future then, he can choose to control his behavior;

8    is that correct?

9    A.    Yes, of course.

10   Q.    And if he can choose to control his behavior, then there

11   is nothing which impairs his volition to prevent him from

12   choosing to control his behavior; is that correct?

13   A.    Not any condition of which I am aware that Mr. Wetmore has

14   would prevent him from making alternative decisions.

15   Q.    And in fact there are things that can be done and there

16   are things that develop chronologically which can help him to

17   make those choices; is that correct?

18        MS. PIEMONTE-STACEY:  Objection.

19        THE COURT:  Overruled.

20   A.    It's stated rather broadly, but I believe I can answer

21   "yes" to that.

22   Q.    That's fine.  I tend to state things broadly, and I'll try

23   to fine-tune it a little bit.  Let's talk about some of those

24   things in particular.  For example, are there treatments which

25   could help Mr. Wetmore choose not to offend sexually?

1   A.    Of variable effectiveness, yes.

2   Q.    Are there psychological or cognitive behavioral therapy

3   methodologies that could help Mr. Wetmore not offend sexually?

4   A.    Cognitive behavior therapy would be one of the likely

5   choices, given that it is the state-of-the-art treatment for

6   sex offenders in general.  It's not what would first come to

7   mind for me.

8   Q.    Okay, before we get to that, what is cognitive behavioral

9   therapy?

10  A.    Cognitive behavior therapy is, as the name would seem to

11  imply, a variety of different strategies that enable a person

12  to contain, control, manage undesirable behavioral responses.

13  It's a fairly broad umbrella.  Under it, as I said, there are a

14  variety of different kinds of procedures, most of which,

15  because we use the word "cognitive," imply that the individual

16  has to work through different strategies for modifying their

17  behavior, and that those strategies are presumably the ones

18  that work best for them.

19  Q.    Now, you said that cognitive behavioral therapy is the

20  standard for sex offender treatment in your field.  Is that

21  accurate?

22  A.    Cognitive behavior therapy is the modality that you will

23  find at most treatment programs for sex offenders around the

24  country.

25  Q.    And you're basing that on your experience dealing with sex

Page 42

1  offenders and programs around the country?

2  A.   Yes.

3  Q.   Now, you said that something else would come to your mind

4  first, and what was it that you were thinking of?

5  A.   The two most critical elements to the treatment of someone

6  like Mr. Wetmore would be, first, covert sensitization and/or

7  aversion therapy, if we're talking about a psychotherapy, and,

8  second, medication.

9  Q.   All right, let's talk about -- frankly, I didn't follow

10  the phrase you were using, the non-medication therapy.  Was it

11  avoidance?

12  A.   Covert sensitization and aversion.

13  Q.   Covert sensitization and aversion.  What is that?

14  A.   These are strategies that are designed specifically for

15  reducing or decreasing deviant sexual arousal.  That would seem

16  to be key in Mr. Wetmore's case.

17  Q.   And are those types of treatments available commonly?

18  A.   I would have to answer "yes," most programs, even

19  institutional programs, will provide some opportunities for

20  engaging in that form of behavior therapy.

21  Q.   And let's talk about medication.  What types of medical

22  treatments are available to help somebody like Mr. Wetmore

23  choose not to offend?

24  A.   The obvious class of medication would be generally

25  referred to as antiandrogens.

cbf41b26-66b6-457b-880e-c778035e1b52

Page 43

1    Q.    Tell the Court what antiandrogens are, please.

2          THE COURT:  We did go through some of this.

3    Q.    And, again, are those therapies commonly available?

4    A.    They are more commonly available as an outpatient in the

5    community.  There are some institutions that, particularly some

6    of the civil commitment programs, that may enable their

7    residents to take an antiandrogen, but, by and large, they are

8    restricted to individuals who are already in the community.

9    Q.    And the antiandrogen essentially reduces an individual's

10   sex drive.  Is that a fair statement?

11   A.    The antiandrogen decreases the level of testosterone in

12   the bloodstream, and it is highly associated with a decrease in

13   the experience of sexual arousal.

14   Q.    So at this point we have two modalities that can be given

15   to Mr. Wetmore; that is, the psychological treatment as you've

16   described it and a physical treatment or medication?  Is that

17   correct?

18   A.    Yes.

19   Q.    And those could be combined into a treatment program; is

20   that correct?

21   A.    Yes.

22   Q.    And that treatment -- excuse me.

23         MR. MILES:  If I may, your Honor?

24         THE COURT:  Go right ahead.

25         MR. MILES:  Thank you.

Page 44

1          THE COURT:  How much longer do you figure you have?

2          MR. MILES:  I'm sorry?

3          THE COURT:  Are you almost done?

4          MR. MILES:  No.

5          THE COURT:  How much longer do you think you have?

6          MR. MILES:  I would guess another 45 minutes or so.

7          THE COURT:  Okay, so I'd like to finish it before the

8   break, at like 11:15, and I would like to get him out of here.

9          When is your plane.

10          THE WITNESS:  The plane, your Honor, isn't until this

11   afternoon.

12          MR. MILES:  I'll do my best, your Honor.

13          THE COURT:  We didn't get going until about 9:15

14   because of the computer problem, so if we could finish him by

15   11:15.  Do you think you'll have any redirect at all?

16          MS. PIEMONTE-STACEY:  I have two questions written

17   down, your Honor.

18          THE COURT:  Good.

19          MR. MILES:  I'll try to finish by 11:00 or 11:05, your

20   Honor.

21          THE COURT:  We'll do our best.  We're moving along.

22   Q.   So, Dr. Prentky, so you've got two modalities that can be

23   combined, one psychological and one physical, to aid

24   Mr. Wetmore in not reoffending; is that correct?

25   A.   Yes.

1  Q.   And despite the existence of a mental disorder on his

2  part, is it your opinion that either of those or both together

3  could successfully allow him to choose not to reoffend?

4  A.   If I might, Counsel, may I elaborate on your --

5  Q.   Feel free.

6  A.   In my opinion, what inhibits impulses to engage in

7  undesirable/unwanted/self-instructive behaviors, assuming that

8  we have ruled out organicity, are usually cognitions, our

9  attitudes, our thoughts, our ideas.  We all are willful human

10  beings.  We all make choices to engage or not engage in

11  different manner of behaviors.  Some of us, for whatever

12  inexplicable reasons, repeatedly engage in behaviors that are

13  self-destructive.  We know that.  And others repeatedly engage

14  in behaviors that are destructive to others.  We know that.  As

15  we mentioned before, we can make alternative decisions.  We

16  don't have to engage in those kind of behaviors.  In the whole

17  realm of criminal behavior, we refer to these things as

18  "criminogenic attitudes," understood to be a prime driving

19  force behind criminal behavior.

20      In the sex offender community, for whatever peculiar

21  reason, they refer to them as "cognitive distortions."

22  Cognitive distortions are simply attitudes that justify and

23  permit us to continue engaging in those kind of behaviors.  In

24  my way of thinking, that is absolutely a critical issue with

25  Mr. Wetmore, that he made a, in his case, fateful decision when

1  he returned back to the community after nine years imprisonment

2  to bring into his employ in his auto repair shop teenagers.

3  Obviously that would never be a part of any tolerable relapse

4  prevention plan, but he made that choice.  Modifying those

5  attitudes, those decisions are, in my estimation, critically

6  important.

7      It was all the more meaningful to me that he shared with

8  me that he made a commitment to himself when he was in prison

9  that he would not reoffend.  That was meaningful to me because

10  it didn't come from therapy.  We can often rationalize that, in

11  the course of therapy, you're arm-twisted to say things and

12  think things that are not internalized, that you don't really

13  believe.  You say it because you know that the therapist wants

14  to hear it.  So these are not thoughts that came from therapy.

15  This was a commitment that Mr. Wetmore made to himself.  It was

16  an internal attitude, and it didn't work.  It wasn't enough.

17  That is, in my opinion, what needs to change.

18  Q.   And that can be changed on an outpatient basis through

19  cognitive behavioral therapy, desensitization, and

20  administration of medication, or some combination of those; is

21  that correct?

22      MS. PIEMONTE-STACEY:  Objection.

23      THE COURT:  Overruled.

24  A.   I would slightly tweak what you just said.

25  Q.   Feel free.

cbf41b26-66b6-457b-880e-c778035e1b52

Page 47

1   A.   The three components, the aversive therapy, the

2   medication, and the third, I believe, that would be key,

3   following up on what I just said a moment ago, would be a

4   behavioral technique referred to simply as "cognitive

5   restructuring."  It targets the very issues that we're just

6   talking about.

7   Q.   And all of those are available, as far as you know, in sex

8   offender treatment programs outside of institutions?

9   A.   Correct.

10  Q.   Let's talk about other factors which may affect

11  Mr. Wetmore's either desire or choice to reoffend.  You

12  administered an actuarial test to help you classify

13  Mr. Wetmore; is that correct?

14  A.   Static-99.

15  Q.   And that is an actuarial test?

16  A.   Correct.

17  Q.   Or actuarial instrument, I should say?

18  A.   Yes.

19  Q.   Okay.  And tell the Court what an actuarial instrument is

20  and what its purpose is.

21          MS. PIEMONTE-STACEY:  Objection, asked and answered.

22          THE COURT:  Yes, sustained.

23          MR. MILES:  I'm sorry?

24          THE COURT:  We did go through this.

25  Q.   Is age a relevant factor in -- actually, let me go back

Page 48

1    one step further.  Does the actuarial instrument allow you to

2    place offenders in groups that have a statistical probability

3    of reoffending?

4    A.   Yes.

5    Q.   And are the statistics of reoffense applicable to the

6    groups and not the individuals who compose the groups?

7    A.   Yes.

8    Q.   So, in other words, even though an individual may be in a

9    group, you can't say there's a 35 or 50 or 60 percent chance

10   that that individual will reoffend, even if the group as a

11   whole may have 60 percent or 35 percent of its members

12   reoffending?

13   A.   That is correct, and what you are alluding to now is yet

14   another area of great controversy in the field, and that is the

15   applicability of actuarial risk assessment in the courtroom,

16   group-based statistics versus an individualistic judgment that

17   the Court must make about Mr. Wetmore.

18   Q.   Correct.  And to the extent the actuarial instrument can

19   be helpful, we'll need to explore just a little bit of it for

20   the Court.  Is age one of the factors that the Static-99 takes

21   into account or uses to measure an individual's risk of

22   reoffense?

23   A.   Yes.

24   Q.   In what manner does age reflect upon risk?

25   A.   One of the most robust factors within all of criminology

Page 49

1   research is the decrease in risk to offend as a function of

2   increased age, an inverse relationship.  The older you get, the

3   less likely you are to reoffend.  That of course applies across

4   the board to the general population of offenders.

5   Q.   Does the Static-99 have a category for age in which a

6   person is scored on that basis?

7   A.   Yes.

8   Q.   And has there been research done by the originator of the

9   Static-99, Dr. Karl Hanson, with respect to revising the

10  Static-99 to take more cognizance of age?

11  A.   Yes.  He and his colleagues have accomplished that.

12  Q.   And if I could see if my technical skills are up to it,

13  let me put something on the screen and see if you recognize it.

14  A.   Someone's skiing.

15  Q.   Right.  Actually, somebody's walking on a glacier.

16           THE COURT:  The slippery slope of the law?

17           MR. MILES:  Absolutely, your Honor.

18  Q.   Let me show you a page and ask you if you recognize it.

19  A.   It looks like a ski slope.

20  Q.   Do you see the Static-99 without the age item?

21  A.   Yes.

22  Q.   Okay, is that Dr. Hanson's research?

23  A.   There's no way of telling.

24  Q.   All right, let me see if I can get up to the top.  Does

25  that elucidate it for you?

Page 50

1    A.   I see Dr. Phenix.  I see Dr. Hanson.

2    Q.   And now if I can figure out how to get back to where I

3    was.  Has the research been done to show the correlation

4    between increasing age and probability of recidivism?

5    A.   Yes.

6    Q.   Does that chart indicate Dr. Hanson's newer conclusions

7    with respect to the effect of age on recidivism?  Do you need

8    me to make it bigger for you?  Would that help?

9    A.   I believe so, yes.

10        THE COURT:  It's hard for me to see.  What is the ages

11   of the -- are those the ages on the X axis?

12        MR. MILES:  Yes, your Honor.

13        THE COURT:  So at the age that he is, at fifty-four,

14   where does it put us?

15        MR. MILES:  That would give us approximately between

16   .02 and .04.

17        THE COURT:  Of what?

18        MR. MILES:  That's what I'm about to ask Dr. Prentky.

19   Q.   Doctor, if you could explain that chart to us, please.

20        THE COURT:  Do you know it?

21   A.   The percent of reoffense is on the Y axis, and obviously

22   the gradient that we're looking at is what happens when you

23   extract the age item.  Is that what the point is here?

24   Q.   Yes.  And what is that --

25   A.   If you remove the age item --

Page 51

1   Q.   And what does that mean to you?

2        THE COURT:  What do you mean?

3        MR. MILES:  I'm sorry, let me rephrase the question.

4   Q.   Is it accurate to say that as one ages, the probability of

5   recidivism drops fairly sharply?

6   A.   Yes.  That's what most studies have found.

7   Q.   And do you know whether the drop is on the order of

8   2 percent each year, so that, for example, if somebody is

9   thirty, is in a group that has a 98 percent chance of

10  reoffending, and when the person turns thirty-one they would

11  have 98 percent of that and so on down the line?  Or is that

12  question so unclear that nobody can comprehend it?

13  A.   The decrease is roughly linear.  That's what you're

14  asking.

15  Q.   Yes.

16  A.   As for the gradient, whether it's 2 percent per year, it

17  sounds to me as though you took that from our '97 paper,

18  possibly, because I believe we reported that, that there seemed

19  to be roughly a 2 percent per year drop.  But, as I indicated a

20  moment ago, the decrease is roughly linear.

21  Q.   Now, with respect to the scoring of the Static-99, when

22  you scored it for Mr. Wetmore, did you score it as of the time

23  you administered or evaluated the Static-99, or did you score

24  it as of the time Mr. Wetmore would be released back into the

25  community without supervision?

Page 52

1   A.   I cannot project forward.  I cannot possibly score it for

2   the future.  However, given the nature of the Static-99, it is

3   static.  As I believe I mentioned yesterday, the only thing

4   that could possibly change is age, and it can't change anymore.

5   He is in the final age category, so there's nothing about

6   Mr. Wetmore that will influence his Static-99 score.  If

7   Mr. Wetmore walks back into this courtroom at the age of 120,

8   his score will be the same.

9   Q.   Let me bring something to your attention, Doctor.  Didn't

10  Dr. Hanson revise the Static-99 to put in a different scoring

11  formula for age?

12  A.   Yes.

13  Q.   And isn't it true that under Dr. Hanson's revised formula,

14  someone of Mr. Wetmore's age would receive a negative 3 on the

15  Static-99 score?

16          THE COURT:  I don't understand what you just asked.  I

17  don't even understand what negative 3 means.

18          MR. MILES:  Let me go back.  I'm trying to avoid going

19  over material that we did yesterday.

20          THE COURT:  I know, but I don't --

21  Q.   If I may, when you score the Static-99, Doctor, you have a

22  list of items to score; is that correct?

23  A.   Yes.

24  Q.   And all of those items could be scored with the exception

25  of two as zero or 1; is that right?

Page 53

1    A.    Correct.

2    Q.    The one that can be scored zero, 1, 2, or 3 is prior

3    convictions?

4    A.    Correct.

5    Q.    So prior convictions are given a perhaps greater weight in

6    the actuarial analysis than the other factors; is that correct?

7    A.    Yes.

8    Q.    Under the old Static-99, age could be scored as a zero or

9    1; is that correct?

10   A.    Correct.

11   Q.    And what category were the zeros?

12   A.    The cutoff is twenty-five.

13   Q.    Okay, so somebody who was over twenty-five would get a

14   zero; somebody under twenty-five would get a 1?  Is that

15   correct?

16   A.    Right.

17   Q.    Under the new Static-99, what is the scoring possibility

18   for the age category?

19   A.    Offhand, I can't tell you, Counsel.  I'm not -- it's

20   been -- it's changed a number of times.  I can't tell you

21   exactly what the -- I actually do have it somewhere, but it's

22   going to take me a few minutes to find it, if you really want

23   me to look.

24   Q.    Actually I would because I would like you to explain to

25   the Court the new impact --

cbf41b26-66b6-457b-880e-c778035e1b52

Page 54

1          THE COURT:  Well, do you have it for him that he can

2     look at it?

3          MR. MILES:  I'm trying to find it, your Honor.  It's

4     lost on my computer at the moment, which is why I turned off

5     the. . .

6          THE COURT:  Despite my desire to have this end early,

7     would it make sense to take a break now and to find it?

8          MR. MILES:  I could skip over this and come back to

9     it.

10         THE COURT:  Do you have it?

11         MS. ROLLINS:  Your Honor, we have a scoring sheet.  We

12    were going to use it with Dr. Phenix, our expert.

13         THE COURT:  Does it have the negative?

14         MS. ROLLINS:  But it has her information on it, which

15    we were going to show the Court.  Can I just show this to

16    counsel?

17         THE COURT:  Yes.

18         (Discussion off the record between attorneys.)

19         MS. ROLLINS:  Thank you, your Honor.

20         MR. MILES:  If I may approach the witness, your Honor?

21         THE COURT:  Yes.

22    Q.   If I could just show you, Dr. Prentky, the risk factor for

23    age and see if that refreshes your recollection.

24         (Witness examining document.)

25    Q.   Now if I can ask you, how is age scored under the revision

Page 55

1   of the Static-99?

2   A.   It's weighted such that individuals in the category of

3   forty to sixty would receive a negative 1.

4   Q.   And what are the other possibilities?

5   A.   A 1 in the age range of eighteen to thirty-five is zero;

6   in the age range of thirty-five to forty, a negative 1 over a

7   twenty-year span from forty to sixty; and once you get over

8   sixty, a negative 3.

9          THE COURT:  I just didn't hear you.  So once you get

10  over sixty, it's a negative 3?

11         THE WITNESS:  Negative 3, which means that you would

12  subtract 3 from whatever the resulting score is.

13         THE COURT:  So in our situation, would that make him

14  a 3?

15         THE WITNESS:  If your score was a 6, but he's not over

16  sixty.

17         THE COURT:  Right, I understand that.

18         THE WITNESS:  Yes, that's correct, that's presumably

19  the way it would work.

20         THE COURT:  And so now at the age of fifty-four --

21         THE WITNESS:  Negative 1.

22         THE COURT:  Fifty-four is negative 1.  Did you do the

23  negative 1?

24         THE WITNESS:  No, I did not.  You mean to reduce him

25  from a 6 to a 5?

Page 56

1          THE COURT:  Yes.

2          THE WITNESS:  No, I did not.

3          THE COURT:  Because?  Do you not agree with this

4   scoring?

5          THE WITNESS:  I actually came up in the past the

6   Static-2002, which I believe uses yet a different scoring

7   system for age.  The changes that are taking place right now as

8   we speak in the last few years, and presumably in the next two

9   years, involving the Static-99, the Static-2002 and its

10  progeny, have resulted in many different changes, many

11  different norms for different groups that I would imagine

12  Dr. Phenix will speak to.  And it's very difficult for me to

13  keep track of that, so the easiest thing to do is to rely on

14  what is known, and in particular what has the largest, largest

15  literature, empirical literature supporting it, and that's the

16  Static-99.  So what I usually do is, I will administer the

17  Static-99 -- that's where the bulk of the empirical literature

18  is -- and then if the individual is in an age range that would

19  warrant consideration for mitigation of risk, I take that into

20  account.

21          THE COURT:  You've seen over a thousand possible sex

22  offenders, as I understand it.

23          THE WITNESS:  Yes.

24          THE COURT:  So how serious a risk is somebody when

25  they are in their fifties and sixties?  Have you seen people,

Page 57

1    sex offenders, when they're in that age range?

2         THE WITNESS:  Yes.  I believe I've seen sex offenders

3    that are close to ninety years old.  I believe the oldest sex

4    offender who's on community notification in the state of

5    New York is 101.  There are obviously out- --

6         THE COURT:  Isn't that extreme?

7         THE WITNESS:  Yes, of course.  I was about to say,

8    there obviously are outliers, and he obviously is an extreme

9    case.

10        So what we're talking about here, like all of science,

11   is group-based statistics; and it is absolutely the case that

12   there is a downward gradient of risk as a function of age.  It

13   is not surprising at all.  It's entirely consistent with three

14   or four major areas of science that would all converge to tell

15   you that this is what you should expect.

16        What our own studies have suggested, however, is that

17   this works somewhat differently with child molesters than with

18   rapists.  That's why I'm a little cautious.  Rapists look like

19   generic criminals when it comes to the age issue.  Rapists

20   conform to that same downward linear decrement and risk as a

21   function of age just like the general criminal population.  Our

22   own data support that, and all of the other studies support it

23   as well.

24        However, with child molesters, it's more complex.

25   Rather than a linear decrease, in our 2007 study, we found a

1    quadratic effect, which means that there is an increase when

2    the individual is rather young, if we're looking at a teenage

3    offender in their early twenties, and then there's a fairly

4    dramatic drop into their thirties, and then the rate goes way,

5    way up and remains stable.  It's like a plateau.  It looks like

6    a table.  The rate remains fairly stable until the fifties, and

7    we don't get a significant drop until the early to -- or I

8    should say mid to late fifties and into the sixties.  So I'm

9    rather cautious, given my own publication in this area, of

10   asserting a risk-mitigatory effect related to age for child

11   molesters until they're well into their sixties.  If I didn't,

12   I would be taken to task for that based on my own research.

13              THE COURT:  Thank you.

14              THE WITNESS:  It's also the case, however, that I

15   would say that what we found is not entirely unique; that what

16   we found is a more exaggerated version of what Dr. Hanson found

17   in 2002, I believe his paper was.  And the reason that our

18   study, I believe, is more exaggerated is because our sample

19   from the Massachusetts Treatment Center is a high-risk sample.

20   All the men in our sample had already been screened and

21   committed as sexually dangerous persons.  So our sample was

22   high-risk, and Dr. Hanson's sample was not.  It was more a

23   general population sample of child molesters.

24   Q.   Let me pursue that for just a second.  When you said sex

25   offenders to the Court a little while ago, were you referring

Page 59

1  to people who had been adjudicated sex offenders?

2  A.   With respect to what, Counsel, the Massachusetts Treatment

3  Center?

4  Q.   The Court asked you, have you ever seen a sex offender

5  over the age of fifty-five or whatever, and you said, well, you

6  saw one who was 101?

7  A.   In that case, I read about it in the newspaper, but I have

8  seen people that were certainly in their eighties.

9  Q.   And are you talking about people who have committed new

10 offenses, or are you just talking about people who are sex

11 offenders?

12 A.   No.  I believe I recall testifying on behalf of a man in

13 the state of Washington who was in his eighties at the time,

14 and he reoffended in his mid-seventies.

15 Q.   And that was one incident.  As you said to the Court,

16 that's an outlier; is that correct?

17 A.   Correct.

18 Q.   Generally speaking, even with child molesters, according

19 to your 2007 data, is it accurate to say that the bounceback

20 effect does not come up to the same level as the initial

21 twenty -- what was the age range for the first one, twenty to

22 thirty-five?

23 A.   Oh, into the late twenties or early thirties.  I don't

24 remember the exact age.

25 Q.   Yes, that's the highest?

Page 60

1    A.    Correct.

2    Q.    Okay, then there's a sharp drop?

3    A.    Correct.

4    Q.    Then you get to the fifties, and there's a bounce?

5    A.    Correct.

6    Q.    That bounce doesn't go back to the beginning, does it?

7    A.    Again, I could pull the paper, if you want me to be

8    precise about it.

