THE UNITED STATES COURT FOR
THE DISTRICT OF MASSACHUSETTS

Eastern Division
Docket No.: 1:07-cv-12058 PBS

-----------------------------

THE UNITED STATES, Petitioner,

v.

JOEL WETMORE, Respondent.

=========================

RESPONDENT'S REQUEST FOR FINDINGS OF FACT AND RULINGS OF LAW

============================================================

Pursuant to the order of the Court, the Respondent Joel Wetmore respectfully proposes the following findings of fact and rulings of law.

## I.   Proposed Findings of Fact.

### A.   Past History

1.   Mr. Wetmore had an age-appropriate relationship with Jesse. 1 Tr. 062 (Prentky).

2.   In 1999, Mr. Wetmore was forty-three years old. 1 Tr. 063 (Prentky).

3.   In 2000, Mr. Wetmore was convicted of possession of child pornography. 1 Tr. 64 (Prentky).

4.   Fifteen year-old Ryan reported the child pornography to the police. 1 Tr. 064 (Prentky).

5.   Mr. Wetmore did not have any significant sex offender treatment during his incarceration for child pornography. 1 Tr. 074 (Prentky).

**B.   Diagnoses**

6.   The DSM-IV-TR is a compendium of psychological terms produced to standardize the labels and treatments that providers use and to increase the reliability of the system. 2 Tr. 007-009 (Prentky).

7.   Dr. Prentky diagnosed Mr. Wetmore as suffering from paraphilia NOS with hebephilia as a specifier. Hebephilia is pattern of recurrent, intense, erotic attraction to pubescent adolescents. 1 Tr. 077 (Prentky).

8.   The research into hebephilia is ambiguous. 1 Tr. 82 (Prentky).

9.   The Abel Assessment of Sexual Preference says that preference for adolescent models is normal in the presence of preference for also adult models. 1 Tr. 080 (Prentky).

10.   It is normal for an adult to respond sexually to a sexually-appealing adolescent. 1 Tr. 078 (Prentky).

11.   Dr. Prentky does not know to what extent the psychiatric community has accepted Dr. Blanchard's proposal to construct a category known as

"pedohebephilia" or attraction to persons fourteen
year old or younger. 1 Tr. 083 (Prentky).

12.   A number of psychologists oppose the inclusion of
hebephilia in the projected DSM-V because
distinguishing between sexual attraction to an
adolescent as normal and sexual attraction to an
adolescent as a disorder is ambiguous. 2 Tr. 009, 28
(Prentky).

13.   There is controversy among providers of psychological
services as to whether or not pedophilia is a
legitimate diagnosis. 2 Tr. 027 (Prentky).

14.   Dr. Prentky did not diagnose Mr. Wetmore as a
pedophile. 2 Tr. 029. (Prentky).

15.   Dr. Phenix's diagnosis of pedophilia was not
consistent with Dr. Prentky's diagnosis of hebephilia.
2 Tr. 178 (Phenix).

16.   Dr. Phenix based her opinion in part upon Dr.
Prentky's report. 3 Tr. 016 (Phenix).

17.   Dr. Phenix's based her diagnosis of pedophilia upon
Mr. Wetmore's previous behavior; she assumed that some
of his victims were prepubescent despite the fact that
she never had seen any of them. She based her
assumption upon the age of the victim and not upon the
victim's appearance and upon her assumption that Mr.

Wetmore was interested in viewing images of prepubescent males which he had downloaded to his computer. 3 Tr. 024-025 (Phenix).

18. In fact, the evidence shows that Mr. Wetmore's primary interest was in adolescents showing secondary sexual characteristics.

19. Dr. Phenix's opinion that Mr. Wetmore suffers from pedophilia rather than from paraphilia NOS with a specifier of hebephilia is not credible. 3 Tr. 022, 023 (Phenix).

20. A child of ten, eleven or twelve could be pubescent. 3 Tr. 096 (Phenix).

21. The age of pubescence referenced by the DSM-IV-TR in the pedophilia diagnosis is a guideline, not a bright-line rule. 3 Tr. 097 (Phenix).

22. Because age eleven is a common age for males to reach puberty, Dr. Prentky opined that Mr. Wetmore was not a pedophile. 2 Tr. 032 (Prentky).

