## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

—————————————————————

)
UNITED STATES OF AMERICA, )
)
       Petitioner, )
)
v. )    Civil Action No. 07-12058-PBS
)
JOEL WETMORE )
)
       Respondent. )
—————————————————————)

## **GOVERNMENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The United States respectfully requests that the Court enter the following findings of fact and conclusions of law in this matter, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## **INTRODUCTION**

This civil action was commenced by the November 17, 2006 certification of the Bureau of Prisons ("BOP") that Respondent Joel Wetmore ("Wetmore" or "Respondent") is a sexually dangerous person pursuant to 18 U.S.C. § 4248(a) (the "Adam Walsh Act" or "the Act"). To order such commitment, the Court must conclude, after an evidentiary hearing at which the government bears the burden of proof, by clear and convincing evidence, that Wetmore is a sexually dangerous person as defined by the Adam Walsh Act. If the Court finds that the government has satisfied its burden, Wetmore must be committed to the custody of the Attorney General to a suitable facility for mental health treatment until he is determined to be no longer sexually dangerous to others. 18 U.S.C. § 4248(d).

Pursuant to 18 U.S.C. § 4247(d), the Court conducted a trial in this matter on July 22, 23, October 14, 15, 20 and December 20, 2010. The Court heard the testimony of Dr. Robert Prentky,

the court appointed Examiner in this case, as well as Dr. Amy Phenix, an expert retained by the

Government, both of whom found Wetmore to be a sexually dangerous person. The Court also

received testimony from the following witnesses:  U.S. Probation Officer Daniel P. Kelly, from the

District of Maine,[1] Senior Officer Specialist Thomas Russell of the Bureau of Prisons ("BOP"), Dr.

Cheryl Renaud, a psychologist who is the Sex Offender Management Program Coordinator for the

BOP, Correctional Counselor Carlos Quiles, a correctional counselor with the BOP, BOP inmates

John Rankin, Roberto Romero, David DiMeo, and, by deposition, inmate Andrew Swarm, as well

as Wetmore's mother, Louise K. Wetmore, Wetmore's brother, Neal B. Wetmore, and the

Respondent, Joel Wetmore.

## **FINDINGS OF FACT**

### I.    **Personal History**

#### A.    **Personal and Occupational History**

1.    Wetmore was born in 1956, and at the time of trial was 54 years old. Tr. 12/20/10 at

18.  He grew up in Houlton, Maine with his mother, father, three brothers, and one sister, all of

whom are still alive.  Id.

2.    Wetmore has predominantly worked as an auto mechanic.  Tr. 12/20/10 at 19.

During High School in Houlton Maine, Wetmore worked for John's Auto Sales. Tr. 12/20/10 at 20.

After graduation in 1975, Wetmore started working for an auto mechanic company named Allied

Sales, also in Houlton.  Tr. 12/20/10 at 19-20.  Wetmore then opened his own auto mechanic shop

in Houlton, which he maintained from approximately 1975 to 1978.  Tr. 12/20/10 at 20-21.  After

his shop closed, Wetmore worked at Houlton Regional Hospital as a boiler operator/maintenance

---

[1] U.S. Probation Officer Kelly testified as designee for U.S. Probation Officer Jefferies, Wetmore's assigned probation officer, who was unable to testify at trial.  Tr. 7/23/10 at 72.

man until 1983.  Tr. 12/20/10 at 21.  He then moved to the State of Texas for two years where he was employed as a manager/maintenance man at a motel in Snyder, Texas.  Id.  Wetmore moved back to Houlton, Maine and became a millwright for a local sawmill for approximately three years.  Id.  He left that position because he "had to go to prison."  Tr. 12/20/10 at 22.[2]  After Wetmore was released from prison in 1995 he began working in Bangor, Maine as a mechanic at an auto auction.  Tr. 12/20/10 at 43.  That job lasted approximately six months.  Id.  Wetmore then opened his own auto mechanic business – JK Auto Repair.  Id.  He maintained that business until 1999, when he was arrested for violating his probation by having multiple underage boys at his business.[3]  Tr. 12/10/10 at 43-45.  During the course of the police speaking to the under aged boys, investigators learned that Wetmore had child pornography on his computer.  Tr. 12/20/10 at 45-46.  Over 2000 images of child pornography were ultimately found on Wetmore's computer, and on October 25, 2000, Wetmore pleaded guilty to one count of receipt of child pornography and one count of possession of child pornography.  Gov. Ex. 3.  Wetmore was sentenced to eighty-seven months on each count, to be served concurrently.  Id.  He has been incarcerated since that time.

**B.      Educational and Social History**

3.      Wetmore attended Houlton High School in Maine and graduated in 1975.  Tr. 12/20/10 at 19.  He has no further formal education.  Tr. 12/20/10 at 20.  Wetmore has been socially awkward his entire life and admitted that since he was twenty-two years old "it was difficult for [him] to find any person that [he] felt comfortable with that [he] didn't feel threatened by."  Tr.

---

[2]  This prison term refers to Wetmore's second conviction involving sexual contact with a minor.  See discussion *infra* starting at paragraph 11.

[3]  Wetmore admitted that he performed oral sex on one of the under aged boys.  Tr. 12/20/10 at 45, 118.

12/20/10 at 26.  Wetmore went on to explain "that [referring to when he was twenty-two years old] was when [he] started hanging around with younger men, younger boys, and that was when [he] started getting into trouble with the law as far as sexually molesting young children."  Tr. 12/20/10 at 27-28.

### C.     Marital, Sexual and Relationship History

4.      Wetmore has been sexually active since the young age of 11 years old.  Tr.  7/22/10 at 40, 46.  He often babysat for younger children with whom he ultimately engaged in sexual activity.  Id.  When Wetmore was 12 years old, he had sexual contact with a 7 year old child.  Tr. 7/23/10 at 180.

5.      Wetmore's first longstanding relationship was with "Clifford" who was 12 years old, when Wetmore was 15 years old.  Tr. 7/22/10 at 47, 180; Tr. 12/20/10 at 23.  This on-again-off-again sexual relationship lasted for roughly 10 years.  Tr. 7/22/10 at 48.  During that time, Clifford introduced Wetmore to several younger boys.  Id.  By this point, Wetmore was approximately 17-18 years old, and the boys he was introduced to, and ultimately engaged in sexual activity with, were all approximately 14 years old.  Id.; Tr. 7/23/10 at 181.   Wetmore's sexual encounters with these children often occurred at "the camp," a property owned by Wetmore's family on a lake, which provided Wetmore the opportunity to be alone with these children, and to offer many activities that the boys would enjoy, such as swimming, boating and fishing.  Tr. 7/22/10 at 50; Tr. 10/14/10 at 8, 19.

6.      From the time Wetmore was 15 years old until he was 24 years old, Wetmore actively recruited young boys aged 12-14 years old to go to the camp with him for the ultimate purpose of having sex with them.  Tr. 7/22/10 at 52; Tr. 7/23/10 at 187.

7.      Wetmore's first pedophilic, sexual relationship occurred when Wetmore was 21 or

22 years old, with "Willy" who was then 11 years old. Tr. 7/22/10 at 49, 182. Wetmore befriended

Willy and they remained friends until Willy was 14-15 years old. Id. Wetmore characterized this

relationship as "gradual grooming[4]." Id. The nature of Wetmore's sexual relationship with Willy

was fondling and oral sex. Id.

8.      Wetmore also testified to having a pedophilic relationship with "Alan" when

Wetmore was 21, and Alan was 12 years old. Tr. 12/20/10 at 28.   Alan was a neighborhood friend

of the family whom Wetmore had known for years. Id. After fishing and swimming at his parents'

camp with Alan and his 13 year old friend, Wetmore fondled Alan's penis, and Alan's 13 year old

friend saw them through the window. Tr. 12/20/10 at 28-29. Wetmore testified that he was arrested

as a result of this incident[5]. Tr. 12/20/10 at 30.

9.      During an interview with a BOP psychologist, Wetmore admitted that he has had

sexual contact with many more minors than his documented history indicates. Tr. 12/20/10 at 120.

Wetmore admitted to sexually abusing more than 35 minor males over a span of more than 30 years.

Tr. 12/20/10 at 121.

10.      Wetmore has had two peer-aged, adult relationships in his lifetime, neither of which

was sustained, and both of which occurred in his 20's. Tr. 7/22/10 at 45.

---

[4] As Dr. Prentky testified, "grooming" is a word that is used for sex offenders, and refers
to setting up a child for potential victimization by very gradually "coming on" to the child,
taking the child's "temperature" to see how the child reacts to the overtures, making
arrangements where the offender will be alone with the child, all leading up to eventual sexual
contact. Tr. 7/22/10 at 49.

[5] Wetmore's testimony is not consistent with Wetmore's conviction history, as "Alan" is
not listed as a victim in any of the convictions for which Wetmore was arrested in the past. See
Gov. Ex. 1-3.

