UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                  )
UNITED STATES OF AMERICA          )
                                  )
              v.                  )  CIVIL ACTION NO. 07-12058-PBS
                                  )
JOEL WETMORE,                     )
                                  )
           Respondent.            )
                                  )
```

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER

March 2, 2011

Saris, U.S.D.J.

### I. INTRODUCTION

The United States seeks to civilly commit Respondent Joel Wetmore ("Wetmore") as a "sexually dangerous person" under Section 302(4) of the Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, Title 111, § 302(4), 120 Stat. 587, 620-22 (2006), codified at 18 U.S.C. §§ 4247-4248.

Two expert witnesses - both licensed psychologists - testified at the trial.  The court-appointed expert, Robert Prentky, Ph.D., was the first witness; both sides agreed on his appointment pursuant to 18 U.S.C. § 4247.  Amy Phenix, Ph.D., testified as the government's expert witness.[1]  Mr. Wetmore did

---

[1] Having reviewed the curricula vitae of Drs. Prentky and Phenix and having heard their testimony, this Court finds that both are qualified to offer expert testimony in this matter both with respect to a diagnosis of Mr. Wetmore and the question of whether Wetmore would have serious difficulty refraining from further acts of child molestation if released.  (See Gov't Exs.

not offer expert testimony.  Both Dr. Prentky and Dr. Phenix testified that, in their opinion, Mr. Wetmore met the statutory definition of a "sexually dangerous person."

The Court also heard testimony from four additional witnesses called by the government: (1) Thomas J. Russell, Senior Officer Specialist at FMC-Devens; (2) Cheryl A. Renaud, Sex Offender Management Program Coordinator and Sex Offender Treatment Program Coordinator at FMC-Devens; (3) Roberto Romero, and inmate at FMC-Devens; and (4) David DiMeo, an inmate at FMC-Devens.  In addition to his own testimony, the respondent introduced testimony from five witnesses: (1) Daniel P. Kelly, a federal probation officer in Maine; (2) Carlos Quiles, a correctional counselor at FMC-Devens; (3) John Rankin, an inmate at FMC-Devens; (4) Louise K. Wetmore, the respondent's mother; and (5) Neal B. Wetmore, the respondent's brother.

After a review of the evidence, the Court finds that Mr. Wetmore is a sexually dangerous person who suffers from the serious mental disorders of pedophilia and paraphilia not otherwise specified, characterized by hebephilia, as a result of which Mr. Wetmore would, if released, have serious difficulty refraining from molesting children.  After an evidentiary hearing held pursuant to 18 U.S.C. § 4247(d), the Court makes the following findings of fact and conclusions of law.

---

4, 7, 8.)

## II. FINDINGS OF FACT

A.  **Personal History**[2]

Mr. Wetmore, born on March 18, 1956, had a normal childhood in a functional family.  There is no record of his being a victim of child abuse or bullying.  Mr. Wetmore reported suffering from emotional problems in his youth, but did not elaborate on the nature or scope of these problems.  He experienced enuresis, or uncontrolled urination, through age twelve.  Mr. Wetmore had some difficulty in school and was enrolled in special education programs from the seventh through ninth grades, but has no history of academic failure.  He reported a self-diagnosis of dyslexia.  He has no history of abusing alcohol or drugs, aside from occasional recreational use of marijuana.  (Trial Tr. vol. 1, 36-44, July 22, 2010.)

Mr. Wetmore identifies as homosexual.  He has maintained few normal adult relationships.  He twice became involved with adult women, once during his mid-twenties and again at the age of twenty-seven, but on both occasions he failed to reach or maintain sexual arousal.  (Id. at 45-46.)  In 1999, when he was forty-three years old, Mr. Wetmore carried on a relationship with

---

[2] This section is, for the most part, derived from the hearing testimony of Drs. Prentky and Phenix, based on reporting by Mr. Wetmore.  The government does not specifically dispute any particular facts recounted within this personal history section, but has generally brought into question Mr. Wetmore's credibility as a self-reporter.

"Jesse," a twenty-four year old man who was employed at the auto repair shop that Mr. Wetmore owned.  According to Mr. Wetmore, this was not a "true" relationship, but the closest he has come to a "legal" one.  (Id. at 62-63.)

During his adult life, Mr. Wetmore has worked and engaged in various activities that put him in contact with children. Besides operating his auto repair shop, Mr. Wetmore spent time as a Scoutmaster and a Big Brother.  He also engaged in group religious activities such as scripture study.  (Trial Tr. vol. 2, 190, July 23, 2010.)

Mr. Wetmore remains on good terms with his family and speaks highly of his siblings, each of whom is married and leads an apparently normal and stable adult life.  (Trial Tr. vol. 1, 36, 38-39.)

B.  **Offense History, Convictions, and Treatment**

Mr. Wetmore's history of sexually molesting boys between the ages of eleven and fifteen is lengthy.  The great majority of the eleven incidents of molestation that Mr. Wetmore has self-reported involved oral sexual contact.  Some, but not all, of these incidents resulted in convictions.  His offense history will be discussed chronologically.

Mr. Wetmore's sexual interest in young boys began when he was eleven years old.  At that age he had his first sexual experience, which involved brief sexual contact with a ten year-

old boy.  (<u>Id.</u> at 46.)  At age fifteen, Mr. Wetmore began what would be a nearly decade-long, periodic sexual relationship with another boy who was age twelve when the affair began.  This child later introduced Mr. Wetmore to a variety of other young boys — most of them about fourteen years old — at a cabin located on Mr. Wetmore's parent's property.  Mr. Wetmore referred to this place as "the camp."

Mr. Wetmore, who was in his late teens by this time, engaged in sexual activity with a number of boys at the camp.  From this period until Mr. Wetmore was about twenty-four, he engaged in "gradual grooming" of young boys, gaining their trust by degrees and eventually molesting them.  One such instance involved an eleven year-old boy, "W."  Mr. Wetmore's relationship with "W" lasted three to four years and involved fondling and oral sex.  The molestations of "W" did not result in a criminal conviction.

Mr. Wetmore's first conviction came on August 5, 1981, when he was found guilty of unlawful sexual contact with a twelve year-old boy, "M," whom he had fondled at the camp on July 5, 1980 in Maine.  "M" reported the incident to his parents.  Mr. Wetmore was twenty-four at the time of the offense.  After a 30-day suspended sentence, Mr. Wetmore was on probation for a period of six months and moved to Texas to volunteer with a religious group.

Eventually, Mr. Wetmore returned to Maine, but continued

volunteering with this religious group.  On May 29, 1987, at the age of 30, he was convicted of gross sexual misconduct with "R," a twelve year-old boy.  Mr. Wetmore met "R" one year earlier through this religious group, when the boy was eleven years old. Mr. Wetmore was convicted of conduct involving fondling and oral sex. Mr. Wetmore also reported that he attempted to engage in anal sex with "R" on one occasion.  He received an eighteen-year sentence, with fourteen years to serve and the remainder suspended.  (Id. at 53-56; see also Gov't Ex. 2.)

While in prison, Mr. Wetmore learned about the availability of child pornography on the Internet.  He apparently took comfort in learning that he would be able to gratify his sexual urges without physically touching children.  Accordingly, Mr. Wetmore set up rules for himself: he would not produce but would consume child pornography; and he would masturbate to this material, but would not assault children, avoiding places where minors gather. (Id. at 59-61.)

