IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,          )
                                   )
                Petitioner         )
                                   )
        -VS-                       ) Civil No. 07-12058
                                   ) Pages 1 - 25
JOEL WETMORE,                      )
                                   )
                Respondent         )


MOTION HEARING


BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE








United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
January 27, 2009, 2:15 p.m.








LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S:

2        JENNIFER C. BOAL, ESQ., EVE A. PIEMONTE-STACEY, ESQ.,
     and JENNIFER A. SERAFYN, ESQ., Assistant United States
3    Attorneys, Office of the United States Attorney,
     1 Courthouse Way, Boston, Massachusetts, 02210, for the
4    Petitioner.

5        PAGE A. KELLEY, ESQ., Federal Public Defender Office,
     408 Atlantic Avenue, Boston, Massachusetts, 02210, for the
6    Respondent.

7        JOHN G. SWOMLEY, ESQ., Swomley & Associates,
     227 Lewis Wharf, Boston, Massachusetts, 02110-3927, for the
8    Respondent.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            P R O C E E D I N G S

2            THE CLERK:  The case of the United States v. Joel

3    Wetmore, Civil Action No. 07-10258, will now be heard before

4    this Court.  Will counsel please identify themselves for the

5    record.

6            MS. BOAL:  Good afternoon, your Honor.  Assistant

7    United States Attorneys Jennifer Boal and Eve Stacey for the

8    government.

9            MR. SWOMLEY:  John Swomley.

10           MS. KELLEY:  And Page Kelley for Mr. Wetmore.  I'm

11   just wondering, if the Court is going to hear us on the

12   question of counsel, if the government needs to be present.

13           THE COURT:  No, they won't be here, but I think,

14   before we even got going on that, what I wanted to do is

15   find out what the status of the case is, use this as a

16   golden moment.

17           Have we been in touch, Robert, with the expert?

18           THE CLERK:  Yes.

19           THE COURT:  And he's agreed?

20           THE CLERK:  Yes.  He just requested some

21   information from counsel, a basic summary of the case.

22           THE COURT:  All right.  So what we'll be doing

23   is -- we agreed on a trial in April, is that it?

24           MS. KELLEY:  If I may say, February 23 I have a

25   two-month -- we do have an April trial date, but this may

1    also be pertinent to Mr. Wetmore's request, which is,

2    February 23 I have what's estimated to be a two-month trial

3    beginning before Judge Gorton with --

4              THE COURT:  Yes, but we're earlier, right, April 6

5    or something?

6              MS. KELLEY:  Right.  This is February 23, a

7    two-month trial which would be March and April before

8    Judge Gorton, and it is actually going.  We thought we had

9    worked out a plea agreement, but we have not.

10             THE COURT:  Well, there's nothing I can do.  We're

11   still sticking with the April 6, and we'll start right up

12   when you're done if we need to.

13             You have a separate government witness, right?  Is

14   that right?

15             MS. PIEMONTE-STACEY:  The expert, your Honor?

16             THE COURT:  Yes.

17             MS. PIEMONTE-STACEY:  Yes.

18             THE COURT:  Who?

19             MS. PIEMONTE-STACEY:  Dr. Sachsenmaier.

20             THE COURT:  Who is she?

21             MS. PIEMONTE-STACEY:  She was originally appointed

22   as the court-appointed examiner in this case, so she is

23   available April 6.

24             THE COURT:  All right.  So, now, do you know yet

25   whether you're going to have your own defense witness, or

1    does it depend on what the expert says?

2           MS. KELLEY:  It depends.

3           THE COURT:  So I understand that there's been a

4    request for a new lawyer.  I'm going to ask you all to step

5    outside, but don't go too far in case there are any

6    questions.  Is there anything else people need to tell me

7    about the status of this?

8           MS. KELLEY:  Well, once we settle the issue of

9    counsel, there are some issues that are ripe to be

10   negotiated, such as we're still working on the -- we're sort

11   of in the final stage of working on what records would go to

12   the experts and so on; but someone needs to work with

13   Mr. Wetmore on agreeing to those things, which I was not

14   able to do.

15          THE COURT:  I have no idea what you're talking

16   about.  This is the privilege issue?

17          MS. KELLEY:  Judge Dein excluded sex offender

18   treatment records because there was no proper waiver of

19   confidentiality.