9    Q.    Well, I'm trying to avoid precision at this stage and --

10   A.    I have the paper right here if you want me to look.

11   Q.    Okay.

12         (Witness examining document.)

13   A.    We're looking on Page 48.

14         MR. MILES:  Excuse me.  Would it help the Court if I

15   put that on the presenter, your Honor?

16         THE COURT:  Sure.

17   Q.    Can you testify without actually referring to the paper?

18         THE COURT:  Well, anyway, just mark it as a --

19   A.    You can ask me questions from it.  Obviously I can see it

20   up on the screen.

21         THE COURT:  Or you stand up there next to him if you

22   need to.

23         MR. MILES:  Do you want to have this marked for

24   identification?

25         THE COURT:  I don't know what it is yet, so I don't

Page 61

1    know how big a point you're making.

2    Q.   Can you tell the Court what this document is that you're

3    referring to.

4    A.   It's an article that was published in the APSA Journal on

5    age at release over a period of twenty-five years of samples of

6    both child molesters and rapists released from the

7    Massachusetts Treatment Center; and, as I indicated, it was

8    published in the Sexual Abuse Journal in the year 2007,

9    twenty-five-year follow-up.

10   Q.   I'd like to refer you to Page 48 of your article.  Can you

11   describe to the Court what the effective age is of child

12   molesters?

13   A.   The reoffense rates for those individuals who are in the

14   age range of eighteen to twenty-nine is 21 percent.

15   Q.   And that's the highest risk category?

16   A.   No.  No, no, it is not.

17   Q.   Okay.

18   A.   In the age range of thirty to thirty-nine, the rate goes

19   up to 41.5 percent, and then it begins to come down.  In the

20   age range of forty to forty-nine, it drops negligibly, but it

21   drops to 36 percent, and then you get a significant drop once

22   the individual hits fifty.  And the age range of fifty to

23   fifty-nine, it's 23 percent, and then over the age of sixty, it

24   drops to 16.7 percent.

25   Q.   So, in other words, if an individual is over the age of

Page 62

1   fifty-nine, you would expect that person to have about a one

2   chance in what, eleven or -- I'm sorry -- one chance in

3   16 percent, one chance in eight or nine of reoffending?

4   A.   If you want to couch it that way.

5   Q.   Yes, okay.

6        THE COURT:  And between fifty and fifty-nine, it's 23

7   percent?

8        THE WITNESS:  23 percent, your Honor.

9   Q.   In all cases, though, it's below 50 percent; is that

10  correct?

11  A.   Yes, correct.

12  Q.   Now, if you had applied the new scoring to the Static-99,

13  the revised scoring, Mr. Wetmore would have at this point in

14  his career, would have been a 5; is that correct?

15  A.   I am not sure, Counsel.  I would have to go back and do

16  the -- I would have to go back and take a look at it again.

17  Q.   But, in any event, it's fair to say that age is

18  progressive and has a progressive effect upon reoffense; is

19  that correct?

20  A.   That's correct, and the Static-99, of course, does not

21  differentiate between rapists and child molesters with respect

22  to risk.

23  Q.   Now, let's go a little bit further.  Are you aware of

24  Mr. Wetmore's conditions of release?

25  A.   Only that I believe he remains with six years probation.

Page 63

1  Q.   Let's assume it's five years probation.  So if he were

2  released tomorrow, he would be on probation until he was either

3  sixty or close to sixty; is that fair to say?

4  A.   Correct.

5  Q.   And then would it be fair to say that the effective age

6  would be even greater on his probability of reoffense?  Or to

7  phrase it another way, his probability of reoffense would be

8  about 16 percent at that point, based on your research?

9  A.   That's right.  I mean, I think you had pointed out before

10 that it's not simply the aggregate.  You have to look at -- you

11 know, there's a range here.

12 Q.   I'm sorry.  The probability of reoffense of the group in

13 which he would fit at that point would be about 16 percent?

14 A.   But even that is an average figure.  You would want to

15 look, obviously, at the range if you wanted to know precisely

16 what the confidence interval was for that group.

17 Q.   You know what, I was trying to avoid confidence intervals.

18      THE COURT:  Yes, but I get the basic point.

19      MR. MILES:  Right.

20 Q.   So are you aware that Mr. Wetmore upon his release will be

21 subject to five years of probation?

22 A.   Yes.

23 Q.   Are you aware that sex offender treatment is a condition

24 of that probation?

25 A.   Yes.

Page 64

1          THE COURT:  I didn't see that actually.  I was looking

2     for it.  Are you sure?

3          MR. MILES:  There was a revised exhibit submitted to

4     you, your Honor.  I think it's Exhibit 3, if I'm not mistaken.

5          MS. PIEMONTE-STACEY:  Your Honor, Exhibit 3 hasn't

6     been submitted to the Court.  Pages 3 and 4 of the original

7     exhibit were missing.  We've fixed that for the Court this

8     morning, but I'm not stipulating that sex offender treatment is

9     in there.

10          MR. MILES:  And we've included, your Honor, the

11     memorandum of sentencing judgment.

12          THE COURT:  It says mental health treatment but not

13     sex offender treatment.  I've got to assume that that's what

14     they're going to do, but --

15          THE WITNESS:  It was my understanding, your Honor, in

16     my discussions with Mr. Wetmore, when he talked about this

17     unnamed therapist in Maine and he spoke about some treatment

18     services from Dr. Saleh, that he would be having some manner of

19     sex-offender-specific therapy.

20          MR. MILES:  If I could direct the Court to Bates

21     No. WE00060, Subsection 3, the second --

22          THE COURT:  I don't think I have that.

23          MR. MILES:  Oh, I'm sorry, your Honor.  If I could

24     submit that to the Court at this time.

25          THE COURT:  What?  Oh, I don't have it yet.

Page 65

1          MR. MILES:  I thought we had put it in.

2          MS. PIEMONTE-STACEY:  No objection.  You have the only

3    copy, as we discussed this morning.

4          (Document passed to the Court.)

5          THE COURT:  So is this revised?  Because this is not

6    in the judgment.  Anyway, I'll assume for purposes of the

7    proceeding he gets sex offender treatment, the standard of

8    care, if you will, for this kind of offense.

9          MS. PIEMONTE-STACEY:  I only know that those two

10   documents exist.

11         THE COURT:  Okay, can we wrap it up for now?

12         MR. MILES:  Yes, your Honor.

13   Q.   So you're aware that Mr. Wetmore upon his release would be

14   obviously obliged to participate in sex offender treatment?

15   A.   In some manner of speaking.  I don't know specifically

16   what he would receive, and based on our conversations, I was

17   not of the impression that there were any concrete arrangements

18   that have been made.

19   Q.   When you say "our conversations," you're talking about

20   your talk with Mr. Wetmore?

21   A.   My conversations with Mr. Wetmore.

22   Q.   And how long ago was that conversation with Mr. Wetmore?

23   A.   I can tell you probably a year and a half ago.

24         (Witness examining document.)

25   A.   I saw him on the 24th of April, 2009, so it's about a year

Page 66

1    and a half.

2    Q.    And were Mr. Wetmore to have made or attempted to make

3    arrangements for appropriate sex offender treatment, residence,

4    and medication, would that reduce his risk of reoffense in your

5    opinion?

6    A.    I would have to give you sort of a bifurcated answer here.

7    Q.    Okay.

8    A.    That, in principle, of course it would reduce his risk of

9    reoffending, just as a sound management plan would reduce the

10   risk of any sex offender returned to the community.  Whether

11   that goes to the issue of serious difficulty is another matter.

12        MR. MILES:  And I, with the Court's indulgence, would

13   ask one more question.

14   Q.    How do you define serious difficulty in that context?

15   A.    His management plan is for me at this point hypothetical.

16   You're saying to me:  If this is in place, if this is in place,

17   and if this is in place, what would your opinion be?  When I

18   reached a conclusion, it was based on all of the information

19   known to me that I had available at that point in time.  I

20   cannot offer an opinion based on that which is hypothetical.

21   Clearly, the release plan, as it were, that I came away from my

22   initial interview with Mr. Wetmore with I defined as not a

23   release plan at all.  If all of those pieces of a plan, the

24   components of a plan were in place, that would constitute a

25   more reasonable, workable, sound, reliable management plan for

cbf41b26-66b6-457b-880e-c778035e1b52

1    him in the community.

2    Q.   And would that change your opinion as to whether or not he

3    had a serious difficulty in refraining from committing further

4    criminal sexual offenses?

5           MS. PIEMONTE-STACEY:  Objection.

6           THE COURT:  What, your hypothetical?

7           MR. MILES:  Yes.

8           THE COURT:  No, overruled.

9    A.   Again, my judgment is based upon what was known to me in

10   the past --

11          THE COURT:  I got that, but he's saying, if you put

12   all these other things in place, would that decrease his risk

13   of reoffending?

14          THE WITNESS:  Yes, of course it will.

15          THE COURT:  Okay.

16          MR. MILES:  Thank you.  No further questions, your

17   Honor.

18          THE COURT:  You have two questions?  Are we up to

19   three?

20          MS. PIEMONTE-STACEY:  Up to two pages.  No.

21   REDIRECT EXAMINATION BY MS. PIEMONTE-STACEY:

22   Q.   Dr. Prentky, when you prepared your expert report and

23   evaluated Mr. Wetmore, you looked through documents, discovery

24   documents; is that correct?

25          THE COURT:  You know, of course.  Let's --

Page 68

1    Q.   And one of the documents was the PS --

2           THE COURT:  Yes, just ask him.

3           MS. PIEMONTE-STACEY:  I'm trying.  It's not showing,

4    your Honor.  I can't control it from here.

5           THE COURT:  There we go.

6    Q.   And you were asked earlier about the child pornography

7    collection, and I am referring you to Paragraph 4 of the PSI

8    report.

9    A.   Yes.

10   Q.   And it contained a collection of nearly 2,000 images of

11   young people?

12   A.   Yes.

13   Q.   And they were engaged in sexually explicit conduct?

14   A.   Yes.

15   Q.   And it included prepubescent minors?

16   A.   Yes.

17   Q.   And the PSI also indicated -- when you testified

18   previously about the downloading, you also reviewed the PSI

19   that showed that Mr. Wetmore had programmed his computer to

20   provide quick access to a select group of Internet news groups

21   related to images of children engaged in sexual activity; is

22   that right?

23   A.   Yes.

24          MS. PIEMONTE-STACEY:  If I might have just one moment,

25   your Honor.

Page 69

1  Q.   And Mr. Wetmore told you during the interview that he was

2  someone who had an exceptionally high sex drive?

3  A.   He didn't use the word "exceptionally," but he certainly

4  described himself as having a -- I believe it was very high sex

5  drive.

6           MS. PIEMONTE-STACEY:  I have nothing further.

7           MR. MILES:  Just one question, your Honor.

8  RECROSS-EXAMINATION BY MR. MILES:

9  Q.   In your parlance, children is not differentiated into

10  prepubescent or pubescent, is it?

11  A.   In the present context, Counsel, I do not make that

12  distinction.  Sitting here in the courtroom talking about

13  matters of criminal behavior, I don't make that distinction.

14  If I put on a hat as a psychologist, then I might very well

15  make that distinction.

16  Q.   But you haven't here; is that correct?

17           THE COURT:  Wait.  Now I don't even understand what

18  you're talking about.  When the presentence report uses the

19  word "children," do you know whether it's referring to

20  prepubescent?

21           THE WITNESS:  I don't know, Counsel.

22           MR. MILES:  No further questions, your Honor.

23           MS. PIEMONTE-STACEY:  Your Honor, if I could just show

24  the doctor "prepubescent" in the PSI.

25

Page 70

1   FURTHER REDIRECT EXAMINATION BY MS. PIEMONTE-STACEY:

2   Q.   Paragraph 4, second line from the bottom -- it's actually

3   highlighted -- "including prepubescent minors," do you see

4   that, Doctor?

5   A.   Yes.

6            MS. PIEMONTE-STACEY:  Thank you.

7            THE COURT:  Thank you.  Doctor, thank you very much.

8   I'm sorry you had to stay overnight.

9            THE WITNESS:  That's all right.

10           THE COURT:  And I thank the lawyers for getting you

11  out of here this morning.  Where are you going, back to

12  Virginia?

13           THE WITNESS:  Princeton.

14           THE COURT:  Princeton?

15           THE WITNESS:  Yes.

16           THE COURT:  Where did I get that from?  Princeton.  So

17  you're gone.  Have a nice weekend.

18           THE WITNESS:  Thank you.

19           THE COURT:  We'll take our break.

20           (Witness excused.)

21           THE COURT:  What do we have coming up after the break?

22           MS. PIEMONTE-STACEY:  Officer Russell, Dr. Renaud as a

23  fact witness, and Dr. Phenix.

24           THE COURT:  So we can get the fact witnesses out of

25  here so they don't have to come back?

1          MS. PIEMONTE-STACEY:  Yes.

2          THE COURT:  Good.  And do you have fact witnesses

3    here?

4          MR. MILES:  I expect to have Mr. Rankin, Mr. Quiles.

5    Mr. Kelly is here.  We probably should take him out of order.

6          MS. PIEMONTE-STACEY:  I agree to take him out of

7    order.  He traveled from Maine, so Probation Officer Kelly is

8    here.

9          THE COURT:  We should just go through all the fact

10   witnesses and just finish them.  How long will your government

11   expert be?

12         MS. ROLLINS:  An hour on direct, if that.

13         THE COURT:  Where is she coming from?

14         MS. PIEMONTE-STACEY:  Washington, Iowa.  It depends.

15         THE COURT:  I just don't know if we can finish it all

16   today.

17         MS. PIEMONTE-STACEY:  We'll do our best.

18         THE COURT:  Not if it goes anywhere near as long as

19   Dr. Prentky's did.

20         MS. PIEMONTE-STACEY:  I don't think it will, your

21   Honor, but --

22         THE COURT:  I need to leave here at around 4:00.

23         MS. PIEMONTE-STACEY:  And Dr. Phenix understands.

24         THE CLERK:  All rise.  Court is in recess.

25         (A recess was taken, 11:16 a.m.)

Page 72

1          (Resumed, 11:54 a.m.)

2          MR. MILES:  Your Honor, the respondent would proffer

3    Dan Kelly, a probation officer from Maine, out of order, if the

4    government agrees.

5          THE COURT:  Good.  All right, come on up, Mr. Kelly.

6                     DANIEL P. KELLY

7    having been first duly sworn, was examined and testified as

8    follows:

9          THE CLERK:  Would you please state your name and spell

10   it for the record.

11         THE WITNESS:  Daniel P. Kelly.  Kelly is K-e-l-l-y.

12   DIRECT EXAMINATION BY MR. MILES:

13   Q.   Thank you, Mr. Kelly.  Where do you work?

14   A.   U.S. Probation Office, Maine.

15   Q.   How long have you worked there?

16   A.   A little over eighteen years.

17   Q.   And are you here as Mr. Roberts' designee?

18   A.   Yes, I am.

19   Q.   Who is Mr. Roberts?

20   A.   It's Robert Jeffreys.

21   Q.   I'm sorry, Robert Jeffreys.

22   A.   He's a probation officer in the Bangor office.

23   Q.   And would he be the probation officer responsible for

24   Mr. Wetmore's supervised release?

25   A.   If Mr. Wetmore would be released to that area.

Page 73

1    Q.   Then he would be the responsible officer?

2    A.   Yes, he would.

3    Q.   And why is he unavailable today?

4    A.   He's at training.

5    Q.   Thank you.  Now, do you have or were you able to access

6    Mr. Wetmore's file in order to prepare yourself for testimony

7    here today?

8    A.   Yes, I was.

9    Q.   Then let me ask you a couple of questions.  Upon

10   Mr. Wetmore's release, would he be subject to supervision by

11   your office?

12   A.   If he were released today, he would be.

13   Q.   And for how long would he be supervised by your office?

14   A.   A period of five years.

15   Q.   Is there any procedure or possibility that the period of

16   supervised release could be extended or reduced?

17   A.   It could not be extended because he has the maximum

18   statutory amount of supervised release.  A reduction might be

19   in place if he was doing extraordinarily well and petitioned

20   the court for reduction.

21   Q.   And the Judge would have to make that determination?

22   A.   That's correct.

23        THE COURT:  You know, I know a lot of this just

24   because it's what I do, so --

25        MR. MILES:  I'm sorry, your Honor.  I don't, so, you

1    know, how much I put in the record is really -- I'm groping.

2            THE COURT:  That's fine.

3    Q.   And could you tell us what the conditions of his

4    supervised release would be.

5    A.   He has a number of standard and special conditions.  I can

6    read through them.

7    Q.   Please.

8            THE COURT:  Well, he doesn't need to read them.

9    They're in the record, right?

10           MR. MILES:  That's right.

11           THE COURT:  All right, so they're in the record.

12   Q.   Does he have a special condition for sex offender

13   treatment?

14   A.   It would be covered under the mental health condition.

15   However, I would probably move to modify, myself or another

16   probation officer, to include a more updated version of what we

17   require for sex offender treatment.

18   Q.   Okay.  And that is not in the record, so could you please

19   tell us what it is.

20   A.   Yes, I can.  The condition reads as follows:  "Defendant

21   shall fully participate in sex offender treatment as directed

22   by the supervising officer.  He shall scrupulously abide by all

23   policies and procedures of that program.  During sex offender

24   treatment, the defendant shall, if required by the therapeutic

25   program, undergo periodic random polygraph examinations to

1    insure compliance with the therapeutic program requirements.

2    No violation proceedings will arise solely on the defendant's

3    failure to pass a polygraph examination or on defendant's

4    refusal to answer polygraph question based on Fifth Amendment

5    grounds."

6    Q.   Thank you.  And what would happen to Mr. Wetmore if he

7    failed to comply with the conditions of probation that are in

8    the record and which you've outlined?

9    A.   We could either seek to modify his conditions or actually

10   seek to revoke his supervised release.

11   Q.   And under those circumstances, what would happen to him?

12   A.   He would go back to jail.

13   Q.   Can you tell us what the procedure would be or what

14   procedure would be followed if Mr. Wetmore were to be released?

15   A.   He probably initially, if he wasn't referred to a halfway

16   house by the Bureau of Prisons, we would put him in a sex

17   offender treatment program and have an assessment done.

18          THE COURT:  Is that inpatient?

19          THE WITNESS:  No, it is not.

20          THE COURT:  It's outpatient?

21          THE WITNESS:  It's outpatient, yes.

22   Q.   And then what role does that assessment play in his

23   further treatment and supervision?

24   A.   Well, based on Bureau of Prisons records, which they

25   normally send to us upon his release, and the sex offender's

Page 76

1  evaluation and assessment, we come up with a program on how to

2  supervise Mr. Wetmore.

3  Q.   And does that program include or could that program

4  include both psychological and medical components?

5  A.   It would not include medical components, but it would

6  include psychological components.

7       THE COURT:  Can you require him to take medications to

8  diminish his sexual urges?

9       THE WITNESS:  Not by the current conditions.

10  Q.   And could he take them voluntarily?

11  A.   Yes, he could.

12  Q.   And could that be made a condition of supervised release

13  if it were recommended by the assessment?

14  A.   Yes, it could, as long as Mr. Wetmore has signed a waiver

15  agreeing to that.

16       MR. MILES:  Thank you.  I have no further questions,

17  your Honor.

18       THE COURT:  Thank you.

19  CROSS-EXAMINATION BY MS. PIEMONTE-STACEY:

20  Q.   You've listed a number of conditions, Mr. Kelly.  Do those

21  conditions stop Mr. Wetmore from reoffending?

22  A.   No.

23  Q.   And, to your knowledge, when does the term of his

24  supervised release begin?

25  A.   The term of supervised release begins as soon as he's

Page 77

1   released from this proceeding.  If he is civilly committed,

2   then it's our understanding that the term of supervised release

3   commences at that same time.

4   Q.   It would be running during the time he was civilly

5   committed, if he were civilly committed?

6   A.   That's correct.

7          MS. PIEMONTE-STACEY:  Nothing further.

8          THE COURT:  Thank you.

9          MR. MILES:  No further questions, your Honor.

10         THE COURT:  Thank you.

11         (Witness excused.)

12         THE COURT:  Thank you for taking that trip down.  Most

13  people are going in the opposite direction.

14         MS. PIEMONTE-STACEY:  Your Honor, the government would

15  call Mr. Thomas Russell to the stand.

16                    THOMAS J. RUSSELL

17  having been first duly sworn, was examined and testified as

18  follows:

19         THE CLERK:  Would you please state your name and spell

20  it for the record.

21         THE WITNESS:  Thomas J. Russell, R-u-s-s-e-l-l.

22  DIRECT EXAMINATION BY MS. PIEMONTE-STACEY:

23  Q.   Mr. Russell, are you currently employed?

24  A.   Yes, I am.

25  Q.   And by whom?

Page 78

1    A.    By the Federal Bureau of Prisons.

2    Q.    What is your position?

3    A.    I'm a senior officer specialist.

4    Q.    And how long have you been with the Bureau of Prisons?

5    A.    Fifteen plus years.

6    Q.    And a senior officer specialist is responsible for what?

7    A.    A senior officer specialist is able to work any post

8    within the institution, and the additional duty is to assist

9    junior officers in their training and daily assignments.

10   Q.    Now, I'd like to direct your attention to September 11,

11   2008.  Did you conduct a cell search of Mr. Wetmore's cell on

12   that date?

13   A.    Yes, I did.

14   Q.    And is there another term used to describe a cell search?

15   A.    There's a terminology we use within the prison system

16   called a "shakedown."

17   Q.    Now, why did you shake down Mr. Wetmore's cell?

18            THE COURT:  Which prison was this?

19            THE WITNESS:  FMC Devens, Massachusetts.

20   Q.    Why is it that you searched Mr. Wetmore's cell?

21   A.    I received a phone call from Counselor Quiles, part of the

22   unit team for G Unit, stating that he had information that

23   there is some type of contraband in his cell, and he requested

24   me to go do a shakedown of the cell.

25   Q.    Is it common for a counselor to call an officer specialist

Page 79

1    to request the shakedown?

2    A.   It's actually common for any staff member to contact the

3    unit officer to do a shakedown.  There's a number of reasons

4    for this:  They may have overheard something on the compound.

5    They may have done a pat search of an inmate and found

6    something on them and thinking that they may have more in their

7    area.  Also, the only ones with the keys to the lockers of the

8    inmates is the officer.

9    Q.   Are shakedowns routinely conducted at FMC Devens?

10   A.   Yes, they are.  There's a target number for each unit

11   officer of five per day.

12   Q.   Are they planned?

13   A.   No.  They're done in a random situation.  They're also not

14   just the inmate living area.  It would be any area that the

15   inmate would have access to.

16   Q.   Are shakedowns conducted anywhere else within FMC Devens?

17   A.   Shakedowns are conducted in every area of the institution.

18   Q.   And why is that?

19   A.   For officer and inmate safety.

20   Q.   Now, on September 11, 2008, when you went to Mr. Wetmore's

21   cell, could you describe the type of cell he was in.

22   A.   He was actually in what's known as an eight-man room,

23   which is very unusual.  Most of the living quarters are

24   two-person cells.  The room is approximately 30 feet long by

25   10 feet wide, and there is four bunk beds within the room and

Page 80

1    also one locker for each bed.

2    Q.    And where was Mr. Wetmore's bunk in the room?

3    A.    He was actually the very last bunk in the room.

4    Q.    And when you went in to shake down the cell, what did you

5    do?

6    A.    It's common practice -- and this is the way we're taught

7    to do a shakedown of a room -- is to first stop and look at the

8    area, and then you start from one side and work methodically

9    through the room to the other side.  That way you make sure

10   that you see -- you go through the entire area, you know,

11   without jumping around.  If you jump around, you may miss

12   something.

13   Q.    And did you follow that procedure on September 11, 2008,

14   in Mr. Wetmore's cell?