23. Dr. Prentky's opinion is the more credible.

**C.   Causal Relationship Between Diagnosis and Actions.**

24. The fact that someone suffers from a mental disorder defined in the DSM-IV-TR does not speak to whether the individual can control the behavior resulting from it. 2 Tr. 039 (Prentky).

25. There was no evidence that Mr. Wetmore was diagnosed as suffering from antisocial personality disorder.

26. Of those who view child pornography, the child molesters are those who display antisocial personality disorder. 1 Tr. 87-88 (Prentky).

27. The diagnosis of paraphilia NOS does not speak to whether Mr. Wetmore can control his behavior. 2 Tr. 039 (Prentky).

28. Mr. Wetmore has the ability to choose to control his behavior. 2 Tr. 040 (Prentky).

29. Nothing impairs Wetmore's volition to prevent him from choosing to control his behavior. 2 Tr. 040 (Prentky).

30. Although the diagnosis of pedophilia is pervasive and may last a lifetime, one with that diagnosis may act on it or not act on it during certain times of life. 2 Tr. 197-198 (Phenix).

31. Pedophilia can remit. The strength of the urges can decrease. 3 Tr. 027 (Phenix).

32. One can act on or not act on the sexual arousal pattern even though the pattern remains constant. 3 Tr. 027 (Phenix).

33. Mr. Wetmore began further sex offender treatment after his federal conviction and during his placement at Butner. He was expelled from the program after he

self-reported that he had violated the rules of the program by engaging in consensual sex play with two other inmates. 3 Tr. 040 (Phenix).

**D. "Serious Difficulty"**

34. "Serious difficulty" is a problematic judgment. It is not defined or operationalized. 1 Tr. 099 (Prentky).

35. Psychologists equate "major mental disorder" with "serious mental disorder;" Neither hebephilia nor pedophilia are "major mental disorders." 2 Tr. 038 (Prentky).

36. Between 1995 and 1999, Mr. Wetmore's sexual partners were of legal age. 6 Tr. 151 (Wetmore).

37. Between 1995 and 1999, Mr. Wetmore had four or five sex partners. He was between thirty-eight and forty-four, and his sex partners were mostly twenty-five to thirty-five. 6 Tr. 151-152 (Wetmore).

38. Mr. Wetmore's sex offender treatment program in the state facility consisted of a fourteen-week preliminary course after which he volunteered for the continuing course and stuck with it until his state sentence expired. 6 Tr. 152 (Wetmore).

39. Mr. Wetmore would have continued to participate willingly in sex offender treatment at the state facility had it been possible. 6 Tr. 152 (Wetmore.)

40. As Mr. Wetmore's release date from federal incarceration approached, he inquired about sex offender programs in the community. 6 Tr. 152 (Wetmore).

41. Mr. Wetmore worked with his counselor at the half-way house and his probation officer to obtain housing and appropriate sex offender treatment. 6 Tr. 152 (Wetmore).

42. Mr. Wetmore does not feel that he needs to be in a secure facility to participate in sex offender and pharmacological treatment. 6 Tr. 153 (Wetmore).

43. There is no evidence that FMC Butner makes pharmacological treatment available to its inmates. 6 Tr. 153 (Wetmore).

44. Mr. Wetmore does not have serious difficulty controlling his sexual desires with respect to relationships with young, male adolescents.

**E.  Current Condition**

45. Mr. Wetmore made a commitment to himself to change his behavior. 2 Tr. 046 (Prentky).

46. Wetmore voluntarily took Prozac to diminish his sexual urges. 3 Tr. 077 (Phenix).

47. Mr. Wetmore decided he never wanted to hurt another child. 1 Tr. 60-61 (Prentky).

48. Wetmore did not reoffend against minors after having received sex offender treatment during his incarceration in Maine between February, 2001, and June, 2003. 3 Tr. 040 (Phenix).

49. Mr. Wetmore did not have anal sex with his partners of any age. 6 Tr. 151 (Wetmore).

50. Dr. Phenix's opinion that Wetmore currently obsesses over prepubescent boys is not credible. 3 Tr. 082 (Phenix).

51. No phallometric arousal test was administered to Wetmore to determine whether prepubescent children aroused him. 3 Tr. 094 (Phenix).