**D.      Criminal History**

11.      Wetmore's first conviction for a sex offense occurred in 1980, when Wetmore was 24 years old, and his victim, "Mark", was 12 years old.  Gov. Ex. 1.  Wetmore invited "Mark" to the camp, where he fondled Mark's genitals underneath his clothing.  Tr. 7/22/10 at 50-51; Tr. 12/20/10 at 115.  As a result of that sexual contact, Wetmore was found guilty of unlawful sexual acts with a minor male, was given a 30-day suspended sentence and 6 months probation by the State of Maine.  Gov. Ex. 1; Tr. 7/22/10 at 50.  Wetmore did not engage in sex offender treatment, or any treatment, after this offense.  Tr. 7/22/10 at 50-51.

12.      Wetmore's next conviction for a sex offense was in 1986, when Wetmore was 31 years old, resulting from sexual contact with "Roland" who was 11 years old.  Tr. 7/22/10 at 53-54; Tr. 12/20/10 at 115.  Wetmore met Roland at a Bible study conference, when Roland was 9 years old.  Tr. 7/22/10 at 53-54; Tr. 7/23/10 at 185; Tr. 12/20/10 at 116.  Wetmore molested Roland by placing Wetmore's genitals in direct physical contact with Roland's anus and mouth.  Gov. Ex. 2; Tr. 7/22/10 at 54-55, 58-59; Tr. 7/23/10 at 185, 187.  Wetmore molested Roland on an almost daily basis by committing oral copulation and sodomy on Roland.  Tr. 10/14/10 at 21.  Wetmore himself characterized his sexual contact with Roland as "too many times to say."  Tr. 12/20/10 at 115.  Wetmore also offered Roland drugs, and showed Roland child pornography.  Id.

13.      As a result of his conviction on the 1986 offense, Wetmore was sentenced to 18 years, all but 14 years suspended, with 6 years of probation to follow.  Gov. Ex. 2; Tr. 7/22/10 at 54-55, 58, 62; Tr. 12/20/10 at 116.  After being released from prison in 1995 in the State of Maine, Wetmore was not ordered to attend sex offender treatment.  Tr. 7/22/10 at 61, 62; Tr. 12/20/10 at 43.

14.      During the time that Wetmore was incarcerated for his 1986 offense against Roland,

Wetmore learned about the availability of child pornography over the Internet.  Tr. 7/22/10 at 60.
Wetmore set up "rules" for himself about child pornography.  Id.  He vowed not to manufacture or
transmit child pornography, and decided that he would use it for his own purposes.  Id.  Wetmore
made a promise to himself that he would not pay for child pornography, and he would avoid any
places where children were present once released.  Tr. 7/22/10 at 61.  Wetmore also made a
commitment to himself that he would never again assault another child, and he would use child
pornography to gratify his needs.  Tr. 7/22/10 at 60-61.

15.     Despite this promise, in 1999, when Wetmore was 44 years old and involved with
a 24 year old man ("Jesse"), he molested at least one other juvenile named "Ryan," who was 15
years old.    Tr. 7/22/10 at 62-63; Tr. 12/20/10 at 45, 118.   Wetmore hired Ryan to work at
Wetmore's auto repair shop, JK Auto Repair.  Tr. 7/22/10 at 63.  When Wetmore hired Ryan, he did
not disclose that he was a sex offender.  Tr. 12/20/10 at 118.  Wetmore performed oral sex on Ryan.
Id.

16.     In 2000, Wetmore pleaded guilty in the United States District Court for the District
of Maine to one count of receipt of child pornography and one count of possession of child
pornography.  Gov. Ex. 3.  Wetmore had more than 2,000 images of child pornography on his
computer depicting minor males, including prepubescent males, engaged in sexually explicit
conduct.   Tr. 7/22/10 at 70, 72; Tr. 7/23/10 at 68, 70; Tr. 12/20/10 at 119.   Wetmore had
preprogrammed his computer to provide quick access to a select group of Internet news groups
related to children engaged in sexual activity.  Tr. 7/23/10 at 68.  Wetmore was sentenced to eighty-
seven months on each count, said terms to be served concurrently.  Tr. 7/22/10 at 73-74.  Wetmore
is subject to a 5-year term of supervised release.  Gov. Ex. 3; Tr. 7/23/10 at 63, 73.  At present,
Wetmore's terms of supervised release include "mental health treatment," but does not specifically

designate sex offender treatment as part of the treatment Wetmore is required to participate in if released.  Tr. 7/23/10 at 74.

### E.    Prison Behavior

17.    In 2007, Dr. Renaud was notified by the BOP mail room that two publications that were mailed to Wetmore were rejected, "Faces of the Rainforest" and "Dream Boys."  Tr. 7/23/10 at 98, 103.  "Dream Boys" is book about a sexual relationship that develops between two high school boys.  Tr. 10/14/10 at 30.  Dr. Renaud testified that this publication could be used by someone with pedophilia as erotic material for purposes of masturbation.  Tr. 10/14/10 at 30.  This book is risk relevant for Wetmore because just seeing images of children or fantasizing about children is part of the chain of reoffending sexually.  Tr. 10/14/10 at 31-32.

18.    Wetmore was housed in an eight-man unit at FMC Devens, measuring approximately 30 feet long by 10 feet wide.  There are 4 bunk beds in the room, and 1 locker is assigned to each bed.  Tr. 7/23/10 at 79-80, 123.  Wetmore's bunk was the last one in the room, and he had two lockers assigned to him.  Tr. 7/23/10 at 80.  Wetmore's housing unit is a general population, low-custody housing unit, where there are 212 inmates.  It is a dormitory style of housing unit.  Tr. 7/23/10 at 92.  Inmates are authorized to have scissors, and there are areas where they are able to cut and paste, including their rooms, the recreation area, and the library.  Tr. 7/23/10 at 90-91.  Inmate John Rankin has seen Wetmore with scissors, although Rankin claims not to have seen Wetmore cut out pictures, glue things together, or put anything under his mattress.  Tr. 7/23/10 at 155-156.

19.    In September 2008, Counselor Quiles received information that there was contraband of a sexual nature in the eight-man room; specifically in Wetmore's bunk.  Tr. 7/23/10 at 125, 126, 128, 132, 137.  As a matter of course, Counselor Quiles received complaints several times a day, in

verbal form, in written form, by a dropped note, or referred to him by correctional officers at BOP. Tr. 7/23/10 at 141.  After receiving the information about Wetmore, he informed Officer Russell, and asked him to conduct a search of Wetmore's cell.  Tr. 7/23/10 at 127-128, 137.

20.    That same day, Officer Russell conducted a "shakedown" of Wetmore's cell.  Tr. 7/23/10 at 78.  A "shakedown" is another term to describe a cell search.  Id.  Officer Russell conducted the cell search because, based on the information he received from Counselor Quiles, he had reason to believe that contraband was in Wetmore's cell.  Id.  "Shakedowns" are routine, and conducted as a matter of officer and inmate safety.  Tr. 7/23/10 at 79.

21.    After finding "nuisance" contraband in Wetmore's locker, Officer Russell continued the search and discovered under Wetmore's mattress a magazine and cut-out images of boys, some with cutout phallic-shaped pieces attached to them.  Tr. 7/23/10 at 80-81, 84, 111, 112; Gov. Ex. 5. The images also included a young, nude boy with a bicycle.  Tr. 7/23/10 at 110, 111; Gov. Ex. 5. After briefly looking through the images, Officer Russell contacted psychology staff of the Sex Offender Management Program ("SOMP"), advised them what he found, and wrote and delivered a memo to the staff.  Tr. 7/23/10 at 86-88.

22.    The SOMP is a management strategy employed by the BOP for sex offenders, where offenders are evaluated, managed, and monitored in a specialized way related to their sex offending behavior.  Tr. 7/23/10 at 95.  The materials sent to SOMP were reviewed by Dr. Renaud to determine if they were risk-relevant and sexually explicit.  Tr. 7/23/10 at 105.  The material provided to Dr. Renaud included magazines, magazine cutouts, and a smaller envelope that had the smaller phallic-shaped cutouts contained inside.  Tr. 7/23/10 at 116-117.  Dr. Renaud determined that the pictures were consistent with what was known about Wetmore's history, that the pictures were risk-relevant given Wetmore's history of sexual attraction to minor males, and that they were

altered in a way to make them sexually explicit.  Tr. 7/23/10 at 113, 115.

23.     Dr. Renaud wrote a memorandum advising Officer Russell that the material he found under Wetmore's mattress was inappropriate, and recommending that an incident report be written. Tr. 7/23/10 at 113; Gov. Ex. 6.  After being advised, Officer Russell wrote an incident report.  Tr. 7/23/10 at 89.  Wetmore was disciplined as a result of the incident.  Tr. 7/23/10 at 135.