Upon his release in 1995, Mr. Wetmore began a period of six years of probation, as a condition of which Mr. Wetmore was to have no contact whatsoever with children under sixteen years of age.  For the most part, in the years after his release, Mr. Wetmore masturbated at least once every evening while looking at child pornography.  (Id. at 97-98.)  It was during this period that he operated an auto repair shop and became involved with

6

twenty-four year-old named "Jesse."

During the same period, Mr. Wetmore also employed a fifteen year-old boy, "R.F.," at the auto shop. In 1999, "R.F." reported that Mr. Wetmore had performed oral sex on him, and another boy reported seeing child pornography on a computer owned by Mr. Wetmore. These reports led to an investigation of Mr. Wetmore. Ultimately, in 2000, Mr. Wetmore was indicted by a federal grand jury for the possession and receipt of child pornography in violation of 18 U.S.C. § 2252A, and was later sentenced to eighty-seven months of incarceration and five years of supervised release. According to the pre-sentence investigation, there were approximately 2,000 images of child pornography on the seized computer, some of which depicted pre-pubescent children engaging in sex and sado-masochism. The vast majority of the images depicted adolescent boys, some appearing as young as seven years old. (Id. at 72.) Mr. Wetmore was not convicted of any crime based upon his sexual contact with "R.F."

Despite this extensive offense and conviction history, Mr. Wetmore has not received sex offender treatment for any meaningful period of time. Following his 1981 conviction, Mr. Wetmore received a thirty-day suspended sentence and was ordered to complete six months of sexual and psychiatric therapy while on probation. He met with a therapist in Texas, where he had moved, but reported to that provider that the incident leading to his

conviction was an isolated one and did not stem from any recurring problem.  The therapist subsequently told Mr. Wetmore "There's nothing I can do for you." (Id. at 51.)  Following his 1987 conviction and the approximately eight-year prison sentence that accompanied it, Mr. Wetmore was not required to undergo treatment of any kind.  Upon his release in 1995 he was assigned to a therapist, but this person allegedly told Mr. Wetmore that he could be of no help.  Finally, following his 2000 conviction, Mr. Wetmore began a treatment program at the Downeast Correctional Facility in Maine.  However, this ended abruptly when Mr. Wetmore was transferred after a short time to the Federal Correctional Institution at Butner, North Carolina ("FCI Butner").  (Id. at 73-74.)  There, Mr. Wetmore was expelled from a voluntary treatment program after just two weeks for violating the program's rules by engaging in sexual activity with two other inmates.  On the advice of counsel, Mr. Wetmore has declined to enroll in voluntary sex offender treatment at the Federal Medical Center at Fort Devens, Massachusetts ("FMC Devens"), where he remains in custody.  (Trial Tr. vol. 4, 59, Oct. 15, 2010.)

C.    **Incidents at FMC Devens**

    Aside from the expert testimony, the fact witnesses at trial largely focused on incidents that have taken place during Mr. Wetmore's time at FMC Devens.

    1.    **Pornographic Images**

8

On September 11, 2008, at FMC Devens, a number of sexualized images of young boys, apparently cut-outs from magazines, were found under Mr. Wetmore's bunk.  (Gov't Ex. 5; see also Trial Tr. vol. 2, 78-81.)  Among the images was one depicting a naked young boy on a bicycle, and a variety of others depicting clothed boys and men with penis-shaped cut-outs affixed.  (Gov't Ex. 5.)  The collection of images also included a large magazine photo of an adult woman's face, with a rectangular cut-out removed from the forehead.  (Id.)  Mr. Wetmore asserts that these materials are not his, claiming that they were planted beneath his bunk by another inmate, Roberto Romero, who then alerted prison authorities with the aim of getting Mr. Wetmore into trouble. (Trial Tr. vol. 6, 142, Dec. 20, 2010.)

In September 2008, Correctional Counselor Carlos Quiles received information from another inmate, whose identity he says (incredibly) he does not recall, that Wetmore had some sort of contraband in his cell.  (Trial Tr. vol. 2, 126.)  Quiles asked Thomas Russell, a Senior Officer Specialist at FMC Devens, to search Wetmore's cell on September 11, 2008.  In complying with Quiles's request, Russell discovered the images in question underneath Wetmore's mattress.  (Trial Tr. vol. 2, 81.)  After finding these magazines, Russell contacted Holly Lindgren, a staff member of the Sex Offender Management Program, and advised her of what he'd found.  She requested that he write a memo

describing his search and the magazine cutouts.  Later, Dr. Cheryl Renaud, another member of the FMC-Devens staff, asked Russell to prepare an incident report for Mr. Wetmore's file. Mr. Wetmore was subject to disciplinary action after the images were found during Mr. Russell's search of the cell.

Russell testified that at the time of this incident, Wetmore was housed in a large cell that accommodates eight inmates, with two in each of four sets of bunk beds.  Mr. Wetmore was assigned to a bed at the bottom of the very last bunk.  Mr. Romero was assigned to the bed directly above Wetmore's.  Russell also testified that the types of cutouts found underneath Wetmore's mattress appeared to be from magazines generally available in the prison.  (Id. at 86.)  In addition, inmates are free to do arts and crafts activities and have access to scissors.  (Id. at 90.)

John Rankin, another inmate at FMC Devens who shared the eight-person cell with Mr. Wetmore and was present during the September 11, 2008 search, also testified at the hearing. According to Rankin, Officer Russell's entire search lasted about one minute: he arrived reporting that he was looking for child pornography in particular, went straight to Wetmore's bunk, and left immediately after recovering the images, remarking aloud that "this is what I came for." (Id. at 156.)  Rankin also testified that Romero disliked Wetmore and called him a "pedophile."  Finally, Rankin testified that Romero was moved

from the cell and was no longer housed with Wetmore beginning the night of or the morning after the search. (Id. at 154.)

Dr. Cheryl Renaud, who coordinates the voluntary Sex Offender Treatment Program (SOTP) and the mandatory Sex Offender Management Program (SOMP) at FMC Devens, also testified. Dr. Renaud did not speak with Mr. Wetmore about the incident or conduct her own investigation. However, she concluded that the materials found beneath Mr. Wetmore's mattress were "risk-relevant" and consistent with Mr. Wetmore's history.[3] (Id. at 105, 113.)

Roberto Romero, the inmate at FMC Devens who Wetmore claims planted the magazine cutouts in his bunk, testified that in September 2008 he discovered the magazine cutouts underneath Wetmore's mattress while searching for a missing lens from his eyeglasses.[4] After realizing that he'd lost the lens, Romero began searching for it in Wetmore's bunk area, which was right below his own bunk. Romero claimed that John Rankin was with him at the time he discovered the magazines. He also stated that he reported what he'd found to Correctional Counselor Quiles.

---

[3] Dr. Renaud also testified that in July, 2007, the mail room staff at FMC Devens rejected two items addressed to Mr. Wetmore based on inappropriate sexual content, one a publication called "Faces of the Rainforest," and the other a book entitled "Dream Boy." (Trial Tr. vol. 2, 98-103.)

[4] At the time Romero found the magazines beneath Wetmore's mattress, he had only been housed in the eight-man room for approximately a month. (Trial Tr. vol. 4, 7.)

(Trial Tr. vol. 4, 6.)  After reporting the magazines to Officer
Quiles, Romero confronted Wetmore about what he'd found and they
had a verbal altercation in the cell.  (Id. at 11-12.)  Romero
claimed that Wetmore spent time cutting pictures out of magazines
every night and that the noise from the scissors bothered him.