20          THE COURT:  Right.

21          MS. KELLEY:  And then the question is, the sex

22   offender treatment records have kind of leaked into the rest

23   of the record by people referring to them and basing

24   opinions on them and so on.  So we had identified some

25   particular documents.  For example, when Mr. Wetmore had his

1   certification interview, the interviewer had those records,

2   used them, refers to them and so on.  So I was working with

3   the government.  We met and agreed on a certain body of the

4   record, certain specific documents that probably should also

5   stay out, and we were going to reach some agreement and some

6   compromise on that, and someone needs to discuss it with

7   Mr. Wetmore before his counsel agrees to certain things.

8   It's just some strategic decisions.

9           THE COURT:  Okay.

10          MS. KELLEY:  So I think that is sort of pending.

11  Also, I guess Mr. Tennen was working with the government to

12  do a summary of the case for Dr. Prentky.  He's just had a

13  baby over the weekend, his wife, so --

14          THE COURT:  That's lovely, yes.

15          MS. KELLEY:  It's great, really good news.

16  Everybody's good, healthy.  So I think that will happen in

17  the next ten days.

18          MR. SWOMLEY:  That's why I'm here.

19          MS. KELLEY:  Yes, Mr. Swomley is not available for

20  the April 6 date.  He has a murder trial scheduled, but

21  Mr. Tennen I assume is available for those days.

22          MS. PIEMONTE-STACEY:  We do have a proposed

23  description that we have sent, or at least I have one today

24  that I could even hand to Mr. Swomley for Dr. Prentky.  But

25  what's also outstanding, your Honor, we had requested in our

1   status report a pretrial order for this case.  Because the

2   date had changed, there's no pretrial order.

3           THE COURT:  Yes, we'll issue a pretrial order.

4   Mr. Alba will send one out with the new date, but I mostly

5   just have to deal today about counsel.  I'm not even sure,

6   frankly, what the standard is because it isn't a criminal

7   case.  So why don't I ask you two to step out, and then I'm

8   going to ask what the problem is.  Actually, I should say

9   you three, huh?

10          (Government counsel leaves the courtroom.)

11          THE COURT:  So, Mr. Wetmore, what's the problem?

12          MR. WETMORE:  Uhm, I guess I'm not sure about the

13  procedure.  I do have a motion that I have typed myself.

14          THE COURT:  Well, let me start by saying, as I

15  understand it, you don't want these two to be your lawyers

16  anymore.

17          MR. WETMORE:  No.  We have -- we've had minor

18  differences over time, but, I mean, recently we had a major

19  problem that I've decided --

20          THE COURT:  With both counsel?

21          MR. WETMORE:  With Page and Eric Tennen.  I

22  haven't worked much with John Swomley on this matter, but --

23          THE COURT:  I hate to get into it because it may

24  reflect some attorney-client issues, but let me just say

25  this to you:  You are my third trial, and I don't think

1    there are many people more knowledgeable about this statute,

2    and in particular these Static-99s and these actuarial

3    methodologies and the actual experts, than these two.

4    They've managed in one case -- in both cases, let's just

5    say, which were, unlike some of the others I hear in the

6    district, pretty strong government cases, they managed to

7    persuade one jury to hang and one jury to come out for the

8    defense point of view, okay.  So both from the point of view

9    of trial skills and from the point of view of actual

10   knowledge of what the law is, I don't think I could find

11   someone else.  I don't even know where I would start.

12             MS. KELLEY:  Well, I can address that, actually.

13             THE COURT:  So I don't know where I would go.  And

14   also we spent a lot of money so far, which isn't the

15   criterion, but it means that someone else has to get up to

16   speed, unless they're already knowledgeable about this,

17   about everything.  I'm not going to restart everything.  I

18   mean, this would just be for trial purposes.  I'm not going

19   to redo a Daubert hearing and all this stuff.  So I'd have

20   to be really persuaded that there's an irretrievable

21   breakdown in order to do this.  And I won't appoint two.

22   I'd appoint one.

23             MS. KELLEY:  Well, if I can just address the issue

24   of who might be qualified to do the case, Mr. Rankin has

25   begun the process of developing a CJA list for SDP trials.

1          THE COURT:  So who would it be?

2          MS. KELLEY:  Well, I don't know precisely the

3     names.