15   A.    Yes, I did.

16   Q.    And what happened next?

17   A.    Going through his lockers, he had some minor nuisance

18   contraband.  Nuisance contraband is usually just thrown away.

19   Proceeding along, the way it's set up is, the bunk bed is

20   against the wall, and at the foot of the bed are two lockers.

21   Inmate Wetmore had two lockers at the time.  One had legal

22   material in it, and the other had his personal property in it.

23   So I went through both of those lockers, and then I went

24   through his bed and underneath his bed and underneath his

25   mattress, and at that time I found some magazines --

Page 81

1          THE COURT:  Just be clear.  Was it under his mattress

2   or on the floor under the bed?

3          THE WITNESS:  It was -- I say under the bed, but I

4   mean it was under the mattress.  To me, a bed is the mattress.

5          THE COURT:  I just want to understand.

6          THE WITNESS:  Okay, I'm sorry.

7          THE COURT:  Did you have to pick up the mattress to

8   see?

9          THE WITNESS:  Yes, I did.

10          THE COURT:  All right, it wasn't on the floor?

11          THE WITNESS:  No, no.  Underneath the mattress is the

12   frame of the bed, and it's a solid steel piece of metal

13   underneath the mattress.

14          THE COURT:  Is it a thin mattress, or is there a box?

15          THE WITNESS:  No box spring, just the mattress, and

16   it's about probably six to eight inches thick.

17   Q.   And after you found material underneath the mattress, did

18   you stop your search?

19   A.   No.  I completed the search.  A lot of times what will

20   happen is, things will be placed in certain areas for the

21   officer to find in order for them to say, "Oh, I found

22   something.  Now I can go give it to my supervisor."  And then,

23   in actuality, the very hard contraband is somewhere else within

24   the cell.  It's sort of a trick you might have that the inmates

25   use to keep the officers from finding what they're really

Page 82

1    looking for.

2    Q.    When you went into the eight-man cell, did you go directly

3    to Mr. Wetmore's bunk?

4    A.    Yes.  I went directly to that area.

5    Q.    And why is that?

6    A.    Because that's the area that I was shaking down.

7    Q.    When Counselor Quiles told you to go shake down the cell

8    or asked you to go shake down the cell, did he tell you what

9    you were looking for?

10   A.    He didn't tell me specifically what I was looking for.  He

11   said that there was some type of contraband in Inmate Wetmore's

12   area and that he had received information about that.

13   Q.    Were you told where in Mr. Wetmore's cell to look?

14   A.    No.

15   Q.    Were you told why you were conducting the shakedown other

16   than what you've testified to?

17   A.    No.

18   Q.    Were there people in Mr. Wetmore's cell during the

19   shakedown?

20   A.    Not in the immediate area of his area.  There were inmates

21   further to the front of the room.  It's general policy for

22   staff to have inmates leave the area.  In a two-man room, you

23   definitely make sure that they're out of the room because a

24   two-man room is about a 15-by-8 room, so there's not a whole

25   lot of room for people to maneuver and move around.  In an

Page 83

1   eight-man room, as I stated, it's kind of unusual, and as long

2   as they're, in my general consensus, a couple of feet away or a

3   couple of bunks away, I would not have them left the room.

4   Q.   Do you know an inmate by the name of Andrew Swarm?

5   A.   Yes.

6   Q.   Do you have any memory of seeing Mr. Swarm in the cell at

7   the time of the search?

8   A.   I don't have any memory of him being there.  Mr. Swarm is

9   a unique individual who likes to sleep a lot.  If he was in the

10  room asleep, I would not have woken him up or had him leave.

11  Q.   Do you know an inmate by the name of John Rankin?

12  A.   Yes, I do.

13  Q.   Do you have any memory of seeing Mr. Rankin in the room

14  during the search?

15  A.   I do not remember Mr. Rankin being there.

16          THE COURT:  Well, can I ask you, who else is in this

17  eight room?  Are they all sex offenders or possible sex

18  offenders?

19          THE WITNESS:  Yes, ma'am.  The unit is known as

20  GB Unit, and it's what's called a general population unit.  And

21  if an inmate is not in the actual treatment program, they would

22  be housed in a general population unit, and that would include

23  sex offenders.

24          THE COURT:  So the seven other people are --

25          THE WITNESS:  Quite possibly could be a sex offender,

Page 84

1    yes, ma'am.

2    Q.   You described during your search, you described looking

3    through Mr. Wetmore's lockers; is that right?

4    A.   Yes.

5    Q.   Are the lockers unlocked during the day?

6    A.   The inmates are required to keep their lockers locked with

7    a combination padlock.  If they don't do it and something comes

8    up missing, it's basically going to be on them.  The officers

9    have the keys to the padlocks.  I believe, as I recall,

10   Mr. Wetmore's lockers were locked.

11   Q.   And is looking under a mattress a routine part of a

12   shakedown that you conduct?

13   A.   Yes, absolutely.

14   Q.   And why?

15   A.   It's a place to hide things.  You're not only looking

16   under the mattress, you're looking at the mattress.  A lot of

17   times they will cut the mattress open and use it as a holding

18   area for their contraband.

19   Q.   And when you picked up the mattress, what is it that you

20   found?

21   A.   I found a magazine.  I found a lot of cut-up images.

22   Q.   Okay, I'm going to show you the first of several pages.

23   Directing your attention to this document, is this part of what

24   you found when you conducted the shakedown under the mattress

25   of Mr. Wetmore's cell?

1  A.   Yes, it is.

2  Q.   Okay.  I'm going to show you a second copy.  Did you also

3  find this?

4  A.   Yes, I did.

5        THE COURT:  Do you know who those kids are?

6        THE WITNESS:  No, I do not.

7  Q.   Did you also find this picture?

8  A.   Yes, I did.

9  Q.   These are in no particular order, for the record.  Is this

10  another picture that you found?

11  A.   Yes.

12  Q.   Is that a picture that you found?

13  A.   Yes.

14  Q.   Did you find this magazine picture as well?

15  A.   Yes.

16  Q.   Did you find this picture of the boy over the paper?

17  A.   Yes.

18  Q.   And, lastly, is this collage part of what you found under

19  the mattress?

20  A.   Yes, it was.

21  Q.   Do these appear to be true and accurate copies of what you

22  found?

23  A.   Yes, they do.

24        MS. PIEMONTE-STACEY:  Your Honor, at this time I would

25  move for admission of these photos into evidence.

Page 86

1          MR. MILES:  No objection, your Honor.

2          (Government Exhibit 5 received in evidence.)

3          THE COURT:  Did you ever see him looking at magazines?

4          THE WITNESS:  No, I did not.

5          THE COURT:  I mean, just in general, are these kinds

6    of magazines available?

7          THE WITNESS:  Yes.  Inmates can get just about any

8    type of magazine as long as it's not something that would be

9    pornographic.

10          THE COURT:  Have you ever seen him cutting out things?

11          THE WITNESS:  No, I have not.

12          THE COURT:  Have you read any reports of him cutting

13    out anything?

14          THE WITNESS:  No, I have not.

15    Q.   After you found the materials that have now been admitted

16    as Exhibit No. 5, did you say anything?

17    A.   I don't believe I said anything.  At that point in time, I

18    completed my cell search and then left the area.

19    Q.   Is it your practice to inform other inmates in the area if

20    you found something during a shakedown?

21    A.   No, it's not.

22    Q.   Did you look through the material, the pictures now

23    depicted as Exhibit 5, did you look through those pictures when

24    you found them?

25    A.   I briefly looked through them and then returned to my

Page 87

1   office.

2   Q.   And what did you do next?

3   A.   What I did next was, I contacted one of the psychology

4   staff and advised them of what I had found.  That person, Holly

5   Lindgren, who is an SOMP specialist, requested I write a memo

6   to her --

7             MR. MILES:  Objection.  Hearsay.

8             THE COURT:  Overruled.

9   A.   -- write a memo to her of what I found and deliver the

10  material and the memo to her.

11  Q.   And did you do that?

12  A.   Yes, I did.

13  Q.   Now, what is a SOMP staff?

14  A.   SOMP stands for Sex Offender Maintenance Program.

15  Q.   And why did you contact someone in the SOMP?

16  A.   Ms. Lindgren is in charge of all SOMP inmates that are not

17  in the SOTP program, which is the treatment program.

18  Q.   And did you prepare a memo as you were requested?

19  A.   Yes, I did.

20  Q.   I'm going to show you a copy of a memorandum dated

21  October 7 --

22            THE COURT:  This may be hearsay.

23            MS. PIEMONTE-STACEY:  Mr. Russell's memo to him.

24            MR. MILES:  I'm sorry?

25            THE COURT:  Is there an objection to it?

1          MR. MILES:  I don't know what it is yet, your Honor.

2          MS. PIEMONTE-STACEY:  This is the memo that you marked

3     as Exhibit 3 at his depo.

4          (Document passed to defense counsel.)

5          MR. MILES:  Yes, I would object to this, your Honor.

6          THE COURT:  Sustained.  Unless there's an issue of

7     chain of custody or veracity that he actually found it, then I

8     might allow it in.

9          MR. MILES:  That's not at issue.

10    Q.   When you described the materials to Ms. Lindgren, how did

11    you describe the materials that you found?

12    A.   I told her I found --

13         MR. MILES:  Objection.

14         THE COURT:  Why is this relevant?

15    Q.   When you looked at the materials -- I'll strike that one.

16    I'll try to rephrase it.  When you looked at the materials,

17    what was your impression of the materials that you saw?

18    A.   I had the impression that they were inappropriate, but I'm

19    not qualified to determine that, which was why I contacted

20    Ms. Lindgren.

21    Q.   And what happened next?

22    A.   I delivered the material to her office.

23    Q.   And then what happened?

24    A.   Nothing.

25    Q.   Did you ever hear back from the sex offender management

Page 89

1    staff?

2    A.    Eventually I did hear back from Dr. Renaud through

3    memorandum, and she requested that I --

4              MR. MILES:  Objection.

5              THE COURT:  I'll allow what she requested.

6    A.    She requested I produce an incident report for the inmate.

7    Q.    I'm sorry, produce an incident report --

8    A.    For the inmate.

9    Q.    And what is the reason that you were producing an incident

10   report?

11   A.    Dr. Renaud advised me that the material was inappropriate.

12   Q.    And did you complete that incident report?

13   A.    Yes, I did.

14   Q.    Was there a period of time between the time you found the

15   photographs until the time you completed the incident report

16   that passed?

17   A.    Yes, there was.

18   Q.    Do you recall how long?

19   A.    I believe a little over a month.

20   Q.    And do you know what the reason was for that delay?

21   A.    No, I do not.

22              THE COURT:  Let me ask you this:  Do you have any

23   basis, based on anything you've heard, to think that someone

24   else possibly put it there?

25              THE WITNESS:  I've heard people talk about that, but I

Page 90

1    have no actual factual information of that.

2            THE COURT:  Did any informants --

3            THE WITNESS:  I'm assuming that's where Mr. Quiles got

4    his information.

5    Q.   Did you have any further involvement with this incident

6    after you wrote the incident report?

7    A.   No, I did not.  Once an incident report is issued, it's

8    delivered to the lieutenant's office, and then they take over

9    from there.

10           MS. PIEMONTE-STACEY:  No further questions, your

11   Honor.

12           THE COURT:  Well, where could someone have engaged in

13   cutting all this out and putting it on a piece of paper that no

14   one else would see?

15           THE WITNESS:  There's 212 inmates in the housing unit,

16   and I'm the only officer, so I have quite a huge duty.  It's

17   very easy for inmates to do arts and crafts and different

18   things.

19           THE COURT:  212 people?

20           THE WITNESS:  Yes, ma'am.

21           THE COURT:  So where would they do this?

22           THE WITNESS:  They could do it in their rooms.  They

23   have craft areas.  They could have done it in the library, the

24   recreation department.

25           THE COURT:  Are they given scissors?

1            THE WITNESS:  Yes.

2            THE COURT:  I see.  So this isn't like a -- it's not

3    like a real prison in the sense of you could get a scissors.

4            THE WITNESS:  Well, FMC Devens is very unusual.  It's

5    an administrative-level facility, being that it's medical.  We

6    have inmates from out custody to max custody within the

7    institution, including a psychiatric lockdown ward.  Mr. Rankin

8    is housed in what's called the general population, low-custody

9    housing unit.

10           THE COURT:  Rankin, are you referring to him?

11           THE WITNESS:  Excuse me.  Mr. Wetmore.

12           MS. PIEMONTE-STACEY:  I have no further questions.

13           MR. MILES:  Thank you.  If I may approach the witness,

14   your Honor?

15           MS. PIEMONTE-STACEY:  Can I just see what you're

16   showing him.

17   CROSS-EXAMINATION BY MR. MILES:

18   Q.   Officer Russell, let me show you a document marked W1025

19   and ask you if you recognize that document?

20   A.   I don't believe so, no.

21   Q.   Let me show you W1026 and ask you if you recognize that

22   document?

23   A.   No, I do not.

24   Q.   Did you find that document along with the documents you

25   were shown by the prosecutor?

Page 92

1    A.    I don't believe so.

2    Q.    And let me show you W1027 and ask you if you recognize

3    that?

4    A.    I do not recognize that either.

5          THE COURT:  Do you know whether or not Mr. Wetmore had

6    any enemies in that room?

7          THE WITNESS:  I don't know that.

8          THE COURT:  Would people from outside the room have

9    had access to the room?

10         THE WITNESS:  Absolutely.  They're not actual lockdown

11   cells.  It's a dormitory style of housing unit.

12         THE COURT:  Have you ever seen anybody else with these

13   cutouts?

14         THE WITNESS:  We have found other inappropriate

15   material amongst the inmates.  Some of it was in the treatment

16   program unit, and, again, the procedure is to turn it over to

17   the psychology staff for them to evaluate it.

18         THE COURT:  I probably asked that incorrectly.  Did

19   you see any of the other men who were in that eight-man ward

20   with that kind of material?

21         THE WITNESS:  Not to my knowledge, no.

22   Q.    Did a gentleman by the name of Roberto Romero live in that

23   room?

24   A.    I'm not sure he lived in the room, but he does live in the

25   dormitory.

Page 93

1   Q.   Do you know if he ever occupied 801 upper?

2   A.   I do not know that.

3   Q.   And was this material found in 801 lower?

4   A.   It was found in 801 lower.

5        THE COURT:  What does "lower" mean, lower bunk?

6        THE WITNESS:  The lower bunk, yes, ma'am.

7   Q.   Did you talk to Mr. Wetmore about the material?

8   A.   No.

9   Q.   So you performed no investigation other than to turn the

10  material over to the psychology staff?

11       MS. PIEMONTE-STACEY:  Objection.

12  A.   That's correct.

13       THE COURT:  Overruled.

14  Q.   Did you talk with any of the other gentlemen who occupied

15  the room about what you had found?

16  A.   No, I did not.

17  Q.   Did you perform any investigation to determine who had

18  compiled the material?

19  A.   No, I did not.

20       MR. MILES:  Thank you.  I have no further questions.

21       MS. PIEMONTE-STACEY:  No redirect, your Honor.

22       THE COURT:  Thank you for coming in.

23       THE WITNESS:  Thank you.

24       (Witness excused.)

25       THE COURT:  Are we continuing with the fact witnesses?

1      MS. ROLLINS:  Yes, we are, your Honor.  Can we please

2  call Dr. Renaud.

3                       CHERYL A. RENAUD

4  having been first duly sworn, was examined and testified as

5  follows:

6      THE CLERK:  Would you please state your name and spell

7  it for the record.

8      THE WITNESS:  Cheryl A. Renaud, R-e-n-a-u-d.

9  DIRECT EXAMINATION BY MS. ROLLINS:

10  Q.   Dr. Renaud, can you please tell the Court what your

11  current occupation is.

12  A.   I am the Sex Offender Management Program coordinator and

13  Sex Offender Treatment Program coordinator at FMC Devens.

14  Q.   And are you a psychologist?

15  A.   I'm a psychologist by training.

16  Q.   And how long have you held the position as a Sex Offender

17  Treatment Program coordinator and Sex Offender Management

18  Program coordinator at FMC Devens?

19  A.   I became the Sex Offender Management Program coordinator

20  in November of 2003.  In September of 2007, the Sex Offender

21  Treatment Program was activated at FMC Devens, so I became the

22  coordinator of that as well at that time.

23  Q.   Okay.  Can you explain for us very briefly, what is the

24  difference between sex offender treatment programs and sex

25  offender management programs at Fort Devens?

Page 95

1   A.   Okay, I'll start with the treatment program because I

2   think it's a little bit easier for people to understand.  The

3   treatment program is a voluntary program where inmates who are

4   eligible and volunteer for treatment participate in a number of

5   psychotherapy activities related to sex offending.  So, for

6   instance, they will be evaluated.  They will participate in

7   psychotherapy process groups, individual therapy, psycho-

8   education classes, community meetings, and a whole host of

9   things.  And it is a time-limited program, in that generally it

10  takes the average participant eighteen months to complete that

11  program.

12       The Sex Offender Management Program in contrast is not a

13  voluntary program.  It is a management strategy employed by the

14  Bureau of Prisons for sex offenders, so the Bureau decides

15  which offenders require specialized sex offender management.

16  They send them to a Sex Offender Management Program site where

17  the offenders are evaluated, managed and monitored in a

18  specialized way that is related to their sex offending

19  behavior.  And we also, as part of the management strategy,

20  utilize that as a tool to try to motivate offenders to

21  participate in sex offender treatment, if it is appropriate for

22  them.

23  Q.   And, if you know, Dr. Renaud, what program is Mr. Wetmore

24  in at Devens?

25  A.   Mr. Wetmore is not technically in one program or the

Page 96

1  other.  However, as a sex offender housed at FMC Devens, he is

2  managed in a specialized way, in the way that we manage sex

3  offenders at Devens.

4  Q.   And very briefly, what education, training, and experience

5  do you have to enable you to be the program coordinator for

6  those two programs?

7  A.   Well, I have a doctorate in clinical psychology from the

8  University of New Brunswick in Canada.  I have been working

9  with sex offenders -- I began working with sex offenders in a

10  clinical way in 1994 during my training, psychology training.

11  In 1999 I took a predoctoral internship at the Federal Medical

12  Center in Rochester, Minnesota, where I was for a year.

13  Subsequent to that, I took a position as a sex offender

14  treatment psychologist in the Sex Offender Treatment Program at

15  FCI Butner in North Carolina prior to coming to FMC Devens.

16  Q.   And, Dr. Renaud, you mentioned FCI Butner in North

17  Carolina.  Did you know Mr. Wetmore when you were at Butner in

18  North Carolina?

19  A.   I have no recollection of ever meeting Mr. Wetmore prior

20  to him coming to FMC Devens.  I know he was there for a period

21  of time, but I believe that that was prior -- that was after my

22  leaving FCI Butner.

23  Q.   And do you manage any staff in your position currently at

24  Devens as the program coordinator for those two programs you

25  just discussed?

Page 97

1    A.   I supervise twelve staff generally, assuming all the

2    positions are filled, which includes four psychologists, five

3    treatment specialists, two postdoctoral fellows, as well as a

4    psychology technician, and interns as well.

5    Q.   And directing your attention, Dr. Renaud, now to your time

6    at FMC Devens, when is the first time you remember becoming

7    familiar professionally with Mr. Wetmore?

8    A.   I became aware that Mr. Wetmore was going to be

9    transferred to FMC Devens for a precertification evaluation, I

10   believe, and I'm not exactly sure of the dates, but I believe

11   that was maybe November of 2006, I think?  I'm not sure.  We

12   were notified that he would be transferred to us.  When I say

13   "we," I mean Sex Offender Management Program staff would be

14   tasked with evaluating him for the purposes of providing

15   information to the Certification Review Branch, Sex Offender

16   Certification Review Branch, which is a branch of the Bureau of

17   Prisons.  And that's when I first became aware of Mr. Wetmore.

18   Q.   And in fact did you engage in a precertification

19   evaluation of Mr. Wetmore?

20   A.   The answer to that is, yes, we did.  However, I'm not

21   exactly sure what my involvement was.  Given the number of sex

22   offenders that we manage and the number of cases that we have,

23   I cannot recall whether or not I was actually in the room when

24   Mr. Wetmore was interviewed.  However, I do know that one of my

25   staff members was, and I definitely reviewed the report and

cbf41b26-66b6-457b-880e-c778035e1b52

Page 98

1    signed the report in concurrence with her conclusions.

2    Q.   And what is the next time, Dr. Renaud, after that

3    precertification occurrence that you just discussed, that

4    Mr. Wetmore came to your attention in your professional

5    capacity?

6    A.   The next occasion of significance I believe is July of

7    2007 when I was notified by our mail room staff that there were

8    materials that were incoming from the mail room that were being

9    rejected for Mr. Wetmore.

10   Q.   And, Dr. Renaud, as you sit here today, do you recall

11   specifically what the instance was involving the mail room?

12   A.   I believe they rejected two publications that were

13   addressed to Mr. Wetmore.  One of them was rejected, and I'm

14   not exactly sure what they were called.  One was something,

15   "Faces of the Rainforest" perhaps, that was rejected due to

16   nudity content because nudity --

17       MR. MILES:  This is hearsay, your Honor.  I would

18   object and move to strike.

19       THE COURT:  Did you see what was rejected?

20       THE WITNESS:  I did not see what was rejected.  They

21   reject, and based on their rejections, they notify me so that I

22   can use it in our management of the inmates in the Sex Offender

23   Management --

24       THE COURT:  Did you ever get a copy of it?

25       THE WITNESS:  No.  I got a description of it.

Page 99

1          THE COURT:  Have you received a copy?  Have you

2     received this?

3          MS. ROLLINS:  We have a Bates number that we have

4     provided, and I apologize for interrupting your Honor.  It's

5     Bates No. WE00420.  I'm going to try to move this in as a

6     business record.  I can ask those questions now, your Honor.

7     They're not the photos.  They're a note that Dr. Renaud took

8     describing the circumstance.

9          THE COURT:  Well, you've got to lay the foundation.

10          MS. ROLLINS:  I plan on it.

11          THE COURT:  How long do you have with Dr. Renaud?

12          MS. ROLLINS:  Very short, your Honor.  I'm moving as

13     fast as we can.  I believe we'll be done hopefully within ten

14     minutes.

15          THE COURT:  Okay, because I'd love to finish her so

16     she could leave before the lunch break and go back to the

17     public's business.

18          MS. ROLLINS:  Okay.

19     Q.   Dr. Renaud, what, if any, system do you use in your

20     professional capacity at FMC Devens to document incidents

21     involving prisoners in your care?

22     A.   We have an electronic database that's called the

23     Psychology Data System where all psychology staff will enter

24     clinical contacts with inmates and any relevant information

25     related to their psychological functioning into this electronic

Page 100

1    record.

2    Q.   And is that data system something that's used frequently

3    by individuals in your profession and at FMC Devens?

4    A.   It is.  It's essentially the offender's permanent

5    psychology record within our prison system, and we use it

6    daily.

7    Q.   And have you ever created Psychology Data System notes?

8    A.   I do regularly.

9    Q.   And do you recall specifically creating one with respect

10   to Mr. Wetmore and the testimony that you just discussed

11   involving these publications?

12   A.   I did.

13   Q.   And they are kept in the normal course of business, as you

14   stated, in your professional role at FMC Devens?

15   A.   They are.

16        MS. ROLLINS:  Your Honor, can I please put on the ELMO

17   the Psychology Data System note that Dr. Renaud --

18        THE COURT:  Yes, but I'm not letting it in yet because

19   it's got to be taken down by someone with knowledge, so I don't

20   know what's in it as to whether or not this would qualify.

21   Q.   Dr. Renaud, can you please tell me, with respect to the

22   two incidents you just discussed of mail being rejected

23   regarding Mr. Wetmore, what your direct knowledge was of that

24   incident.