52. No phallometric arousal test was administered to Wetmore to determine whether post pubescent children still arouse him. 3 Tr. 094 (Phenix).

53. The Abel Screen for Sexual Interest was not applied to Wetmore to determine whether he still experiences arousal by either prepubescent or post-pubescent children. 3 Tr. 095 (Phenix).

54. As Mr. Wetmore grew older, the subjects of his sexual interests became older.

**F.     Treatment Alternatives**

55.   Treatment and other methods allow individuals to
      develop volitional controls to resist pedophilic
      sexual urges. 3 Tr. 028 (Phenix).

56.   Sex offender treatment may provide a pedophilic sex
      offender with the skills and abilities to control his
      sexual urges. 3 Tr. 029 (Phenix).

57.   In 2001, Wetmore received sex offender treatment from
      Cathance Psychological Services in Maine, and he
      volunteered for ongoing treatment. 6 Tr. 139
      (Wetmore).

58.   The panoply of protections available in the community
      for released sex offenders, including registration,
      more intense supervision, and longer supervision are
      working. 3 Tr. 059 (Phenix).

59.   Various modalities of treatment are available to
      reduce deviant sexual arousal. 2 Tr. 042 (Prentky).

60.   Three forms of effective therapy are available in sex
      offender treatment programs in the community. They
      are: aversive therapy, medication by antiandrogen and
      cognitive restructuring. 2 Tr. 047 (Prentky).

61.   Mr. Wetmore should have been prescribed antiandrogens
      a long time ago. 1 Tr. 103, 104 (Prentky).

62.  Antiandrogen medication would have lowered his sexual urges. 1 Tr. 104 (Prentky).

63.  Antiandrogen treatment is commonly available for outpatient treatment in the community. 2 Tr. 043 (Prentky).

64.  Two available antiandrogen medications will lower testosterone essentially to zero so that the individual experiences almost no sexual drive and very low libido. When the sexual arousal for a person is deviant, lowering the sex drive generally will stop the deviant sexual fantasies and arousal, in this case, to minors, and will render the subject safer. 3 Tr. 036 (Phenix).

65.  Antiandrogen treatment is the standard of care when a sex offender is released into the community. 1 Tr. 107 (Prentky).

66.  An appropriate treatment program for Wetmore's release would include: a safe living environment; antiandrogen medication; psychiatric treatment by a psychiatrist familiar with antiandrogen treatment; supervision by probation. 1 Tr. 104-105 (Prentky).

67.  Antiandrogen medication could be made a condition of supervised release so long as Wetmore signs a waiver agreeing to it. 2 Tr. 076 (Kelly).

**G.    Actuarial Instruments.**

68.   The Static-99 recidivism rates are 35% over ten years.
      1 Tr. 94 (Prentky).

69.   The Static-99R recidivism rates for persons with the
      score that Mr. Wetmore achieved are significantly
      lower because they are based on contemporary samples
      that have lower base rates. The probability of
      reoffense for the groups that contain individuals with
      similar scores to those of Wetmore are twenty percent
      over five years and twenty-seven and seven tenths
      (27.7%) percent in ten years. 3 Tr. 058-059 (Phenix).

**H.   Effect of Aging on Risk of Reoffense.**

70.   Age decreases the probability that an individual will
      reoffend. 2 Tr. 049 (Prentky).

71.   As one ages, the probability that one will reoffend
      drops sharply. 2 Tr. 051 (Prentky).

72.   The decrease in probability of reoffense is linear at
      about two percent per year. 2 Tr. 051 (Prentky).

73.   Sex offenders aged between fifty and fifty-nine have a
      recidivism rate of twenty-three percent. 2 Tr. 062
      (Prentky).

74.   Age has a progressive effect upon reoffense. 2 Tr. 062
      (Prentky.)

75. Once Mr. Wetmore reached age 60, his score on the Static-99 would drop three points, so that he would have score of three. 2 Tr. 55 (Prentky).

76. The probability of reoffense after Mr. Wetmore turns sixty is sixteen percent. 2 Tr. 061-062 (Prentky).

**I.   Risk of Reoffense**

77. Mr. Wetmore credibly denies stating that he had no resistance to sexual stimuli and denies that in fact he has no resistance to sexual stimuli. 6 Tr. 140 (Wetmore).