24.     A disciplinary hearing was conducted by the BOP, and Wetmore was allowed to call witnesses on his behalf.  Inmate Rankin was one inmate who provided a statement during the disciplinary hearing on Wetmore's behalf.  Tr. 7/23/10 at 160-161.

25.     Although Wetmore denied that the pictures found under his mattress were his, there was no testimony to support Wetmore's claim that the information was planted by "an enemy," nor was there testimony from anyone with any knowledge that Wetmore indeed had "enemies."  Tr. 7/23/10 at 106, 137.

26.     Although Wetmore for the first time at trial advanced the theory that Inmate Romero "planted" the sexually explicit pictures of young boys that were found under Wetmore's mattress, Romero's name was never raised during Wetmore's disciplinary proceedings, and no evidence suggests that Romero "planted" the contraband.  Tr. 7/23/10 at 161, 171.  To the contrary, Rankin testified that he believed Romero informed Counselor Quiles that Wetmore had the material under his mattress.  Tr. 7/23/10 at 169.

27.     Romero was housed in the 8-man unit with Wetmore.  Tr. 10/15/10 at 4.   In September of 2008, Romero was looking for the lens of his glasses, with Rankin, when they decided to look under Wetmore's mattress to see if the lens fell behind the mattress.  Tr. 10/15/10 at 5-6, 22. Romero raised the mattress, saw a magazine and some of the sexually explicit pictures, looked at it the material, and returned it underneath Wetmore's mattress.  Tr. 10/15/10 at 6.  Rankin also saw

the materials. Id.; Tr. 10/15/10 at 15. Romero identified the pictures depicting child pornography, introduced into evidence as Gov. Ex. 5, as some of what he found under Wetmore's mattress. Tr. 10/15/10 at 7-8, 13. Romero found other pictures in addition to the ones introduced into evidence. Tr. 10/15/10 at 9, 13. Romero confronted Wetmore about the pictures Romero found under Wetmore's mattress, and Wetmore denied they were his. Tr. 10/15/10 at 5, 11-12, 18.

28.     Romero denied planting the materials under Wetmore's mattress. Tr. 10/15/10 at 7. He had been in FMC Devens for less than a month, was coming from another prison, and didn't know Wetmore well. Id.

29.     Although Wetmore denied the cutout pictures were his, Romero testified that he was kept awake at night by Wetmore's cutting up of magazines. Tr. 10/15/10 at 10. Romero asked that Wetmore cut magazines during the day, rather than at night. Tr. 10/15/10 at 27-28. Romero was also kept awake by Wetmore's masturbating 4-5 times a week. Tr. 10/15/10 at 30-31.

30.     Romero reported Wetmore's possession of the pictures, and how he found them, to Counselor Quiles. Tr. 10/15/10 at 6, 10, 20-21. Romero did so because he was new to FMC Devens, was Wetmore's "bunk mate," and thought that if there was a random search conducted in the cell, and they found Wetmore's material, many inmates - himself included - would be disciplined. Tr. 10/15/10 at 7, 11. Romero testified that he believed Wetmore put him in a "bad situation" by having that material in he cell. Tr. 10/15/10 at 20. Romero told Counselor Quiles that Wetmore "needed help," and also told Counselor Quiles about the pictures to try to get Wetmore some help. Tr. 10/15/10 at 11, 20.

31.     Given the lack of evidence to support Wetmore's claim that the sexually explicit material found under his mattress was "planted," coupled with the corroboration of Romero's testimony, this Court concludes that the contraband pictures were Wetmore's, and his testimony to

the contrary is not credible.

32.     DiMeo was also housed in the 8-man unit with Wetmore beginning July 7, 2009.  Tr. 12/20/10 at 57.  DiMeo observed Wetmore taking an interest in other inmates at Devens, all of whom look to be under the age of 25 year old.  Tr. 12/20/10 at 61.  While incarcerated, DiMeo grew his hair and facial hair in an effort to deter any advances from Wetmore, and any other inmates who found young-looking boys attractive.  Tr. 12/20/10 at 61.

33.     When DiMeo was first assigned to the 8-man unit, Wetmore would push on DiMeo's hip to wake him up.  Tr. 12/20/10 at 62.  DiMeo told Wetmore to stop touching him, but Wetmore did not immediately stop.  Tr. 12/20/10 at 63, 90.

34.     In 2009, DiMeo woke on occasion to find Wetmore staring at him.  Tr. 12/20/10 at 63-64.  As Wetmore stared at DiMeo, one of Wetmore's hands was in his pants.  Tr. 12/20/10 at 64.  DiMeo complained to other inmates about Wetmore's behavior.  Tr. 12/20/10 at 65.

35.     In July/August of 2009, DiMeo was taking medication that caused priapism.  Tr. 12/20/10 at 65.  One morning, Wetmore asked DiMeo what he had been dreaming about, and commented on DiMeo's erection.  Tr. 12/20/10 at 65-66.

36.     In 2009, Wetmore asked DiMeo about his masturbation habits, and Wetmore told DiMeo that Wetmore thought he must be hypersexual, because Wetmore had to masturbate at least once a night.  Tr. 12/20/10 at 67.

37.     During the time that DiMeo was housed with Wetmore, DiMeo witnessed Wetmore looking at, and cutting out, pictures of little boys.  Tr. 12/20/10 at 68.  On one occasion, in September of 2009, DiMeo witnessed "dog eared" pages of little boys, ranging in age from 6-12 years old, with their shirts off, from a book on the South Pacific.  DiMeo found the book over a lamp that Wetmore used, which was located between his and Wetmore's bunks.  Tr. 12/20/10 at 69.

38.     In August of 2010, DiMeo witnessed another inmate bring Wetmore a magazine, and request that Wetmore not cut out any pictures until the inmate was finished looking at the magazine. Tr. 12/20/10 at 70.  A few days later, the magazine was returned to Wetmore, who in front of DiMeo opened up a page to a boy, not older than 6 years old, in his underwear, and Wetmore said "that's definitely a good one," or words to that effect, stating that he would definitely keep that picture.  Id.

39.     Over the course of 9 months in 2010, Wetmore purchased anywhere between $1,200 - $1,500 in commissary purchases for other inmates, in return for sexual favors. Tr. 12/20/10 at 71. On one occasion, Wetmore asked DiMeo to make commissary purchases for him, because Wetmore had exceeded his monthly commissary limit.  Id.

40.     In September of 2010, Wetmore told DiMeo that, over the course of 10 years of incarceration in the federal system, Wetmore has had approximately 50 sexual partners ranging from general massage to oral or anal sex.  Tr. 12/20/10 at 72.  Wetmore stated that during the institutional movie on Friday and Saturday, and on any holiday evening at 6:00-6:30 p.m., he would go into the shower area, throw a towel or shorts or something over the stall to indicate he was there, and another inmate would follow Wetmore in, or vice versa, for "prison sex." Tr. 12/20/10 at 73.  Wetmore also told DiMeo that sexual activity was easier in the Special Housing Unit ("SHU") because only 2 people were in a cell, corrections officers could be heard when they were approaching, and there was time to conceal the sexual activity.  Id.  Wetmore also described to DiMeo places that Wetmore had been sexually active in Devens' education department.  Tr. 12/20/10 at 74-75.

41.     In September of 2010, Wetmore arranged for a "rock," made by Wetmore, to be implanted into his penis. Tr. 12/20/10 at 77-78, 108.  A "rock" is a marble sized object, about 1/8 inch in diameter, that Wetmore fashioned from a domino by cutting it, polishing it, and scraping it with various tools that Wetmore was able to obtain from his job at Devens.  Id.  Wetmore paid

another inmate to implant it in Wetmore's penis in order to enhance Wetmore's orgasm, masturbatory and sexual pleasure.  Id.; Tr. 12/20/10 at 99, 109.

## II.      **Wetmore Has Engaged In Sexually Violent Conduct or Child Molestation In The Past**

42.      Wetmore's past conduct satisfies the first element of the statute; namely, whether he has engaged in, or attempted to engage in, acts of sexually violent conduct or child molestation in the past.  18 U.S.C. § 4248.

43.      Wetmore's conviction for his 1980 unlawful sexual contact with Mark, who was 12 years of age, and his 1986 conviction for gross sexual misconduct, where Wetmore engaged in approximately 3 years of sexual misconduct with Willy from age 9-12, constitutes sexually violent conduct or child molestation for purposes of the Adam Walsh Act.  Tr. 7/23/10 at 147; Tr. 10/14/10 at 18; Gov. Ex. 1; Gov. Ex. 2.

44.      To BOP psychologist, Dr. Monica Ferraro, Wetmore admitted having 35 victims of child molestation.  Wetmore identified 14 victims as prepubescent, and 21 victims as post pubescent. Tr. 7/23/10 at 188; Tr. 10/14/10 at 47.