(Id. at 10.)  He unequivocally denied "planting" the magazine
cutouts underneath Wetmore's mattress.

        Although the evidence is disputed, the Court does not find
that the magazine cutouts were "planted" beneath Wetmore's
mattress.  The extensive collection of cutouts included
approximately 25 pictures of young boys, many of which had been
manipulated into sexually suggestive poses or were affixed with
exposed genitalia.  (Gov't Ex 5.)  Such a project would have
taken some time to complete, and there was no testimony that
Roberto Romero was seen cutting out pictures from magazines
during the month that he spent in the eight-man cell.  To the
contrary, Romero testified that Mr. Wetmore often spent time
cutting pages out of magazines, and that such activities kept
Romero up at night.  The Court finds that Mr. Wetmore amassed the
collection of photographs of young boys that was found beneath
his mattress at FMC Devens.

        **2.   Evidence of Sexual Urges**

        The final witness who testified about Mr. Wetmore's behavior
at FMC Devens was an inmate named David DiMeo who was assigned to

                                12

the bunk above Wetmore at some point after Romero was moved to another cell.[5]  DiMeo testified that Wetmore took an interest in him once he arrived at FMC Devens, and attempted several times to engage DiMeo in conversations about sexual topics.  At one point, Wetmore asked DiMeo about his masturbatory habits, and when DiMeo refused to answer, Wetmore responded that he believed himself to be hypersexual due to his need to masturbate at least once a day.  (Trial Tr. vol. 6, 68.)  DiMeo also claimed to have seen another inmate bring Wetmore an issue of InTouch Weekly magazine, opened to a picture of a young boy in his underwear.  Upon seeing the picture, Wetmore stated, "That's definitely a good one."  (Id. at 70.)  DiMeo testified in detail about conversations that he had with Wetmore regarding tactics for engaging in sex in prison.  (Id. at 72-77.)  At one point, Wetmore told DiMeo that he had had a "rock" implanted in his penis while he was incarcerated at FMC Devens.  A "rock" is made from a domino that is sanded and polished into a sphere approximately one-eighth of an inch in diameter, which an inmate implants beneath the skin on the bottom of his penis by making an incision with a razor blade.  (Id. at 77.)  Mr. Wetmore told DiMeo that he had inserted the "rock" in order to enhance his "masturbatory pleasure and his sexual

_____

[5] DiMeo was quite candid about the fact that he had offered to provide this testimony in the hopes of having his own sentence reduced.

pleasure."[6]  (<u>Id.</u> at 99.)

Wetmore also discussed his time at FCI-Butner with DiMeo, telling him that when he enrolled in the sex offender treatment program, he listed eleven past victims, but stated "It's a good thing my memory wasn't that good at the time."  (<u>Id.</u> at 78-79.)

### D.   <u>Post-Release Conditions and Requirements</u>

As part of his sentence from the 2000 child pornography conviction, Wetmore is subject, upon leaving the custody of the Bureau of Prisons, to a five-year term of supervised release. (Gov't Ex. 3.)  In addition to a series of standard conditions of supervision (e.g., restrictions on movement, reporting requirements, etc.), Wetmore is subject to certain special conditions imposed by the sentencing court.  (<u>Id.</u>)  For example, Wetmore will not be allowed any unsupervised contact with minors under eighteen years of age, and he will be subject to periodic, unannounced searches of his computer.  (<u>Id.</u>)  In addition, Wetmore will be required to participate in "mental health treatment."  At the hearing, Mr. Daniel P. Kelly, a probation officer in Maine and designee for Mr. Robert Jeffries, the Bangor-based probation officer who would be assigned to Wetmore upon his release, testified that he or Mr. Jeffries would move to

---

[6] During his own testimony, Mr. Wetmore corroborated the fact that he had a "rock" inserted in his penis at Devens.  His testimony was that "it was inserted for sexual enhancement to enhance masturbation and when you are having sex and to give more pleasure to your sex partner."  (Trial Tr. vol. 6, 109.)

modify the terms of Wetmore's supervised release to specifically require sex offender treatment.  The record is silent, however, as to the exact character and scope of the treatment program to which Wetmore would be assigned.  Mr. Kelly testified generally to the strict terms of supervision.  (Trial Tr. vol. 2, 72-77.)

**E.   "In the Custody" of the Bureau of Prisons**

The government may only certify that a person is a sexually dangerous person under the Adam Walsh Act if that person is "in the custody of the Bureau of Prisons."  18 U.S.C. § 4248(a). Although this case has been pending for four years, just before trial respondent contended for the first time that he was not properly given credit for time served in custody prior to the imposition of his federal sentence for the child pornography conviction, and therefore was not properly in the custody of the Bureau of Prisons ("BOP") at the time the government certified that he was a sexually dangerous person.  Post-trial briefing on the point was submitted by both parties, who supplemented the record post-trial at the Court's request.

Respondent contends that the government must prove by clear and convincing evidence that he was in the lawful custody of the BOP at the time the certification was filed.  There is no statutory basis for the contention that the burden of proof on this issue must be by clear and convincing evidence, and no court has addressed the issue.  In any event, the Court finds that the

15

government has proven that Mr. Wetmore was properly in the custody of the BOP at the time the certification was filed.

As a threshold matter, the government claims that Wetmore failed to raise this challenge in the proper forum, and that he should have challenged the credits he was given by presenting the request to the Bureau of Prisons and then appealing any adverse decision by means of an action pursuant to 28 U.S.C. § 2241. Romandine v. United States, 206 F.3d 731, 736 (7th Cir. 2000); see generally 28 C.F.R. Part 542, Subpart B (Administrative Remedy Program). Although there is no guidance in the case law on the question of whether or not a respondent whom the government seeks to civilly commit under Section 4248 may challenge a previous sentence during a commitment proceeding, Supreme Court precedent in parallel circumstances suggests that he may not. In Custis v. United States, 511 U.S. 485 (1994), the Court held that a defendant whose sentence may be enhanced under the Armed Career Criminal Act ("ACCA") cannot collaterally challenge the predicate convictions and sentences on which the enhancement is based before the Court that sentences him under ACCA. 511 U.S. at 496-97 (holding that, with the sole exception of convictions obtained in violation of the right to counsel, a defendant in a federal sentencing proceeding has no constitutional right to collaterally attack the validity of previous state convictions used to enhance his sentence under

16

ACCA).

While this Court may not resentence the respondent for his conviction in the District of Maine, the facts of this case suggest, in any event, that he was properly in the custody of the BOP at the time the government filed its petition.

Mr. Wetmore was released from state prison in Maine in 1995. From 1995 to 1999, respondent was serving a period of probation in Maine related to his conviction of gross sexual misconduct. Wetmore committed the federal offense of receipt and possession of child pornography on June 5, 1999 (Count 1) and October 23, 1999 (Count 2). (Miranda Aff., Ex. A.) On October 22, 1999, Mr. Wetmore was arrested for violating the terms of his state probation, namely that he was prohibited from having any contact with persons under the age of sixteen. According to the presentence report prepared in connection with the federal offense, the police had received information from a fifteen year-old boy that the respondent had performed a sexual act on him. (Miranda Aff., Ex. B, ¶ 3.) Another juvenile informed the police that he had seen child pornography on the respondent's computer. (Id.) Mr. Wetmore was detained by state authorities following his arrest.