4          THE COURT:  We never did it because we heard

5     basically that everything was going to the Fourth Circuit.

6          MS. KELLEY:  Well, I spoke to him about this, and

7     he has, he said, four or five names on a list that he had

8     begun before it looked like the government stopped bringing

9     cases, so he stopped working on that.

10          THE COURT:  People who are knowledgeable now or

11     would get up to speed?

12          MS. KELLEY:  They are people who do SDP cases in

13     state court and have been doing them for some time, so

14     they're qualified to do -- they know the science, similar to

15     Mr. Swomley and Mr. Tennen.

16          THE COURT:  So let me just say, I would not allow

17     the new person to start from scratch, start again with

18     Daubert hearings and motions to dismiss and all that kind of

19     thing.  We're at the point that we're going to go to trial

20     in April.

21          MR. WETMORE:  It's understood.

22          THE COURT:  Okay?  So, now, I don't know what the

23     area of disagreement is, and, quite candidly, I'm not sure

24     if it's disclosable.

25          MS. KELLEY:  Well, I will just say that

1    Mr. Wetmore, and not to disparage him as a person --

2    obviously he's been very cordial -- we are at a complete

3    standstill and loggerheads about our strategy, about the

4    law, et cetera; and it's reached the point where I really

5    think he has no confidence in us.  And my honest assessment

6    is, for him to start now, even knowing that the trial date

7    is in April, and we've told him the trial date is almost

8    certainly not going to be moved and that it would --

9            THE COURT:  I don't know if that's true.  I mean,

10   to some extent, you're just sitting there.  Now, with these

11   two attorneys, it was so hard to even get a date.  I mean,

12   we booked this months in advance.  This one has this

13   problem, this one has that problem.  I don't even know --

14   there are so few lawyers who know these cases.  Assume I

15   find one, because I'm not appointing two at this point,

16   assume I find one lawyer, I'm not sure I could find one who

17   could do April 6.  I mean, it may mean that you're off until

18   September.  You're just sitting there.

19           MR. WETMORE:  I wouldn't mind that.  I would

20   rather have it done right in 2011 than wrong today.

21           THE COURT:  Can I ask, is there a legal question

22   that I could help solve, or is this purely factual?

23           MS. KELLEY:  In order to explain it, I think we

24   would --

25           THE COURT:  You'd give away too much.

1        MS. KELLEY:  -- he would need to make some

2    admissions and so on.

3        THE COURT:  Is there a way that I could have a

4    magistrate judge work this through and actually hear what

5    the issues are so I wouldn't hear it?

6        MS. KELLEY:  Well, I will just say that it's

7    mainly one specific issue, but it's also many subsidiary

8    issues.  We have just lost the ability to communicate.  In

9    seeing Mr. Wetmore, in talking with him about the trial and

10   our strategy and what we intend to do, I mean, just to give

11   you an example, recently he announced that he would not

12   attend the trial, he would rather not come and sit at the

13   trial if we were going to represent him in the way in

14   which --

15       THE COURT:  Is that how you feel?

16       MR. WETMORE:  Yes, I'm afraid so, ma'am.

17       THE COURT:  Now, what happens if I appoint one of

18   these -- let's say I found someone who was willing to take

19   it on a fast turnaround and I appoint someone, and what if

20   they tell you the exact same thing?  You know, I'm not going

21   to keep doing this.

22       MR. WETMORE:  Well, I'm aware of that, yes.

23       THE COURT:  So then you represent yourself?

24   That's the worst of all worlds.  I mean, I can't bless any

25   one lawyer.  I'm sure they're human, and they may make

1    mistakes or just make judgments that you don't agree with.

2    But I am telling you that there is no couple, no duo that's

3    going to know as much.  And you're only going to get one

4    additional person.  I mean, I appointed two only -- it was

5    serendipity, I mean, just pure -- because there were so many

6    big -- just pure chance that you were one of the first cases

7    coming through and there were such major Daubert and

8    constitutional issues.  But now it's just facts, as far as

9    I'm concerned, you know, the facts and law, and I'll just

10    appoint one lawyer.  Do you understand that?

11              MR. WETMORE:  Yes.

12              THE COURT:  And there's no guarantee they're going

13    to be as knowledgeable or that they will disagree.