25   A.   One of the procedures that we have established at

Page 101

1   FMC Devens for managing our sex-offending population, incoming

2   mail for inmates will come in through the mail room.  Mail room

3   staff are trained to monitor that mail for all traditional

4   kinds of contraband, so weapons and drugs and those types of

5   things, as well as materials that may be relevant for sex

6   offenders.  When they do come across those materials, they

7   typically notify us if something is rejected.  So I was

8   notified that a publication coming in to Mr. Wetmore was

9   rejected due to its nudity content.

10          MR. MILES:  Objection, move to strike.

11          THE COURT:  Yes, I think you need the person who

12   actually saw it to be the person with knowledge as to what was

13   in it.  I think she can put in the fact that two publications

14   were rejected, but what was in it I think doesn't qualify under

15   the business record unless you have the person in it who

16   provided that information with the firsthand knowledge.

17          MS. ROLLINS:  Okay, your Honor.

18          THE COURT:  Because you never saw it, right?

19          THE WITNESS:  I did not see the --

20          THE COURT:  You were inputting based on what this

21   other person told you?

22          THE WITNESS:  They provide the inmate with a rejection

23   notice as well as an explanation as to why it was rejected, and

24   those notices is what I obtain.  I obtain copies of those.

25   Q.   And why would that information with respect to individuals

1  in the Sex Offender Treatment or Management Program receiving

2  inappropriate materials, why would that be of relevant to you

3  as the coordinator of those programs?

4  A.   Well, because it is relevant to their management within

5  the program or within the institution for good order and

6  security of the institution purposes, as well as making sure

7  that that information is contained in their clinical record, so

8  that when we evaluate their risk, which we do routinely at

9  FMC Devens, that we have a sense of what types of behaviors

10  they engage in within the prison system that is relevant to

11  their sex-offending conduct.

12  Q.   Now, you mentioned, Dr. Renaud, that the staff, the mail

13  staff -- who I'm assuming are not psychologists at FMC Devens,

14  the mail staff?

15  A.   That's correct, right.

16  Q.   -- they receive training with respect to the

17  appropriateness of material that should be sent to inmates.  Is

18  that accurate?

19  A.   I train staff at the institution, newly hired staff when

20  they first come in, and then I provide typically training on an

21  annual basis for all staff at FMC Devens as to what types of

22  things may be relevant.  They are also informed that, of

23  course, we don't expect them to be the experts; but if during

24  the regular course of their duties they come across any of

25  these materials, they forward them to the clinical staff, who

1  then are in a position to determine whether or not those

2  materials are indeed risk-relevant for that individual and

3  whether or not they are problematic.

4  Q.   Now, Dr. Renaud, do you have knowledge of the title of the

5  second document that was rejected for Mr. Wetmore?

6  A.   Dream Boy, I believe it was called.

7           MR. MILES:  Objection.

8           THE COURT:  Overruled.  I will allow in what the

9  titles are, but the description that was in there, you're just

10  going to need the person -- I'll allow the fact there was two

11  items, two magazines that were rejected, that he got notices

12  that they were rejected, and what the titles are, but as far as

13  a description as to what's in there, she isn't the person with

14  notice because she didn't look.

15          MS. ROLLINS:  Perfect, your Honor.

16  Q.   And just to make sure the record is clear, the title of

17  the first publication was what that was rejected?

18  A.   I believe it was "Faces of the Rainforest," if my memory

19  serves.

20  Q.   And what was the second thing that was rejected?

21  A.   Dream Boy, a book, I believe.

22          THE COURT:  Are you personally familiar with either of

23  those publications?

24          THE WITNESS:  I have to say honestly, no, because I'm

25  not sure -- usually what will happen, if there's no description

Page 104

1  provided, I will Google search them or go out to Barnes & Noble

2  to see what the description is because many of these

3  publications may be available at those places, and based on

4  that description, I would provide my description in the note.

5  Q.   And as you sit here today, do you recall doing that with

6  respect to Mr. Wetmore?  Is that something you normally do in

7  the course of your business?

8  A.   It is normally something that I do.  Specifically in this

9  circumstance, I cannot recall.

10        MS. ROLLINS:  And, your Honor, if this document in

11  fact does contain the description and she has testified that

12  she does it normally in her course of business, is that

13  something you'd be interested in hearing?

14        THE COURT:  No, not unless you can get the people

15  who -- I mean, if she has knowledge now as to what's in those,

16  whether they're pornographic or not, I'd allow it, but

17  otherwise she says she doesn't remember.  Right?

18        THE WITNESS:  I don't recall.

19  Q.   Okay, moving on --

20        THE COURT:  And you don't recall as you sit here

21  whether you looked it up or whether someone reported it to you,

22  right?

23        THE WITNESS:  I don't.

24  Q.   Do you have knowledge now as you sit here today of what it

25  contained?

Page 105

1    A.    I do.

2    Q.    And what is that?

3              MR. MILES:  Objection.

4              THE COURT:  Well, how do you know that, based on this

5    note?

6              THE WITNESS:  Based on my note, yes.

7              THE COURT:  I sustain the objection.

8    Q.    What is the next incident you recall in your professional

9    capacity as the program coordinator involving Mr. Wetmore?

10   A.    Sometime I believe in September of '08 or early October of

11   '08, I became aware that materials had been found in his

12   personal property that were on my desk for review to determine

13   whether or not they were indeed risk-relevant and sexually

14   explicit.

15   Q.    So this time, Dr. Renaud, you actually received the

16   material that was in question; is that accurate?

17   A.    I did.

18   Q.    As opposed to the time we just spoke about when you didn't

19   yourself see them?

20   A.    Yes.

21   Q.    So it's brought to your attention, you said, that there

22   were materials found in Mr. Wetmore's possession?  Is that what

23   you're told?

24   A.    Yes.

25   Q.    And what, if anything, did you do when you received those

Page 106

1  materials?

2  A.   I reviewed the materials.  I would have then reviewed also

3  his record to make sure that -- to make an assessment as to

4  whether or not they were risk-relevant for him, and I made a

5  determination and prepared a memo.

6         THE COURT:  Can I ask you, do you notice that other --

7  have you had experiences of one sex offender framing another

8  sex offender?

9         THE WITNESS:  I have not had that experience, to my

10 knowledge.  It may have happened.  I would not say for certain,

11 but --

12        THE COURT:  Based on your experience, have you heard

13 of any enemies that --

14        THE WITNESS:  I have not heard of anybody planting

15 things on another inmate or reporting them for things that they

16 do not do.

17        THE COURT:  But very specifically, have you heard of

18 anybody in the course of their treatment professing hostility

19 or anger towards Mr. Wetmore?

20        THE WITNESS:  Not to my knowledge, no.  I have not had

21 any inmate reports or any observations that anybody has had any

22 conflict with Mr. Wetmore.

23        THE COURT:  To your knowledge, do you have any reports

24 of Mr. Wetmore looking at these cutouts?

25        THE WITNESS:  No.

cbf41b26-66b6-457b-880e-c778035e1b52

Page 107

1   Q.   Now, Dr. Renaud, you testified that when you received

2   these materials in the third instance we were just talking

3   about involving Mr. Wetmore, you reviewed his file, for lack of

4   a better word, to see the risk relevance and to give you a

5   background of Mr. Wetmore's circumstance?  Is that an accurate

6   statement?

7   A.   Yes.

8   Q.   And would one of the things that you reviewed in

9   Mr. Wetmore's personnel file be a Psychology Data System note

10  involving publications that he had received?

11  A.   I would have reviewed the entire Psychology Data System

12  record, yes.

13  Q.   And one of them would have been the mail document that we

14  talked about, the two instances there prior?

15  A.   Yes.

16  Q.   All right.  Now, I'm going to put up on the ELMO, if I

17  can, a document that's already been admitted into evidence as

18  Government's 5.  Do you see this document?  I know it's getting

19  blurred.

20       THE COURT:  No, that's blurred.  Pull it back.  There

21  we go, perfect.

22  Q.   Do you see this document?

23  A.   Yes, I do.

24  Q.   And what is it?

25  A.   It is a photocopy of some of the materials that were

Page 108

1    provided to me that were found in Mr. Wetmore's property.

2    Q.   Okay.   It's already been admitted as an exhibit, but I'm

3    going to go through each page.  Do you see this picture here?

4    A.   Yes.

5    Q.   Do you recall what this is?

6    A.   I believe it was part of the package of materials that

7    were provided.

8    Q.   And the same with Page No. 3?

9    A.   Yes.

10   Q.   And No. 4?

11   A.   Yes.

12             THE COURT:   Is No. 4 a female or a male?  It's upside

13   down.  Can you just --

14             MS. PIEMONTE-STACEY:  I'll put it right side up.

15             THE COURT:  Can you tell if that's a prepubescent --

16             THE WITNESS:  It is a boy, and --

17             THE COURT:  As opposed to a young girl?

18             THE WITNESS:  Yes, it is a boy.  And I would, although

19   my expertise is not necessarily in determining whether images

20   of children are prepubescent or postpubescent, in my

21   experience, I would say that that would probably be a

22   prepubescent boy.

23             MR. MILES:  Objection.

24             THE COURT:  Well, there's the original.

25             MS. ROLLINS:  And, your Honor, I'm going to actually

Page 109

1   put the originals up on the ELMO.

2          THE COURT:  Oh, I see.  It's just hard to see on

3   the --

4   Q.   I'm going to put the original up on the ELMO, but before I

5   do, this picture of the woman with part of her forehead cut

6   out --

7   A.   Yes.

8   Q.   -- is that something you remember seeing?

9          MR. MILES:  If I may, there's an objection on the

10  floor, and I move to strike the testimony.  This was supposed

11  to be a fact witness, and she's being asked to --

12         THE COURT:  Yes, I'll strike it.

13         MR. MILES:  Thank you.

14         MS. ROLLINS:  What part of the testimony was stricken,

15  your Honor?  I'm sorry.

16         THE COURT:  Whether it was a pre- or postpubescent

17  boy.

18  Q.   The next picture, do you remember seeing that?

19  A.   Yes, I believe so.

20  Q.   And this page here, do you remember seeing that?

21  A.   Yes.

22  Q.   All right, as well as the last page I'm showing you?

23  A.   Yes.

24  Q.   Now, I'm going to actually put up the originals of some of

25  these photographs.  This one here, do you see that?  I'm going

Page 110

1    to zoom in.  Do you see this picture?  And I might actually

2    walk it up to you because -- can you describe what that picture

3    is?

4    A.    That is a picture of what appears to be a young boy with a

5    bicycle, and the young boy is nude.

6    Q.    And his genitals are clearly depicted in the photo?

7              MR. MILES:  Objection.

8    A.    They are.

9              THE COURT:  Which one is it?  I'm just --

10             MS. ROLLINS:  Your Honor, I apologize for doing this.

11   The ELMO is not working.

12             THE COURT:  I see it on the screen.  I just don't have

13   it on the originals, do I?

14             MS. ROLLINS:  Yes, your Honor.  It's in the upper

15   left-hand corner of the first page.  The problem is that the

16   photocopy was dark, so because the child is so little, the

17   genitals are shaded.  And I apologize for having to say that to

18   you, but if I can show you this picture, it's very clear in the

19   original -- and I will show it to Attorney Miles first -- that

20   this child is nude.  His genitals are clearly exposed, and

21   there's no shadows on the original.  I will walk that to

22   Dr. Renaud as well.

23             THE COURT:  Oh, I see what the issue is.  It's my last

24   page.

25             MS. ROLLINS:  I apologize, your Honor.  It's our first

Page 111

1  page.

2          THE COURT:  I see.

3          MS. ROLLINS:  So this page here, your Honor.

4  Q.  Dr. Renaud, I'm placing before you the original picture of

5  this photo in the upper left-hand corner.  Do you see that

6  picture?

7  A.  I do.

8  Q.  And can you describe it, please, again now that you have

9  it in front of you.

10  A.  It is a young boy with a bicycle, and the young boy is in

11  the nude.

12          MS. ROLLINS:  And, your Honor, can you see from

13  that --

14          THE COURT:  I've got it.  It was just on my last page,

15  not on my first page.

16  Q.  And, Dr. Renaud, if I could have you describe, please,

17  back on this first or last page, depending on who's looking at

18  this, there are some pictures that I'm touching right now on

19  the screen.  Do you see that where my finger is touching?

20  A.  I do.

21  Q.  Is that showing up for you, the arrows?

22  A.  Yes.

23  Q.  What are those?

24  A.  Those appear to be cutout phallic-shaped pieces of

25  magazine.

Page 112

1    Q.   Okay.  And if I could direct your attention to this

2    photograph -- let me clear all this -- this photograph here, do

3    you see that?

4    A.   Are you pointing to the man with the -- or the boy with

5    the shorts or the one above it?

6    Q.   No.  I'm pointing right here.  Do you see that?

7    A.   Okay, yes.

8    Q.   So that picture there that I circled, is there anything

9    relevant with respect to that photo to you?

10   A.   You can't tell from the photocopy, but that was actually

11   one of those little phallic-shaped cutouts that was affixed

12   somehow --

13   Q.   Meaning these phallic-shaped cutouts?

14   A.   Yes.

15   Q.   Something like that?

16   A.   Something like that.

17   Q.   That was affixed to the picture of what appears to be a

18   leg and shorts of a human?

19   A.   Yes.

20   Q.   And above that inserted phallus into that picture, do you

21   see the three what appear to be male individuals right above

22   that here?

23   A.   Yes.

24   Q.   Can you please describe for the Court what those pictures

25   appear to have done to them.

1          MR. MILES:  Objection.

2          THE COURT:  I can see that.  That's fine, I get it.

3    Q.   And what, if anything, did you do when you received this

4    packet?

5    A.   Well, after reviewing the packet and after reviewing the

6    record, I determined that they were consistent with what was

7    known about Mr. Wetmore's history, and that they were indeed

8    risk-relevant for him, given there appears to be a history of

9    sexual attraction to minor males, so that was consistent with

10   that.  And they were materials that were altered in such a way

11   as to make them sexually explicit.  So I wrote a memorandum for

12   Mr. Russell indicating that and recommending that an incident

13   report be written.

14   Q.   And did you have personal knowledge of the information

15   that you wrote down in the memo?

16   A.   Yes.  I wrote the memo.

17          MS. ROLLINS:  If I could take a minute, your Honor.

18          (Discussion off the record amongst attorneys.)

19          MS. ROLLINS:  Your Honor, I'm going to put up on the

20   ELMO --

21   Q.   Dr. Renaud, I've just placed on the screen a document.

22   Can you look at it and please tell us what it is.

23   A.   That is the memo I wrote to Mr. Russell related to the

24   materials found in Mr. Wetmore's property.

25   Q.   Okay.  And you had testified earlier --

Page 114

1        MS. ROLLINS:  Your Honor, I apologize.  The government

2   is going to move the admission of this document as

3   Government 6.  There's no objection, as I understand it.

4        MR. MILES:  No objection.

5        (Government Exhibit 6 received in evidence.)

6   Q.   Dr. Renaud, you stated that after you reviewed these

7   materials, you then also reviewed Mr. Wetmore's file.  Is that

8   accurate?

9   A.   His Psychology Data System records, yes.

10  Q.   And what is it that you found when you reviewed that?

11       MR. MILES:  Objection.

12       THE COURT:  Where are we going with this?  I'm just

13  trying to finish it.  Is this just that she --

14       MS. ROLLINS:  Say it again, your Honor?

15       THE COURT:  I'm trying to figure out where we're going

16  with this.  Are there additional facts that --

17       MS. ROLLINS:  No, your Honor.  This is the last

18  incident that we're going to discuss.

19  Q.   Dr. Renaud, so you reviewed the entire file, and then you

20  wrote this memorandum?

21  A.   I did.

22  Q.   And again can you state just for the record what the risk

23  relevance was of those materials that you reviewed.

24       MR. MILES:  Objection.

25       THE COURT:  Overruled.

Page 115

1   A.   They were consistent with Mr. Wetmore's documented history

2   of sex-offending behavior and his sexual interests.

3        MS. ROLLINS:   I have nothing further, your Honor.

4   CROSS-EXAMINATION BY MR. MILES:

5   Q.   Good afternoon, Dr. Renaud.

6   A.   Good afternoon.

7   Q.   Dr. Renaud, did you talk to Mr. Wetmore about these

8   pictures after you received them?

9   A.   I did not.

10  Q.   Did you do any investigation to determine whether in fact

11  Mr. Wetmore had compiled these images?

12  A.   No.

13  Q.   Now, you said to the prosecutor that these images were

14  consistent with Mr. Wetmore's interests; is that correct?

15  A.   As I understood them to be, yes.

16  Q.   You understand that his interest was toward young males;

17  is that correct?

18  A.   That's correct.

19       MR. MILES:   And if I can have the exhibit, your Honor,

20  for a moment to show to the doctor.   Thank you.

21       MS. ROLLINS:   Which one is it?

22  Q.   Allow me to show you --

23       MR. MILES:   Do you want this on the ELMO, your Honor?

24       THE COURT:   I looked at them.   It's up to you.

25  Q.   Let me show you a photograph and ask you if that was one

cbf41b26-66b6-457b-880e-c778035e1b52

Page 116

1   of the photographs or one of the pictures you were given?

2   A.   It was, I believe.

3   Q.   And is that a photograph of a woman?

4   A.   It is.

5   Q.   Is that a photograph of what would be a pubescent woman?

6   A.   It was not the content of the photograph so much that was

7   of interest but rather the cutout.

8   Q.   If you could answer my question, please.  Is that a

9   photograph of a pubescent woman?

10  A.   That appears to be an adult woman.

11  Q.   An adult woman.  That's not Mr. Wetmore's interest, is it?

12  A.   Not to my understanding.

13  Q.   Did you ever inquire of Mr. Wetmore why a picture of an

14  adult pubescent woman would be included among the images?

15  A.   No.

16        MR. MILES:  Thank you.  No further questions.

17        MS. ROLLINS:  Very briefly, your Honor.

18  REDIRECT EXAMINATION BY MS. ROLLINS:

19  Q.   Dr. Renaud, why was this picture of the adult woman with

20  the square cut out of her head relevant to you, if at all?

21        MR. MILES:  Objection.

22        THE COURT:  Overruled.

23  A.   When the materials were provided to me, they came in an

24  inner office envelope, and there were magazines, magazine

25  cutouts, and a smaller envelope inside that had the smaller

cbf41b26-66b6-457b-880e-c778035e1b52

1    cutouts that have been now photocopied all together on one

2    form.  Among those items was this image where -- the white

3    square that is seen is actually a cutout, and it appeared to be

4    part of the materials that were used to cut out the small

5    penises that were then affixed to some of the images.

6    Q.  So, for example, we photocopied things for the Court and

7    as exhibits to make things easier so we wouldn't have to show

8    all of these pictures, but, for example, these little penises

9    that I'm dropping out of an envelope, flesh-colored penises

10   here --

11            THE COURT:  That didn't come out right.

12            MR. MILES:  I think at this point, without being

13   prolix, I have to object.

14   Q.  These documents here, is this what you were speaking

15   about?

16   A.  Yes.  Those appear to be cutouts from magazines.  The

17   penises appear to have been cut out from --

18            MR. MILES:  Objection to the characterization.

19            THE COURT:  Overruled.  But let's finish it because

20   I've got -- I understand the testimony now.

21            MS. ROLLINS:  All right, I have nothing further.

22            THE COURT:  Thank you very much.

23            MR. MILES:  Excuse me, your Honor.

24            THE COURT:  Oh, you have more?

25            MR. MILES:  Yes, just a couple of questions based on

Page 118

1   the redirect.

2   RECROSS-EXAMINATION BY MR. MILES:

3   Q.   You said there were other materials forwarded to you

4   besides the pictures you were shown here?

5   A.   There was in the envelope an actual, I believe, magazine.

6   I don't know if it was the entire magazine, but --

7   Q.   Let me show you some pages, if I may, your Honor, and ask

8   you if these were in the envelope?

9   A.   I can't say.  I don't know for certain.

10          THE COURT:  Which magazine was it?

11          THE WITNESS:  I don't know.  It appeared to be a

12   generic magazine that it was just --

13          THE COURT:  Generic, you mean like Newsweek?

14          THE WITNESS:  Maybe a Newsweek.  It could have been a

15   USA Today.  I don't know, but it appeared that some of the

16   pages had been torn out and cut out for collage purposes.

17   Q.   Were any of the magazines in Spanish?

18   A.   I can't say.  I don't know.

19          THE COURT:  Do you still have them?

20          THE WITNESS:  No, actually.

21          THE COURT:  She does.  Do you want them?

22          MR. MILES:  Yes.

23          THE COURT:  Have you not seen them?

24          MR. MILES:  I believe I have, your Honor, but I didn't

25   realize they were appropriate in this context.

Page 119

1       MS. ROLLINS:  These are the originals, your Honor,

2   that we're handing now.

3       THE COURT:  What's the name of the magazine?

4       MS. ROLLINS:  Blender, and I'll show it on the ELMO

5   very quickly, just the cover.

6       THE COURT:  What kind of magazine is Blender?

7       MS. ROLLINS:  It's not about blenders.  There's an

8   artist by the name of Lil Wayne on the cover, and it's about

9   R.  Kelly.  It appears to be music related or pop culture

10  related.  So this was the actual nonsexual magazine that

11  Dr. Renaud --

12      THE COURT:  That's fine.  I see.

13  Q.  Did you ever make any inquiry to determine whether

14  Mr. Wetmore received Blender as part of his publications?

15  A.  No.

16      MR. MILES:  I have no further questions, your Honor.

17      THE COURT:  Thank you very much.

18      (Witness excused.)

19      THE COURT:  I've got five beautiful minutes.  Who else

20  do we have?  Do we have another fact witness over there?

21      MS. ROLLINS:  We can get through the introductions of

22  our expert.

23      THE COURT:  Are there any fact witnesses?

24      MR. MILES:  Well, there's Mr. Quiles.

25      MS. ROLLINS:  Would you like to call him out of order?

Page 120

1      THE COURT:  Yes, call him out of order.

2      MR. MILES:  I would prefer not.

3      THE COURT:  Yes, but we're going to get these people

4  out of here because they're fact witnesses.

5      MR. MILES:  I can't finish him in five minutes, your

6  Honor, so he has to come back anyway.

7      THE COURT:  I know, but once we get going on this

8  expert, we're going to be here for two hours, and I can't

9  guarantee him.  So let's just put on the fact witness.

10      MR. MILES:  Yes, your Honor.  Mr. Quiles, please.

11                    CARLOS QUILES

12  having been first duly sworn, was examined and testified as

13  follows:

14      THE CLERK:  Would you please state your name and spell

15  it for the record.

16      THE WITNESS:  I'm sorry?

17      THE CLERK:  Would you please state your name and spell

18  it for the record.

19      THE WITNESS:  My name is Carlos Quiles.  I'm a

20  correctional counselor at FMC Devens.  I've been with the BOP

21  for eighteen years.

22  DIRECT EXAMINATION BY MR. MILES:

23  Q.   What other positions have you held, if any, Mr. Quiles?

24      MS. ROLLINS:  Excuse me.  You need to speak loudly,

25  Mr. Quiles.

Page 121

1       THE WITNESS:  Yes, I'm sorry.  I beg the Court's

2  indulgence because I don't hear very well.

3       MR. MILES:  Could I approach him then, your Honor?

4       THE COURT:  Sure.  You know what, we have these

5  things, Robert.

6       THE CLERK:  Yes, I know.

7       THE COURT:  "Things," I'm very articulate.  We have

8  these devices that amplify the sound.  Do you want them?

9       THE WITNESS:  Yes, I would appreciate one.

10       THE COURT:  Yes, they're terrific.

11       THE WITNESS:  I don't catch certain frequencies in a

12  chamber like this one.

13       (Discussion off the record.)