78. Mr. Wetmore credibly denies that he is unable to control himself at present when sexually propositioned. 6 Tr. 140 (Wetmore).

79. Mr. Wetmore recognizes that a combination of sex offender treatment and pharmacological treatment would help him control his sexual drives. 6 R. 145 (Wetmore).

80. Probation and sex offender treatment after release would decrease Mr. Wetmore's probability of reoffending. 2 Tr. 067 (Prentky).

81. Probation conditions would include full participation in sex offender treatment as directed by the supervising officer. Probation conditions also would include the requirement that Wetmore scrupulously

abide by all policies and procedures of the sex
offender treatment program. Wetmore would have to
undergo periodic polygraph examinations if the program
required it. 2 Tr. 74-75 (Kelly).

82. Upon Wetmore's release, the Probation Department would
put him an outpatient sex offender treatment program
and have an assessment done. 2 Tr. 075 (Kelly).

83. Mr. Wetmore's parents are willing to help him
financially to get situated in the community upon
release, and his mother would continue to care for him
and advise him. 3 Tr. 007 (Mrs. Wetmore)

84. Mr. Wetmore's mother would report him to the police
were he to violate the terms and conditions of his
probation. Mrs. Wetmore's mother would feel
comfortable communicating with Mr. Wetmore's probation
officer. 3 Tr. 008 (Mrs. Wetmore) Mr. Wetmore has a
fifty-six year-old elder brother, Neal B. Wetmore. 3
Tr. 009 (Neal B. Wetmore).

85. Neal Wetmore has been an audio-visual engineer for
thirty-five years. 3 Tr. 009 (Neal Wetmore).

86. Neal Wetmore intends to help Mr. Wetmore find a place
to live in the Bangor, Maine, area; he intends to help
him find a job; and, he intends to take his mother's
place advising Mr. Wetmore during the winter months

when his mother and father are in Hawaii. 3 Tr. 010 (Neal Wetmore).

87. Neal Wetmore would ask his clients if any of them had positions for his brother. 3 Tr. 011 (Neal Wetmore).

88. Neal Wetmore already has tried to locate treatment providers for his brother; he would expect to see his brother weekly if his brother located to a place within a couple of hours drive; otherwise, monthly. 3 Tr. 012 (Neal Wetmore).

89. Mr. Wetmore has strong family support which will help to protect him against reoffending.

J. **Specific Issues.**

   i. **Pornography downloads.**

90. The pornographic images on Mr. Wetmore's computer depicted boys between the ages of seven and seventeen. 3 Tr. 025 (Phenix).

91. Pornography downloads can include young children even though the person downloading the images did not intend to download images of young children. 2 Tr. 033 (Prentky).

92. Mr. Wetmore did not intend to download images of children under the age of thirteen to his computer. 6 Tr. 150 (Wetmore).

93. Mr. Wetmore had a slow modem, so his practice was to highlight a bunch of photographs, click on "download," go do something else while they downloaded, and then come back to view them. He would delete images of children under the age of thirteen because they were of no interest to him. 6 Tr. 150 (Wetmore).

### ii.  The Modified Magazine Photographs.

94. After he had been informed that Mr. Wetmore had hidden sexually-oriented contraband beneath his mattress, Counselor Quiles called Officer Russell to shakedown Wetmore's portion of his eight-man cell for contraband. 2 Tr. 078, 082 (Russell).

95. Although Counselor Quiles denied knowing who informed him about the contraband clippings, his testimony was not credible. 2 Tr. 175 (the Court).

96. Officer Russell found magazines and cut-up images under Mr. Wetmore's mattress. 2 Tr. 081 (Russell).

97. Mr. Wetmore denied that he had cut out and modified the photographs. 2 Tr. 136 (Quiles).

98. Looking under a mattress is a routine part of a shakedown. 2 Tr. 084 (Russell).

99. Officer Russell neither heard anything about Wetmore cutting anything nor saw Mr. Wetmore cut up any magazines. 2 Tr. 086 (Russell).

100. Officer Russell heard people talking about the material under Mr. Wetmore's mattress being planted. 2 Tr. 089-090 (Russell).