45.      Accordingly, having considered the foregoing testimony, this Court finds that Wetmore has engaged in or attempted to engage in sexually violent conduct or child molestation in the past.  18 U.S.C. § 4248.

## III.      **Mental Illness, Abnormality, Or Disorder**

### A.      **Experts' Qualifications**

46.      Pursuant to 18 U.S.C. § 4247(b), the Court designated, Dr. Robert Prentky, a licensed psychologist, as the court-designated examiner.  The Court also heard testimony from a licensed psychologist retained by the government, Dr. Amy Phenix.

47.      Dr. Phenix holds psychology licenses from California, Florida and Washington.  Gov.

Ex. 7.  She has been involved in the treatment or evaluation of sex offenders since 1991.  Id.  She has published peer-reviewed articles on the topic of sex offenders and written a chapter in Innovations in Clinical Practice: A Source Book pertaining to the risk assessment of sex offenders. Gov. Ex. 7, 8.  She has provided numerous training sessions and conference presentations, as well as published on the use of actuarial instruments, such as the Static-99, and their use with sex offender risk assessment.  Id.

48.      Dr. Robert Prentky is a licensed psychologist in Massachusetts, New Jersey, and Pennsylvania.  Gov. Ex. 4.  He has evaluated sex offenders several thousand times over the last thirty years.  Tr. 7/22/10 at 32.  He has published or presented on the topic of sex offenders.  Gov. Ex. 4.  In determining Wetmore's dangerousness, Dr. Prentky reviewed all of the discovery available to him, and conducted an interview of Wetmore that lasted approximately 6 hours.  Id.  Wetmore gave informed consent for the interview with Dr. Prentky.  Tr. 7/22/10 at 34-35.

49.      The Court having reviewed the curricula vitae of Drs. Phenix and Prentky, and having heard their testimony, finds that both are qualified by education and experience to offer expert testimony in this matter both as to the diagnosis of Wetmore and as to the issue of whether Wetmore would have serious difficulty in refraining from further acts of sexually violent conduct or child molestation if released.[6]

**B.      Materials reviewed**

50.      Both experts in this matter were provided with extensive records of Wetmore's background, including records of conviction and police reports, records of Wetmore's incarceration at the BOP, including records of treatment while incarcerated, and Wetmore's deposition.  Tr.

---

[6] Neither party objected to either psychologists' qualifications to give expert testimony, and Respondent stipulated to Dr. Phenix's qualifications.  Tr. 7/23/10 at 144.

7/22/10 at 32, 33; Tr. 7/23/10 at 145; Tr. 10/14/10 at 16.  These records are the type of records reasonably relied upon by professionals in the field in forming opinions or making inferences as to whether someone is a sexually dangerous person.  Tr. 7/23/10 at 145.

51.     Dr. Prentky also interviewed Wetmore on April 24, 2009 for six hours.  Tr. 7/22/10 at 32; Tr. 7/23/10 at 65.

52.     Wetmore refused to be interviewed by Dr. Phenix.  Tr. 7/23/10 at 146; Tr. 10/14/10 at 17.  However, Dr. Phenix was able to evaluate whether Wetmore was a sexually dangerous person without conducting an interview of him.  It is an accepted practice in the profession to do so as long as, if a diagnosis is rendered, there is sufficient history and information to do so without an interview.  Tr. 7/23/10 at 146.  Dr. Phenix had sufficient records and information to diagnose Wetmore and to form an opinion as to his sexual dangerousness in this case.  Id.

### C.     Both Experts Opined That Wetmore Suffers From A Serious Mental Illness, Abnormality or Disorder

#### (i)     Dr. Robert Prentky

53.     Dr. Prentky determined that there was "overwhelming behavioral evidence supporting a classification [of Wetmore] of same-sex pedophilia."  Tr. 10/15/10 at 72.  However, Dr. Prentky diagnosed Wetmore, at this point in his life, with Paraphilia Not Otherwise Specified ("NOS"), as found in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision ("DSM") with a descriptor of "hebephilia."  Tr. 7/22/10 at 77; Tr. 7/23/10 at 29; Tr. 10/15/10 at 72.  The DSM is a compendium of classification of mental disorders adopted by the American Psychiatric Association.  Tr. 7/23/10 at 4.  It is a classification manual of mental disorders commonly diagnosed by mental health professionals.  Tr. 7/23/10 at 148.

54.     Paraphilia NOS (hebephilia) is a pattern of intense, recurrent, erotic attraction to

pubescent adolescents, and is a mental illness, abnormality or disorder.  Tr. 7/22/10 at 77, 85.  In addition, these recurrent intense sexual urges must exist for a period of 6 months, and cause clinically significant distress or impairment in social, occupational or other important areas of functioning.  Tr. 7/22/10 at 90.  Dr. Prentky testified that hebephilia would be characterized by attraction to teenagers to age 14.  Tr. 7/23/10 at 10.  Wetmore's reported sexual preference is for boys in the age range of 11 to 14.  Tr. 7/23/10 at 31.  Dr. Phenix agreed that Wetmore has a sexual arousal to post-pubescent boys.  Tr. 7/23/10 at 151.   However, some of the boys identified as Wetmore's sexual preference would be considered prepubescent.  Tr. 7/23/10 at 31.

55.    A proposed, pending recommendation for the DSM-V includes a new category of Paraphilia called "pedohebephilia" which describes an attraction to young adolescents up to age 14. Tr. 7/22/10 at 82-83; Tr. 7/23/10 at 8, 26.  The DSM-V is expected to be published in 2012 or 2013. Tr. 7/23/10 at 7.

**(ii)    Dr. Amy Phenix**

56.    Dr. Phenix testified that Wetmore suffered from a serious mental illness, abnormality or disorder, diagnosed as Pedophilia, sexually attracted to males, nonexclusive.  Tr. 7/23/10 at 147-148; Tr. 10/14/10 at 22.

57.    "Pedophilia" is defined by the DSM as intense, recurrent, sexually arousing fantasies, sexual urges, or behaviors with prepubescent children, generally age 13 or younger.  Tr. 7/23/10 148-149, 150; Tr. 10/14/10 at 23.  The DSM requires that the person has acted on the sexual urges, or those urges or fantasies have caused distress or impairment, or inner personal difficulty to the person.  Tr. 7/23/10 at 149.  Furthermore, the individual at the time of the pedophilia diagnosis is made must be at least 16 years of age, and there must be a 5-year age difference between the victim and the perpetrator.  Id.; Tr. 10/14/10 at 24.   "Nonexclusive" pedophilia means that Wetmore has

sexual arousal not only to prepubescent males, but to postpubescent males and perhaps adult males as well.  Tr. 7/23/10 at 148.  It is not unusual for individuals with pedophilia to be aroused to prepubescent boys through pubescence and postpubescence.  Tr. 7/23/10 at 152, 178.

58.     In diagnosing Wetmore with pedophilia, Dr. Phenix looked at Wetmore's behaviors; what sexual inappropriate behaviors he committed toward prepubescent males in the past, the frequency and duration of that behavior, what admissions Wetmore made, and examined his pornographic habits, including a description of the images that Wetmore was viewing when he was looking at pornography.  Tr. 7/23/10 at 149-150.  Dr. Phenix had very sufficient evidence for a diagnosis of pedophilia, and did diagnose Wetmore with paraphilia NOS (hebephilia), but recognized this as Wetmore's arousal pattern.  Tr. 7/23/10 at 178-179; Tr. 10/14/10 at 22.

59.     Pedophilia is a longstanding and pervasive, enduring condition that lasts throughout a person's lifetime.  Tr. 7/23/10 at 196.  pedophilia is a sexual orientation that a person does not outgrow, a conclusions that is supported by peer-reviewed literature as well as the DSM.  Tr. 7/23/10 at 197-198; Tr. 10/14/10 at 27-28.  Pedophilia is usually chronic, especially in those individuals who, like Wetmore, are attracted to males.  Tr. 10/14/10 at 28-29.  The recidivism rate for individuals with pedophilia involving a preference for males is roughly twice that for those who prefer females.  Tr. 10/14/10 at 29.

60.     According to Dr. Phenix, a person who is diagnosed with Paraphilia NOS experiences sexual fantasies, urges, or sexual behaviors involving nonliving objects, sexual sadism, humiliation or causes pain to another person or oneself, or those fantasies, urges or behaviors toward children or other nonconsenting persons.  Tr. 10/14/10 at 85-86.  Paraphilia NOS is included in the DSM. Tr. 10/14/10 at 88.  "Hebephilia" is a Paraphilia NOS.  Id.

61.     "Hebephilia" is characterized by an arousal to boys becoming pubescent.  Tr.

10/14/10 at 82.  Dr. Phenix testified that it is abnormal for an adult to be attracted to children between the ages of 12-14 years old.  Id.; Tr. 10/14/10 at 84.  Hebephilia is a mental abnormality, illness or disorder when it is marked by a lifetime of attraction to minors, and it has caused distress. Tr. 10/14/10 at 84-85.  Dr. Phenix has provided that diagnosis throughout 15 years of her work in the field of sex offender treatment and assessment.  Id.  It is a recognized mental disorder in peer-reviewed journal articles published in the sex offender profession.  Id.