On November 15, 1999, Mr. Wetmore was "borrowed by federal authorities pursuant to a Writ of Habeas Corpus ad Prosequendum." (Miranda Decl. ¶ 5.) He appeared before a Magistrate Judge and

was returned to state custody on the same day.

On February 14, 2000, Mr. Wetmore's state probation was revoked and he was sentenced in state court to a term of four years for violating conditions of his probation on his earlier gross sexual misconduct conviction.

On April 11, 2000, Mr. Wetmore was indicted on federal child pornography charges.  He pleaded guilty to those charges on July 10, 2000 and was sentenced to 87 months incarceration on October 25, 2000.  The sentencing judge returned Wetmore to state custody, pending completion of his state sentence.  He also gave Wetmore credit for time spent in pretrial detention.  The BOP granted a "nunc pro tunc" designation to allow the federal sentence to commence on the date it was imposed.

Mr. Wetmore's federal sentence commenced on October 25, 2000, but he was given credit for time spent in state custody from October 22, 1999 (when he was arrested for violating state probation) to February 13, 2000 (when his state probation was revoked and he began serving his state sentence).  Wetmore contends that he should have received credit for all or part of the period from February 14, 2000 through October 25, 2000, when his federal sentence commenced.  18 U.S.C. § 3585(b) provides:

> A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences – (1) as a result of the offense for which the sentence was imposed; or (2) as a result of any other charge for which the defendant was arrested after

18

the commission of the offense for which the sentence
was imposed; that has not been credited against another
sentence.

In Section 3585(b), Congress "made clear that a defendant could
not receive a double credit for his detention time." United
States v. Wilson, 503 U.S. 329, 337 (1992); see also United
States v. Mills, 501 F.3d 9, 11 (1st Cir. 2007) (holding that
"[s]ince credit for 365 days that Mills was in state custody was
properly applied to the eventual guilty plea on separate state
charges, Mills is not entitled to have that time also credited
towards his federal sentence"); United States v. Labeille-Soto,
163 F.3d 93, 99 (2d Cir. 1998) (holding that "a defendant has no
right to credit on his federal sentence for time that has been
credited against his prior state sentence" even if some of that
time was spent in federal custody); Dawson v. Scott, 50 F.3d 884,
887 n.4 (11th Cir. 1995 (noting that Congress's "actual purpose
in altering [the previous statute] was 'to make clear that a
defendant could not receive a double credit for his detention
time'" (quoting Mills v. Taylor, 967 F.2d 1397, 1400 (9th Cir.
1992))).  Because his state sentence was imposed on February 14,
2000, his incarceration from that date through October 25, 2000
was "credited against" his state sentence, and therefore deemed
ineligible for credit against his federal sentence.  See also
Willis v. United States, 438 F.2d 923, 925 (5th Cir. 1971)
(holding that defendant was not entitled to credit for time he

was actually serving on his state sentence for offenses unrelated to his federal charge).

Nonetheless, Wetmore contends that he was entitled to prior custody credit for the February to October 2000 period under Section 5G1.3 of the United States Sentencing Guidelines. Section 5G1.3 stated that if "the undischarged term of imprisonment resulted from offense(s) that have been fully taken into account in the determination of the offense level for the instant offense, the sentence for the instant offense shall be imposed to run concurrently to the undischarged term of imprisonment."[7]  An application note to the section states that "[w]hen a [concurrent] sentence is imposed . . . the court should adjust the sentence for any period of imprisonment already served as a result of the conduct taken into account in determining the guideline range for the instant offense if the court determines that period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons."  U.S.S.G. § 5G1.3 application note 2.  While the sentencing court did not reference Section 5G1.3 in imposing its sentence, Mr. Wetmore appears to argue that his sentence should have been automatically adjusted to reflect the February through October 2000 period that he served on his

---

[7] The district court in Maine relied on the 1998 edition of the Guidelines Manual in imposing its sentence.  Accordingly, this Court will analyze Wetmore's argument using the 1998 Guidelines.

state sentence.

There are two problems with Wetmore's argument.  First, the revocation in state court was probably not based upon Wetmore's possession of child pornography, as the search warrant for Mr. Wetmore's home was not executed until October 23, 1999, the day after he was arrested for violating his probation.  If the revocation was related to a violation of the term of probation that prohibited Mr. Wetmore from having contact with children under age sixteen, which is likely, then Section 5G1.3's application note would not seem to apply.  The second problem is that application note 6 to Section 5G1.3 suggests that adjustments should not be made when the undischarged sentence is related to a probation revocation.  Id. application note 6 ("If the defendant was on federal or state probation, parole, or supervised release at the time of the instant offense, and has had such probation, parole, or supervised release revoked, the sentence for the instant offense should be imposed to run consecutively to the term imposed for the violation of probation, parole, or supervised release in order to provide an incremental penalty for the violation of probation, parole, or supervised release.").

The bottom line is that any adjustments to a sentence under Section 5G1.3 are within the discretion of the sentencing judge.  See id. application note 5 (stating that in "complex situations,"

the sentencing court "may exercise its discretion . . . to fashion a sentence of appropriate length and structure it to run in any appropriate manner to achieve a reasonable punishment for the instant offense").  In addition, later amendments to this guideline clarified that the court should only apply such a credit if it determines that the state offense is "relevant conduct to the instant offense" and "has resulted in an increase in the . . . offense level for the instant offense."  See U.S.S.G. § 5G1.3(b), as amended by Amendment 660 (effective Nov. 1, 2003).  There is no evidence that the sentencing court increased the offense level on the basis of Mr. Wetmore's state court probation revocation.  Because the sentencing court did not provide an adjustment under Section 5G1.3, the Bureau of Prisons did not have the discretion under 18 U.S.C. § 3585(b) to give Mr. Wetmore prior custody credit for the February through October 2000 period.  This Court has no jurisdiction or discretion to retroactively resentence Mr. Wetmore.

The Court finds that respondent was lawfully in the custody of the BOP at the time the government filed its certification under the Adam Walsh Act.

### III.  CONCLUSIONS OF LAW

The Act provides for the civil commitment of "sexually dangerous person[s]."  See 18 U.S.C. § 4248.  Under 18 U.S.C. § 4247(a)(5), a "sexually dangerous person" is one "who has engaged

or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." A person is "sexually dangerous to others" if he "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6). Thus, to commit an individual under the Act, it first must be established that the person "has engaged or attempted to engage in sexually violent conduct or child molestation." 18 U.S.C. § 4247(a)(5). If this threshold prong is established, the court then must decide if the person has a "serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6); see also Kansas v. Crane, 534 U.S. 407, 413 (2002) (holding that proof of "serious difficulty in controlling behavior" is a necessity for commitment). This must be proven by clear and convincing evidence. 18 U.S.C. § 4248(d).

Thus, in order to prove that Mr. Wetmore is a "sexually dangerous person," the government must prove three elements: (1) that Mr. Wetmore engaged in or attempted to engage in sexually violent conduct or child molestation; (2) that Mr. Wetmore suffers from a serious mental illness, abnormality, or disorder; and (3) that, as a result of the serious mental illness,

23

abnormality, or disorder, Mr. Wetmore would have serious
difficulty in refraining from sexually violent conduct or child
molestation if he were to be released.  See 18 U.S.C. §
4247(a)(5)-(6); 18 U.S.C. § 4248.