14              MR. WETMORE:  Understood.

15              THE COURT:  So --

16              MR. WETMORE:  What I have is a major -- how can I

17    explain?  I guess I'll turn to Page.  Can you read this over

18    quickly?  Would you mind if she does?

19              THE COURT:  Can I ask you, what's your background?

20    Are you educated?  Did you have a high school education?

21              MR. WETMORE:  Yes, I did.

22              THE COURT:  And college education?

23              MR. WETMORE:  No.

24              THE COURT:  And have you been educating yourself a

25    little bit in the prison library?

1        MR. WETMORE:  Yeah, a little bit, but --

2        MS. KELLEY:  Well, essentially, speaking for

3    Mr. Wetmore, he feels that we have not dealt competently

4    with the case, we have not responded to his needs that he's

5    told us about in the case.  He feels that we have lied to

6    him.  He feels that we have utterly different takes on the

7    defense strategy, that we've wrongly --

8        THE COURT:  Would it make sense for some

9    magistrate judge -- let's say we got somebody who was not

10   even Judge Dein or me, because she's involved in another

11   aspect of it, to talk through some of the issues, like

12   Judge Sorokin, for example, to just talk through the -- I

13   think, because I am the ultimate fact-finder, I should not

14   be the one to actually hear these issues.  Regardless of

15   what a jury does, as the former President said, "I'm the

16   decider," okay?  So I decide.  So I don't want to hear this,

17   I think is the best way for this to go.

18        So I could send you to Judge Sorokin to talk it

19   through.  I'm afraid I'm going to get rid of the two of you,

20   putting it bluntly, and we're going to have another lawyer

21   who comes to the same judgment, and we're just going to be

22   nine months down the road.

23        MS. KELLEY:  Well, I think Mr. Wetmore -- I have

24   gone over this with Mr. Wetmore and said, "You are probably

25   only going to get one lawyer, not two," et cetera.  But you

1    have to also understand there is a group of inmates at

2    Devens who basically has the same pool of lawyers

3    representing them, and sometimes we're kind of playing

4    musical chairs with these trial dates.

5              THE COURT:  Is there anybody else who's a --

6              MS. KELLEY:  Well, the issue is, I think, he would

7    be very happy to just have an entirely new attorney, not

8    someone who's been litigating this all along.  And really --

9              THE COURT:  I thought Mr. Rankin, I thought we had

10   abandoned that list, but maybe he has a few people on --

11             MS. KELLEY:  I just talked to him the day before

12   yesterday.  He has a list.  They're very experienced

13   lawyers.  They would have made the list if it had ever

14   been --

15             THE COURT:  Like who?

16             MR. SWOMLEY:  I know all the people on the list.

17   It would be Michael Farrington.  It would be -- and most of

18   them actually went into the committee.  Bruce Carroll is on

19   the state court list.

20             MS. KELLEY:  These are people who have done SDP

21   cases in --

22             THE COURT:  Would you want one of those type

23   people?  I don't know any of them.  They're not on a list of

24   mine.  I, quite candidly, don't know them.  I don't know

25   their reputation.  I've never heard of them.  I was on the

1   state court, but I never did one of these cases there.  I

2   thought I escaped them and came to Federal Court, and here

3   I've got them.  So I don't know these lawyers, so we would

4   just have to be going off one of these lists.  Do you

5   understand that?

6            MR. WETMORE:  Yes, I do.

7            THE COURT:  Do you think they would be willing to

8   do federal stuff?

9            MR. SWOMLEY:  I am sure that one of them would

10  like the opportunity to do it.  I don't know that that's --

11           THE COURT:  Should we just fish for one of them

12  and --

13           MR. SWOMLEY:  I'm happy to reach out.

14           MS. KELLEY:  I think there was quite a bit of

15  interest in this list, but it was not developed because it

16  looked like the government wasn't bringing any more cases.

17           THE COURT:  Is that still true, by the way?

18           MS. KELLEY:  Yeah.

19           MR. SWOMLEY:  I would bet you anything that once

20  the dust settles down in the Fourth Circuit, they will start

21  rerouting people back up here.  I have no information about

22  that, but I would be --

23           THE COURT:  I had that little bit of an ulterior

24  institutional motive to groom some more people because it is

25  in fact true that you have developed the lion's share of the

1   expertise.