14  BY MR. MILES:

15  Q.   Can you hear me now, Mr. Quiles?

16  A.   Yes, I do.

17  Q.   And if you have any trouble hearing me, just let me know.

18  A.   Thank you.

19  Q.   Mr. Quiles, could you spell your last name, please.

20  A.   My last name is Q-u-i-l-e-s.

21  Q.   Mr. Quiles, what positions have you held with the Bureau

22  of Prisons?

23  A.   I'm a correctional counselor at FMC Devens.

24  Q.   I'm sorry?

25  A.   I'm a correctional counselor at FMC Devens.

Page 122

1    Q.    Right, and you were with the Bureau of Prisons for

2    eighteen years; is that correct?

3    A.    Yes, sir.

4    Q.    Okay.  And what positions have you held other than the one

5    you're in now?

6    A.    Previously I've been a correctional officer in different

7    grades until senior officer, and then I became a correctional

8    counselor.

9    Q.    In what institutions have you served?

10   A.    I have served in Federal Prison Camp, Duluth, Minnesota,

11   FCI Pekin in Illinois, and FMC Devens in Massachusetts.

12   Q.    What are your current you duties?

13   A.    Well, I'm a correctional counselor for the unit.  I

14   currently work in the unit for the Sex Offender Treatment

15   Program.  Among some of my duties, I'm another correctional

16   figure.  I also have among my duties to procure sanitation

17   items for them, run the unit in a way that there is order.  I

18   assign bed or bunk assignments.  I make changes between units.

19   I try to get them connected with their family members out there

20   via phone, with their attorneys, court, that kind of stuff.

21   Q.    Now, in the course of those duties, did you have an

22   encounter involving Mr. Wetmore?

23   A.    Yes, I have.

24   Q.    And you were here while Dr. Renaud was testifying; is that

25   correct?

Page 123

1   A.   Uh-huh, yes.

2   Q.   Did you hear Dr. Renaud's testimony?

3   A.   Yes, sir.

4   Q.   Did you see the documents that were shown to Dr. Renaud?

5   A.   I saw them.

6   Q.   And now let me take you back to the day that that event

7   occurred when those documents were seized.  Before that event

8   occurred, had you seized any contraband from Mr. Wetmore?

9   A.   Are you talking about myself only?

10  Q.   No.  I'm talking about, are you aware of any contraband

11  being seized from Mr. Wetmore?

12  A.   Before that?

13  Q.   Yes.

14  A.   No, I don't recall.

15  Q.   Okay.  And before that, had you ever seen Mr. Wetmore

16  cutting up magazines?

17  A.   I have not seen him do that.

18  Q.   Have you ever seen Mr. Wetmore gluing things together?

19  A.   I have not seen him do that.

20  Q.   Mr. Wetmore was housed in what we call the 800 Unit; is

21  that correct?

22  A.   It's what we call the eight-man room.

23  Q.   The eight-man room.

24  A.   Which, yeah, it's within the 300 range.

25  Q.   Okay.  And at the time of this incident, how many people

Page 124

1    were actually housed in that eight-man room?

2    A.   I can't remember, but it's usually full with about seven

3    or six.

4    Q.   And do you know if Roberto Romero was housed in that

5    eight-man room at that time?

6    A.   I do not remember that.

7    Q.   Do you know who Roberto Romero is?

8    A.   I do.

9    Q.   And have you received information from Mr. Romero about

10   other inmates on occasion?

11          MS. PIEMONTE-STACEY:  Objection.

12          THE COURT:  Overruled.

13   A.   No, I have not received any -- not that I remember.

14   Q.   Okay, not that you remember, or you haven't received any?

15   A.   About what?

16   Q.   About anything.  Did he talk about other inmates to you?

17          MS. PIEMONTE-STACEY:  Objection.

18          THE COURT:  Overruled.

19   A.   Well, I can't remember anything, anything specific.  Are

20   you talking about an incident that could be unlawful?

21   Q.   Yes.

22   A.   No.  No, sir.

23   Q.   And you don't remember any other conversations you've had

24   with him about other inmates?

25   A.   You mean him, Mr. Romero, or Mr. Wetmore?

Page 125

1   Q.   Him, Mr. Romero.

2   A.   No, sir.

3   Q.   Now, at some point did you receive information that there

4   was contraband in the eight-man room?

5   A.   Yes, I have.

6   Q.   And how many times have you received information of that

7   nature?

8   A.   Well, I don't remember.  I may have received it several

9   times.

10  Q.   But you don't know?

11  A.   I don't know a specific number.

12  Q.   Okay.  Do you remember any other incident besides this

13  one?

14  A.   About that specific eight-man room?

15  Q.   Correct.

16  A.   Yes, I have.

17  Q.   Okay, when was the one most recent before this one?

18  A.   Well, uhm, let me see.  I think there was an inmate

19  complaint about some inmate having extra blankets or something

20  like that.

21  Q.   Okay.  And how long before this incident did that occur?

22  A.   You mean before Inmate Wetmore's?

23  Q.   Yes.

24  A.   There's maybe -- well, this, what I'm talking to you is

25  something recent as far as about maybe two weeks ago or

Page 126

1   something like that.

2   Q.   Okay, I'm talking about the incident involving Mr. Wetmore

3   and the photographs.  Do you have that fixed in your mind?

4   A.   Yes.

5   Q.   Okay.  Before that, had you received information about

6   anybody in the eight-man room possessing contraband?

7   A.   No, sir.

8   Q.   Did you receive information about Mr. Wetmore possessing

9   contraband?

10  A.   Yes, I have.

11  Q.   Do you remember from whom you received it?

12  A.   No, I do not.

13  Q.   So you have no recollection of the person who gave you the

14  information about contraband being in Mr. Wetmore's room?

15  A.   No, sir, I do not.

16  Q.   Do you know whether the person who gave you the

17  information was actually housed in the eight-man room?

18  A.   I think he was because he felt uncomfortable about that.

19  Q.   I see.

20       THE COURT:  Let me just be clear.  Are you not

21  mentioning his name because you're afraid that there might be

22  ramifications for him in the jail?

23       THE WITNESS:  No.  I'm not mentioning his name because

24  I do not remember it.

25       MR. MILES:  May I proceed, your Honor?

1         THE COURT:  Yes.

2    Q.   Did you write down his name anyplace?

3    A.   You mean the person who told me that?

4    Q.   Yes.

5    A.   No.

6    Q.   Is it your practice at the institution to write down

7    information that you receive from inmates about other inmates?

8    A.   It depends on the relevance of the information.

9    Q.   Well, here the information was about contraband.  That

10   would be relevant information, would it not?

11   A.   It could be.

12   Q.   But you didn't write it down?

13   A.   I did not write it down.

14   Q.   Did you tell anybody else who had given you the

15   information?

16   A.   I'm sorry, did I tell what?

17   Q.   Did you tell any other officer or employee of the Bureau

18   of Prisons who had given you the information?

19   A.   No.  Well, I don't remember.  Like I told you, I don't

20   remember who told me this.  I just can't picture it in my mind.

21   But I do -- I relay that to Mr. -- the officer of the day,

22   Mr. Russell.

23   Q.   Did you tell Mr. Russell who had given you the

24   information?

25   A.   If I did, I do not remember.

cbf41b26-66b6-457b-880e-c778035e1b52

Page 128

1   Q.   Do you remember what you told Mr. Russell?

2   A.   What I told him?

3   Q.   Yes.

4   A.   I told him that there was some -- some contraband.  Pretty

5   much this is it because I don't remember exactly, but I have

6   gotten information that there may be some contraband making

7   somebody uncomfortable upstairs, and it needs to get out.

8   Q.   Did you tell Officer Russell what kind of contraband had

9   been reported?

10  A.   Yes.  I think it had to do with sexual nature.

11  Q.   Okay.  And do you remember what Officer Russell said back

12  to you, if anything?

13  A.   I do not remember.

14  Q.   What did you tell Officer Russell to do?

15  A.   Well, I don't -- I'm not his supervisor.  I don't tell him

16  to do anything specific, but I may have suggested, if we have

17  some time to do it, he -- perhaps it would have been a good

18  thing for him to check.  Sometimes I could do it myself, but I

19  may have been busy.

20  Q.   Did you tell Officer Russell where to check?

21  A.   Yes.

22  Q.   What did you tell Officer Russell?

23  A.   In the eight-man room.

24  Q.   Did you tell him where in the eight-man room to check?

25  A.   I don't -- I think I remember I refer him to Mr. Wetmore's

cbf41b26-66b6-457b-880e-c778035e1b52

Page 129

1  bunk.

2  Q.   And did you give him any information about what to do with

3  respect to the bunk?

4  A.   No.  Mr. Russell is a trained officer.  He knows what to

5  do.

6  Q.   Was it your expectation that Mr. Russell would search the

7  bunk and under the mattress?

8  A.   My expectation about him would be that he would do a

9  thorough job.

10  Q.   Would that include searching the bunk and under the

11  mattress?

12  A.   That and even more.

13       THE COURT:  Let me ask you this, since it is about ten

14  past 1:00.  I hate to make him come back, but how much longer

15  do you think you have?

16       MR. MILES:  Probably ten minutes, your Honor.

17       THE COURT:  And will you have some?

18       MS. ROLLINS:  Briefly, your Honor.

19       THE COURT:  Yes, we'll probably be better off coming

20  back at 2:00 and finishing this up, but we will get you out of

21  here, I'm sure, by 2:30 anyway.  And then who's the next

22  witness?

23       MS. ROLLINS:  Dr. Phenix, your Honor.

24       THE COURT:  Are you done with all your fact witnesses

25  that are here today?

Page 130

1           MR. MILES:  That are here today, yes, your Honor.

2           THE COURT:  Okay, let me just ask you this:  How long

3      do we think we are with Dr. Phenix?

4           MS. ROLLINS:  No longer than an hour, hopefully about

5      forty-five minutes, if that.

6           THE COURT:  Is there a challenge to her qualifications?

7           MR. MILES:  No.

8           THE COURT:  I'm just thinking --

9           MS. ROLLINS:  We're planning on putting in her CV and

10     publications.  If you want, I can just start with Mr. Wetmore

11     and not go --

12          THE COURT:  Maybe you could orchestrate it, if you

13     could get it in and get her done.  I just can't stay late

14     because I'm actually presiding at a wedding situation.  I don't

15     want to give people heart failure if I'm late.  So if we can't,

16     we can't, but I hate to make her fly back here.  I'd love to

17     finish him, it sounds pretty quickly.  I don't know how much

18     you'd have to ask, and we'll see what we can do.  Come back

19     here at 2:00.  Thank you very much.

20          THE CLERK:  Court is in recess.

21          (A recess was taken, 1:07 p.m.)

22          (Resumed, 2:12 p.m.)

23          THE COURT:  Let me say before we get going two things:

24     One is, I understand that Mr. Wetmore is not feeling well, so

25     you'll let me know if there's a problem.  Sorry about that.

Page 131

1       What I want you to do is mark those two records I

2   excluded under the business records rule, mark them for

3   identification because I'm not sure of that evidentiary ruling,

4   whether someone with knowledge who then transmits to somebody

5   who doesn't have knowledge but is the record keeper.  We can

6   all look that up.  I don't know the answer to that.  But,

7   anyway, it will at least be in the records.

8          All right, come on up.

9          MR. MILES:  Ready, Mr. Quiles?

10         THE WITNESS:  Good afternoon.

11  BY MR. MILES:

12  Q.   And again, Mr. Quiles, if you have any trouble hearing me,

13  please tell me, and I'll try to accommodate you.

14  A.   Thank you.

15  Q.   Mr. Quiles, do you recall earlier this afternoon we were

16  talking about the complaint that was made about materials in

17  Mr. Wetmore's area?

18  A.   I do.

19  Q.   And are you having trouble remembering who conveyed that

20  information to you?

21  A.   I don't remember.

22  Q.   Do you remember the conversation?

23  A.   No.  Well, I could say it was somewhat like a quick

24  message.

25  Q.   Okay.  Do you remember what the person said to you?

Page 132

1    A.    Pretty much something like, "There's something in

2    Mr. Wetmore's bunk."  And they --

3          THE COURT:  You know, you need to pull the mike in

4    because I'm not really hearing you very well.

5          THE WITNESS:  Can you hear me now?

6          THE COURT:  Just put the mike up.

7          THE WITNESS:  Closer?

8          MS. PIEMONTE-STACEY:  You can pull it.

9          THE WITNESS:  Like this?

10          THE COURT:  Yes.  All right, what's the next question?

11    Q.    The question was, do you recall any of the conversation

12    you had with the individual?

13    A.    Well, actually it was not even a conversation.  It was

14    more like a monologue.  This person showed up quickly through

15    the door, and he said to look something under where

16    Mr. Wetmore's bunk, "Because we don't like what he's doing over

17    there, and they might get us in trouble."

18    Q.    Did he say he didn't like Mr. Wetmore?

19    A.    Not -- he didn't refer to Mr. Wetmore but to his actions.

20    Q.    Did he say he didn't like the guy, the guy was weird?

21    A.    Something like that.

22    Q.    Do you recall having your deposition taken?  Do you

23    remember I deposed you?

24    A.    I can remember some of it.

25    Q.    But do you remember having your deposition taken?

Page 133

1   A.   Yes, I do.

2   Q.   Okay.  And do you remember it was on June 11, 2009?

3   A.   Yes.

4   Q.   And during that deposition, did you say that "Now, when

5   this person said he didn't like the guy, the guy was weird, and

6   he may have something that could hurt all of us"?  Do you

7   remember saying that?

8   A.   Yes.

9   Q.   And then you were asked, "Did he say where it was

10  located?"

11  A.   Uh-huh.

12  Q.   Okay.  And do you recall what you said at that time?

13  A.   I'm sorry?

14  Q.   Do you recall what you said, what you answered?

15  A.   My answer?

16  Q.   Yes.

17  A.   Something like, "Well, I will take care of it."

18  Q.   And did you tell him how you were going to take care of

19  it?

20  A.   No.

21  Q.   Do you know if anybody was transferred out of the

22  eight-man room within a week or so of that incident?

23  A.   I do not know that, but that happens almost every day, not

24  because we want to.  Sometimes they request a room change.

25  Q.   And had you ever seen Mr. Wetmore behaving in a sexually

cbf41b26-66b6-457b-880e-c778035e1b52

Page 134

1   inappropriate way?

2   A.   I have not.

3   Q.   And did you ever see him saying sexually inappropriate

4   things?

5   A.   No, I have not.

6   Q.   Was this incident a unique incident with respect to

7   Mr. Wetmore?

8   A.   Well, I don't remember he has any similar incidents before

9   or after.

10  Q.   So you have no memory whatsoever of any similar incidents

11  before or after; is that correct?

12  A.   Yes.

13  Q.   Do you remember any other inmate complaining about

14  Mr. Wetmore besides this gentleman?

15  A.   No.

16  Q.   Have you had experience with inmates complaining about

17  each other in order to get revenge or move somebody out of a

18  unit?

19  A.   Yes.

20  Q.   And what experiences have you had?

21  A.   Well, for example, somebody saying somebody's threatened

22  somebody, we move them out, or we take measures to prevent

23  that.

24  Q.   Somebody's what?  I'm sorry, I didn't catch that.

25  A.   Say there's a threat against somebody, we take measures to

Page 135

1    prevent that.

2    Q.   But have you had experience with an inmate reporting

3    something about another inmate in order to get the other inmate

4    in trouble?

5    A.   It happens, but I haven't seen it in particular myself.

6    Q.   But you know it happens?

7    A.   Yes, it does happen.

8    Q.   And in order to prevent that, is there any protocol or

9    procedure at FMC Devens, is there any procedure to investigate

10   things like that?

11   A.   Yes, there is.

12   Q.   What is the procedure?

13   A.   Well, first, we refer -- we investigate to a certain

14   extent.  Then we refer the incident to the lieutenant's office,

15   and they take it from there.

16   Q.   Now, as a result of this incident, Mr. Wetmore was given

17   some disciplinary sanction; is that correct?

18   A.   Yes, sir.

19   Q.   And was any attempt made at that time to tell Mr. Wetmore

20   who had complained about him or complained about the materials?

21           MS. PIEMONTE-STACEY:  Objection.

22           THE COURT:  Overruled.

23   A.   Can you repeat the question, please?

24   Q.   Certainly.  At or around the time this incident occurred

25   and around the time that Mr. Wetmore had some disciplinary

Page 136

1    action taken against him because of it, was Mr. Wetmore told

2    who had complained about him?

3    A.   No.  I don't think so.

4    Q.   And was any investigation made into the relationship

5    between the person who complained -- I'm sorry, let me go back

6    one step.  Around the time that this event occurred --

7            THE COURT:  Well, can I just, did he deny it,

8    Mr. Wetmore?

9            THE WITNESS:  Did he deny?

10           THE COURT:  Yes, that it was his?

11           THE WITNESS:  Yes, he denied it.

12   Q.   And he asked for a hearing on it?  Is that true?

13   A.   And he what?

14   Q.   He asked to have a hearing?

15   A.   Yes, yes.

16   Q.   Okay.  Now, you don't today remember who gave you the

17   information; is that correct?

18   A.   That's correct.

19   Q.   Okay.  At the time that the information was given to you,

20   did you see the person who was reporting it?

21   A.   No, I didn't see him because, like I said, it was

22   through -- my door was partly open.  I was working at my desk,

23   and this person came with a quick message.

24   Q.   Okay, did the person come into your office?

25   A.   Uh-huh.  Yeah, he may have looked into the office.

1    Q.    But did you see his face?

2    A.    No, I did not see him.

3    Q.    And did you talk to him?

4    A.    No.  If anything, maybe I would have said something like,

5    "Okay, thank you.  I'll take care of that."

6    Q.    So that person said, "I don't like the guy.  He's got

7    material that could hurt us.  He's weird," and you didn't do

8    anything to find out who was giving you that information?

9    A.    Yes, I did.  I referred -- I referred it to the officer.

10   Q.    To Officer Russell?

11   A.    Mr. Russell.

12   Q.    Did you tell Mr. Russell to find out who gave the

13   information?

14   A.    Uhm, no.  I told him to look into what could have been the

15   possible contraband in Mr. Wetmore's bunk.

16   Q.    But you didn't do anything to find out who gave you the

17   information?

18   A.    No, I don't think so.

19   Q.    Did you have any knowledge of whether Mr. Wetmore had any

20   enemies in the eight-man room?

21   A.    No, I don't -- I do not.

22   Q.    Did you have any information about whether Mr. Wetmore had

23   any enemies in the unit outside the eight-man room?

24   A.    Not specifically.

25          THE COURT:  Well, did the other guys think he was

Page 138

1    weird?  Did they tell you that?

2              THE WITNESS:  Pardon me?

3              THE COURT:  Did any of the other guys think he was

4    weird?  Did they say that?

5              THE WITNESS:  Well -- well, "weird" is not precisely

6    the problem, the words.  Just that some of them, most of these

7    sex offenders, they carry a stigma that is not liked -- they're

8    not even liked by the other inmates.  So I'm not talking -- so

9    he's looking for a specific enemy, but there might not be any

10   specific enemy, but they don't like him in general.

11             THE COURT:  I thought everyone in that unit was a sex

12   offender, in that eight-man unit.  No?

13             THE WITNESS:  I'm sorry?

14             THE COURT:  Was everyone in the eight-man unit a sex

15   offender?

16             THE WITNESS:  No, no, ma'am.

17             THE COURT:  Was he the only sex offender?

18             THE WITNESS:  No, I can't remember if he was the only

19   sex offender.

20             THE COURT:  Excuse me?

21             THE WITNESS:  I can't remember if he was the only one.

22             MR. MILES:  May I proceed, your Honor?

23             THE COURT:  Yes, sure, sure.

24   Q.  Were you able to tell if the individual who gave you the

25   information about Mr. Wetmore was Hispanic?

Page 139

1   A.   No, I don't think he was a Hispanic.

2   Q.   Was he African-American?

3   A.   No.  I think he was a white guy.

4   Q.   Do you know how tall he was?

5   A.   No.  I have no idea.

6   Q.   Do you remember what his voice sounded like?

7   A.   It sounded like you.

8   Q.   I'm sorry?

9   A.   He sounded like you.

10  Q.   Okay, well, I've never been arrested and in the facility,

11  I take it.

12          (Laughter.)

13  Q.   Do you know anybody else at the facility whose voice

14  sounds like mine?

15  A.   I do not.

16          MR. MILES:  Circumstantial evidence, your Honor.

17          MS. PIEMONTE-STACEY:  I want it in.

18          (Laughter.)

19          THE COURT:  So he didn't have a Spanish accent?

20          THE WITNESS:  Your Honor, I do not remember that.

21  Q.   And I take it, did you get up from your desk and go out to

22  identify this person?

23  A.   No.  I picked up the phone.

24  Q.   To call Officer Russell?

25  A.   Yes, sir.

Page 140

1   Q.   Had you received any other complaints about Mr. Wetmore's

2   behavior before this event occurred?

3   A.   No, sir.

4   Q.   Had you received any other complaints about material

5   Mr. Wetmore had in his possession before this event occurred?

6   A.   Before?

7   Q.   Yes.

8   A.   No, sir.

9   Q.   Did you determine from the person who gave you the

10  information or from anybody else why the individual had made a

11  complaint about Mr. Wetmore?

12  A.   Well, the person said it himself.  He said that he had

13  stuff over there that people don't like to be around.

14  Q.   And from that, did you draw any conclusions about whether

15  he was a resident of the eight-man room or not?

16  A.   No, I do not.  I only know that he was a resident from the

17  GB.

18  Q.   And that would be the unit that includes the eight-man

19  room?

20  A.   Yes.

21       MR. MILES:  Thank you.  I have no further questions,

22  your Honor.

23  CROSS-EXAMINATION BY MS. PIEMONTE-STACEY:

24  Q.   Mr. Quiles, can you describe generally how you receive

25  complaints when you're in the institution.

Page 141

1   A.   Well, some are verbal, some are written.  Some of them

2   could be like a dropped note.  Some of them are referred to me

3   by the officers.

4   Q.   And how often do you receive complaints?

5   A.   It could be any day.  Several times a day I may receive a

6   complaint from somebody.  Sometimes a day may go by without

7   even a single incident.

8   Q.   Have you had any complaints about Mr. Wetmore since the

9   incident?

10  A.   Since the incident?  Yes, I have.

11  Q.   And what is that?

12  A.   Well, I don't think he got written about for it, but there

13  are many, for example, instances in which I think he hide a

14  piece of equipment --

15            MR. MILES:  Objection.

16  A.   -- from facilities.

17            THE COURT:  Overruled.  What do you mean he hides a

18  piece of equipment?

19            THE WITNESS:  Well, I think during one of those

20  shakedowns of the unit, they found something in his area that

21  belonged to the facilities department.

22            THE COURT:  Is that something you saw?

23            THE WITNESS:  Something that I saw?

24            THE COURT:  Yes.

25            THE WITNESS:  No.  She asked me whether I have heard

Page 142

1    anything about it.  I heard about it.

2             THE COURT:  Then I sustain.  That's hearsay.

3             MS. PIEMONTE-STACEY:  I said if you received a

4    complaint, so I'm sorry.

5             Okay, I have nothing further, Mr. Quiles.

6             MR. MILES:  No further questions, your Honor.

7             THE COURT:  Thank you for coming in.  How did those

8    ear things work, good?

9             THE WITNESS:  Very good.

10            THE COURT:  Are they good earphones?  Good.

11            MR. MILES:  Thank you.

12            (Witness excused.)

13            THE COURT:  Okay, are we done with the fact witnesses?

14            MR. MILES:  We have Mr. Rankin here, but I understand

15   that the government wishes to proceed with its case.