101. People not housed in Mr. Wetmore's room had access to it. 2 Tr. 092 (Russell).

102. Officer Russell did not perform any investigation into who had compiled the material he found under Mr. Wetmore's mattress. 2 Tr. 093 (Russell).

103. Officer Russell came into the eight-man room, and he said that he was looking for child porn. 2 Tr. 156 (Rankin), Swarm Deposition at 6-7.

104. Officer Russell immediately lifted up Mr. Wetmore's mattress, took the cut up pages and modified photographs into his custody, said, "This is what I cam for," and left within thirty seconds to a minute. 2 Tr. 156, 165 (Rankin), Swarm Deposition at 7.

105. It was obvious that Officer Russell knew exactly where he was going when he initiated the search. 2 Tr. 159, 169 (Rankin).

106. Officer Russell awakened Mr. Swarm when he entered the room. Swarm Deposition at 7.

107. After Officer Russell found the cut-out pictures, he said, in Mr. Swarm's hearing, "Yes. This is kiddy porn." Swarm Deposition at 7.

108. In fact, the images were not "kiddy porn" as that term is commonly used.

109. Mr. Romero resided in the room. 2 Tr. 153 (Rankin).

110. Mr. Romero left the room to reside elsewhere around the time that the photographs were detected and seized. 2 Tr. 154 (Rankin).

111. Mr. Rankin never saw Mr. Wetmore with scissors or cutting up magazines. 2 Tr. 155 (Rankin).

112. Mr. Romero subscribed to magazines and had access to scissors. 2 Tr. 158 (Rankin).

113. Mr. Romero got moved out of the room that night. 2 Tr. 159 (Rankin).

114. After he was moved, Mr. Romero did not return to the eight-man room while Mr. Wetmore was present. 2 Tr. 160 (Rankin).

115. Cutting up magazines is against the rules at Devens, but inmates residing in other rooms have done it. 2 Tr. 170 (Rankin).

116. No one other than Mr. Romero disliked Wetmore or did not get along with Mr. Wetmore. 2 Tr. 172 (Rankin).

117. Mr. Wetmore credibly denies creating or possessing cut-out magazine pictures that were found under his mattress. 6 Tr. 142 (Wetmore).

118. Officer Russell found Spanish-language magazines among the material.

119. Mr. Wetmore does not speak Spanish.

120. Mr. Wetmore did not cut up magazines images and paste parts of them together to form sexual images of young males.

### iii. Mr. Romero's Testimony.

121. Mr. Romero had an altercation with Mr. Wetmore; Mr. Romero was hostile toward Mr. Wetmore because of Mr. Wetmore's sexual orientation. Swarm Deposition at 27.

122. There is no evidence that Wetmore ever looked at the cutout material that Officer Russell found and Dr. Renaud reviewed. 2 Tr. 106 (Renaud).

123. Mr. Swarm never saw Mr. Wetmore cutting images out of magazines and pasting them together. Swarm Deposition at 29.

124. Mr. Wetmore did not have any pictures of children in his locker. Swarm Deposition at 30.

125. Mr. Romero had access to Mr. Wetmore's bunk when Mr. Wetmore was out of the room. Swarm Deposition at 34.

126. Mr. Romero informed Counselor Quiles that Wetmore had contraband said that he did not like Wetmore, that Wetmore was weird. 2 Tr. 133 (Quiles).

127. Mr. Romero called Wetmore a pedophile. (2 Tr. 155). (Rankin).

128. The relationship between Mr. Romero and Mr. Wetmore deteriorated significantly over the course of a day or two. 2 Tr. 154 (Rankin).

129. Counselor Quiles never saw Wetmore cutting up magazines or gluing things together. 2 Tr. 123 (Quiles).

130. Mr. Romero's testimony about how he came to find the magazine clippings under Wetmore's mattress is not credible. 4 Tr. 005 (Romero).

131. Mr. Romero's testimony that he did not plant the magazine clippings under Wetmore's mattress is not credible. 4 Tr. 007 (Romero).

132. Mr. Romero's testimony that he saw Wetmore cutting up magazines is not credible. 4 Tr. 008-009 (Rombero).

**iv.   DiMeo's Testimony.**

133. Counselor Quiles never saw Wetmore act out sexually and had no memory that Wetmore had committed any similar incident either before or after. 2 Tr. 134 (Quiles).