62.     Wetmore's relationship with Willy (see ¶ 7), who was 10 years old, qualifies as a pedophilic relationship because Wetmore was over 16 years old, there was an age difference of greater than 5 years between them, and the molestation lasted for 3-4 years.  Tr. 7/23/10 at 182; Tr. 10/14/10 at 24. The DSM would characterize Willie as prepubescent, based on the fact that he was younger than 13.  Tr. 7/23/10 at 188.

63.     Wetmore's 1980 conviction for unlawful sexual contact, when Wetmore was 24 years old, and his victim, "Mark", was 12 years old, also qualifies as pedophilia.  Gov. Ex. 1; Tr. 7/23/10 at 182; Tr. 10/14/10 at 24. The DSM would characterize Mark as prepubescent, based on the fact that he was younger than 13.  Tr. 7/23/10 at 188.

64.     Wetmore's 1986 conviction resulted from sexual contact with "Roland" who was 12 years old, qualifies for pedophilia.  Tr. 7/22/10 at 53-54; Tr. 10/14/10 at 25.  Wetmore was 30 years old at the time.  Tr. 10/14/10 at 26.  Wetmore molested Roland on an almost daily basis by committing oral copulation and sodomy on Roland.  Tr. 10/14/10 at 21. The DSM would characterize Roland as prepubescent, based on the fact that he was 12.  Tr. 7/23/10 at 188.

65.     Wetmore's self-report of 14 prepubescent victims also contributed to Dr. Phenix's diagnosis of Wetmore with pedophilia.  Tr. 7/23/10 at 188.  Wetmore's report of 21 postpubescent victims supports a diagnosis Paraphilia NOS (hebephilia).  Tr. 10/14/10 at 47.

66.     Dr. Phenix testified that Wetmore described how he would take roles in the community that would allow him access to children for sexual activity, because he was aroused to them. Tr. 7/23/10 at 190.  Wetmore was a scoutmaster, Big Brother, participated in youth activities, Bible study conferences, and designed his life in a way that would give Wetmore access to children who would later become his victims, which is very typical behavior for someone with pedophilia. Tr. 7/23/10 at 190-191; Tr. 12/20/10 at 136.

67.     Wetmore has an extensive history of use of child pornography, having at one time 2,000 - 4,000 images[7] on his computer, containing images of prepubescent boys ranging in the age of 7-17 years old.  Tr. 7/23/10 at 191; Tr. 10/14/10 at 25.

68.     In arriving at a diagnosis of pedophilia, Dr. Phenix looked at Wetmore's sexual development, the pattern and duration of his sexual behavior with prepubescent males, as well as his arousal to prepubescent boys from the time that Wetmore was 21 years old through 1999, where Wetmore continued to view pornography of prepubescent males.  In addition, Dr. Phenix considered the evidence that Wetmore was still preoccupied, at the time of trial, with prepubescent males as demonstrated by Wetmore's homemade child pornography that was discovered under his mattress at Devens.  Tr. 7/23/10 at 191-192; Tr. 10/14/10 at 30.  This homemade child pornography is risk relevant because it is part of the chain of sexual reoffense.  Tr. 10/14/10 at 31.

69.     Even if Wetmore did not possess child pornography in prison, Dr. Phenix's diagnosis of pedophilia would remain valid.  Tr. 10/14/10 at 81.  Wetmore's disorder is such that he has, throughout his entire adult life, fantasized about minor boys, and masturbated frequently to those

---

[7] Some records, such as the Presentence Investigation Report indicate 2,000 images of child pornography, while Wetmore's own disclosure represented that he had 4,000 images of child pornography.  Tr. 7/23/10 at 191.  In any case, Wetmore's possession of child pornography is undisputed.  Gov. Ex. 3.

deviant sexual fantasies.  Id.  Wetmore does not require pornography in order to do so because he has those visions in his mind every day.  Id.

70.     Dr. Phenix also considered that Wetmore, who was 53 years old in 2009, sought antiandrogen medication.  This medication is taken to reduce deviant sexual arousal, to reduce testosterone, and is evidence that Wetmore continues to still experience an arousal to minor boys.  Tr. 10/14/10 at 33, 35.  In 2005, Wetmore described his sex drive as "overactive."  Tr. 12/20/10 at 140-141.

IV.     **As A Result Of Wetmore's Serious Mental Illnesses, Abnormalities, or Disorders Wetmore Would Have Serious Difficulty In Refraining From Sexually Violent Conduct Or Child Molestation If Released**

A.      **Experts' Methodology**

71.     Both experts conducted an assessment of whether Wetmore's mental illnesses, abnormalities or disorder would cause him to have "serious difficulty in refraining from sexually violent conduct or child molestation" if released.  18 U.S.C. § 4248.

72.     In arriving at her opinion, Dr. Phenix used the clinically adjusted actuarial approach, the approach used most frequently in evaluating sex offenders.  Tr. 10/14/10 at 41.  The clinically adjusted actuarial approach involves examining one or more actuarial instruments, as well as examining additional risk factors outside of the actuarial instruments and considering overall risk collectively.  Id.

B.      **Actuarial Risk Assessment Instruments**

73.     Dr. Prentky used an actuarial risk assessment instrument called the Static-99 in evaluating whether Wetmore is a sexually dangerous person.  Tr. 7/22/10 at 91-92.  The Static-99 is routinely used in civil commitment proceedings for sex offenders, has been extensively validated and subjected to peer review, and has gained general acceptance in the scientific community.  Id.

Dr. Prentky scored Wetmore with a 6 on this instrument, placing Wetmore in the "high risk" category of reoffense. Tr. 7/22/10 at 92-93. Dr. Prentky testified that Wetmore falls within a group of individuals with an approximate 35% chance of reoffense over a ten year period of time. Tr. 7/22/10 at 94; Tr. 7/23/10 at 48.

74.     Dr. Phenix scored Wetmore on the Static-99, the Static 99R (revised), the Static-2002, the Static-2002R, and the MnSOST-R (Minnesota Sex Offender Screening Tool - Revised). Tr. 7/23/10 at 146; Tr. 10/14/10 at 16. Dr. Phenix used these actuarial instruments because it is important for her to see converging evidence on overall risk from different instruments, for a more comprehensive risk assessment. Tr. 10/14/10 at 42; Gov. Ex. 10.

75.     The Static-99 is an actuarial instrument that contains ten static risk factors. Tr. 10/14/10 at 45. Dr. Phenix is one of the authors of the Static-99 Coding Manual. Tr. 10/14/10 at 46.

76.     Dr. Phenix scored Wetmore with a 6 or 7 on the Static-99, the result of which depended on whether Wetmore had a stranger victim. Tr. 10/14/10 at 46. A score of 6 classified Wetmore as "high risk" to reoffend. Tr. 10/14/10 at 48. Dr. Phenix testified that, in the study sample of all those who scored a 6 or above on the Static-99, 39% reoffended in 5 years, 45% reoffended in 10 years, and 52% reoffended in 15 years. Id.

77.     Dr. Phenix also scored Wetmore on the Static-99R, an instrument that has been recommended to replace the Static-99. Tr. 10/14/10 at 49. The Static-99R better accounts for age, and there are new norms, or probabilities of sexual reoffense, that are more contemporary and based on newer samples. Id. Wetmore scored a 5 on the Static-99R, putting him in the 81.4% - 89.7% range (meaning only 10.3% - 18.6% of sex offenders scored lower than he), and placing him at a "moderate-high" to "high" risk of reoffense. Tr. 10/14/10 at 49-50, 56. The average score on the

Static-99R for a sex offender is a 2.  Tr. 10/14/10 at 57.  A score of 5, such as Wetmore's, translates to a reoffense rate of 20% over 5 years, and 27.7% over ten years.  Tr. 10/14/10 at 58.  These rates are lower than the Static-99 rates because age is more fully accounted for, and there was less recidivism in the study samples due to reasons such as treatment, more intensive supervision, longer supervision in the community, and sex offender registration laws.  Tr. 10/14/10 at 59.

78.     On the Static-2002, Dr. Phenix scored Wetmore with a 7 or 8, which is considered "moderate-high" risk.  Tr. 10/14/10 at 62, 65.  Wetmore's score on the Static-2002 and Static-2002R was identical.  Tr. 10/14/10 at 65.

79.     Finally, Dr. Phenix scored Wetmore on the MnSOST-R.  Tr. 10/14/10 at 65.  Wetmore scored an 11, which is in the "high risk" range.  Tr. 10/14/10 at 69.