Wetmore's mental condition was discussed at the hearing by
two testifying experts: (1) Robert Alan Prentky, Ph.D., who was
appointed by the Court; and (2) Amy Phenix, Ph.D., the
government's expert.

## A.    The First Element: Child Molestation

The parties in this case have stipulated to three past acts
and to the introduction of the certified court records detailing
the child molestation involved in each of those three past acts.
In addition, Mr. Wetmore has admitted to sexually molesting at
least eleven boys between eleven and fifteen years old.  The
respondent does not dispute that the government has proven the
first element.  (See Respondent's Req. for Findings of Fact &
Conclusions of Law at 25; see also Trial Tr. vol. 1, 28.)

## B.    The Second Element: Serious Mental Disorder

The two experts who testified in this case offered
different, but not necessarily conflicting, diagnoses of Mr.
Wetmore.  Dr. Prentky diagnosed Mr. Wetmore with paraphilia not
otherwise specified, characterized by hebephilia, while Dr.
Phenix diagnosed him with pedophilia.

### 1.   Dr. Prentky's Opinion

At the hearing, Dr. Prentky testified that Mr. Wetmore suffers from paraphilia not otherwise specified, characterized by hebephilia.  This diagnosis was based on: (1) Dr. Prentky's review of Mr. Wetmore's record; (2) a six-hour interview that Dr. Prentky conducted with Mr. Wetmore on April 24, 2009; and (3) the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision ("DSM-IV-TR").  According to Dr. Prentky, paraphilia refers to any intense, recurrent pattern of erotic interest that goes beyond normal sexual activity, or that has very low incidence in the general population.  The DSM-IV-TR sets forth the diagnostic criteria for paraphilias:

> The essential features of a Paraphilia are recurrent, intense sexually arousing fantasies, sexual urges, or behaviors generally involving 1) nonhuman objects, 2) the suffering or humiliation of oneself or one's partner, or 3) children or other nonconsenting persons that occur over a period of at least 6 months . . . [and that] cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

Am. Psychiatric Ass'n, DSM-IV-TR 522-23 (4th ed. 2000).  Some paraphilias are not specified as separately-listed disorders, such as exhibitionism, pedophilia, or sexual sadism.  Rather, Dr. Prentky testified, Mr. Wetmore suffers from paraphilia not otherwise specified, which is described in section 302.9 of the DSM-IV-TR:

> This category is included for coding Paraphilias that do not meet the criteria for any of the specific

categories.  Examples include, but are not limited to,
telephone scatologia (obscene phone calls), necrophilia
(corpses), partialism (exclusive focus on part of
body), zoophilia (animals), coprophilia (feces),
klismaphilia (enemas), and urophilia (urine).

Id. at 576.

Dr. Prentky elaborated on this diagnosis by testifying that

Mr. Wetmore's paraphilia not otherwise specified is characterized

by hebephilia.  According to Dr. Prentky, hebephilia is a pattern

of intense, recurrent erotic attraction to pubescent adolescents.

(Trial Tr. vol. 1, 77.)  Dr. Prentky testified that

> in general, for adults, adults males to respond to a
> psychosexually mature young adolescent girl with the
> physical sexual characteristics of an adult woman would
> not be regarded as abnormal and unusual.  The same
> would be true for a similar aged male.  And those
> images are used all the time in advertising and
> marketing because it's understood that a sexually
> appealing adolescent is just that, sexually appealing.
>     A problem comes in when we understand a great gap
> in . . . age discordance.  So for a seventeen year-old
> to sexualize a fifteen year-old would be regarded as
> highly normal; for a forty-seven year-old to sexualize
> a fifteen year-old would not.  And it would raise
> numerous questions about the level and degree of adult
> adaptation across multiple domains for that individual.
> It would call into question the level of adaptation in
> domains such as education, acquisition of social and
> interpersonal skills, vocational skills.  It would be
> difficult for most forty-seven year-olds to sustain a
> relationship.

(Id. at 78-79.)  Dr. Prentky testified that because a pattern of

intense, recurrent erotic attraction to young pubescent boys has

been exhibited by Mr. Wetmore over a period of many years and has

caused a readily ascertainable level of dysfunction in his life,

he can legitimately be diagnosed with paraphilia not otherwise

specified, characterized by hebephilia.  (<u>Id.</u> at 85.)

When asked by the Court why he did not diagnose Mr. Wetmore with pedophilia, Dr. Prentky stated

> I didn't, your Honor, for one very specific reason;
> that if I try to come up with . . . the best
> approximation of this man's sexual preference, it would
> be an interest in boys in the age range of eleven to
> fourteen.  I believe that is what Mr. Wetmore has said
> to me in no uncertain terms, and I believe that the
> behavior effectively speaks for itself.

(Trial Tr. vol. 2, 31.)  Dr. Prentky stated that because many boys as young as eleven will begin showing signs of puberty through the development of secondary sex characteristics, he did not diagnose Wetmore with pedophilia.  (<u>Id.</u>)

Respondent challenges whether or not paraphilia not otherwise specified, characterized by hebephilia, is properly considered to be a "serious mental illness, abnormality or disorder."  However, the First Circuit has directly considered this issue and found that paraphilia not otherwise specified, characterized by hebephilia, can constitute a serious mental disorder.  <u>United States v. Carta</u>, 592 F.3d 34, 40-41 (1st Cir. 2010).

### 2.  Dr. Phenix's Opinion

Dr. Amy Phenix, the government expert, diagnosed Mr. Wetmore with pedophilia.  Unlike Dr. Prentky, Dr. Phenix did not have the opportunity to interview Mr. Wetmore because he declined to meet with her, but she was able to review all charging and conviction

documents, pre-sentence investigation reports, arrest reports,

records from prisons where Mr. Wetmore was incarcerated, medical

records, and reports related to other evaluations of Mr. Wetmore.

(Trial Tr. vol. 2, 145.)  She testified that it is possible to

evaluate whether someone is a sexually dangerous person without

doing an interview, so long as the evaluator is provided with

sufficient history and information to provide a diagnosis.  (Id.

at 146.)

Dr. Phenix based her diagnosis of pedophilia, sexually

attracted to males, nonexclusive type,[8] on the DSM-IV-TR. Under

the DSM-IV-TR the diagnostic criteria for pedophilia are:

> A. Over a period of at least 6 months, recurrent,
> intense sexually arousing fantasies, sexual urges, or
> behaviors involving sexual activity with a prepubescent
> child or children (generally age 13 or younger).
>
> B. The person has acted on these sexual urges, or the
> sexual urges or fantasies cause marked distress or
> interpersonal difficulty.
>
> C. The person is at least age 16 years and at least 5
> years older than the child or children in Criterion A.

Am. Psychiatric Ass'n, DSM-IV-TR 571-72.  In making this

diagnosis, Dr. Phenix considered Mr. Wetmore's sexually

inappropriate behavior toward prepubescent males in the past, the

frequency and duration of that behavior, his self-reports to

---

[8] In the context of this diagnosis, "nonexclusive type"
means that the diagnosed individual is sexually aroused or has a
sexual preference for not only prepubescent males but also
postpubescent males and perhaps adult males.  (Trial Tr. vol. 2,
148.)

others, and his pornographic habits.  (Trial Tr. vol. 2, 149-50.)