2          MS. KELLEY:  Well, if they bring a lot more cases

3   up here, our office is not going to be able to keep taking

4   them all.

5          MR. SWOMLEY:  FYI, I am on your CJA panel separate

6   and apart from the SDP stuff, and if ever you wanted my

7   assistance or my office's assistance --

8          THE COURT:  Oh, good.

9          MR. SWOMLEY:  I'd love it if I could bring my own

10  associate, Eric Tennen, who has been working on this, and he

11  was one of those that was in the hopper for the CJA list.

12         THE COURT:  Good.

13         MR. SWOMLEY:  Because I think he is someone who is

14  very knowledgeable and also smart on the law.

15         THE COURT:  All right, fabulous.

16         So you want a new lawyer.

17         MR. WETMORE:  Yes.

18         THE COURT:  You understand there's no guarantee.

19  I want to do this in April.  I've been pushing them

20  actually.  I've wanted to do this six months ago, but things

21  kept coming up and then we had the expert problems,

22  et cetera, and people's trial schedules.  Do you understand

23  there's no guarantee I'm going to find someone who can do

24  it?

25         MR. WETMORE:  I understand.

1          THE COURT:  Okay?

2          MR. WETMORE:  Yeah.

3          THE COURT:  And if they come up with the same

4   judgment and you want to fire them, you may end up going

5   this alone, and you don't have the education to do that.

6   I'm just telling you flat out, okay?

7          MR. WETMORE:  Yes.

8          THE COURT:  But you can't keep picking and

9   choosing.

10          MR. WETMORE:  Oh, yes, understood.

11          THE COURT:  All right, why don't we bring in the

12  government.  I can't think of any other solution, right?

13          MS. KELLEY:  I don't believe so.  Do you want me

14  to get the government?

15          THE COURT:  Yes.

16          (Government attorneys return to the courtroom.)

17          THE COURT:  So here's the problem:  As you know

18  because I unsealed the motion, there is an irretrievable

19  breakdown between counsel.  The problem I have is, I can't

20  appoint the Federal Defender's Office and Mr. Swomley

21  separately on the list, and there's no guarantee that these

22  other people who are somewhat knowledgeable about sexually

23  dangerous persons cases are on my CJA list.  My guess is

24  they're not.  I do not recognize any of the names that were

25  mentioned.  Mr. Rankin, who I do trust, has started vetting

1    these people.  I don't know if he's completed vetting them.

2    I think I can appoint off the list under extraordinary

3    circumstances.

4            So I think what we need to do is have you,

5    Ms. Kelley, get the list of people, and ideally Mr. Alba

6    will call and see if they're willing.  And then we'll have

7    to get, I guess, their resumes.  I mean, I'm not even sure

8    what it takes.  Maybe I'll call Mr. Rankin to even find out

9    if they're, you know -- I think I can statutorily do this if

10   there's no one on the list who had the expertise to handle

11   this.  I think I can.

12           MS. KELLEY:  I think Mr. Rankin thought that you

13   could.

14           THE COURT:  I think I can, so I would do that.  It

15   means that we are going to try and get someone who can do it

16   on April 6.  If they cannot, I will get them in as soon as

17   possible.  In the meantime, I am going to keep counsel, not

18   let them withdraw until new counsel is in so we can work out

19   at least some of these issues, so that we can at least get

20   what we can get to the psychiatrist so that he can start

21   working on it, so it's not what I would call "dead time"

22   while we're doing this because that pushes me even further

23   behind.  So we should be getting the materials to the

24   psychiatrist who I have now appointed.  I am not going to go

25   back on any of the law of the case on this.  And we need to

1    resolve the document issues, or I will refer whatever is

2    left to Judge Dein so that this is fruitful time, so that

3    we're really ready to try this case.

4         MS. KELLEY:  Well, one of the document issues

5    really requires somebody who Mr. Wetmore trusts to go over

6    some strategic considerations with him.  I will send him

7    copies of the materials in question.  That's actually

8    already been done, but he'll be back at Devens, I think

9    tomorrow, and can look at those, and perhaps I can talk to

10   him about that.  But hopefully, if we get new counsel soon,

11   we can bring them up to speed and they can work that out.