16            MS. PIEMONTE-STACEY:  He's incarcerated at FMC Devens.

17   He can come back, as opposed to having our expert fly back.

18            THE COURT:  How long will Rankin be?

19            MR. MILES:  He should be relatively short, your Honor.

20            THE COURT:  Like what?

21            MR. MILES:  Ten minutes, fifteen minutes.

22            THE COURT:  Is he downstairs now?

23            THE MARSHAL:  We were told that the other witness was

24   going first, so it will take about ten, fifteen minutes to get

25   him.

Page 143

1      THE COURT:  Well, why don't we get going on the

2  witness, you bring him up so we don't have to -- it's a huge

3  expense to transport these people back and forth.

4      MS. ROLLINS:  And, your Honor, with respect to

5  housekeeping, you mentioned you wanted me to mark two exhibits.

6  Attorney Miles actually agreed to the admission of

7  Government 6, which is the October 7, 2008 memo from

8  Dr. Renaud.  So I think what you were speaking about -- and I'm

9  not speaking for the Court -- but is the sort of hearsay you

10 were arguing, the document about Dream Boys and "Faces of the

11 Rainforest."

12      THE COURT:  Yes, yes.

13      MS. ROLLINS:  That's the one that the government will

14 mark, okay?

15      THE COURT:  Yes, for identification, and then I think

16 we all need to look at the business records.  If someone with

17 knowledge reports to someone who doesn't have knowledge and

18 then they put it into the record, is that good enough?

19      MS. ROLLINS:  All right, but Government 6, there was

20 no objection to the admission.

21      THE COURT:  Yes, all right.  Yes, that's great.

22      All right, let's call your witness, get going.  It

23 takes ten or fifteen minutes to get these people upstairs.  So

24 are they going to bring him up?

25      THE CLERK:  Yes, yes.

Page 144

1          THE COURT:  Good, good.

2          MS. ROLLINS:  The government calls Dr. Phenix.

3                         AMY PHENIX

4    having been first duly sworn, was examined and testified as

5    follows:

6          THE CLERK:  Would you please state your name and spell

7    it for the record.

8          THE WITNESS:  Amy Phenix, A-m-y P-h-e-n-i-x.

9          MR. MILES:  I stipulate to the doctor's

10   qualifications, your Honor.

11         THE COURT:  All right.

12         MS. ROLLINS:  Additionally, your Honor, during lunch

13   we agreed with respect to the admission of Dr. Phenix's CV as

14   Government 7.

15         THE COURT:  Good.

16         MS. ROLLINS:  As well as her publications as

17   Government 8, so those documents are already in evidence.

18         THE COURT:  Okay.

19         (Government Exhibits 7 and 8 received in evidence.)

20   DIRECT EXAMINATION BY MS. ROLLINS:

21   Q.   Dr. Phenix, did you render an opinion in this case as to

22   whether Mr. Wetmore is a sexually dangerous person?

23   A.   Yes.

24   Q.   And what is that opinion?

25   A.   That he is a sexually dangerous person.

Page 145

1   Q.   And is that opinion given to a reasonable degree of

2   professional certainty?

3   A.   Yes.

4   Q.   And did you write a report that contains your conclusion?

5   A.   I did.

6   Q.   Before you wrote that report, Dr. Phenix, did you review

7   any materials?

8   A.   Yes.

9   Q.   What were the materials that you reviewed?

10  A.   The discovery in the case included all the legal

11  records -- that would be charging and conviction documents --

12  as well as presentence investigation reports, arrest reports;

13  also the records from the federal prison term, the most recent

14  federal prison term; information from SOTP or psychological

15  reports that had been conducted on him prior to the time that I

16  evaluated him; his formal criminal record as well as medical

17  records.

18  Q.   Okay.  And did you review any materials after you wrote

19  the report?

20  A.   I did.  I reviewed Dr. Prentky's report as well as

21  Mr. Wetmore's deposition.

22  Q.   Are those records the type that are reasonably relied upon

23  by experts in your field in forming opinions or inferences as

24  to whether someone is a sexually dangerous person?

25  A.   Yes.

Page 146

1   Q.   What, if any, actuarials did you use in connection with

2   your review?

3   A.   I scored the Static-99, the Static-99-R, or revised, the

4   Static-2002, the Static-2002-R, and the MnSOST-R, Minnesota Sex

5   Offender Screening Tool - Revised.

6   Q.   And did you interview Mr. Wetmore?

7   A.   I did not.

8   Q.   Why not?

9   A.   He declined.

10  Q.   In the past, have you evaluated whether somebody was a

11  sexually dangerous person without doing an interview?

12  A.   Yes.

13  Q.   And is that an accepted practice in your field?

14  A.   It's accepted.  It's ethical as long as, if you render a

15  diagnosis, you have sufficient history and information to do

16  that without a face-to-face interview.

17  Q.   And did you have sufficient records and information in

18  order to perform an evaluation in this case?

19  A.   I did.

20  Q.   With respect to the first criteria, past sexual conduct,

21  has Mr. Wetmore engaged in or attempted to engage in --

22          THE COURT:  I think that piece is stipulated, right?

23          MR. MILES:  The criminal record is stipulated to, your

24  Honor.  I don't know if that's where the question is going, and

25  I may need -- once I figure it out, I may object.

1          THE COURT:  Well, all right, you'd better ask the

2     question then.

3          MS. ROLLINS:  Thank you, your Honor.

4     Q.   Has Mr. Wetmore engaged in or attempted to engage in

5     sexually violent conduct or child molestation in the past?

6     A.   Yes.

7     Q.   And would you describe Mr. Wetmore's past instances of

8     sexually violent or child molestation conduct in the past.

9     A.   Yes.  That would be --

10         MR. MILES:  Objection.

11         THE COURT:  Overruled.

12    A.   His conviction for unlawful sexual contact, that would be

13    with Mark P who is twelve years of age that he took on a

14    camp-out and fondled the boy; furthermore, a conviction for

15    gross sexual misconduct where he engaged in approximately three

16    years of sexual misconduct with Willy from age nine to twelve.

17    Q.   And is that opinion with respect to the first criteria

18    given with a reasonable degree of professional certainty?

19    A.   It is.

20    Q.   And with respect to the second criteria diagnosis, does

21    Mr. Wetmore suffer from a serious mental illness, abnormality,

22    or disorder, in your opinion?

23    A.   Yes.

24    Q.   And what does he suffer from?

25    A.   I believe he suffers from pedophilia, sexually attracted

Page 148

1    to males, and I diagnosed nonexclusive type.

2    Q.   And just for us that don't understand, nonexclusive type

3    means what?

4    A.   That would mean sexually aroused, having a sexual

5    preference or arousal not only to prepubescent males but

6    postpubescent males and perhaps adult males.

7    Q.   And is pedophilia a paraphilia?

8    A.   Yes, it is.

9    Q.   Okay.  And are you familiar with the DSM-IV-TR?

10   A.   Yes.

11   Q.   I'm going to direct your attention, if I can, to -- well,

12   what is the DSM-IV-TR used for?  Are there definitions in this

13   document?

14   A.   Yes.  It's a classification manual of mental disorders

15   commonly diagnosed by mental health professionals.

16   Q.   And is there a definition in this document that I just

17   showed everyone for pedophilia?

18   A.   Yes.

19   Q.   And I'm going to place this on the ELMO right now.  Do you

20   see that, Doctor?

21   A.   Yes.

22   Q.   Can you please tell us what the definition of pedophilia

23   is.

24   A.   Yes, actually the definition would be on the next page,

25   but it would say that the individual suffers from intense,

cbf41b26-66b6-457b-880e-c778035e1b52

1   recurrent sexually arousing fantasies, sexual urges, or

2   behaviors with prepubescent children, generally age thirteen or

3   younger.

4       There are two other criteria.  The one is that the person

5   would have acted on those sexual urges, or that those urges or

6   fantasies cause the individual distress or impairment, inner

7   personal difficulty.  And, furthermore, the individual at the

8   time of the diagnosis needs to be at least sixteen years of

9   age, and that there is a five-year difference between the

10  victim and the perpetrator.

11  Q.   Okay.  And so the first page that I showed you,

12  Dr. Phenix, that says "Pedophilia," that is not the definition?

13  That just sort of describes what pedophilia is, and the next

14  page that I showed you, is that the diagnostic criteria?

15  A.   That's correct.

16  Q.   And that's what you were speaking of?

17  A.   Yes.

18  Q.   And does Mr. Wetmore, from your professional opinion, meet

19  those three diagnostic criteria for pedophilia?

20  A.   Yes, he does.

21  Q.   Now, how did you go about making that diagnosis with

22  respect to pedophilia?

23  A.   Well, I looked at several -- first of all, I looked at his

24  behaviors, what sexual inappropriate behaviors has he committed

25  toward prepubescent males in the past; the frequency and

1   duration of that behavior; what admissions he has made to

2   others; and also an examination of his pornographic habits,

3   what images he was viewing when he was looking at pornography.

4   Q.   And with respect to the diagnostic criteria for

5   pedophilia, where I'm pointing my finger here, the age is

6   thirteen, is it not?  We've heard testimony -- you have been

7   here present for all the testimony -- about other ages.  Is it

8   thirteen and below?

9   A.   Yes, the guideline, which this is a guideline, the

10  DSM-IV-TR, would advise that children thirteen years or under

11  would be considered in general prepubescent.

12  Q.   And, again, your diagnosis of pedophilia is given to a

13  reasonable degree of professional certainty?

14  A.   It is.

15  Q.   Were you present, Dr. Phenix, for Dr. Prentky's --

16       THE COURT:  Did you want to finish this line of

17  questioning, and then we'll jump into --

18       MS. ROLLINS:  Sure.  I'll ask the last question, your

19  Honor, about Dr. Prentky.

20  Q.   Sorry, Dr. Phenix.  Were you present for Dr. Prentky's

21  direct and cross-examination?

22  A.   I was.

23  Q.   And did you hear Dr. Prentky's diagnosis of Mr. Wetmore?

24  A.   I did.

25  Q.   And what was that, if you could just refresh all of our

Page 151

1   memory?

2   A.   Paraphilia not otherwise specified, hebephilia.

3   Q.   And do you agree with that diagnosis by Mr. Prentky?

4   A.   I agree that he has sexual arousal to postpubescent

5   developing boys.

6   Q.   "He" being Mr. Wetmore?

7   A.   Yes.

8   Q.   And how can that be, for the lay people here, that you can

9   say he has pedophilia, and Dr. Prentky can say he has

10  hebephilia?  How can it be that those two things are the same?

11           MR. MILES:  I object to the form of that question,

12  your Honor.  She's asking the witness to comment on another

13  witness's testimony.

14           THE COURT:  Overruled.  I'll allow it.

15           MS. ROLLINS:  And this will be the last question, and

16  then we'll break.

17           THE COURT:  Okay.

18  A.   It seemed to me -- I don't know all of Dr. Prentky's

19  thoughts on this, but it seemed to me that --

20           THE COURT:  Just based on his testimony here.

21  A.   Yes, based on his testimony here, it seemed that he for

22  some reason did not view the younger victims and the evidence

23  of arousal to prepubescent boys as sufficient for a diagnosis

24  of pedophilia.  I don't know why.  And he focused more on the

25  crossover.  And it's not unusual for individuals with

Page 152

1    pedophilia, as I think Dr. Prentky nicely described, that there

2    can frequently be arousal to prepubescent boys through

3    pubescence, as they're becoming pubescent, and then after that.

4    So he seemed to focus more on the older boys that were becoming

5    or were pubescent, when I think that there is quite sufficient

6    evidence in this case that Mr. Wetmore has pedophilia.

7            MS. ROLLINS:  And, your Honor, at this point --

8            THE COURT:  Yes, why don't we take a brief hiatus.

9    We'll bring out this other gentleman, and then we'll come back

10   to you.  Thank you.

11           THE WITNESS:  Thank you, your Honor.

12           (Witness excused.)

13           (Pause.)

14                       JOHN RANKIN

15   having been first duly sworn, was examined and testified as

16   follows:

17           THE CLERK:  Would you please state your name and spell

18   it for the record.

19           THE WITNESS:  John Rankin, J-o-h-n R-a-n-k-i-n.

20           MR. MILES:  Sorry, your Honor.  My DVD drive is dying.

21           THE COURT:  Oh, all right.

22   DIRECT EXAMINATION BY MR. MILES:

23   Q.   Mr. Rankin, tell us how old you are, sir.

24   A.   Sixty.

25   Q.   And where do you reside?

Page 153

1   A.   At Fort Devens.

2   Q.   How long have you been there?

3   A.   Three years, three and a half.

4   Q.   I'm sorry?

5   A.   Three and a half years.

6   Q.   And do you know Mr. Wetmore?

7   A.   Yes, I do.

8   Q.   How have you come to know him?

9   A.   I was housed with him for maybe two years, the same room.

10   Q.   What room was that?

11   A.   We called it the eight-man room.

12   Q.   And during the time that you resided there and Mr. Wetmore

13   resided there, did Mr. Swarm also reside there?

14   A.   Yes, he did.

15   Q.   Was there an individual by the name of Roberto Romero who

16   resided there?

17   A.   Yes.

18   Q.   And when did Mr. Romero reside there?

19   A.   I'm not sure the length of time.  I'm going to say maybe

20   three months, but I really don't recall at all.

21   Q.   And were you able to observe the relationship between

22   Mr. Romero and Mr. Wetmore?

23   A.   Uhm, somewhat.  I -- I lived at the other end of the room

24   and minded my own business very much.

25   Q.   What did you observe, sir?

Page 154

1   A.   Well, they didn't talk, they didn't have much to say, and

2   then I didn't really pay any attention to it until it just sort

3   of heated up all of a sudden over a day or two.

4   Q.   At what point did it heat up?

5   A.   Right before Mr. Romero left the room.

6   Q.   How long was it before he left the room?

7   A.   Uhm, well, again, I don't recall how long he was there,

8   but there was the incident that I think I'm here about, and he

9   left, I believe either that night or the next morning.

10  Q.   And can you tell me how it had heated up before the

11  incident occurred?

12  A.   I just -- I'd heard Mr. Romero talking and that he didn't

13  like --

14          MS. ROLLINS:  Objection, your Honor.

15          THE COURT:  Overruled.  I'll allow it as to Romero's

16  state of mind.

17          MR. MILES:  Thank you, your Honor.

18  A.   -- that he didn't like him.  I'd heard this kind of talk

19  before, so I didn't put a whole lot of significance to it.

20  Q.   Did Mr. Romero say why --

21          THE COURT:  Does Romero speak English?

22          THE WITNESS:  Yes, he does.

23          THE COURT:  Does he speak with a Hispanic accent?

24          THE WITNESS:  Not much of one.  He's very well-spoken

25  in English.

Page 155

1    Q.   And did Mr. Romero express why he didn't like Mr. Wetmore?

2    A.   He called him a --

3         MS. ROLLINS:  Objection again, your Honor.

4         THE COURT:  Overruled.

5    A.   I don't remember the names, but mainly "pedophile" was

6    the. . .

7    Q.   And did he do that to Mr. Wetmore's face?

8    A.   Not that I was aware of.

9    Q.   Okay, so was this while you were in the room and

10   Mr. Romero was in the room?

11   A.   Yes.

12   Q.   Before this incident occurred, had you seen Mr. Wetmore

13   cut up magazines in any way?

14   A.   Not that I recall, no.

15   Q.   Have you ever seen Mr. Wetmore in possession of scissors?

16   A.   I think so, yes.

17   Q.   Did you see what he did with the scissors?

18   A.   No.

19   Q.   Did you ever see Mr. Wetmore gluing things together in the

20   room?

21   A.   No.

22   Q.   Did you ever see Mr. Wetmore put anything under his

23   mattress?

24   A.   No.

25   Q.   Did you ever see Mr. Wetmore with cutout photographs in

1    his possession?

2    A.    No.

3    Q.    All right, now, as this incident evolved, how long before

4    a search took place did Mr. Romero start talking about

5    Mr. Wetmore?

6    A.    It was the same day, I believe.  It could have been the

7    previous day.  I don't really recall.  It was, I would say,

8    within 24 hours, though, of the search.

9    Q.    And then at some point, did an officer come in to search a

10   portion of the eight-man unit?

11   A.    Yes.  He came in and went straight to Joel's bunk and said

12   he was looking for child porn, I think.  He lifted up the

13   mattress, grabbed something.  Again, I wasn't paying a whole

14   lot of attention.  I was reading a book, and there's a couple

15   of bunks between myself and Joel's bunk.  But he was there

16   maybe 30 seconds or a minute.  He says, "Yeah, this is what I

17   came for," and he turned around and walked out.

18   Q.    Where was your bunk?

19   A.    It was at the other end of the room next to the door.

20   Q.    What was the number of the bunk?

21   A.    I don't recall the number.  I was in an upper bunk and

22   Joel was in a lower bunk.

23         THE COURT:  Where was Romero's bunk?

24         THE WITNESS:  His was -- his was over Joel's.

25         THE COURT:  Up on top of Joel's?

Page 157

1           THE WITNESS:  Yes.

2           THE COURT:  Mr. Wetmore's?

3           THE WITNESS:  Yes.

4    Q.   All right, now, after Officer Russell took the materials

5    into his possession, did you see where he went?

6    A.   He just left the room is all I know.

7    Q.   Other than saying he got what he was looking for, did he

8    say anything else?

9    A.   Not that I recall.

10   Q.   Was anybody else in the room at the time?

11   A.   Uhm, I don't recall who was in there.  I think Andy Swarm

12   was in there and. . .  I don't recall anybody else there.

13   Q.   Do you know where Mr. Wetmore was at the time?

14   A.   I believe he was working.

15   Q.   And can you tell me what your general hours were in the

16   room at that time?

17   A.   My hours were generally most of the time.

18   Q.   And why was that?

19   A.   I had a p.m. job.  And Andy Swarm didn't have a job, so he

20   was there.  And I went to recreation maybe two hours a day and

21   go to lunch, but otherwise I'd be around the room for the most

22   part.

23   Q.   And what was Mr. Romero's pattern of occupancy in the

24   room?

25   A.   He came and went.  He was -- again, he was a fairly new

1   guy, so I don't really recall his hours, but he was around

2   during the daytime from time to time.

3   Q.   And did you ever see him with scissors?

4   A.   I think everybody there has scissors.  It's a very common

5   item to have.

6   Q.   Did you ever see him with magazines?

7   A.   Yes.  He subscribed to quite a few magazines.

8   Q.   Do you remember any of them in particular?

9   A.   Uhm, I think People, Us, these weekly entertainment

10  magazines.  I don't really -- I remember People.  I don't

11  remember the others.

12  Q.   Did he share his magazines?

13  A.   I think he did, you know, but I don't -- I didn't have --

14  he didn't share them with me because I didn't have an interest

15  in them, but I think other people did.

16  Q.   Where did he keep his magazines?

17  A.   I don't know.

18  Q.   Did he have a locker?

19  A.   Yes.

20  Q.   Do you know if he used it?

21  A.   I assume he did.

22  Q.   No, I'm asking if you remember whether he did or did not.

23  A.   Sure he did.  Yes, he did.

24  Q.   Now, let's go back to Officer Russell's search.  Can you

25  tell us how long that took?

Page 159

1    A.   I don't think it was even a minute.  I know he didn't

2    really search anywhere.  He lifted the mattress, and it was

3    quite obvious that he knew exactly where he was going, and he

4    said, "Yeah, this is what I came for," and he left.  So it was

5    no search.

6    Q.   Did you happen to see what he had taken?

7    A.   No.  I -- it looked like it was -- it could have been a

8    magazine or bundle of papers.  You know, I just remember it was

9    like a notebook-size thing.

10   Q.   How much later did Mr. Wetmore return to the room?

11   A.   I don't know that either.

12   Q.   Were you there when Mr. Wetmore came back?

13   A.   I don't recall.

14   Q.   Did you have any conversation with Mr. Wetmore about what

15   had happened?

16   A.   I don't recall that either.

17   Q.   And did anything else happen with respect to this incident

18   that got your attention?

19   A.   Romero was -- I believe he was gone that night, but I'm

20   not sure of that, but --

21   Q.   Out of the room?

22   A.   Yes.  He got moved.

23   Q.   Do you know where he got moved to?

24   A.   Another cell.

25   Q.   After he got moved, did he ever come back to the room?

1   A.   I don't -- I think he came around at times but not -- not

2   too much.  He came back for maybe a few days.

3   Q.   Was Mr. Wetmore in the cell at that time?

4   A.   Not that I recall.  I think, by the end, we -- we knew

5   there was some -- something going on of significance, so they

6   were -- he wasn't coming around when Joel was around.

7           MR. MILES:  I have no further questions, your Honor.

8   CROSS-EXAMINATION BY MS. ROLLINS:

9   Q.   Mr. Rankin, you didn't see the materials that were

10  confiscated, did you?

11  A.   No, I did not.

12  Q.   And you never spoke with Mr. Wetmore's staff

13  representative, did you?

14  A.   I don't -- I don't know who his staff representative would

15  be.

16  Q.   Do you know Shawn Reidy?

17  A.   No.  I know who he is, but I never spoke to him, no.

18  Q.   Okay.  You went to Mr. Wetmore's hearing, didn't you?

19  A.   No.

20  Q.   Did you provide a statement with respect to the hearing

21  Mr. Wetmore had about possession of these materials?

22  A.   Yes, I did.

23  Q.   Did you testify there, or did you give a statement?

24  A.   I responded to questions asked by one of the officers, I

25  believe, if I recall.

Page 161

1   Q.   So you were physically present there, though, right, sir?

2   A.   I was called into a room with the officer.  I wasn't at

3   the hearing itself, a separate room.

4   Q.   Right, I'm not trying to trick you.  I'm just trying to

5   figure out if you wrote something down or if your voice said

6   something to somebody.

7   A.   I believe I just -- he asked me questions and I responded.

8   I don't recall a written statement.

9   Q.   And you didn't provide Romero's name at that hearing, did

10  you?

11  A.   No, I did not.

12  Q.   And you have absolutely no knowledge as you sit here today

13  who those materials belonged to, do you, or who put them there?

14  A.   No, I don't.

15  Q.   But you do know they were found in Mr. Wetmore's cell

16  area, correct?

17  A.   Yes.

18  Q.   And you, sir, are in the Sex Offender Treatment Program?

19  A.   No.

20  Q.   Are you in the SOMP?

21  A.   Yes.

22  Q.   So that's mandatory, correct?

23  A.   Yes.

24  Q.   And does that mean that you yourself have committed a sex

25  crime against children?

Page 162

1    A.    Under the law, yes.

2    Q.    Under the law?

3    A.    Under the law, yes.

4    Q.    And in fact isn't it true that you were convicted of

5    possession of child pornography yourself?

6    A.    Yes.

7    Q.    In this courthouse, correct, with Judge Gertner?

8    A.    Yes.

9    Q.    And, sir, do you remember being deposed in this matter?

10   A.    Yes.

11   Q.    You met not with myself but another individual, I believe

12   this woman sitting right in front of me?

13   A.    Yes.

14   Q.    Do you remember drawing a picture of what your cell looked

15   like?

16   A.    Yes.

17   Q.    And, sir, I'm going to put something up on the screen

18   right now.  Please tell me if this is -- oops, let me make sure

19   I get this right.  I'll put it this way.  I don't want to get

20   you dizzy but -- sir, I'm going to point my finger at something

21   now.  Is it marking up on your screen?  Is that your name right

22   there?

23   A.    I don't see your finger.

24   Q.    I'm sorry.  Is there an arrow pointing out where I just

25   touched it on your screen?

Page 163

1   A.   Oh, yes.

2   Q.   That's your name, correct?

3   A.   Yes, it is.

4   Q.   And do you remember drawing this picture, sir?

5   A.   Yes.

6   Q.   Okay.  And I am going to clear this and touch here.  Do

7   you see there where it says the word "door" where I just

8   touched, and there should be a dot on the screen?

9   A.   Yes.

10  Q.   Is that where you drew that somebody would walk into the

11  eight-man cell?