134. Before the cut-out and modified images incident, Counselor Quiles had not received any other complaints about Wetmore. 2 Tr. 140 (Quiles).

135. Mr. DiMeo had a strong motive to relate false information about Mr. Wetmore. Mr. DiMeo wanted to use his testimony against Mr. Wetmore to reduce his eighty-seven month sentence to time-served. 6 Tr. 82, 83, 86 (DiMeo).

136. Mr. Wetmore did not approach Mr. Johnson for the purpose of having sex with him. 6 Tr. 105 (Wetmore)

137. Mr. Johnson attempted to extort commissary items from Mr. Wetmore by threatening to tell people that Mr. Wetmore was having a sexual relationship with him. 6 Tr. 104-105 (Wetmore.)

138. Mr. Wetmore complained in writing to staff that Mr. Johnson was attempting to extort things of value from him. 6 Tr. 105 (Wetmore.)

139. Mr. Wetmore never had sex with Mr. Johnson. 6 Tr. 105 (Wetmore.)

140. Mr. Wetmore never went into a closet with Mr. Johnson. 6 Tr. 105 (Wetmore.)

141. Mr. Wetmore never initiated or invited a walk with Mr. Johnson. 6 Tr. 106 (Wetmore.)

142. Mr. Wetmore never appeared outside a room with Mr. Johnson for forty-five minutes. 6 Tr. 106 (Wetmore.)

143. Mr. Wetmore did not have any relationship with Mr. Johnson from August of 2010 to the present. 6 Tr. 106 (Wetmore).

144. Mr. DiMeo's testimony that he observed Mr. Wetmore having relations with Mr. Johnson is not credible.

**iv.   Retroactivity of Statute.**

145. All of Mr. Wetmore's convictions for sex offenses occurred before the passage of the Adam Walsh Child Protection and Safety Act, 18 U.S.C. §4258.

146. All of the acts to which Mr. Wetmore admitted or because of which he was convicted took place before the passage of the Adam Walsh Child Protection and Safety Act, 18 U.S.C. §4248.

**v.   Lawfulness of Custody.**

147. Mr. Wetmore perceived that the Bureau of Prisons had miscalculated the number of days of credit for pretrial detention that he should have received.

148. Mr. Wetmore petitioned the Bureau of Prisons to recognize that the Federal sentence was intended to run concurrently with his state sentence and to grant him credit for time served during his pretrial detention.

149. The Bureau of Prisons ultimately concluded that the Federal sentence was intended to run concurrently with the state sentence. 6 Tr. 148 (Wetmore).

150. As a result, the Bureau of Prisons, acting by and through Stephen L. Morgan, Regional Inmate Systems Administrator, granted Mr. Wetmore credit for time served from October 25, 2000. 6 Tr. 50-53; Exh. 3.

151. Mr. Wetmore was in the custody of the United States Marshals Service at the Penobscot County Jail for a total of one hundred forty-one days, one hundred thirty-one of them consecutive, for which he received no credit toward his concurrent Federal sentence. 6 Tr. 148-149; Exh. 2 (Wetmore).

152. The Government filed its petition to commit Mr. Wetmore shortly before his sentence was due to expire and after Mr. Wetmore had been released to a half-way house.

153. Had Mr. Wetmore been given credit for time served in the custody of the United States Marshals Service, he would have been released more than four months before the Government petitioned for his commitment.

154. Mr. Wetmore never traveled in interstate commerce after the passage of the Adam Walsh Child Protection and Safety Act.

155. Mr. Wetmore's possession of images of child

pornography occurred before the date on which the Adam

Walsh Child Protection and Safety Act took effect.