**(i)     Dynamic Risk Factors**

80.     In arriving at her opinion that Wetmore was a sexually dangerous person, Dr. Phenix also considered dynamic risk factors, factors that are changeable and were developed in the STABLE 2007, a dynamic risk instrument developed by Drs. Hanson and Harris.  Tr. 10/14/10 at 71.

**a.     Intimacy Deficits**

81.     Intimacy deficits are essentially the inability to form, or problems that the offender has in forming, meaningful, longer-lasting relationships.  Tr. 10/14/10 at 71.  Longer lasting relationships seem to be protective factors against sexual reoffense.  Id.  Wetmore has had no long-lasting peer relationships.  Tr. 10/14/10 at 72.

82.     Another factor that measures intimacy deficits is emotional identification with children.  Tr. 10/14/10 at 72.  These types of offenders tend not to establish adult relationships, put themselves in the proximity of where children will congregate or where they will have access to

children.  Id.  In Wetmore's case, he was a Big Brother, was involved with youth at his church for

a number of years, informally was a foster parent for boys, and put himself in a position where he

had access to children.  Id.  Wetmore also had boys coming to his home by offering them drugs and

alcohol.  Id.  Wetmore's intimacy deficits increase his risk of reoffense.  Tr. 10/14/10 at 73.

### b.     Poor Sexual Self-Regulation

83.     Sexual self-regulation is measured by Wetmore's level of sexual preoccupation; how

often he thinks about sex, has sex, his masturbatory habits, and his viewing of pornography.  Tr.

10/14/10 at 74.  Between 1997 - 1999, Wetmore viewed thousands of images of child pornography.

Id.  He masturbated 21 times a week to these images, and spent about 24 hours a week viewing child

pornography.  Tr. 10/14/10 at 74-75.  For offenders like Wetmore who have had a "hands on"

offense, this preoccupation with child pornography increases risk of recidivism.  Tr. 10/14/10 at 75.

84.     Wetmore's poor sexual self regulation is also measured by his ordering "Dream

Boys," a story of two boys having sex, by having pornography within the prison, and by reporting

recently that he needed antiandrogen medication to help him control a lifelong hypersexuality.  This

is convincing evidence that Wetmore suffers from sexual preoccupation that has caused him

problems throughout his life.  Tr. 10/14/10 at 76.

### c.     Lack Of Cooperation With Supervision

85.     Dr. Phenix also considered that Wetmore's 1999 child pornography offense was a

probation violation.  Tr. 10/14/10 at 76.  Wetmore was not supposed to be in the presence of boys

under the age of 16, and was in their presence, resulting in Wetmore reoffending against at least one

of these boys.  Id.  He also violated several conditions by furnishing alcohol to a minor, and

possessing child pornography.  Tr. 10/14/10 at 76-77.  In prison, Wetmore had disciplinary

violations, but the most important disciplinary violation was for possessing sexually explicit

-24-

material.  Tr. 10/14/10 at 77.

### d.     Prior Sex Offender Treatment

86.     Wetmore was mandated to attend treatment after his first offense in 1980, which he participated in for approximately 6 months.  Tr. 10/14/10 at 39.

87.     The second time Wetmore engaged in treatment was in the Department of Corrections in Maine, from February 2001 - June 2003.  Wetmore attended group sessions approximately once a week during the 2 ½ year period of time with Cathance Psychological Services in Maine.  Tr. 10/14/10 at 39-40; Tr. 12/20/10 at 138.

88.     Wetmore was next placed in sex offender treatment, this time with the BOP at FCI Butner.  Tr. 10/14/10 at 40.  During treatment in 2005, Wetmore admitted that he had a sexual attraction to male children.  Tr. 12/20/10 at 141.  Wetmore was in treatment for a short period of time when he violated treatment program rules by engaging in sexual activity with two other inmates, and was expelled from treatment.  Id.; Tr. 7/22/10 74-75, 76; Tr. 12/20/10 at 139.

89.     From 2005-2007, Wetmore was prescribed Prozac for his sexual impulses.  Tr. 12/20/10 at 145.  He stopped taking the medication because it didn't control his impulses.  Tr. 12/20/10 at 146.  As of June 2009, Wetmore continued to have a high sex drive.  Id.

90.     Wetmore has not participated in psychological treatment since 2008.  Tr. 12/20/10 at 142.

### e.     Presence of Dynamic Risk Factors

91.     The presence of these dynamic risk factors is consistent with Wetmore being high risk to sexually reoffend.  Tr. 10/14/10 at 77.  Wetmore has not been in treatment that has been effective for him, his 5 years of supervised release are insufficient for someone with Wetmore's history and sexual deviancy, and Wetmore is high risk to reoffend if released.  Tr. 10/14/10 at 78.

(ii)     **Protective Factors**

92.     Dr. Phenix considered Wetmore's 5 years of supervised release as a protective factor. However, Wetmore had community supervision the last time he was released and it did not stop him from reoffending sexually.  Accordingly, Dr. Phenix opined that inpatient treatment was necessary to lower his risk before releasing Wetmore to community supervision.  Tr. 10/14/10 at 78.

C.     **Experts' Conclusions on Sexual Dangerousness**

93.     This Court must determine if Wetmore is a sexually dangerous person "if released." 18 U.S.C. § 4247(a)(6).

(i)     **Dr. Prentky**

94.     Dr. Prentky opined to a reasonable degree of professional and medical certainty that Wetmore would have serious difficulty in refraining from further sexual acts involving children if released.  Tr. 7/22/10 at 96.  Wetmore is volitionally impaired.  Tr. 7/23/10 at 38.

95.     Dr. Prentky testified that the duration of Wetmore's sexualized interest in children extends from roughly the age of 11 to the present, or roughly 40+ years, and is a risk factor contributing to Wetmore's sexual dangerousness.  Tr. 7/22/10 at 96.  Wetmore has had an extraordinary amount of reinforcement of his fantasies and urges of young children in the 11-15 year old age group.  Tr. 7/22/10 at 96-97.  Wetmore's sexual preference for boys of roughly the same age and roughly the same kind of sexual acts has extended throughout most of Wetmore's lifetime.  Tr. 7/22/10 at 98.

96.     The second risk factor Dr. Prentky analyzed is Wetmore's high sexual drive. Wetmore disclosed masturbating to images of children or child pornography every night, at least as recently as the year 2000.  Tr. 7/22/10 at 97-98.

97.     A third risk factor, a statistical risk factor, relevant for Dr. Prentky's analysis for

-26-

Wetmore's sexual dangerousness is that all of Wetmore's victims are male.  Most scientific studies suggest that same-sex child molesters have the highest reoffense rate.  Tr. 7/22/10 at 98.

98.    Dr. Prentky further opined that, relevant to serious difficulty refraining, Wetmore has spent roughly nine years in prison, learned about child pornography over the Internet, and felt that he had found a safe way to gratify his sexual needs without committing another offense against a child.   Toward that end, Wetmore made a contract with himself that he would rely on child pornography, and he followed through with that "contract" in 1999 by collecting roughly 2,000 images of child pornography, and masturbating nightly to these images.  Despite this, however, Wetmore still brought teenage boys into his automotive shop, and engaged in sexual acts (oral sex) with at least one of the boys.  Tr. 7/22/10 at 99-100.  This breach of a promise to himself was particularly meaningful because Wetmore was not forced to make this promise in therapy; "it was an internal attitude, and it didn't work."  Tr. 7/23/10 at 46.

99.    Another factor considered by Dr. Prentky in determining serious difficulty refraining was that, from 1995-1999, Wetmore admitted that he had to "look the other way" to override his urges to act out against children, and so he leaned on the Internet and masturbated on average twice a day to child pornography.  Tr. 7/22/10 at 102.

100.    Dr. Prentky testified that a fourth factor relating to Wetmore's serious difficulty refraining is that, as recently as September 11, 2008, numerous pictures of small boys scantily clothed in sexually provocative positions were confiscated from Wetmore's cell at FMC Devens.  Some of the pictures had "makeshift penises attached near the genitals which appear to be pornographic in nature."  These pictures reflected not only Wetmore's poor judgment, but the intensity of his urges.  Tr. 7/22/10 at 102.

101.    Fifth, despite strong libidinal urges, Wetmore has never been placed on anti-androgen

medication ("chemical castration") to lower his levels of testosterone, which thereby diminish sexual drive, sexual urges, or sexual appetite.   Tr. 7/22/10 at 102-103, 104; Tr. 7/23/10 at 43.   However, anti-androgens alone are not enough for Wetmore.   Tr. 7/22/10 at 104-106.

102.   Dr. Prentky further considered that Wetmore's past exposure to sex offender treatment was "minimal" and "unlikely to mitigate risk."   The treatment Wetmore has had never included behavior therapy, which is recommended to diminish Wetmore's deviant arousal.   Tr. 7/22/10 at 103.