When asked about Dr. Prentky's diagnosis of hebephilia, Dr. Phenix testified that

> I provided the diagnosis . . . of pedophilia because I certainly have sufficient information to support that diagnosis.  I agree, however, that his pattern of arousal includes boys who are going through puberty. So the DSM says age thirteen and under are prepubescent, and in general that's true.  But he also has arousal, it's not unusual, for boys fourteen, fifteen, sixteen . . . .
>
> So he has additional patterns of arousal, not only prepubescent children.  It would not be incorrect to diagnose pedophilia, sexually attracted to males, nonexclusive type, and to include paraphilia NOS, hebephilia.  But I had very sufficient evidence for pedophilia, and feel that he certainly fits into that diagnosis, and simply just did not add on paraphilia NOS, but I recognize his arousal patterns.

(Id. at 178-79.)  In addition, it appears that Dr. Phenix adhered more closely to the definition of prepubescent given in the DSM-IV-TR, in that she generally considered Wetmore's victims who were age thirteen and younger to be prepubescent.

Of Wetmore's multiple offenses, Dr. Phenix testified that three contribute directly to the diagnosis of pedophilia: (1) the relationship with "W," an eleven year-old boy, that persisted over three or four years; (2) the molestation of "M," a twelve year-old boy, in 1980; (3) the relationship with "R," from age ten to thirteen, that persisted over three years and resulted in a conviction in 1986.  (Id. at 182-87; Trial Tr. vol. 3, 26, Oct. 14, 2010; see also Gov't Exs. 1-2.)  Dr. Phenix also relied on

29

Wetmore's self report to another evaluator that he had victimized a total of thirty-five victims, fourteen of which were prepubescent. (Trial Tr. vol. 2, 188.)

In addition, Dr. Phenix testified that Mr. Wetmore has an extensive history of using pornography. He has self reported that he had 4,000 images of child pornography. The pre-sentence investigation connected to Mr. Wetmore's federal child pornography conviction found that he had possession of pornographic images depicting prepubescent children. (Id. at 195.)

Although Mr. Wetmore has been incarcerated since 2000, Dr. Phenix concludes that his sexual preference for prepubescent and young adolescent males has not changed, largely because in 2007 he attempted to order a book, to be delivered to the prison, describing an erotic relationship between two high school aged boys, and in 2008 he was caught with pornography fashioned by pasting together magazine cutouts of young boys. (Trial Tr. vol. 3, 30.)

While the DSM-IV-TR only requires a six-month time frame for a diagnosis of pedophilia, Dr. Phenix testified that Mr. Wetmore's sexual preference for prepubescent males persisted "from the time that Mr. Wetmore is twenty-one years of age and has the first pedophilic relationship with "W," over three to four years, through the time period that he continued to view

30

pornography . . . and so throughout his adult lifetime, including additional evidence that he is still preoccupied with prepubescent males." (Trial Tr. vol. 2, 195-96.)

### 3. Reconciling the Expert Opinions

Although Dr. Prentky and Dr. Phenix reached different medical diagnoses for Mr. Wetmore, they agree that he has a demonstrated history of sexual preference for young boys age eleven to fourteen. Many of his victims were age eleven or twelve, which is generally thought to be prepubescent, although the onset of puberty varies largely. In addition, Wetmore possessed numerous images of prepubescent children on his computer when he was arrested in 1999, and the pornographic magazine cutouts found underneath his mattress at FMC Devens include pictures of at least five children who are likely prepubescent.

While Dr. Prentky considered victims age eleven and older to be pubescent for the purposes of his diagnosis, this assumption goes against the guidelines in the DSM-IV-TR, which are generally accepted in the fields of psychology and psychiatry. He does, however, agree with Dr. Phenix that Mr. Wetmore has a history of abusing eleven and twelve year-old boys. For this reason, the Court credits both Dr. Phenix's diagnosis of pedophilia, and Dr. Prentky's diagnosis of paraphilia NOS, characterized by hebephilia.

The government has proven by clear and convincing evidence
that Wetmore suffers from a serious mental illness, abnormality,
or disorder, and has thereby satisfied the second requirement of
the Act.

## C.   The Third Element: Serious Difficulty Refraining

The third element requires the government to prove by clear
and convincing evidence that Mr. Wetmore would have serious
difficulty refraining from future acts of child molestation as a
result of his mental disorder if released.   Both Dr. Prentky and
Dr. Phenix testified that, in their opinion, Mr. Wetmore would
have serious difficulty, if released, refraining from further
sexual acts involving children.   While their testimony was
similar, each expert relied on different considerations, so I
address their testimony in turn.

### 1.   Dr. Prentky's Opinion

Dr. Prentky concluded to a reasonable degree of professional
and medical certainty that, as a result of Mr. Wetmore's
paraphilia not otherwise specified, characterized by hebephilia,
Mr. Wetmore would have serious difficulty refraining from sexual
contact with young boys.   In reaching this conclusion, Dr.
Prentky cited seven considerations.

The first consideration is based upon four risk factors
exhibited by Mr. Wetmore's history.   These risk factors include:
(1) the duration of Mr. Wetmore's sexual interest in young boys,

32

which has persisted for over forty years, during which time he has reinforced his fantasies and urges by frequent masturbation and through at least eleven sexual encounters with children; (2) his very high sexual drive as exhibited through daily masturbation while looking at child pornography and his own admission; (3) the fact that all of his victims were male, which is significant according to Dr. Prentky because most actuarial studies have found that same-sex child molesters have the highest re-offense rate; and (4) that over the past forty years, there has been a remarkable stability in Mr. Wetmore's preferences for the same sexual acts with boys eleven to fifteen years of age, which suggests to Dr. Prentky that it is a real and genuine sexual preference. (Trial Tr. vol. 1, 96-98.)

The second consideration Dr. Prentky cited was the fact that after nine years of incarceration, Mr. Wetmore broke a promise to himself that he would not re-offend, and that he would satisfy his sexual urges through child pornography and masturbation. Despite constant viewing of child pornography, Mr. Wetmore was still attracted to teenage boys and in fact performed oral sex on a fifteen year-old in his auto repair shop. (Id. at 99-100.)

Third, Mr. Wetmore reported that during his four years in the community from 1995 to 1999, he had to "look the other way to override the natural urges to act out" and that he "leaned on the Internet" and masturbated on average twice a day to child

pornography to keep from re-offending.  (Id. at 102.)

The fourth consideration was the fact that, as recently as September 11, 2008, numerous pictures of small boys scantily clad in sexually provocative positions were confiscated from Mr. Wetmore's cell at FMC-Devens.  According to the incident report, some of the boys had "makeshift penises attached near their genitals which appear to be pornographic in nature."  Dr. Prentky testified that if the pictures belonged to Mr. Wetmore, which he disputed, "they would reflect not only poor judgment but the intensity of his urges."  (Id.)

Fifth, Mr. Wetmore's exposure to sex offender treatment programs has been minimal, and the meager treatment he has received is unlikely to reduce his risk of re-offense.[9]  In particular, Mr. Wetmore has never received behavior therapy, which Dr. Prentky says would have been recommended to diminish his deviant arousal.  (Id. at 103.)