12        THE COURT:  Right.  One of the problems is, as you

13   well know, I'm the ultimate fact-finder, and so I have not

14   delved into the actual underlying dispute between counsel

15   because I am the fact-finder.  It's just a problem that I

16   think I have.  So I'm not sure what the dispute is.  My

17   worry, of course, is that new counsel might see things a

18   similar way, and I don't know.

19        So what we can do is, do you have an objection,

20   Mr. Wetmore, to at least getting the documents to the

21   expert?  And then if you disagree with counsel's decisions

22   on that, then we'll have to wait until new counsel is

23   appointed.

24        (Discussion between Mr. Swomley and Mr. Wetmore.)

25        MR. WETMORE:  Okay, yes.

1          THE COURT:  In the meantime, Mr. Swomley should

2     get me a final bill for Wetmore because as soon as the

3     transfer of documents has happened, I should then pay your

4     final invoice.

5          MR. SWOMLEY:  I'd be happy if you paid the last

6     two.  I'm --

7          THE COURT:  Well, Peavy --

8          MR. SWOMLEY:  I have not been paid for any of the

9     SDP work.

10          THE COURT:  I've done interim billing, haven't I,

11     for this case?

12          MR. SWOMLEY:  I'm sorry, yes, you did an interim

13     payment on Peavy way back.

14          THE COURT:  And I thought I did an interim bill on

15     Shields --

16          MR. SWOMLEY:  I have not been --

17          THE COURT:  -- your final bills because I'm going

18     to wait till the final thing, so -- but I am happy to pay

19     this final one, and I've done interim on the other ones,

20     right?

21          MR. SWOMLEY:  Just so you know, I consider myself

22     final and done on both Mr. Peavy and Mr. Shields.

23          THE COURT:  Completely final?

24          MR. SWOMLEY:  Yes.

25          THE COURT:  Because it's styled an interim bill.

1          MR. SWOMLEY:  I think it was originally styled an

2    interim bill, and then I talked with Mr. Alba, and I

3    refashioned it, I thought, or at least I had my office

4    refashion it as final bill.  I'm done.  I've stopped billing

5    on both of those matters.

6          THE COURT:  So there's nothing?

7          MR. SWOMLEY:  Right.

8          THE COURT:  Well, suppose whatever I rule, one

9    side or the other moves for reconsideration?

10          MR. SWOMLEY:  As I understood it, I was helping

11    Federal Defenders, so they're still on the case.

12          THE COURT:  So Ms. Kelley will do that.

13          MR. SWOMLEY:  Yes.

14          THE COURT:  If it's a final bill, I'm happy to do

15    it.  What I don't want to do --

16          MR. SWOMLEY:  No, I get that.  I would greatly

17    appreciate it if you would treat them both as final bills

18    and --

19          THE COURT:  So you have no further involvement

20    with Peavy or with --

21          MR. SWOMLEY:  If I do it, I'll do it on my time,

22    Judge.

23          THE COURT:  Fine, no problem.  So if Mr. Alba can

24    get me that, I'll treat it as the final bill.

25          MR. SWOMLEY:  Thank you very much.

1          THE COURT:  I'm sorry, I don't know what the

2     standard is in a civil case.  He has a statutory right to

3     counsel.  I do not really know what the dispute was.  I

4     don't think there's a way I can find out, as a practical

5     matter.  In a criminal case, as you know, a jury decides; it

6     doesn't matter if I find out.  In this one it might, but all

7     three seem to agree that they're at a point of total

8     breakdown on strategy.  So anything else?

9          MS. PIEMONTE-STACEY:  Your Honor, I don't know if

10    the Court wants to entertain this at this time, but there's

11    no date for the disclosure of expert reports.  So that is

12    just one kind of deadline.  If we're assuming we're moving

13    forward on April 6 --

14         THE COURT:  Why don't I first find a lawyer.  Then

15    we'll hold a status conference and set all these dates.

16    What's happening in all these other cases of yours?  Are any

17    in front of the First Circuit?

18         MS. BOAL:  No, no.  There were ten filed here

19    initially, and one the government voluntarily dismissed.