12  A.   Yes.

13  Q.   And, sir, your name is John Rankin, correct?

14  A.   Correct.

15  Q.   So where this next dot is where it says "2 beds Rankin on

16  top," is that accurate that you were on the top bunk of that

17  first set of beds?

18  A.   Yes.

19  Q.   Okay.  And the next bed -- so there's a second bed if

20  we're moving to the left in this photo.  That's a bunk bed as

21  well, correct?

22  A.   Correct.

23  Q.   And then there is a third bed which is another set of bunk

24  beds, correct?

25  A.   Yes.

Page 164

1   Q.   And then there is a fourth bed, the last bed where you

2   wrote "2 beds Romero on top, Wetmore on bottom."  Do you see

3   that?

4   A.   Yes.

5   Q.   And that means that Wetmore was on the bottom bunk and

6   Romero was on the top bunk; is that accurate, sir?

7   A.   Yes.

8   Q.   And it's your testimony today that you were in your top

9   bunk three beds away when the sweep of the room by

10  Officer Russell occurred?

11  A.   Yes.

12  Q.   And it's your testimony today, sir, that on the top

13  bunk -- and you, I think, testified that you weren't really

14  paying attention on your direct.  Do you remember saying that?

15  A.   Yes.

16  Q.   So while you were lying in your top bunk not really paying

17  attention, it's your testimony that you could see what

18  Officer Russell was doing three beds away, down one bed?

19  A.   I was reading a book.  You know, I was trying to keep my

20  eyes into my -- my nose into my book.  The two beds between us,

21  the top beds, interrupts my line of vision.  All I could see is

22  Mr. Russell bent over at Joel's bed.  I couldn't see where he

23  was looking.  I know he was looking under the bed, under the

24  mattress or under the bed, but I couldn't really -- but he

25  wasn't there very long at all.  He -- and then I saw -- I

Page 165

1    believe I recall seeing the mattress get lifted up, and he

2    said, "This is what I came for," and he stood back up.

3    Q.   So your testimony today, sir, is that from your top bunk

4    looking through two beds to the third bed down, you could see

5    through those two beds down to the first bed somebody lifting

6    up a mattress while you were reading and not paying attention?

7    Is that what you're saying?

8    A.   Yes.

9    Q.   Okay.  You've had incidents with officers before, right?

10   You've been written up twice recently?

11   A.   Yes.

12   Q.   And would you consider Mr. Wetmore a friend?

13   A.   No.

14   Q.   How many times have you talked to Mr. Wetmore about your

15   testimony at his hearing?

16   A.   I'm going to say maybe a month and a half, two months ago,

17   he told me that I was probably going to get called for the

18   hearing.

19   Q.   And do you mean the hearing while we're here before

20   Judge Saris today?

21   A.   Yes.

22   Q.   Okay.  Let's take a step back, sir, and go to the hearing

23   about the materials that were found under Mr. Wetmore's -- in

24   Mr. Wetmore's cell, okay?

25   A.   Okay.

1   Q.   So I'm sorry I wasn't clear about that.  With respect to

2   that hearing at Devens, how many times did you speak to

3   Mr. Wetmore about your testimony there?

4   A.   I don't really recall.  I'm sure once anyway.

5   Q.   And isn't it true, you didn't speak to Mr. Wetmore about

6   testifying on his behalf for several days after the incident

7   happened?

8   A.   I don't know -- I don't recall that, but it could be as

9   likely true as not.

10  Q.   And, sir, Mr. Swarm, you said that he's in your eight-man

11  cell.  Is that accurate?

12  A.   Yes.

13  Q.   Isn't it true that Mr. Swarm usually has earphones in and

14  a towel wrapped around his head and is sleeping all the time?

15  A.   Yes.

16  Q.   And is it also true, sir, that you and others refer to

17  Mr. Romero as a snitch?

18  A.   No.  I don't refer to him as that.

19  Q.   As you've already testified, sir, you gave a deposition in

20  this matter.  Do you remember that?

21  A.   Yes.

22  Q.   And you were sworn prior to giving your testimony there,

23  and you were told to give the truthful testimony, were you not?

24  A.   Yes.

25  Q.   And did you have an attorney present on your behalf or no?

Page 167

1    A.    No.

2    Q.    But Mr. Harry miles was present, is that accurate, who

3    represents Mr. Wetmore?

4    A.    Yes.

5          MS. ROLLINS:  And, Attorney Miles, I'm going to

6    Page 34 of Mr. Rankin's deposition testimony.  I'm going to

7    walk this up.  Oh, I apologize, your Honor.  May I approach?

8    Sorry.

9          THE COURT:  Although given the fact that this is a

10   bench trial, you can also just put them on the document camera,

11   and you'll be able to see it.  While she's walking, what are

12   you committed to Devens for?  Is it because of the sex

13   offender, or do you have a medical illness?

14         THE WITNESS:  Yes.

15         THE COURT:  Which?

16         THE WITNESS:  Sex offender.

17   Q.    Mr. Rankin, just so I want to make sure that you know that

18   I'm actually looking at your deposition here, do you see your

19   name up top here, "Depo, John Rankin"?

20   A.    Yes.

21   Q.    And, sir, I'm pointing to Page 34, and I will try to zoom

22   in on this.  I apologize.  And you were asked a question on

23   Line 23.  The question is, "Have you ever heard Mr. Romero

24   referred to as a snitch?"  Did I read that correctly?  I'm sure

25   you can't see it.

Page 168

1        MS. ROLLINS:  Your Honor, can I just approach so this

2   happens quickly?

3        MS. PIEMONTE-STACEY:  She's done something to it.

4   Q.   Sir, I'm going to hand you this.  I'm reading from --

5        (Witness examining transcript.)

6   A.   Okay.

7   Q.   Sir, I'm reading from Page 34, starting at Line 23:

8   "Question:  Have you ever heard Mr. Romero referred to as a

9   snitch?"  Did I read that accurately?

10  A.   Yes.

11  Q.   "Answer," and that would be you, "After this, yes, we were

12  all kicking that word around."

13  A.   Yes.

14  Q.   Did I read that accurately?

15  A.   Yes.

16  Q.   Can I ask you the question again, sir:  Did you refer to

17  Mr. Romero as a snitch?

18  A.   No.  I said we were --

19       THE COURT:  Did other people refer to him as a snitch?

20  A.   If I can clarify.

21  Q.   Go ahead.

22  A.   I don't use that word.  Other people do, I said "yeah,"

23  but I don't prefer to throw labels on people, which was, to me,

24  how this whole incident got started.  So I'm very reluctant to

25  use those words, even though I think he is one and that he is

Page 169

1   the one that turned Joel in --

2           THE COURT:  Why do you think that?

3           THE WITNESS:  Uhm, because of the -- the -- the -- the

4   ease of which the information was found by the officer.  He

5   went straight -- he knew exactly where he was going.  He didn't

6   search his locker.  He didn't search under his pillows.  I

7   mean, if we get searched, they search us.  They tear the whole

8   cell apart.  They look at everything.  And he went to one

9   specific place, grabbed something, and said, "This is what I

10  came for," and he left.

11          So that, to me, indicated he knew it was there,

12  somebody had turned him in.  I didn't know it was Mr. Romero at

13  the time.  I still don't know it for a fact today, but -- then

14  Mr. Romero leaving that evening, it seemed awfully convenient.

15  And maybe it was totally coincidental, but it seemed to me like

16  the shoe seems to fit.

17  Q.  And snitches tell, sir.  They don't plant, right?

18          MR. MILES:  Objection.

19          THE COURT:  Sustained, sustained.

20          Let me ask you this:  Mr. Romero, do you know why he's

21  committed to Fort Devens?

22          THE WITNESS:  Sex offender.  That's about the extent

23  of it.

24          THE COURT:  Did you see him with scissors cutting up

25  magazines?

1          THE WITNESS:  No.

2          THE COURT:  Did you ever see anyone doing that?

3          THE WITNESS:  Uhm, not really.  That's against the

4   rules at Fort Devens.  That's why you -- if people do it, they

5   do it very secretively.

6          THE COURT:  Right, so I'm asking, did you see someone

7   doing it secretively?

8          THE WITNESS:  Uhm, no, I haven't.  I've seen a couple

9   people doing it that -- they're clipping out magazines.  They

10  got --

11         THE COURT:  Who did you see clipping out magazines?

12         THE WITNESS:  Well, not -- other inmates.

13         THE COURT:  Yes, so who?  Well, let me put it this

14  way:  Just at that period of time in that block.

15         THE WITNESS:  Well, not in this eight-man room,

16  nobody.

17         THE COURT:  Well, did you see anyone else in that --

18  what would you call it, the floor -- in that period of time?

19         THE WITNESS:  The floor, yes.  Yes, I have.

20         THE COURT:  At that period of time?

21         THE WITNESS:  On occasions.  There's people that

22  collect cartoons.  There's people that collect magazine

23  articles.  There's people that collect pictures.  So a lot of

24  people do it, but it's against the rules, so -- especially if

25  you're in the SOMP program, they can write you an incident

Page 171

1   report for doing it, so --

2          THE COURT:  Well, did you see Mr. Wetmore clip stuff

3   out?

4          THE WITNESS:  No.

5          THE COURT:  Did you see Mr. Romero clip stuff out?

6          THE WITNESS:  No, I didn't.

7          THE COURT:  Mr. Swarm?

8          THE WITNESS:  No, I haven't.

9          THE COURT:  Henderson?

10          THE WITNESS:  I don't recall a Henderson.

11          THE COURT:  What's the name of that guy?

12          MS. ROLLINS:  Hunt, Hunt.

13          THE WITNESS:  Hunt, no.

14          THE COURT:  Right in the next bed over was --

15          MS. ROLLINS:  Oh, Houseman.

16          THE COURT:  Houseman.

17          THE WITNESS:  No, ma'am.

18          THE COURT:  So do you know how that magazine got under

19   that mattress, those clippings?

20          THE WITNESS:  No.

21   Q.   Did you ever learn, Mr. Rankin, whether Mr. Wetmore was

22   held responsible for the incident involving the sweep of his

23   room?

24   A.   I believe I was told that he -- yeah, I think he told me

25   that he was.

Page 172

1   Q.   That he was held responsible, correct?

2   A.   Yes.

3        MS. ROLLINS:  Nothing further, your Honor.  Thank you,

4   Mr. Rankin.

5        THE COURT:  Anything else from you, Mr. Miles?

6   REDIRECT EXAMINATION BY MR. MILES:

7   Q.   Is there anybody else in the eight−man room at that time

8   who did not like Mr. Wetmore or did not get along with

9   Mr. Wetmore?

10       (Witness pausing.)

11  A.   I −− not at that time.  I don't believe so.

12       MR. MILES:  Thank you.  I have no further questions,

13  your Honor.

14       THE COURT:  Thank you.

15       (Witness excused.)

16       THE COURT:  So there's no one else downstairs you're

17  holding for transport, right, other than Mr. Wetmore himself?

18       MR. MILES:  Excuse me, your Honor.  Mr. Wetmore

19  indicates he's ill and will need a minute.

20       THE COURT:  Yes, we'll take a break.

21       MR. MILES:  Thank you.

22       THE COURT:  I suggest you quickly get Mr. Wetmore in

23  there because I think he's sick to his stomach.  Why don't we

24  get him in there first, if I've heard correctly what's the

25  problem.

Page 173

1          MR. MILES:  Yes, your Honor.

2          (Respondent removed from the courtroom.)

3          THE COURT:  What's wrong?

4          MS. ROLLINS:  I just saw Mr. Miles standing up, and I

5     thought we were supposed to be standing up.

6          THE COURT:  Oh, all right.  There's no other witness

7     here other than Dr. Phenix, right?

8          MR. MILES:  Correct.

9          THE COURT:  Well, let me ask you this:  Based on this

10    testimony, did you still need Swarm?

11         MR. MILES:  We've agreed to redact the deposition and

12    submit him by deposition, your Honor.

13         THE COURT:  Okay, so we can let the Federal Defender --

14    is Mr. Gold still here?

15         MS. PIEMONTE-STACEY:  I informed Mr. Gold this

16    morning.

17         THE COURT:  All right, so he's here for his own

18    edification.

19         MR. GOLD:  Actually, your Honor, I happen to be out of

20    uniform.

21         THE COURT:  I just thought you were going undercover

22    there.  I just wanted to make sure you knew.

23         MR. GOLD:  They discussed it with me, yes.

24         THE COURT:  Okay, so one of the reasons I wanted to

25    get that through is so we could wrap up that issue.

Page 174

1          MR. MILES:  Yes, your Honor.

2          THE COURT:  And can I see counsel at side bar for one

3   minute.

4   SIDE-BAR CONFERENCE:

5          THE COURT:  Just for the record, the marshal told us

6   that Mr. Wetmore in fact is vomiting right now, so I don't know

7   what that means for the rest of our day.  I have two suggestions.

8   One is to essentially summarize her opinion and put in her

9   report subject to your cross.

10         MR. MILES:  I would object to the report, your Honor.

11         THE COURT:  We've done it in other cases.  If you

12  object -- I'm just simply thinking that -- is there a

13  particular portion you object to?

14         MR. MILES:  I object to the recounting of all of the

15  details that she gleaned from the records because --

16         THE COURT:  I understand that, I understand that.  I'm

17  trying to think if there's another shortcut, but we may not

18  have one.

19         The second thing is -- I want to turn to you -- I

20  mean, I have this uncomfortable feeling that that officer does

21  know who told him.

22         MS. PIEMONTE-STACEY:  We have explored it.  I just --

23  I think that's why I asked what the nature of the tips were.

24  At the end of the day, regardless of who told him, the material

25  was there, and there was a full hearing at the facility, and he

cbf41b26-66b6-457b-880e-c778035e1b52

Page 175

1    had the benefit of the full hearing with the staff

2    representative.

3         THE COURT:  Let me put it this way:  I just have that

4    feeling.

5         MS. PIEMONTE-STACEY:  I understand.

6         THE COURT:  And he may be wanting to protect someone

7    from institution retaliation otherwise, and I would just ask

8    that you talk to him privately and perhaps Mr. Russell

9    privately.

10         MS. PIEMONTE-STACEY:  I have done that more than once

11    already, your Honor.  I will do it again.

12         THE COURT:  It doesn't make sense that he has no

13    memory of what he -- maybe he wouldn't remember a name because

14    maybe there are a lot of people coming up, but he would

15    remember what he looked like.

16         MS. PIEMONTE-STACEY:  But I think that's the part that

17    was getting lost, and I don't want to supplement the record at

18    all, but they get a bajillion of these a day.  He just -- if it

19    was a shank or if it was something super-serious --

20         THE COURT:  Maybe.  I just had that feeling.  It

21    sounds as if the likely person was Romero.

22         MR. MILES:  If it would help, your Honor --

23         THE COURT:  I'm not sure if that helps.  I'm not sure

24    it helps your case.

25         MR. MILES:  I understand, but if it would help the

Page 176

1   government, your Honor, I have no objection to them putting in

2   a pseudonym so that Quiles does not have to disclose an actual

3   name on the record.

4          MS. PIEMONTE-STACEY:  He doesn't remember.

5          THE COURT:  I also had this uncomfortable feeling that

6   this last witness knew who he saw cutting things up, but --

7   just you look at body language.  And I can only imagine what

8   it's like to be in one of those institutions, either as a guard

9   or as an inmate, so I'm not here to fault, but you look at body

10  language and see things.  I'm not sure if it cuts any

11  particular way, but --

12         MR. MILES:  It's what we're working with,

13  unfortunately.

14         THE COURT:  It's what we're working with.

15         So I don't know what to do.  We need to take a break

16  here until we -- let's see how he's -- how's he doing there?

17  Mr. Miles, I hate to do this to you --

18         MR. MILES:  Not a problem, your Honor.

19         THE COURT:  If you went back and see if he felt

20  well --

21         MR. MILES:  Sure.

22         THE COURT:  Is it okay if he goes back to see if he

23  feels well enough to continue with the hearing, or maybe we

24  take a fifteen-minute break or something?

25         MR. MILES:  I'll be glad to see what's going on and

Page 177

1    report back, your Honor.

2           THE COURT:  Yes.  And in the meantime, maybe Mr. Alba

3    can be checking with you on the date to continue this hearing.

4           (End of side-bar conference.)

5           (A recess was taken, 3:15 p.m.)

6           (Resumed, 3:31 p.m.)

7           THE COURT:  Come on up, Dr. Phenix.

8           MS. ROLLINS:  Your Honor, just for a matter of

9    housekeeping, the parties have agreed that Dr. Renaud's

10   July 31, 2007, Psychology Data System note is marked as

11   Government's 9 just for identification.

12          THE COURT:  Okay.

13          MS. ROLLINS:  So if the record is clear, we've handed

14   that to the Clerk.

15          (Government Exhibit 9 marked for identification.)

16          THE COURT:  All right, but let's going because we have

17   a half an hour left for Dr. Phenix, and I'd love to finish her

18   direct examination if possible.  We definitely won't finish the

19   cross.

20                          AMY PHENIX

21   having been previously duly sworn, was examined and testified

22   further as follows:

23   CONTINUED DIRECT EXAMINATION BY MS. ROLLINS:

24   Q.   Do you remember, Dr. Phenix, before we broke that you were

25   discussing Dr. Prentky's diagnosis?

Page 178

1   A.   Yes.

2   Q.   And you were stating that you agreed with his diagnosis of

3   hebephilia, even though your diagnosis is paraphilia?

4   A.   Yes.

5   Q.   Or pedophilia.  I apologize.  They're both paraphilias.

6   You say pedophilia; he says hebephilia in the later years.  Is

7   that accurate?

8   A.   Yes.

9   Q.   And how can that be, Dr. Phenix?  To lay people, those

10  sound like two different things.  How can you agree with that

11  but have a different diagnosis?

12  A.   Well, I provided the diagnosis that it's in the DSM-IV-TR

13  of pedophilia because I certainly have sufficient information

14  to support that diagnosis.  I agree, however, that his pattern

15  of arousal includes boys who are going through puberty.  So the

16  DSM says age thirteen and under are prepubescent, and in

17  general that's true.  But he also has arousal, it's not

18  unusual, for boys fourteen, fifteen, sixteen; and at least in

19  two incidents, he had sexual activity with male inmates who

20  were adults.

21        So he has additional patterns of arousal, not only

22  prepubescent children.  It would not be incorrect to diagnose

23  pedophilia, sexually attracted to males, nonexclusive type, and

24  to include paraphilia NOS, hebephilia.  But I had very

25  sufficient evidence for pedophilia, and feel that he certainly

Page 179

1   fits into that diagnosis, and simply just did not add on

2   paraphilia NOS, but I recognize his arousal patterns.

3   Q.   Okay.  And can we talk, Dr. Phenix, about the specific

4   facts that you looked at when making that diagnosis with

5   respect to pedophilia.

6   A.   Yes.  Just looking at his sexual development, he has

7   disclosed to evaluators that he began --

8           MR. MILES:  Objection.

9           THE COURT:  Overruled.

10  A.   -- a sexual relationship when he was age twelve with a

11  seven-year-old, so we see an early pattern --

12          THE COURT:  Where is that?

13          THE WITNESS:  That information was disclosed either to

14  Dr. Ferraro or to Dr. Prentky.  I'd have to refresh my memory.

15          THE COURT:  Who's Ferraro?

16          THE WITNESS:  She completed the -- I'm not exactly

17  sure what -- psychological evaluation that made a determination

18  that Mr. Wetmore qualified as a sexually violent predator.

19          MR. MILES:  Renew my objection, move to strike.

20          THE COURT:  Overruled.  You mean a BOP person?

21          THE WITNESS:  Yes.

22          THE COURT:  So Wetmore said this to --

23          THE WITNESS:  One of the two.

24          THE COURT:  One of the two.

25          THE WITNESS:  I have to check.  Either her report that

Page 180

1  she completed for the BOP or from his report, but my notes

2  clearly reflect that he had an early relationship at age twelve

3  with a seven-year-old child.

4          The next relationship was Clifford, which he reported

5  to Dr. Prentky.  This was when he was fifteen years old and

6  Clifford was twelve.  So we begin to see an early pattern of

7  choosing boys who are younger than him.  For example, when he's

8  fifteen, he's postpubescent, and a twelve-year-old would be

9  prepubescent, so --

10          THE COURT:  How do you know?

11          THE WITNESS:  I'm sorry?

12          THE COURT:  How do you know a twelve-year-old would be

13  prepubescent?

14          THE WITNESS:  Generally they would, so that's why the

15  DSM specifies that children age thirteen years or younger would

16  be considered prepubescent.  We often don't have pictures of

17  the boys, and so we need some general guidelines, which are

18  derived from the average time when boys would get secondary

19  sexual characteristics.  For example, they would generally get

20  adult-looking pubic hair around age fourteen, a little into

21  their years, fourteen to sixteen; and so we would consider a

22  twelve-year-old just beginning to go through pubescence, if you

23  don't have pictures or secondary sexual characteristics.  But I

24  think what's important here is the pattern that we see in

25  choosing these partners.

1          The next relationships described were when Mr. Wetmore

2     was at the camp, and Clifford would bring other boys --

3          MR. MILES:  Objection.

4          THE COURT:  Unless this says otherwise, are these all

5     based on his statements to some evaluator?

6          THE WITNESS:  Yes.

7          THE COURT:  Overruled.

8          THE WITNESS:  This was to Dr. Prentky.  And Clifford

9     would bring Richard and Randy who were fourteen years of age.

10    At this time now, Mr. Wetmore is seventeen years of age, and we

11    are continuing to see a pattern of his interest in younger

12    boys.  Mr. --

13         THE COURT:  Can I stop you there.  Seventeen and

14    fourteen is not such an age discrepancy, so I thought that

15    wasn't a problem.

16         THE WITNESS:  It's not a problem in terms of --

17         THE COURT:  I'm not talking about whether it's a

18    statutory rape, but I'm talking about an abnormal sexual

19    attraction.

20         THE WITNESS:  Indeed.  That could be more of a peer

21    relationship, and so I need to continue to look at his

22    behaviors to see, is this a developing pedophilia, or is this

23    just immaturity on his part that draws him to younger boys, for

24    example.  And that's why, until someone is sixteen, we can't

25    even diagnose pedophilia.  But I think that the pattern is

1  clear here.

2          His next relationship when he's twenty-one years of

3  age for three to four years was with eleven-year-old Willy.

4  Willy would be considered prepubescent.  This is a lengthy

5  pedophilic relationship that he has when he's now twenty-one.

6  And so the pattern is becoming much clearer of who he is

7  aroused to.

8          I would, given that information in and of itself --

9  three to four years, Willy is eleven years of age and he's

10  twenty-one -- would certainly qualify for a diagnosis of

11  pedophilia because Mr. Wetmore is over sixteen, there's a

12  greater than five-year difference, a ten-year difference, and

13  it went on for three to four years.  It would go on for that

14  long because of his arousal to that age group.

15          THE COURT:  Three to four years from eleven to

16  fourteen for Willy?

17          THE WITNESS:  Yes, so prepubescent through pubescence

18  to postpubescence.

19          The next relationship that would be a marker for

20  pedophilia is when he's twenty-four and he molests Mark, who is

21  twelve years of age, again, by the DSM, would qualify that Mark

22  would be considered a prepubescent victim.

23          Then we see another very significant period of years

24  where he has molested Willy, Roland Willy, which is a different

25  Willy --

Page 183

1        THE COURT:  Can we just say RW?

2        THE WITNESS:  RW, actually I think Willy is not the

3   last name.  The last name is blacked out in the police report.

4   I think that that may be a middle name, but I don't know for

5   sure.