**II.  Proposed Rulings of Law.**

A.    The Adam Walsh Child Protection and Safety Act is not

retroactive.[1]

B.    The Petitioner bears the burden of proving the

Respondent sexually dangerous by clear and convincing

evidence. The clear and convincing evidence standard

is an intermediate standard somewhere between

preponderance of the evidence and proof beyond a

reasonable doubt. The Government must produce evidence

indicating that the thing to be proved is highly

probable or reasonably certain. 18 U.S.C. §4248(d),

---

[1] Most of the litigation around this issue concerns the retroactivity of state and federal sex offender registration acts. The United States Supreme Court has held that the sex offender registration provisions of the Adam Walsh Child Protection and Safety Act are not retroactive. *Carr v. U.S.*, ___ U.S. ___, 130 S.Ct. 2229, 176 L.Ed.2d 1152 (2010). [Statutory language supports forward-looking application of the statute.] Therefore, by analogy, past conduct cannot supply the basis for commitment. At best, it only can serve as evidence in the determination of a respondent's current mental state and current dangerousness to the public. *Kansas v. Hendricks*, 521 U.S. 346, 117 S.Ct. 2072 (1996). Therefore, no matter how heinous an offender's conduct before the effective date of the Act, it has no bearing on the question of the offender's sexual dangerousness unless the trial court finds that in a specific case past conduct is a reasonable and reliable predictor of future behavior. In this case, Mr. Wetmore's advancing age makes unreliable the predictive value of his past conduct.

*Addington v. Texas*, 441 U.S. 418, 433, 99 S.Ct. 1804, 1813 (1979).

C.   In light of the testimony of the court-appointed expert that psychologists equate "major" with "serious" and that neither hebephilia nor pedophilia are regarded as "major" disorders, Petitioner has failed to prove by clear and convincing evidence that any mental illness, abnormality or disorder, whether hebephilia, pedophilia, or pedohebephilia from which the Respondent may suffer is "serious."

D.   The Petitioner must prove by clear and convincing evidence that the Respondent suffers from some volitional impairment which makes it difficult for him to control his sexual impulses.

E.   The Petitioner has failed to prove by clear and convincing evidence that a causal relationship exists between any mental condition from which the Respondent may have suffered or does suffer and any current volitional impairment which makes it difficult for him to control his sexual impulses.

F.   The Petitioner has failed to prove by clear and convincing evidence that the Respondent has serious difficulty in refraining from sexually violent conduct or child molestation if released.

G.   The Petitioner has failed to prove by clear and convincing evidence that the Respondent was in the lawful custody of the United States at the time the Petition was filed against him. *U.S. v. Volungus*, 595 F.3d 1 (1st Cir.2009)[Federal custody is a precondition to the inauguration of commitment proceedings.]

H.   The Petitioner has failed to prove by clear and convincing evidence that the Respondent should not have been released more than four months before the Government filed its petition to commit him.

I.   The Petitioner lacked standing to file the petition because the Respondent was not in the lawful custody of the United States at the time the petition was filed.

J.   The Petitioner has failed to prove by clear and convincing evidence that it had standing to file the petition; that the Respondent suffered from a serious mental impairment, illness, or disorder; that the Respondent currently has serious difficulty controlling his sexual impulses; and that there is a causal relationship between the Respondent's current mental condition and any difficulty the Respondent may have in controlling his sexual desires or impulses.

25

K.  Because the Respondent did not commit any sexual

offense after the effective date of the Adam Walsh

Child Protection and Safety Act; because the

Respondent did not travel in interstate commerce after

the effective date of the Adam Walsh Child Protection

and Safety Act; and because the Adam Walsh Child

Protection and Safety Act is not retroactive, the

court lacks subject matter jurisdiction over the

matter so the Petition must be dismissed.

L.  The Petitioner did not prove by clear and convincing

evidence that the Respondent is sexually dangerous

currently, so that judgment must enter for the

Respondent and the Petition must be dismissed.

Dated at Northampton, February 1, 2011.

Respectfully submitted,
Joel Wetmore, by his attorney
*/s/Harry L. Miles*
Harry L. Miles, of
*Green, Miles, Lipton & Fitz-Gibbon LLP*
77 Pleasant Street
P.O. Box 210
Northampton, MA 01061-0210
Voice:    413.586.8218; Fax: 413.584.6278
Email:    harrymiles@aol.com
BBO#:     345800

Certificate of Service: I hereby certify that this document,
filed through the ECF system, will be sent electronically to the
registered participants as identified on the Notice of
Electronic Filing (NEF). There are no non-registered
participants as of February 1, 2011, to my knowledge.

*/s/Harry L. Miles*, Attorney for Respondent