103.   While Wetmore's age is a risk-mitigating factor for most criminals, Dr. Prentky opined that age is less conclusive for extrafamilial child molesters such as Wetmore.   Tr. 7/22/10 at 103.   Wetmore turned 53 in 2010, but with his lengthy offense history, Dr. Prentky was not inclined to believe that age alone was a significant mitigating factor.   Id.   Scientific research, including Dr. Prentky's own research, indicates that there is an increase in offending in an offender's early 20's, then a fairly dramatic drop of reoffense in an offender's 30's, then the offense rate "goes way up" and remains stable until mid-to-late-50's and into the offender's 60's.   Tr. 7/23/10 at 58.

104.   Wetmore has no release plan if he were to be released to the community.   Tr. 7/22/10 at 108; Tr. 7/23/10 at 66.   He has no residential address for release, a "vague notion" that there are boarding or halfway houses that accept sex offenders, he plans to live alone in the Portland, Maine area, and no known psychologist who would treat him.   Tr. 7/22/10 at 108.   Wetmore does not know the address of the apartment complex where he claims he plans to live and where sex offenders are welcome, has no knowledge of whether sex offender services are offered at the apartment complex, does not know the name of the apartment complex, and has no knowledge whether there is a room for him if released.   Tr. 12/20/10 at 147.

105.   Dr. Prentky opined to a reasonable degree of professional and scientific certainty that

Wetmore meets the legal standard of a sexually dangerous person pursuant to 18 U.S.C. § 4248.  Tr. 7/22/10 at 109.

        **(ii)**    **Dr. Phenix**

106.    Dr. Phenix opined to a reasonable degree of professional certainty that Wetmore is a sexually dangerous person.  Tr. 7/23/10 at 144-145; Tr. 10/14/10 at 15, 88.  Dr. Phenix opined, to a reasonable degree of professional certainty, that Wetmore would have serious difficulty refraining from sexually violent conduct or child molestation if released.  Tr. 10/14/10 at 38-39.

107.    Wetmore has extreme problems with volition, as evidenced by his 600 incidents of molestation over a 4-5 year period of time.  Tr. 10/14/10 at 79-80.

108.    In terms of a release plan, Dr. Phenix testified that Wetmore reported the possibility of treatment in Massachusetts, but planned to live in Maine in a halfway house or a boarding house.  As Dr. Phenix testified, Wetmore will require a very structured, intensely supervised release plan, which he does not currently have, and 5 years of community supervision is not enough for Wetmore.  Tr. 10/14/10 at 80.  Wetmore requires intensive treatment before he is released to the community, so he can handle supervision and develop a relapse prevention plan, rather than struggling with the same urges and fantasies that he has acted upon in the past.  Tr. 10/14/10 at 81.

## CONCLUSIONS OF LAW

109.    Wetmore was in the custody of the BOP on November 17, 2006 when the BOP certified him as a "sexually dangerous person" under the Adam Walsh Act. See 18 U.S.C. § 4248.

110.    "'Sexually dangerous person' means a person who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." 18 U.S.C. §4247(a)(5).

111.     "'Sexually dangerous to others' with respect to a person, means that the person suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. §4247(a)(6).

112.     As defined in the Adam Walsh Act, a "sexually dangerous person" is "a person who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others."  18 U.S.C. §4247(a)(5).  Congress did not further define child molestation.  However, BOP regulations define "sexually violent conduct" as "any unlawful conduct of a sexual nature with another person ("the victim") that involves: a) the use or threatened use of force against the victim; b) threatening or placing the victim in fear that the victim, or any other person, will be harmed; c) rendering the victim unconscious and thereby engaging in conduct of a sexual nature with the victim; d) administering to the victim, by force of threat of force, or without the knowledge or permission of the victim, a drug, intoxicant, or other similar substance, and thereby substantially impairing the ability of the victim to appraise or control conduct; or e) engaging in such conduct with a victim who is incapable of appraising the nature of the conduct, or physically or mentally incapable of declining participation in, or communicating unwillingness to engage in, that conduct."  28 C.F.R. § 549.92 (2008).  The regulations define "child molestation," for purposes of certification, as including "any unlawful conduct of a sexual nature with, or sexual exploitation of, a person under the age of 18 years." 28 C.F.R. § 549.93 (2008).

113.     Pursuant to 18 U.S.C. § 4247, the Government must show that:

a.     Wetmore has engaged or attempted to engage in sexually violent conduct or child molestation (in the past);

-30-

     b.     Wetmore (currently) suffers from a serious mental, illness, abnormality, or disorder; and

     c.     As a result of which Wetmore would have serious difficulty in refraining from child molestation (in the future) if released from confinement.

114.    The Government must prove the first element beyond a reasonable doubt and must prove the second and third elements by clear and convincing evidence.  United States. v. Shields, 522 F.Supp.2d 317, 330 (D. Mass. 2007).  The clear and convincing evidence standard is higher than the "preponderance of the evidence" standard typically used in civil cases and requires the government to prove its contentions are "highly probable."  Colorado v. New Mexico, 467 U.S. 310, 316 (1984); John W. Strong, ed., 2 McCormick on Evidence, , Law of Evidence § 340, West Group 1999).

115.    The meaning of the term "child molestation," though not defined by the statute, is clear from the plain language of the statute and congressional intent.  The term child molestation means any unlawful conduct of a sexual nature with, or sexual exploitation of, a person under the age of eighteen years.  Such a definition is consistent with the broad purpose underlying the Adam Walsh Act, which was to protect children from all forms of sexual exploitation.  See preamble to Adam Walsh Act, PL, 109-248, Stat. 587 (July 27, 2006), codified at 42 U.S.C. § 16911.

116.    Wetmore has stipulated that he has committed past acts of child molestation, the Government has proven beyond a reasonable doubt that Wetmore has engaged in past acts of child molestation, and this Court finds that Wetmore has engaged in past acts of child molestation.

117.    The Court concludes that the Government has proved, by clear and convincing

evidence, that Wetmore suffers from a serious mental illness, abnormality or disorder; namely, pedophilia or Paraphilia NOS (hebephilia).

118.    The Court concludes that pedophilia is a serious mental illness, abnormality or disorder.  See Kansas v. Hendricks  521 U.S. 346, 360 (1997) ("The mental health professionals who evaluated Hendricks diagnosed him as suffering from pedophilia, a condition the psychiatric profession itself classifies as a serious mental disorder.").

119.    The Court concludes that the Government has proved, by clear and convincing evidence, that Wetmore suffers from a serious mental illness, abnormality, or disorder; namely, Paraphilia NOS (hebephilia).

120.    The Court concludes that Paraphilia NOS (hebephilia) is a serious mental illness, abnormality, or disorder.  "The essential features of a paraphilia are recurrent, intense, sexually arousing fantasies, sexual urges, or behaviors fixated on a specific stimuli, which occur over a period of at least 6 months and cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.  The DSM states that the frequent objects of fixation are nonhuman objects, the suffering or humiliation of oneself or one's partner, and children or other nonconsenting persons."  See United States v. Carta, 592 F.3d 34, 40 (1st Cir. 2010).

121.    Additionally, various courts have upheld the civil commitment of a sexually dangerous person on the basis of a paraphilia NOS diagnosis with hebephilic characteristics.  See In re Matter of G.R.H., 758 N.W.2d 719 (Supreme Court of N.D. 2008) (upholds continued commitment of sexually dangerous person where expert finds respondent suffers from antisocial personality disorder and paraphilia NOS hebephilia); In re Matter of Civil Commitment of K.H., 2008 WL 4648460 (unpublished) (N.J. Super.A.D. 2008) (civil commitment where expert finds

respondent suffers from paraphilia NOS and hebephilia and personality disorder NOS with

narcissistic and anti-social traits); In re Matter of Civil Commitment of E.J.S., 2007 WL

1038894 (unpublished) (N.J. Super. A.D. 2007) (upholds continued commitment where

diagnosis of paraphilia NOS hebephilia is contested); In re the Detention of Wayne Atwood,

2005 WL 974042 (unpublished) (Iowa App. 2005) (finding ample record evidence on which a

jury could have found respondent's hebephilia to be a mental abnormality justifying his

commitment without reliance on alcohol dependency or depression evidence); In the Matter of

the Civil Commitment of V.A., 357 N.J. Super. 55 (Superior Court of New Jersey 2003);  In the

Matter of Martinelli, 649 N.W.2d 886, 891 (Court of Appeals Minnesota 2002) ( "the evidence

as a whole establishes a diagnosis of a mental disorder or abnormality (hebephilia and antisocial

personality disorder) which is linked to a difficulty in controlling behavior that is properly

described as serious.").

122.   Even where there is a disagreement among respected professionals in the field,

such disagreements do not preclude the court from finding that the Government has met its

burden as to whether a respondent suffers from a serious mental illness, abnormality or disorder.