Sixth, Dr. Prentky testified that his determination about Mr. Wetmore's serious difficulty refraining from future molestation was consistent with the STATIC-99 actuarial risk assessment that he used to evaluate Mr. Wetmore.  The Static-99

---

[9] Despite his strong libidinal urges, Mr. Wetmore has never been placed on anti-androgen medications such as Lupron or Depo-Provera, which could lower the testosterone in the bloodstream to diminish sexual drive and sexual urges.  (Trial Tr. vol. 1, 103-04.)  He has, however, expressed his willingness to undergo anti-androgen treatment throughout this litigation.  (Trial Tr. vol. 6, 140-41, 143, 145.)

is an actuarial sex offender risk assessment instrument developed
in 1999 by Dr. Karl Hanson and Dr. David Thornton.  On Dr.
Prentky's evaluation, Mr. Wetmore scored six on the Static-99,
which places him in the "High Risk" category.  (_Id._ at 91-92.)
Dr. Prentky testified that individuals in this category have, on
average, been found to re-offend (based on re-conviction rates)
at 35 percent over ten years.

Finally, Dr. Prentky discussed the issue of Mr. Wetmore's
age, which is often viewed as a protective factor.  He stated
that

> [a]lthough age clearly is a risk-mitigating factor for
> most criminals, including rapists, the evidence is less
> conclusive for extrafamilial child molesters.  Mr.
> Wetmore turned fifty-three this past March.  Which Mr.
> Wetmore's lengthy offense history, I'm not inclined to
> believe that his age alone at this point is a
> significant mitigating factor.

(_Id._)

### 2.  Dr. Phenix's Opinion

Like Dr. Prentky, Dr. Phenix also concluded to a reasonable
degree of professional certainty that, as a result of Mr.
Wetmore's pedophilia, he would have serious difficulty, if
released, refraining from sexually violent conduct or child
molestation.  (Trial Tr. vol. 3, 38.)  She described several
methods of assessing risk, including actuarial tools and dynamic
risk factors.

### i.   Methods for Assessing Risk: Actuarial Tools

Dr. Phenix described her use of a "clinically adjusted actuarial approach" to evaluate Mr. Wetmore's risk of reoffending.  Dr. Phenix used three actuarial instruments to assess Mr. Wetmore: the Static-99 (and Static-99 revised), the Static-2002 (and Static-2002 revised), and the Minnesota Sex Offender Screening Tool Revised (MnSOST-R).  (Id. at 16.)  She claims it is important to consider the results of all three actuarial instruments for a "more comprehensive risk assessment." (Id. at 42.)

On the Static-99, Dr. Phenix scored Mr. Wetmore a six or a seven, depending on whether or not he had ever had a stranger victim, defined as someone known less than 24 hours.  (Id. at 46.)  A score of either 6 or 7 places Wetmore in the "high risk" category, which Dr. Phenix says corresponds with a group of individuals who have, on average, been found to re-offend (based on re-conviction rates) at 39 percent over five years, 45 percent over ten years, and 52 percent over fifteen years.  (Id. at 48.)

The revised version of the Static-99 ("Static-99-R") was unavailable when Dr. Phenix initially completed her report, but become available prior to trial.  She scored Mr. Wetmore on the new actuarial instrument prior to testifying.  The Static-99-R includes more refined age categories and a new sample upon which to base relative risk ratios.  On this new instrument, Dr. Phenix scored Mr. Wetmore a 5 or a 6, depending on whether or not he had

36

any stranger victims.  A score of five would place Mr. Wetmore in a moderate high risk category, while a score of six would place him in the high risk category.  For a score of five, the relative risk ratio for reoffending is 20% over five years and 27.7% over ten years.  (Id. at 49-58; see also Gov't Ex. 11.)

On the Static-2002 instrument, Dr. Phenix scored Mr. Wetmore a 7 or an 8, again depending on whether he had any stranger victims.  These scores both fall within the moderate-high risk category.  He received an identical score on the revised version of the Static-2002.

Finally, on the MnSOST-R, Dr. Phenix gave Wetmore a score of eleven.  On this instrument, any score above eight is considered to be in the "high" range.  (Trial Tr. vol. 3, 69.)

It is critical, however, to remember that the recidivism estimates generated all of the actuarial instruments are group estimates based upon re-convictions and thus do not directly correspond to the recidivism risk of an individual offender. An offender's risk may be higher or lower based on other factors not adequately measured (or measured at all) by the actuarial instrument.

ii.  Methods of Assessing Risk: Dynamic Risk Factors

In addition to the actuarial instruments, which only look at so-called "static" risk factors, Dr. Phenix also considered dynamic risk factors for Mr. Wetmore.  These are "risk factors

37

that are changeable," unlike those that are historically based. The factors used by Dr. Phenix come from the Stable 2007, which is a dynamic risk instrument developed by Drs. Hanson and Harris. (Id. at 71.)  Three dynamic risk factors present for Mr. Wetmore are intimacy deficits, poor sexual self-regulation, and lack of cooperation with supervision.

Intimacy deficits refer to a person's difficulty in forming meaningful, long-lasting relationships that can be protective against sexual reoffense.  In Mr. Wetmore's case, he has not had any significant long-term intimate relationships.  Dr. Phenix went on to explain that

> [a]nother factor that measures intimacy deficits is emotional identification with children.  Some individuals who molest children have this present; others do not.  They just are aroused to sex with children, but they don't want to spend time with them. They don't want to have them as their friends.  They have adults as friends.  But there are some offenders that are higher risk because they have an emotional identification with children.  They tend not to establish adult relationships.  They tend to put themselves in the proximity of where children will congregate or where they have access to children, where they would do social activities with children.

(Id. at 72.)  In Mr. Wetmore's case, he took on roles where he would have access to young children, such as being a Big Brother and volunteering with youth at his church.  "[H]is whole social circle essentially [was] young boys."  (Id.)  Dr. Phenix said that Wetmore's emotional connection with children is one of his dynamic risk factors, because he has not cultivated "the skills

and abilities to develop an appropriate adult relationship."
(<u>Id.</u> at 73.)

The second dynamic risk factor considered by Dr. Phenix was
Mr. Wetmore's poor sexual self-regulation.  This is "measured by
his level of sexual preoccupation; how often he thinks about sex,
has sex, his masturbatory habits, looking at pornography."  (<u>Id.</u>
at 74.)  Mr. Wetmore self-reported "a complete preoccupation"
with child pornography between 1997 and 1999.  "He said he
masturbated twenty-one times a week - that would be about three
times a day - to these images of child pornography."  (<u>Id.</u> at
75.)  For child pornography offenders who also have a history of
"hands-on" offenses, this is considered to increase the risk of
reoffense.

The final dynamic risk factor considered by Dr. Phenix was
lack of cooperation with supervision.  In 1999, Mr. Wetmore was
on probation, and a condition of that probation was that he not
be in the presence of boys under the age of sixteen.  He violated
that term of probation by not only hiring a fifteen year-old boy
to work in his auto repair shop, but also by engaging in oral sex
with that fifteen year-old.  In addition, while at FMC-Devens,
Mr. Wetmore violated prison rules by possessing magazine cutouts
fashioned into child pornography.

"[T]he presence of a number of these important dynamic risk
factors . . . is consistent with [Wetmore] being high risk to

39

sexually reoffend." (Id. at 77.)  The one protective factor
identified by Dr. Phenix is the fact that upon release, Mr.
Wetmore will be subject to five years of community supervision.
However, she nonetheless believes that "he requires inpatient
treatment to lower his risk prior to . . . going back to
supervision." (Id. at 78.)