20    Another one was transferred in by -- Mr. Swomley's firm

21    transferred one up from North Carolina to here.  That's the

22    one in front of Judge Zobel.  Judge Wolf has two.  One has

23    been tried.  There's no decision.  The other one is not

24    scheduled for trial.  Judge Tauro has three, and all those

25    are scheduled for trial.  So there's no final decision in

Page 23

1   any of the cases.

2          THE COURT:  There was another case that I heard

3   that was going up to the First Circuit on a 4246.

4          MR. BOAL:  Yes, your Honor, in Ecker, E-c-k-e-r.

5          THE COURT:  From Judge Gorton?

6          MS. BOAL:  Yes.

7          THE COURT:  Do you know about this?

8          MS. BOAL:  That was argued before the First

9   Circuit, and there's no decision.

10          THE COURT:  What was the issue there?

11          MS. BOAL:  The issue -- well, there was a

12   jurisdictional issue because I think the gentleman had been

13   certified in Minnesota, and the criminal case was here, and

14   Judge Gorton released the person.  It was a 4246.  And I

15   know the government felt that he didn't have jurisdiction to

16   do so because we believe the statute says it has to be by

17   the certifying court.  And then he also felt -- Judge Gorton

18   had ruled that the government should have made more efforts

19   to place him in state facilities, and so that was another

20   issue as well.

21          THE COURT:  Well, I just heard about that, and I

22   wondered whether it had an impact on anything I did in

23   Peavy, so I just wanted to flag that.  There's some issue

24   percolating up through the Gorton session having to do with

25   4246.

1          MS. BOAL:  The jurisdictional issue, and I think

2    we talked about this in the Peavy case.  Well, Mr. Swomley

3    is here, even though he said he's not working on Peavy

4    anymore, but I assume Mr. Fick is, who's not here.

5          MR. SWOMLEY:  I'll forward whatever needs to be

6    forwarded.

7          THE COURT:  I just wanted to flag that issue to

8    follow it because it's not your case, but it's that parallel

9    statute, you know.

10         MS. BOAL:  Yes.

11         THE COURT:  I didn't know if some of the

12   jurisdictional or federalism or all those kind of issues

13   were somehow -- are they percolating in front of the First

14   Circuit right now?

15         MS. BOAL:  Yes.

16         MS. KELLEY:  Well, it's very interesting, if you

17   look at the Comstock decision, a lot of the reasoning on

18   that would appear to also apply to 4246.

19         THE COURT:  I couldn't agree with you more.  I

20   couldn't agree with you more.

21         MS. KELLEY:  It's just very curious.

22         THE COURT:  When I read it, I went -- but then I

23   started hearing about this case, so that's why I'm following

24   it, and you all should too.  So I wanted to make sure you

25   knew about it.

1           MS. KELLEY:  I'll mention that to Mr. Fick, yes.

2   Thank you, your Honor.

3           THE COURT:  Great.  All right, we'll stand in

4   recess.

5           We'll try and get you that new lawyer and have a

6   scheduling conference as soon as we get someone in the door.

7   Thank you to everyone.  And make sure, Mr. Swomley, as I'm

8   sure you will, that I'll treat those as final bills.

9           MR. SWOMLEY:  Thank you.

10          THE COURT:  Because I usually only pay one or two

11  interims, and then I just wait for the end, and you're

12  saying you're at the end?

13          MR. SWOMLEY:  I am.  I appreciate it.  And any

14  wrap-up work I'm happy to do.

15          THE COURT:  Fine, fine.

16          THE CLERK:  Court is in recess.

17          (Adjourned, 2:45 p.m.)

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3

      UNITED STATES DISTRICT COURT )
4     DISTRICT OF MASSACHUSETTS    ) ss.
      CITY OF BOSTON               )
5

6

7              I, Lee A. Marzilli, Official Federal Court

8     Reporter, do hereby certify that the foregoing transcript,

9     Pages 1 through 25 inclusive, was recorded by me

10    stenographically at the time and place aforesaid in Civil

11    Action No. 07-12058-PBS, United States of America v. Joel

12    Wetmore, and thereafter by me reduced to typewriting and is

13    a true and accurate record of the proceedings.

14             In witness whereof I have hereunto set my hand

15    this 14th day of October, 2011.

16

17

18

19

20             /s/ Lee A. Marzilli
               _____
21             LEE A. MARZILLI, CRR
               OFFICIAL COURT REPORTER
22

23

24

25