6        MS. PIEMONTE-STACEY:  That is accurate.

7        THE COURT:  All right, all right.

8        THE WITNESS:  And I'll just say Roland.

9        THE COURT:  All right.

10       THE WITNESS:  Okay.  And so then Roland reported that

11  he had been molested by Mr. Wetmore over a three-year period,

12  and from the time that he was interviewed by police at that

13  time, he was --

14       MR. MILES:  Objection, move to strike.

15       THE COURT:  This now starts to be getting more of a

16  problem.  Did you ever see whether Mr. Wetmore made comments

17  about Roland?

18       THE WITNESS:  I know Mr. Wetmore's report about

19  Roland.

20       THE COURT:  I think that's -- I think you -- well, let

21  me ask you this:  To what extent do you rely on police who are

22  talking to a child or perhaps a child's mother?  How reliable

23  do you consider that in the profession?

24       THE WITNESS:  It depends on what the self-report looks

25  like.  If the child looks as if they're confused, that they --

1    THE COURT:  But you won't know that, right?

2    THE WITNESS:  Well, sometimes you can tell by how it's

3    written, but I won't always know that, that's for sure.

4    THE COURT:  I sustain the objection to what the child

5    said to the police, but I'll allow it based on what Mr. Wetmore

6    told any of the investigators.

7    THE WITNESS:  You know, frankly, I think Mr. Wetmore

8    has some secondary gain to make the victim older when he's

9    having sex with them, so it's not unusual for someone to report

10   because that's more normal.

11   THE COURT:  I understand.  I understand why you do

12   certain things, but I have my hearsay rules, and I've got to be

13   sure it's reliable.  So unless I had some indicia of

14   reliability, I've got a problem.

15   THE WITNESS:  I understand, your Honor.

16   Q.   Well, Dr. Phenix, can I ask you a quick question.  In your

17   profession, when you're making a diagnosis about individuals

18   that are sex offenders themselves, do you normally look prior

19   to writing an expert report at police reports?  Do you normally

20   look at the court records and the documents that were used

21   prior to a conviction?

22   A.   Yes.  We look at any of those that are available.

23   Q.   And why do you do that as opposed to just listening to

24   what it is a sex offender might say to a therapist?

25   A.   Well, self-report by sex offenders about their offending

Page 185

1    is generally not relied upon by individuals like myself who

2    conduct these evaluations because it's human nature for someone

3    to minimize, deny, or alter facts so that it places them in a

4    more favorable light.

5         THE COURT:  Do you know whether this boy was put under

6    oath at a grand jury or in a court proceeding?

7         THE WITNESS:  No, I don't know.

8         THE COURT:  Do you know whether he made any fresh

9    complaints to his mother?

10        THE WITNESS:  No, I don't know that.

11        THE COURT:  All right.  Just I'm not sure enough as to

12   whether or not the time span of the molestation, whether it was

13   from -- he was what, eleven for the conviction, right?

14        THE WITNESS:  I believe he was twelve.

15        THE COURT:  Twelve for the conviction?

16        THE WITNESS:  I figured it was nine to twelve.

17        THE COURT:  So that's what the police believed, it was

18   nine to twelve, but I don't have anything in a court record,

19   right?

20        THE WITNESS:  Uhm, a court record.  That I don't know.

21        THE COURT:  Like a part of a plea or --

22        THE WITNESS:  No, I did not see it as part of a plea.

23        MS. ROLLINS:  And let me, your Honor --

24        THE COURT:  Excuse me.  Was this a trial?

25        MS. ROLLINS:  Yes.  And, your Honor, what I'll do just

Page 186

1   to make the record clear, let's take another step back.

2   Q.   Dr. Phenix, you mentioned a Mark that Mr. Wetmore

3   self-disclosed to Dr. Prentky.  Do you remember testifying

4   about that?

5   A.   Yes.

6   Q.   Was that the same Mark that Mr. Wetmore pled guilty to the

7   unlawful sexual conduct with?

8   A.   Yes, I believe so.

9   Q.   Okay, and let's take the next step.  You were talking

10  about an individual by the name of Roland.  Is that accurate?

11  A.   Yes.

12  Q.   And was there a corresponding criminal charge with

13  Mr. Wetmore regarding Roland as you know?

14  A.   Yes, gross sexual misconduct.

15       MS. ROLLINS:  Okay, so, your Honor, I think the record

16  is clear that that was the 1986 incident.

17       THE COURT:  Well, you know, there must have been a

18  trial, right?  He was convicted.  There must have been

19  testimony.  So we'll see what the court record says.

20  Q.   And what I would do, if I could, Dr. Phenix, is direct

21  your attention to Dr. Prentky's expert report, which I believe

22  you said you reviewed?

23  A.   Yes.

24  Q.   And if you turn to Page 5, ma'am.

25  A.   Yes.

Page 187

1  Q.   And read the third full paragraph under the title "Sex

2  Offense and Institutional History By Report."  You can read it

3  to yourself, ma'am, not into the record, if you don't mind.

4           (Witness examining document.)

5           MS. ROLLINS:  And, your Honor, this is a self-report

6  by Mr. Wetmore to Dr. Prentky about that incident.

7           THE COURT:  That's fine.  I'll allow that in.

8           MS. ROLLINS:  Okay, thank you, your Honor.

9           THE COURT:  What was the self-report from Mr. Wetmore?

10          THE WITNESS:  The self-report was that from age

11  fifteen to twenty-four, he was actively recruiting young

12  adolescents in the age range of twelve to fourteen to accompany

13  him to the camp for fishing, swimming, and to have sex.  It

14  also indicates that he met Roland when Roland was eleven years

15  of age at a religious group.  He said, "Over the next few years

16  we became good friends," and then he said he started molesting

17  him when he was twelve.

18  Q.   Thank you, Dr. Phenix.  And I interrupted you, I

19  apologize, but you were speaking about Roland, and that was the

20  self-report by Mr. Wetmore that you just read about.  You were

21  going through the things that you thought of when making or

22  looked to in making your diagnosis with respect to pedophilia

23  for Mr. Wetmore, and I interrupted you, so what was the next

24  thing you looked at?

25  A.   Well, I looked at Roland.  Now, if Roland was twelve when

cbf41b26-66b6-457b-880e-c778035e1b52

Page 188

1   this sexual activity was initiated, then he would be considered

2   by the DSM as prepubescent.  Furthermore, there was a report in

3   the arrest report by Willy, by Roland, that Mr. Wetmore also

4   sexually touched --

5               MR. MILES:  Objection.

6               THE COURT:  Let me hear what it is, and then you'll

7   move to strike because it may be consistent with what was the

8   conviction.  Go ahead.

9               THE WITNESS:  -- sexually touched his little brother

10  Josh who was --

11              THE COURT:  Is that the one with the acquittal?

12              THE WITNESS:  -- nine years of age.  It's my

13  understanding that, although the records are difficult to know,

14  I do not know if Josh was charged or not.

15              MR. MILES:  Move to strike.

16              THE COURT:  Sustained.

17  Q.   And what was the next thing you looked at, Dr. Phenix?

18  A.   There was, additionally, information in Dr. Ferraro's BOP

19  report that Mr. Wetmore had admitted to a total of thirty-five

20  victims of sexual molest; and of those, he identified fourteen

21  of those victims as being prepubescent and twenty-one as

22  postpubescent, so --

23  Q.   And, Dr. Phenix -- I apologize for interrupting -- there

24  was some question by the Court with respect to this report.

25              MS. ROLLINS:  Now, your Honor, we're not moving the

Page 189

1  admission of this, but --

2  Q.   Is the document that I'm putting up with respect to

3  psychological evaluation here regarding Mr. Wetmore, and then

4  I'm going to turn to -- and that starts at Bates No. WE00002 at

5  the bottom here, if you see that.  And then this is a signature

6  page by Dr. Renaud and Dr. Ferraro.  Do you see that?

7  A.   Yes.

8  Q.   That's what you're referring to?

9  A.   Yes, I am.

10       MR. MILES:  And I object and move to strike.

11       THE COURT:  She isn't admitting it, are you?

12       MS. ROLLINS:  No.  I said specifically I'm not.

13       MR. MILES:  I'm sorry, your Honor.  The testimony

14  based on that.  At this point we're dealing with perhaps totem

15  pole hearsay.  The person who took that self-report isn't here

16  for me to cross-examine on the extent to which --

17       THE COURT:  Well, you can subpoena that person.  If

18  it's a self-report, I think that that's reliable hearsay

19  evidence that an expert can rely on.  When it's three levels

20  removed into a police report, I've got a bigger problem with

21  it.

22  Q.   Dr. Phenix, I interrupted you again.  Can you please tell

23  us what the next incident you considered was with respect to

24  the diagnosis of pedophilia for Mr. Wetmore.

25  A.   Mr. Wetmore has described to evaluators specifically how

Page 190

1    he would seek out children for sexual activity.

2            MR. MILES:  Your Honor, I don't mean to be obstructive

3    but --

4            THE COURT:  It's a continuing objection.  To the

5    extent he reported it to either Ferraro or Prentky, I'm going

6    to allow her to rely on it.

7            MR. MILES:  And I'm not objecting to that.  I'm

8    objecting to in general it was reported to --

9            THE COURT:  Fair enough.  You've got to be very

10   specific here because we're now -- do you testify a lot in

11   court?

12           THE WITNESS:  I do.

13           THE COURT:  So we just have to rely on -- what the

14   basis for your information is is important.

15           THE WITNESS:  And the basis for my information would

16   be Mr. Wetmore's report to Dr. Prentky and to Dr. Ferraro.

17           THE COURT:  All right.

18           THE WITNESS:  And in that report he described how he

19   would play roles in the community that would allow him access

20   to children because he was aroused to them for sexual activity.

21   He was a scoutmaster.  He was a big brother.  He also

22   participated in youth activities, Bible study conferences,

23   which is the place where he met Roland and Roland's father.  He

24   designed his life in a way that he would have access to

25   children, who would become victims of sexual molest, which is

Page 191

1   very typical for someone with pedophilia.

2          Furthermore, he has an extensive history of the use of

3   pornography.  He self-reported to Dr. Ferraro.  In her report

4   it noted that he had 4,000 images of children, child

5   pornography.  The PSI indicated that of that pornography, which

6   I did not personally see but was described in the PSI and we

7   saw in earlier testimony was prepubescent --

8          MR. MILES:  Objection.

9   A.   -- boys included.

10         THE COURT:  Overruled.  It's in the PSI.

11         MS. ROLLINS:  And the PSI was not objected to, we'll

12   note, your Honor.

13         THE COURT:  Although I'm not sure it's 4,000 versus

14   2,000, but --

15   Q.   Go ahead, Dr. Phenix.

16   A.   Yes, the PSI reported 2,000, I'm sorry, and it was a

17   self-report to the evaluator of 4,000.  And, furthermore, while

18   I did not view that pornography, there was information in the

19   police report from the offense in 1999 that resulted in a

20   probation violation for Mr. Wetmore by Brad, who was working

21   with Mr. Wetmore at his auto shop, that Brad had himself seen

22   several thousand, or thousands, he said -- that was the

23   quote -- thousands of pictures of child porn, and he

24   believed --

25         MR. MILES:  Objection.  Objection, move to strike.

Page 192

1      THE COURT:  So this is Brad telling who?

2      THE WITNESS:  The police in a police report.

3      MR. MILES:  Objection, move to strike.

4      THE COURT:  You said there was a probation revocation

5  as a result of it.  Do we have those court proceedings,

6  whether -- do we know that?

7      MR. MILES:  Your Honor, I believe the revocation was a

8  result of him associating with somebody under the age of

9  sixteen and also having committed a further crime.  The

10  specifics of that further crime would be irrelevant and not an

11  element of the --

12      THE COURT:  I don't know if it's irrelevant or not

13  till I know what it is.  Do we have the probation revocation

14  hearing transcript?

15      MS. ROLLINS:  We're pulling it right now, your Honor.

16  Q.  Dr. Phenix, it's your understanding that the probation

17  violation resulted from Mr. Wetmore doing what?

18  A.  The probation violation --

19      THE COURT:  Not what her understanding is.  It should

20  be right there.  It should be right in the record.  It can't

21  come out of a police report.  Was this a state revocation

22  proceeding?

23      MS. PIEMONTE-STACEY:  Your Honor, it was United States

24  District Court, District of Maine; and while we have the

25  supporting records, we don't have a transcript of the

Page 193

1    revocation.

2            THE COURT:  Do we have findings from the judge or the

3    violation report from Probation?

4            MS. PIEMONTE-STACEY:  I'm looking at a copy of the

5    docket right now, your Honor.  I have a copy of the docket.

6            THE COURT:  Well, why don't we keep moving on.  We're

7    obviously not going to finish this today anyway.

8    Q.   What was the next thing, Dr. Phenix, that you considered

9    when making your diagnosis that Mr. Wetmore was a pedophile?

10   A.   That was referring to statements by sixteen-year-old Brad

11   that worked with Mr. Wetmore in his auto shop.  He had hired

12   him to work with him.  He also engaged in --

13           MR. MILES:  Objection.

14           THE COURT:  You know, I feel like I'm a broken record

15   here a little bit.  Is this based on what?

16           THE WITNESS:  Based on an incident report,

17   No. 99-60514.

18           THE COURT:  From who?  Who wrote it?

19           THE WITNESS:  It's the Hampton Police Department

20   synopsis.

21           THE COURT:  I sustain the objection.

22           MR. MILES:  Thank you, your Honor.

23   Q.   What was the next thing you relied upon --

24           THE COURT:  Now, now, let me just say that Dr. Prentky

25   testified that Mr. Wetmore told him that he had oral sex with a

Page 194

1   fifteen-year-old in his auto shop, so I'm assuming that's the

2   same -- no, it's something different.

3          THE WITNESS:  Yes.

4   Q.   If I could, Dr. Phenix, turn your attention to Page 6 of

5   Dr. Prentky's report.

6   A.   Yes.

7   Q.   And if you could read the second paragraph to yourself.

8          (Witness examining document.)

9   Q.   And after reading that, Dr. Phenix, can you testify as to

10  what Mr. Wetmore self-reported to Dr. Prentky with respect to

11  incidents in 1999?

12  A.   Mr. Wetmore reported that while he worked at the JK Auto

13  Repair Time, that he was involved with Ryan, a fifteen-year-old

14  boy who worked for Mr. Wetmore.  Ryan disclosed that

15  Mr. Wetmore performed oral sex on him, and a second juvenile

16  male reported to police that he had seen --

17         MR. MILES:  Objection unless that was a report by

18  Mr. Wetmore.

19         THE COURT:  I don't know.  Can you tell?

20  Q.   Reading this report, is it clear to you whether or not

21  Mr. Wetmore self-disclosed this to Dr. Prentky or that they

22  spoke about this incident?

23  A.   They did speak about the incident.  Dr. Prentky's report

24  says that he asked him about all the incidents in the records

25  that involved sexual activity.

Page 195

1          THE COURT:  All right, keep reading, yes.

2     A.   Right.  So that he has seen child pornography on

3     Mr. Wetmore's computer.  Further information that Dr. Prentky

4     discussed was the 2,000 child images that is documented in the

5     conviction for child pornography.

6     Q.   And was there any discussion that you know of, Dr. Phenix,

7     with respect to the pubescence, if that is a word, of the males

8     in that pornography?  Was it post or pre?

9     A.   There were prepubescent males engaging in sex and

10    sadomasochism.

11         THE COURT:  That's the offense of conviction?

12    Q.   That resulted in the child pornography conviction?

13    A.   Yes.  Actually, in terms of making this diagnosis, so I

14    looked at the development, his sexual development, the pattern

15    and duration of his sexual behavior with prepubescent males, as

16    well as his arousal to prepubescent pornography, thousands of

17    models of prepubescent boys in pornography.  And if I look at

18    the time frame, a six-month period of time is required to

19    provide a diagnosis of pedophilia in the DSM, and that time

20    frame, in my opinion, is from the time that Mr. Wetmore is

21    twenty-one years of age and has the first pedophilic

22    relationship with Willy, over three to four years, through the

23    time period that he continued to view pornography, 1997 to

24    1999, where it's reported that that was of prepubescent males,

25    and so throughout his adult lifetime, including additional

Page 196

1   evidence that he is still preoccupied with prepubescent males.

2   That would be the violation in prison for having homemade child

3   pornography, of which some of those images, in my opinion, show

4   prepubescent males.  About five or six of those I think are

5   clearly prepubescent-looking.  That all of that together would

6   certainly indicate that Mr. Wetmore suffers from pedophilia.

7              THE COURT:  And I have to make a factual

8   determination, and I haven't heard all the evidence yet.  If I

9   found I wasn't sure who made those clippings -- I don't know

10  yet, I haven't heard everything -- would you still have the

11  same opinion?

12             THE WITNESS:  I would definitely have the same

13  opinion.  The reason is because pedophilia, the clinical course

14  of pedophilia is seen as longstanding and pervasive and an

15  enduring condition that lasts throughout someone's lifetime.

16  Much like a sexual orientation, that doesn't change in a day.

17  What you find yourself aroused to in your early teens in your

18  sexual development stays with you in almost all cases

19  throughout your life.

20             THE COURT:  Even when you get old?

21             THE WITNESS:  Yes.

22             THE COURT:  Older, older?

23             THE WITNESS:  Yes, yes, and you can act on it or not

24  at certain times in your life, but that orientation generally

25  is very pervasive, and we know that's the clinical course of

Page 197

1   pedophilia.

2          The thing about individuals with pedophilia who are in

3   institutions, and the reason it's not surprising when they are

4   released and sometimes reoffend, is because they can reinforce

5   that sexual deviancy internally by thinking about their past

6   victims, by thinking of past pornography that they've seen that

7   has been arousing, and by masturbating to those sexual

8   fantasies.  No one sees it.  No one knows it.

9          THE COURT:  But do you know that in particular about

10  Mr. Wetmore, or you're just saying that's a general profile?

11         THE WITNESS:  I don't know about Mr. Wetmore in terms

12  of interviewing him and him telling me that or even telling

13  others that he's masturbating to those fantasies while he's

14  incarcerated.  On the other hand, that's all he's ever been

15  aroused to, really, throughout his life.  It would be very,

16  very unusual if suddenly he is institutionalized and he's now

17  sexually fantasizing to appropriate adult males.  Even when he

18  acted out twice --

19         THE COURT:  So what if he moved on to postpubescent,

20  does that undermine a diagnosis of pedophilia?

21         THE WITNESS:  Well, it doesn't happen, unfortunately.

22  That's not really the course of that disorder.  You don't kind

23  of outgrow --

24         MR. MILES:  Move to strike.

25         THE COURT:  Overruled.

Page 198

1          THE WITNESS:  You don't outgrow a sexual orientation.

2          THE COURT:  All right.  I thank you.  You've, I

3     understand, come up with another date, is that right?

4          MS. ROLLINS:  Have we?

5          THE COURT:  I'm told, between everybody's schedule,

6     this pushes it off two and a half months, is that right?

7          MR. MILES:  Your Honor, with the caveat that I can get

8     my fact witnesses from Maine in here.  I didn't have an

9     opportunity to consult with them.

10          THE COURT:  But what we'll do is, we'll at least get

11     this doctor done because she's got a really busy schedule, and

12     I've basically lost August apparently with everybody's,

13     including my own, vacation schedule, and then I think we lost

14     September with various conflicts with people's schedules, so

15     I'd at least like to get the doctor done.  We may move forward

16     at a snail's pace, but we need to do it.  And I know

17     Mr. Wetmore wants to testify.  Who are the people from Maine?

18          MR. MILES:  His mother and his brother.

19          THE COURT:  Okay, so, you know, we won't make them

20     come down for nothing.  I understand that's a huge hassle for

21     people.  If we have to do it three hours at a time, we'll do it

22     three hours at a time, but what I prefer to do is, because he's

23     coming in from a distance -- what do we have in October?  Do we

24     have just an afternoon, or do we have like a full week?

25          MS. PIEMONTE-STACEY:  Your Honor, I know that

Page 199

1   Dr. Phenix said that she was available the week of October 11

2   through the 15th.  The only day or time that I'm not available

3   that week is the afternoon of the 13th, which is the Shields

4   discharge hearing before this Court.

5           (Discussion off the record between the Court and

6   Clerk.)

7           THE COURT:  So we'll do that then.  Let me just sort

8   of script this because this has just gone, you know,

9   according -- we've been working hard, but, I mean, you know,

10  things happen, you know, people get sick and various other

11  things.  So how much longer do you have on direct for this?

12          MS. ROLLINS:  Forty-five minutes maybe?

13          THE COURT:  So a lot longer than you thought.  All

14  right, so that's fine.  And how much on cross?

15          MS. ROLLINS:  Your Honor, there are lots of questions.

16          THE COURT:  That's fine.  I understand that.  I'm not

17  stopping you, but I'm just trying to get a feeling for it.

18          MS. ROLLINS:  I will move quickly.

19          MR. MILES:  My best guess would be about an hour.

20          THE COURT:  All right, so we need a couple of hours

21  for her.  We can get her out of here in an afternoon.  Well,

22  maybe not.  Hopefully we can get her from 2:00 to 5:00, I

23  think.  So the second day, you should just not bring your

24  people down the first day.

25          MR. MILES:  Yes, your Honor.

1    THE COURT:  Bring them down the second day.  And if we

2    need to, we'll get going with Mr. Wetmore, fill in with his

3    parents, his family, and then continue with him.  Does that

4    make sense?

5    MR. MILES:  It does, your Honor.

6    THE COURT:  And I think what would be really helpful

7    here, because you see how I'm moving, I mean, I think it's

8    appropriate for self-reports, to rely on that as reliable from

9    Mr. Wetmore.  I think anything from court documents are

10   reliable, what he pled guilty to, if there's a transcript under

11   oath, what a judge found in a probation hearing.  I mean, those

12   are the kinds of things --

13   (Discussion off the record.)

14   (Respondent removed from the courtroom.)

15   THE COURT:  Let me do this.  It's obviously very

16   upsetting to him, and maybe he has food poisoning or maybe it's

17   upsetting.

18   MR. MILES:  He has migraines, your Honor, with

19   accompanying nausea and auras.

20   THE COURT:  So, in any event, we will see you in

21   October, but you have a sense so that you can have it right at

22   your fingertips.  Just police reports are a problem for me

23   because I don't know who said what and whether it was

24   transcribed properly.  It's just not what I'll consider as

25   reliable.  In any event, I think we've got the protocol done.

Page 201

1          Do you think you can come up with proposed findings of

2     fact and law for those October hearing dates?  That's what I

3     would like.  And then if you need a brief opportunity to

4     supplement based on this testimony, so be it, but I think we've

5     got the gist of --

6          MS. PIEMONTE-STACEY:  And, I'm sorry, I don't mean to

7     interrupt, your Honor.  Are we talking October 14 and 15?

8          THE COURT:  Whatever Mr. Alba told you.

9          THE CLERK:  Both afternoons, 2:00 to 5:00.

10         THE COURT:  Okay?  We can at least do a first round of

11    facts and law, and then we can supplement based on what came

12    in, okay?

13         MR. MILES:  Your Honor, may I move for an order that

14    there be a transcript of the hearing up until this point?

15         THE COURT:  Yes, yes, we'll have a transcript made,

16    absolutely.

17         MR. MILES:  Thank you.

18         THE COURT:  Thank you very much.  And I'm sorry for

19    the inconvenience.  I wanted that prisoner in and out, so,

20    thank you.

21         MS. PIEMONTE-STACEY:  Thank you.

22         THE CLERK:  Court is in recess.

23         (Adjourned, 4:06 p.m.)

24

25

Page 202

1                        C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )

5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 2-1

9  through 2-201 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Civil Action No. 07-12058-PBS,

11 United States of America v. Joel Wetmore, and thereafter by me

12 reduced to typewriting and is a true and accurate record of the

13 proceedings.

14     In witness whereof I have hereunto set my hand this 20th

15 day of August, 2010.

16

17

18

19

20          /s/ Lee A. Marzilli
           _____
21          LEE A. MARZILLI, CRR
           OFFICIAL COURT REPORTER
22

23

24

25