Disagreements between psychiatric professionals on definitions do not tie the Government's

hands in setting the bounds of its civil commitment laws.  "In fact, it is precisely where such

disagreement exist that legislatures have been afforded the widest latitude in drafting such

statutes . . . As we have explained regarding congressional enactments, when a legislature

"undertakes to act in areas fraught with medical and scientific uncertainties, legislative options

must be especially broad and courts should be cautious not to rewrite legislation." Kansas v.

Hendricks, 521 U.S. 346, 360 at n. 3 (1977) (internal citations omitted).  As the Supreme Court

stated in a later case, "the science of psychiatry, which informs but does not control the ultimate

legal determinations, it is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law." Kansas v. Crane, 534 U.S. 407 at 413 (citing the DSM-IV and noting the imperfect fit between the questions of ultimate concern to the law and the information contained in the [DSMs] clinical diagnosis).

123.    The Court concludes that the Government has proved, by clear and convincing evidence, that Wetmore is sexually dangerous to others because the serious mental illness, abnormality or disorder of pedophilia and/or Paraphilia NOS (hebephilia) would cause Wetmore to have serious difficulty in refraining from child molestation if released.  The United States Supreme Court precedent makes clear that the "serious difficulty" language does not require total or complete lack of control, but does require that it must be difficult, if not impossible, for the person to control his dangerous behavior.  See Kansas v. Crane, 534 U.S. 407, 411 (2002) (citing Kansas v. Hendricks, 521 U.S. 346, 358 (1997)).

124.    In Hendricks, however, the Supreme Court recognized that the Kansas civil commitment statute required only proof of the respondent's *risk to reoffend* if released.  521 U.S. at 357 (noting statute required proof of "likelihood" of committing sexually violent conduct)."[8] Thus, the statute does not require proof that a particular respondent will reoffend, as Congress presumably recognized such a burden is impossibly high, but rather requires an assessment of the risk a respondent presents of reoffending.

125.    The evidence has shown, through expert testimony and accompanying

---

[8]  The Government has not found a state civil commitment statute that uses precisely the same language as the Adam Walsh Act, but the wording of the Kansas civil commitment statute is similar and is the statute examined by the Supreme Court in Hendricks.  The statute "establishes procedures for civil commitment of persons who, due to a 'mental abnormality' or a 'personality disorder,' are likely to engage in 'predatory acts of violence.'").  Kan. State. Ann. §59-29a01, et seq. (1994).

documents, that, given his history and his diagnosis, Wetmore will have serious difficulty in refraining from sexually violent conduct and/or child molestation if he is released.  Wetmore is at moderate-high to high risk to reoffend on the basis of his scores on various actuarial instruments, such as the Static-99, and an evaluation of dynamic risk factors that increase his risk of reoffense.[9]

126.    It is generally accepted in the sex offender field that validated actuarial risk assessment instruments provide a more accurate and reliable assessment of a sex offender's likelihood of reoffending than even the best and most experienced clinical judgments.  See United States v. Shields, 2008 WL 544940, *2 (D. Mass. Feb. 26, 2008) (finding that actuarial risk assessments are reliable under Daubert, in part because they "are generally accepted as a reliable methodology within the relevant scientific community and they have been subject to peer review"); United States v. Shields, 597 F. Supp.2d 224, 236 (D. Mass. 2009).

127.    The Supreme Court of Illinois considered the use of actuarial risk assessment instruments in a case that questioned their admissibility under Frye v. United States, 293 F. 1013 (D.C. Cir. 1923); In re: Commitment of Stephen E. Simons, 213 Ill.2d 523, 821 N.E. 2d 1184 (2004).  The court concluded: "[W]hether or not actuarial risk assessment is subject to Frye, there is no question that it is generally accepted by professionals who assess sexually violent offenders and therefore is perfectly admissible in a court of law.  As of this writing, experts in at least 19 other states rely upon actuarial risk assessment in forming their opinions on sex

---

[9] The actuarial instruments look at existing risk factors for sexual recidivism and calculate a total score that corresponds to various risk categories, all based on a sex offender's personal history.  These actuarial instruments are accepted in the field, and are moderate predictors of risk of recidivism.

offenders' risks of recidivism." Simons, 213 Ill.2d at 535, 821 N.E. at 1192 (citations omitted).[10]

128.    However, as this Court has noted, "[a]n offender's risk may be higher or lower based on other factors not adequately measured (or measured at all) by the actuarial instrument." Shields, 597 F. Supp. at 237.   Accordingly, each expert also examined other risk factors. Indeed, this Court has previously found that "while I have considered [the Respondent's] scores on the actuarial instruments, these scores are not the primary basis upon which I rest my conclusion of sexual dangerousness.  In fact, I afforded them little weight in my final analysis. Rather, as detailed above, I focused on [the Respondent's] past conduct, lack of successful sex offender treatment to date, and the testimony of the experts *as a whole* (not simply their predictions on the actuarial instruments)." Id. at 236 n. 18 (emphasis in original).

129.    The Court bases this conclusion on the facts found by this court, including, but not limited to:

> a.      The Court appointed Examiner, Dr. Prentky, determined that there was "overwhelming behavioral evidence supporting a classification [of Wetmore] of same-sex pedophilia."  However, Dr. Prentky diagnosed Wetmore, at this point in his life, more specifically with a serious mental illness, abnormality or disorder of Paraphilia NOS (hebephilia).  Dr. Phenix testified that Wetmore suffered from a serious mental illness, abnormality or disorder, diagnosed as Pedophilia, sexually

---

[10] As the Adam Walsh Act was enacted in 2006, and state civil commitment statutes for sex offenders have existed in many states for a long time, almost all reported decisions are from state courts.  The Simons case from the Supreme Court of Illinois is particularly instructive, as the opinion includes a thorough review of case law from other jurisdictions with sex offender civil commitment statutes, as well as the literature in the sex offender field, in arriving at its holding that risk assessment instruments such as the Static-99 are admissible on the issue of sexual dangerousness.

attracted to males, nonexclusive type.

b.      As Dr. Phenix testified, dynamic risk factors that increase Wetmore's risk

of reoffense include that Wetmore has no long-lasting, peer relationships in his

history, emotionally identifies with children, and places himself in positions

where he will have access to children, such as informal foster parenting, Boy

Scouts, Bible study conferences, and inviting boys to his home by offering them

drugs and alcohol.

c.      Despite being incarcerated on more than one occasion for having sexual

contact with minors, and despite being released on conditions of release that

included that Wetmore stay away from minor males, Wetmore invited minor

males to his home and his work, showed them child pornography, and engaged in

sexual contact with at least one minor male, causing the terms of his release to be

revoked.

d.      While incarcerated, Wetmore has shown poor sexual self-regulation, by

ordering "Dream Boys," by reporting that he required anti-androgen medication

to control a lifelong hypersexuality.  Additionally, the evidence has shown the

Wetmore has continued to engage in sexual activity while incarcerated, and

continues to exhibit signs of hypersexuality.

e.      Wetmore has never seriously engaged in sex offender treatment, despite

having the opportunity to do so.  United States v. Shields, 597 F.Supp.2d 224, 239

(D. Mass. 2009) (Saris, J.).  To the contrary, Wetmore violated the rules of the

FCI Butner sex offender treatment program by having sexual contact with at least

two other inmates while he was participating in treatment.  Treatment has not

been effective for Wetmore.

f.      As Dr. Prentky testified, Wetmore has had a sexualized interest in children

for more than 40 years.  Wetmore's sexual drive is high, and Wetmore admitted

to masturbating nightly to images of children or child pornography.  Further,

because all of Wetmore's victims have been male, research suggests that

Wetmore is at higher risk to reoffend if released.

g.      As recently as 2008, numerous pictures of young boys, scantily clad and

in sexually provocative positions, were confiscated from underneath Wetmore's

mattress.

h.      In 2010, Wetmore paid another inmate to implant an object into his penis

in order to heighten his sexual and masturbatory arousal, and has continued to be

sexually active in prison.

i.      For all of these reasons, the Court finds that Wetmore is a sexually

dangerous person as defined in the Adam Walsh Act, and further orders that

Wetmore be committed to the custody of the Attorney General for care and

treatment in accordance with the provisions of 18 U.S.C. § 4248(d) and (f).

## CONCLUSION

After having considered Wetmore's decades long sexual involvement with prepubescent

and pubescent minor males, his inability to complete sex offender treatment, and his compulsive

behavior as a result of his sexual arousal, this Court finds that Wetmore would have serious

difficulty in refraining from acts of child molestation or sexually violent conduct if released.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:  /s/ *Eve A. Piemonte Stacey*
Eve A. Piemonte Stacey
Rachael S. Rollins
Assistant U.S. Attorneys
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
Dated: February 1, 2011          (617) 748-3100

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing
(NEF), and paper copies will be sent to those indicated as non-registered participants.

  /s/ Eve A. Piemonte Stacey
Eve A. Piemonte Stacey
Dated: February 1, 2011          Assistant United States Attorney

-39-