　　　　iii. Methods of Assessing Risk: Treatment History

　　　Dr. Phenix also considered Mr. Wetmore's history of sex
offender treatment.  The first time Mr. Wetmore received any
treatment was in 1980, as part of a program mandated by the court
after his first conviction of a sex offense.  This course of
treatment was very brief, consisting of only one meeting.[10]  (Id.
at 70.)  The second time he engaged in treatment was through the
Department of Corrections in Maine, between February 2001 and
June 2003.  He attended group therapy sessions once a week for
approximately two and a half years. (Id. at 39-40.)  His third
course of treatment took place at FCI-Butner, where Mr. Wetmore
enrolled in a voluntary sex offender treatment program.  He was
expelled from that program after a short period of time after
violating the program's rules by engaging in sexual activity with
two other inmates.  Mr. Wetmore self-reported that violation.

_____

　　　[10] Initially, Dr. Phenix testified that this course of
treatment lasted for six months, but after having her
recollection refreshed, agreed that Mr. Wetmore only saw the
therapist once.  (Trial Tr. vol. 3, 39.)

(Id. at 40.)  In her testimony, Dr. Phenix did not explain the significance of these treatment programs to her risk assessment.

### 3.   The Court's Finding

Although Dr. Prentky and Dr. Phenix offered slightly different justifications for their conclusions that Wetmore would have serious difficulty refraining from engaging in child molestation if released, the bottom line is that both experts agreed he is at high risk of reoffending and will have serious difficulty controlling his sexual urges.  Indeed, Wetmore put forth no evidence, aside from his own testimony, disputing the experts' conclusions.

While the experts, particularly Dr. Phenix, relied in part on actuarial instruments to determine risk of reoffense, the Court does not find these instruments to be dispositive.  This evidence is not as persuasive as the evidence documenting Mr. Wetmore's substantial history of victimizing young children and his dynamic risk factors.

The Court finds particularly compelling the lack of effective sex offender treatment in Mr. Wetmore's history.  In light of his serious offense history, with untreated pedophilia and paraphilia characterized by hebephilia, the government has demonstrated by clear and convincing evidence that Mr. Wetmore will have serious difficulty refraining from future acts of child molestation if released into the community.

D.    **Retroactivity Argument**

Near the end of the trial, respondent submitted a motion to dismiss the government's petition on the grounds that Section 4248 is impermissibly retroactive [Docket No. 178].  He argues that because all of the underlying criminal convictions took place before the enactment of the Adam Walsh Act, the Act is impermissibly retrospective.

Respondent correctly notes that no court has directly addressed the issue of retroactivity in the context of the Adam Walsh Act.  However, Supreme Court precedent is clear that statutes permitting the civil commitment of sexually dangerous persons are not impermissibly retroactive and do not violate the Ex Post Facto Clause.

In Hendricks v. Kansas, 521 U.S. 346 (1997), the Court examined a state civil commitment statute that is substantially similar to Section 4248.  The Kansas Sexually Violent Predator Act "establishes procedures for the civil commitment of persons who, due to a 'mental abnormality' or a 'personality disorder,' are likely to engage in 'predatory acts of sexual violence.'" 521 U.S. at 350.  The petitioner in Hendricks mounted both substantive due process and Ex Post Facto challenges to the Kansas statute.  Notably, the Court held that the Kansas statute

> clearly does not have retroactive effect.  Rather, the
> Act permits involuntary confinement based upon a
> determination that the person currently both suffers
> from a "mental abnormality" or "personality disorder"

42

> and is likely to pose a future danger to the public.
> To the extent that past behavior is taken into account,
> it is used, as noted above, solely for evidentiary
> purposes.  Because the Act does not criminalize conduct
> legal before its enactment, nor deprive Hendricks of
> any defense that was available to him at the time of
> his crimes, the Act does not violate the Ex Post Facto
> Clause.

Id. at 371.

Accordingly, the Court finds that Section 4248 is not impermissibly retroactive as applied to the respondent.

E.    Commitment Pursuant to Section 4248

Once a court has found by clear and convincing evidence that an individual is a sexually dangerous person, the court must commit the individual to the custody of the Attorney General.  18 U.S.C. § 4248(d).  The Act outlines specific obligations that the Attorney General has regarding the custody, care, and treatment of the committed person.  First, the Attorney General "shall make all reasonable efforts" to cause the state where the person is domiciled or was tried to assume responsibility for the custody, care, and treatment of the committed person.  Id.  "If, notwithstanding such efforts, neither . . . State will assume such responsibility, the Attorney General shall place the person for treatment in a suitable facility."  Id.

Before placing the person in a particular facility, the Attorney General must "consider the suitability of the facility's rehabilitation programs in meeting the needs of the person."  Id. § 4247(i)(C).  The Attorney General must also consult with the

43

Secretary of the Department of Health and Human Services regarding the "establishment of standards for facilities used" for commitments pursuant to the Act, as well as the "general implementation" of the Act's provisions. Id. § 4247(i)(D).

The director of the facility in which a person is committed under the Act also has several responsibilities under the statute. First, the director is required to inform the committed person of "any rehabilitation programs that are available." Id. § 4247(e)(2). In addition, the director must provide the committing court with "annual reports concerning the mental condition of the person and containing recommendations concerning the need for his continued commitment." Id. § 4247(e)(1)(B) (stating that the committing court may also order copies of the report to be submitted to other persons).

Once committed to a facility by the Attorney General, the person is to remain in that facility until a State assumes responsibility for his custody, care, and treatment, or "the person's condition is such that he is no longer sexually dangerous to others, or will not be sexually dangerous to others if released under a prescribed regimen of medical, psychiatric, or psychological care or treatment; whichever is earlier." Id. § 4248(d). However, if, at any time, the director of the facility determines that the person satisfies this latter criteria, he "shall promptly file a certificate to that effect" with the

committing court; the court must then either order the discharge of the person or hold a hearing to determine whether the person should be released.  Id. § 4248(e).

In addition, the committed person may, via counsel or legal guardian, file a motion for a hearing to determine whether [he] should be discharged from the facility.  18 U.S.C. § 4247(h). The committed person may make such a motion at any time, so long as it is not within 180 days of a court determination that he remain committed.  18 U.S.C. § 4247(h).

### III.  ORDER

The Court **ORDERS**:

(1) Respondent Wetmore shall be civilly committed as a sexually dangerous person to the custody of the Attorney General pursuant to 18 U.S.C. § 4248(d); and

(2) The Attorney General, within thirty (30) days of this ORDER, shall file a certificate with this Court stating whether a State has agreed to assume responsibility for Respondent Wetmore's custody, care, and treatment. If no State has agreed to assume responsibility by that date, the certificate shall detail all efforts the Attorney General has made to cause a State to assume such responsibility and shall identify the facility in which the Attorney General plans to place Respondent Wetmore. The certificate shall also explain why the facility is "suitable" for Respondent Wetmore, particularly with respect to the suitability

of the facility's rehabilitation programs for meeting the needs
of Respondent Wetmore; and

(3) Sexual offender treatment shall be offered to Respondent
and shall be ready to commence within thirty (30) days of this
ORDER, and an affidavit shall be filed by the director of the
facility documenting the program; and

(4) The annual report required under 18 U.S.C. §
4247(e)(1)(B) shall be filed with this Court, with copies
provided to Respondent Wetmore and his counsel, by March 2, 2012.


 /s/ PATTI B. SARIS
PATTI B. SARIS
United States District Judge


46