IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,          )
                                   )
              Petitioner           )
                                   )
        -VS-                       ) Civil No. 07-12058
                                   ) Pages 1 - 33
JOEL WETMORE,                      )
                                   )
              Respondent           )



STATUS CONFERENCE


BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




                    United States District Court
                    1 Courthouse Way, Courtroom 19
                    Boston, Massachusetts
                    December 3, 2009, 10:15 a.m.




            LEE A. MARZILLI
         OFFICIAL COURT REPORTER
      United States District Court
      1 Courthouse Way, Room 7200
          Boston, MA  02210
           (617)345-6787

1    A P P E A R A N C E S:

2         EVE A. PIEMONTE-STACEY, ESQ., Assistant United States
     Attorney, Office of the United States Attorney,
3    1 Courthouse Way, Boston, Massachusetts, 02210,
     for the Petitioner.
4
          HARRY L. MILES, ESQ., Green, Miles, Lipton, White &
5    Fitz-Gibbon, 77 Pleasant Street, Northamptom, Massachusetts,
     01061-0210, for the Respondent.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   P R O C E E D I N G S

2           THE CLERK:  The case of the United States v. Joel

3    Wetmore, Civil Action No. 07-12058, will now be heard before

4    this Court.  Will counsel please identify themselves for the

5    record.

6           MS. PIEMONTE-STACEY:  Good morning, your Honor.

7    Eve Piemonte-Stacey for the United States.

8           MR. MILES:  Good morning, your Honor.  Harry Miles

9    for the respondent, Joel Wetmore.

10          THE COURT:  I hear you hit some traffic?

11          MR. MILES:  It was interesting, your Honor.

12   Normally I get stopped at Natick and wend my way through,

13   and I allow for that.  This time I got stopped at 495 and

14   didn't move.  I was afraid I wouldn't be here.

15          THE COURT:  Let me start off by saying I'm sorry

16   you have to travel such distances, but I guess you took that

17   on when you agreed to do this.

18          MR. MILES:  Yes, your Honor.

19          THE COURT:  Perhaps in the future you could do a

20   teleconference when it's just a pure status.  That would be

21   fine with me.

22          MR. MILES:  I considered that, but I thought there

23   were three sealed motions that might be under consideration

24   as well, so --

25          THE COURT:  Well, first of all, I'm not sure

1   why -- Judge Dein told me to essentially have a status

2   conference.  And this is not a criminal case.  Let me just

3   start there.

4             MR. MILES:  Right.

5             THE COURT:  So if you want, you can see me about

6   the sealed motions at sidebar, but I wasn't sure why they

7   were sealed, given that this is a civil case and not a

8   criminal case.

9             MR. MILES:  I can explain that without

10  compromising the reason, your Honor, if the Court will

11  permit me.

12            THE COURT:  It's for expenses, right?

13            MR. MILES:  Yes, your Honor.  However, in my view,

14  the underlying grounds at this point would reveal too much

15  of my potential strategy.

16            THE COURT:  You know what?  It's not a criminal

17  case, so I'm not going to do it sealed.  It's a civil case.

18  But I have a bigger overarching question is, I've sort of

19  forgotten about you because it's been on hold for so long,

20  and when Judge Dein called, I went "Oh, yes."  As I

21  understand it, Comstock is not even scheduled for argument

22  before the Supreme Court until January.  I would be

23  surprised if we got an opinion before June.  Mr. Wetmore has

24  been sitting in prison a very long time.

25            MR. MILES:  Yes, your Honor.

b96dd756-8da2-44fd-bfdf-76dc5fe5a30b

1        THE COURT:  A very long time.

2        MR. MILES:  He has.

3        THE COURT:  At his consent and request almost, in

4    the sense that you all wanted to wait until the Supreme

5    Court ruled.  I'm not positive that was the right decision

6    to make, now that I know how late the case has been

7    scheduled for argument and the fact that he's like -- in

8    other words, if he -- let's assume for a minute the Supreme

9    Court goes your way, I just release him, essentially is what

10   I'm planning on doing unless somebody else is holding him on

11   a detainer.  But if they uphold the statutory scheme, I'm

12   essentially starting from scratch at that point, and it

13   could be another six months beyond that.  That's my concern,

14   and especially if I'm going to start paying money.  If I'm

15   going to start paying money, big money to let you defend

16   him -- which is essentially what you want, right?

17        MR. MILES:  Yes, and not -- I don't consider it

18   big but --

19        THE COURT:  -- I don't know that I'm saving so

20   much if -- you know, I'm just wondering whether we shouldn't

21   just set an earlier trial date.

22        MR. MILES:  Well, your Honor, if I may, my client

23   and I have talked about the stay, and he is still --

24        THE COURT:  He's still with it?

25        MR. MILES:  He's still with the stay.

1        THE COURT:  He's just sitting there.  He's just

2    sitting there in purgatory.

3        MR. MILES:  I understand that.

4        THE COURT:  He's neither getting services, as I

5    understand it -- I mean, he could be with services by now.

6    You know the case better than I do, but are you sure he

7    still wants this?

8        MR. MILES:  I spoke with him last week, and he's

9    still with that, he still wants to stay.  I can only assure

10   the Court that I have talked with him at length about that

11   issue and posed both sides of the question to him.  He's

12   considered it.  In my view, he's a relatively intelligent

13   client, certainly not at the level of some of my clients on

14   the state side, and that's the conclusion he's come to.  I

15   will next time I talk to him voice the Court's concerns.

16       THE COURT:  Yes, because it took me with

17   Mr. Shields maybe two weeks to try the case and maybe

18   another three months to write it.

19       MR. MILES:  I would anticipate that this case

20   should be ready to roll within 30 days after the U.S.

21   Supreme Court makes its decision, if this Court retains

22   jurisdiction as a result of that decision.

23       THE COURT:  Sure.  If not, he just leaves, as far

24   as I'm concerned.

25       MR. MILES:  Correct.

1          THE COURT:  There's nothing holding him, is there?

2     Do you know?

3          MS. PIEMONTE-STACEY:  I'm not aware of anything

4     holding him.

5          THE COURT:  Is he getting any services where he

6     is?

7          MS. PIEMONTE-STACEY:  Well, it's the position that

8     they are refusing services because of the uncertainty of

9     what happens with these treatment records, whether or not

10    they're discoverable in a later trial.  So at least it's my

11    understanding that he was advised by prior counsel not to

12    participate in services.

13         THE COURT:  What about normal treatment, like just

14    mental health, those aren't discoverable, are they?

15         MR. MILES:  Well, that's an interesting issue,

16    your Honor, and nobody is certain of the outcome.  It's

17    going to take a court to tell us whether they're

18    discoverable or not.

19         THE COURT:  You've worked through all the records

20    at this point with Judge Dein?

21         MR. MILES:  Yes.

22         THE COURT:  All right, so now let's talk about the

23    expert stuff.  Why don't you give me a pitch about what you

24    need.  It's civil, not criminal.  She has a right even to

25    depose the people.  I mean, that's why it's just not even --

1   you can depose her experts; she can depose yours.  This is a

2   civil proceeding.  So I know it feels sometimes like

3   criminal, but it's civil, preponderance.  You know, it's --

4          MR. MILES:  If I may, your Honor, my position on

5   sealing the records is that under Rule 26, I need not

6   disclose my experts if they're for consultation purposes.

7   So I've endeavored, and whether or not -- I mean, if the

8   Court tells me I can't do it, obviously I won't do it, but

9   I've endeavored to maintain the or not to disclose the

10  identity of those experts at this point because, from my

11  point of view, the first step is consultation, and then the

12  next step is designate --

13         THE COURT:  Well, what's your position?  I mean,

14  at some point you have to disclose and she gets to discover.

15         MR. MILES:  As soon as they're designated as

16  testifying experts, I have no problem giving her the full

17  Rule 26 mandated disclosure and submitting them for

18  deposition.

19         THE COURT:  All right, so you acknowledge the

20  difference between civil and criminal.

21         MR. MILES:  Oh, absolutely.

22         THE COURT:  So did you have a problem with that?

23         MS. PIEMONTE-STACEY:  The problem I have, just

24  from the government's perspective -- no.  I think we're

25  amicable.  I don't think there's a dispute over whether

1    we're entitled to the documents that the government was

2    looking for or that we're entitled to discovery and experts.

3    The problem that the government has with the sealed motions

4    is that in the past, your Honor may recall that all of these

5    motions were out in the open.  In some cases we objected to

6    the rates being charged by the experts.  The government paid

7    for the experts in those cases, and so I'm having no basis

8    to at least make an objection if the government is going to

9    be paying for these experts.

10         THE COURT:  Well, that has been a problem in the

11   past, so why don't we just discuss in general not who the

12   person is but what kinds of rates you're asking and how much

13   the money is, which she is entitled to know, and then I will

14   try and endeavor to read -- to see if I think the time is

15   right.  I'll rule on the papers in a sealed fashion.  So why

16   don't we just talk generically.  Who are they?

17         MR. MILES:  Generically, your Honor, one of them

18   would be a medical doctor.  And that motion, by the way, was

19   mistitled.  I carelessly left in the wrong expert's name on

20   it.  You have two motions in front of you with the title for

21   the same expert.  The body of the motion actually sets forth

22   who they are.  One is a medical individual.  One is a

23   clinical psychologist who would testify --

24         THE COURT:  So with the medical individual, what's

25   his specialty?

1          MR. MILES:  His specialty is the medical causes,

2     in this case, the medical causes of or treatment of sex

3     offenders.

4          THE COURT:  And how much an hour is he looking

5     for?

6          MR. MILES:  I believe I can get him to take $350

7     an hour.

8          THE COURT:  Do you have a problem with that?

9          MS. PIEMONTE-STACEY:  I need to look.  My memory

10    is that the past experts were between $200 and $250 an hour,

11    your Honor.

12         THE COURT:  Well, let me just say this, just

13    because I'm a criminal judge as well as a civil one:

14    Routinely psychiatrists cost at least $250.  Let me just --

15         MS. PIEMONTE-STACEY:  Right.

16         THE COURT:  So routinely.  Now, I don't know what

17    his expertise is.  $350 doesn't knock my socks off like some

18    of these people have where I've cut back the fees.

19         MS. PIEMONTE-STACEY:  No, I think in the past, in

20    this particular case actually, our huge objection was to a

21    doctor who wanted -- I believe it was Berlin -- somewhere

22    like $400 or $450 an hour, and that caused a real problem

23    for the government.

24         THE COURT:  So $350 doesn't jump out at me, and I

25    will be cautious about hours.  How many hours does he think

1   he needs to spend?

2             MR. MILES:  I don't have that information yet

3   because he hasn't had a real chance to look at the client,

4   your Honor.

5             THE COURT:  What about the second one?

6             MR. MILES:  The second one, our second substantive

7   expert is a clinical psychologist who would testify with

8   respect to the question of volitional impairment, which is a

9   major issue in this case.

10            THE COURT:  He's a psychologist?

11            MR. MILES:  That's correct.

12            THE COURT:  And how much an hour does he charge?

13  Do you remember?

14            MR. MILES:  I can get him to come in at $350 an

15  hour.

16            THE COURT:  And who's the third one?

17            MR. MILES:  The third would be another clinical

18  psychologist who would be for the Daubert hearing, which I

19  anticipate moving for.

20            THE COURT:  Is this a new issue than the one I

21  had?

22            MR. MILES:  I don't recall off the top of my head

23  the issue you had, your Honor.

24            THE COURT:  Let me just say this, what I want you

25  to do before I authorize anything.  I've done it, and I'm

1    not likely to redo it, okay?  He was present with counsel.

2    I'm not going to -- I think it was all three of them were

3    combined.  Did you know that?

4              MR. MILES:  Yes.

5              THE COURT:  I'm not going to redo it, and I'm not

6    going to waste the money to do it.

7              MR. MILES:  If I may --

8              THE COURT:  There may be a brand-new issue, fair

9    enough, but what I've done I'm not redoing.

10             MR. MILES:  The issue that I would propose for the

11   Daubert hearing comes directly from -- and I'll disclose

12   this at this point because I think I need to -- the issue

13   that I would propose for a Daubert hearing comes directly

14   from the testimony of Dr. Prentky, who is the court-appointed

15   expert in this case.  During his deposition, Dr. Prentky

16   diagnosed Mr. Wetmore as suffering from a condition called

17   paraphilia NOS, with a specifier called hebephilia.

18             THE COURT:  Oh, I remember that issue.

19             MR. MILES:  Yes, and it's come up in Carta and

20   it's come up in Shields, I believe.  The psychological

21   community, people who do risk assessment on sex offenders

22   across the country, is deeply split on whether hebephilia

23   is, number one, a diagnosis, and, number two, a significant

24   condition, and, number three, a deviant condition.  All

25   three of those I would submit play into the question of

1   whether or not the testimony of a psychologist on that issue

2   is admissible before the Court under the --

3           THE COURT:  What did Judge Tauro rule on that?

4           MS. PIEMONTE-STACEY:  In the Carta case,

5   Judge Tauro ruled that he found that hebephilia was not

6   medically accepted based on the testimony before him.  I

7   will say that we never really had a Daubert hearing on

8   hebephilia before Judge Tauro, but the government's expert

9   testified, "Yes, there's something called paraphilia NOS

10  with the descriptor of hebephilia.  You know, I recognize

11  it, others recognize it."  And the defense expert said, "No,

12  no such thing as hebephilia," and there was a split between

13  the two of them.

14          THE COURT:  And it's not in the DSM, right?

15          MS. PIEMONTE-STACEY:  It's not in the DSM, your

16  Honor, but there's case law out there that says it doesn't

17  have to be in the DSM.

18          THE COURT:  I understand.  Is there any judge in

19  the United States of America who have recognized it as a --

20          MS. PIEMONTE-STACEY:  In the Abregana case, what

21  the court held was that -- I think it was Dr. Barbaree that

22  testified in that case, and the court held that they assumed

23  that hebephilia was medically accepted, but found that in

24  Abregana's case, it was not a serious condition.

25          THE COURT:  Are there other diagnoses for

b96dd756-8da2-44fd-bfdf-76dc5fe5a30b

1   Mr. Wetmore?

2          MS. PIEMONTE-STACEY:  Our expert, Dr. Phenix, has

3   diagnosed Mr. Wetmore with pedophilia, which this is very

4   similar to the issue in Shields where there was --

5          THE COURT:  Are you pushing forward with

6   hebephilia?

7          MS. PIEMONTE-STACEY:  That's what the court

8   examiner has found, and so, yes, that would be his

9   testimony.

10          THE COURT:  Then I think he has the right to

11   challenge that.  That's not repeating what I did in the

12   earlier Daubert hearing.  If I remember correctly, I found

13   based on that hearing, if anything, I think I found there

14   was no support on the record before me then.

15          MS. PIEMONTE-STACEY:  Right, and I think it was a

16   very different -- I was not --

17          THE COURT:  It's a very skimpy record, but I

18   remember the issue vividly because I remember being

19   surprised.

20          MS. PIEMONTE-STACEY:  Right, I think you had --

21   and I was not at that hearing, your Honor, but I believe you

22   had Dr. Tomich with a diagnosis of hebephilia, not

23   paraphilia NOS.  Paraphilia NOS is in the DSM.  Hebephilia

24   is a descriptor that some of these psychologists use.  And

25   so I think what you had before you in Shields was Dr. Tomich

b96dd756-8da2-44fd-bfdf-76dc5fe5a30b

1   with his diagnosis of hebephilia.  I don't think the record

2   was as fulsome as it would be.

3           THE COURT:  But the case does not go away if I

4   throw out paraphilia because there's also pedophilia, is

5   that it?

6           MS. PIEMONTE-STACEY:  Yes, with some other, you

7   know --

8           THE COURT:  Well, so let me just ask you this:  Do

9   you care enough to be incurring these kinds of expenses and

10  time to go through a whole Daubert hearing?

11          MS. PIEMONTE-STACEY:  Well, yes, simply because

12  that's what the court examiner has found.

13          THE COURT:  So what?  You're the prosecutor or

14  the -- I fell into your lingo -- you're the government, and

15  so at the end of the day, you can pick and choose what you

16  want.

17          MS. PIEMONTE-STACEY:  And we've had that

18  discussion, and I'm certainly willing to have it again

19  within the office, but --

20          THE COURT:  Because at some point you're going to

21  have -- I mean, that is true, that's hotly -- that's classic

22  Daubert world.  I don't know what the right answer is.  I

23  remember last time it was a really thinly supported case for

24  the government, and I threw it out in Shields.  You know

25  that, right?

1          MR. MILES:  Yes.

2          THE COURT:  If anything, you've got the upper hand

3    on this.  And Tauro threw it out without a Daubert hearing.

4    I mean, that's enough to get him an expert on the issue.  So

5    how much does this guy want?

6          MR. MILES:  I believe his normal rate is $250 an

7    hour, but I would need to check back with him.

8          THE COURT:  But you'll get it up?

9          MR. MILES:  I'll try to push it up a little bit,

10   if I can.

11         THE COURT:  No, that's fine.  So the issue now is,

12   I will read the -- you don't know what the hours are, right?

13         MR. MILES:  That's correct.

14         THE COURT:  Why don't I do this.  Why don't I

15   allow you to do the following:  I will authorize five hours

16   apiece for each expert to explore and give me a proffer as

17   to how long it would take and what they think the issues

18   they need to explore on so I can put some cap on hours if it

19   gets crazy.  Does that make some sense?  Give them five

20   hours to sort of look at the files, see how much time it

21   would take to prepare, what are the likely areas they want

22   to explore?  And then I would come up with a realistic, you

23   know, I allow you $5,000 or $10,000, or whatever the amount

24   is.

25         MR. MILES:  If I may make a counter-suggestion,

b96dd756-8da2-44fd-bfdf-76dc5fe5a30b

1   your Honor?

2            THE COURT:  Okay.

3            MR. MILES:  I ask the Court to consider another

4    alternative.  In my experience, I would doubt that these

5    people would need more than ten hours to complete their

6    record review and consult with me about it; and allow me to

7    draft a further affidavit to the Court to go the next step,

8    if that's appropriate.

9            THE COURT:  So you're talking about essentially

10   between $10,000 and $12,000?

11           MR. MILES:  Yes, for all three.

12           THE COURT:  That makes some sense rather than --

13   that's not the kinds of money we were talking about before.

14           MS. PIEMONTE-STACEY:  No, and that was my concern,

15   where before we paid not only for the court examiner but for

16   one examiner of the defendant's choosing, and here now we're

17   getting into three.  In other cases where the respondents

18   did not agree with the conclusion of the court examiner and

19   the examiner that they retained, they then separately on

20   their own with their own funds --

21           THE COURT:  Yes, but let me ask you this:  Is one

22   of these going to be your person?

23           MR. MILES:  Yes.

24           THE COURT:  Your designee.  They get a designee.

25           MR. MILES:  Well, two would be the designee, one

1    on the medical side and one on the psychological side.

2             THE COURT:  I don't feel -- you know what, why

3    don't I think about that.  I at least am going to pay for

4    one designee, so who would you like that to be at this

5    point?  And I'm going to pay for one Daubert person, and it

6    does not have to be the same person.  So who are the two we

7    should get going on?  You're only entitled to one designee

8    under the statute.

9             MR. MILES:  I understand, your Honor.  The

10   reason -- and forgive me for pushing this, but I feel I need

11   to spread this out for the Court.

12            THE COURT:  Sure.  You're doing your best by this

13   guy.  That's fine.

14            MR. MILES:  The problem with this particular case,

15   and given what the Court has said, I'll discuss it in a

16   little more detail than I had intended but --

17            THE COURT:  Well, let me just say, which one -- I

18   think it's not going to be a secret -- who's your designee

19   that you want me to pay for?

20            MR. MILES:  Well the Daubert designee would be

21   Dr. Joseph Plaud, P-l-a-u-d, who's local.

22            THE COURT:  Sure, I know him.  He's great.  All

23   right, Plaud, good.  All right, so fine, he's qualified.

24   Wasn't he my --

25            MS. PIEMONTE-STACEY:  He was the expert in

b96dd756-8da2-44fd-bfdf-76dc5fe5a30b

1    Shields, the court examiner in Shields.

2         THE COURT:  Yes, yes, so great.  I know him, like

3    him.  Good.  All right, so he's your designee or just the

4    Daubert person?

5         MR. MILES:  The Daubert person.

6         THE COURT:  Well, why wouldn't he also be your --

7         MR. MILES:  Because I've gone through this with a

8    couple of experts, and they don't like -- they refuse to

9    testify on some kind of ethical ground, which, frankly, I

10   don't understand, having reviewed the APA code of ethics;

11   but they claim there's some kind of conflict of interest or

12   dual relationship that's created by the Daubert and then the

13   substantive testimony.  And I've been through this on the

14   state side.  I can't tell the Court why that's true.  I can

15   only tell the Court what has happened.  So my clinical

16   expert, who is directed and focused on the volitional

17   impairment issue, is different from the person I'm having

18   talk about hebephilia, Dr. Plaud.

19        THE COURT:  So who's the court-appointed -- let me

20   do this:  Let me think about it, go back and read it.  The

21   hourly rate sounds fine.  He's at least entitled to ten

22   hours of a Daubert witness and a court designee.  I don't

23   know that you're entitled to a second court designee, and I

24   want to think about that one.

25        MR. MILES:  If I may again elucidate on that, your

1   Honor.

2           THE COURT:  Yes.

3           MR. MILES:  The clinical person I would consult

4   with and then intend to designate, assuming that the

5   consultation led me to do that, would be a Dr. Fred

6   Winsmann, who, again, has testified on the state side in

7   these kinds of cases.

8           THE COURT:  He's the clinical psychiatrist?

9           MR. MILES:  Clinical psychologist.

10          THE COURT:  Yes.

11          MR. MILES:  Okay?  And his focus is volitional

12  impairment, which to me is going to be the central issue in

13  this particular case.

14          THE COURT:  What does that even mean?

15          MR. MILES:  Under the construct that the Federal

16  Courts or that Congress has put on us, as I understand it,

17  there's got to be some reason to believe that currently the

18  individual is unable to control his sexual impulses.  As

19  soon as you talk about control, you talk about, in some

20  psychologist's view, the question of volition.  Once you

21  talk about volition, the question is, does this person have

22  control or not have control, in an oversimplified way?

23          THE COURT:  Right, but that's the psychologist.

24          MR. MILES:  That's correct.

25          THE COURT:  I understand that, okay.  So what's

1   the need for medicals?

2            MR. MILES:  Now, the second side of the volitional

3   impairment issue is, is there some physical cause of the

4   individual's diminution of control?

5            THE COURT:  I see.

6            MR. MILES:  And if there is a physical cause, then

7   the question arises, if we eliminate the physical --

8            THE COURT:  You mean like a brain tumor, just

9   speculating?

10           MR. MILES:  Yes, just as a hypothesis.  If we

11  eliminate the physical cause and restore the volitional

12  capacity, does the government have the authority to commit?

13  And the medical person I want to consult is an expert in

14  that area.  And Dr. Prentky himself during his deposition

15  said that Mr. Wetmore should have been given antiandrogens,

16  which is the drug that reduces sexual impulses and enables

17  volitional control to be restored or enhanced, he should

18  have been given those years and years ago.

19           THE COURT:  All right, but let me just say, apart

20  from, since we're waiting for the Supreme Court -- I went

21  through this with the government -- why doesn't it make

22  sense to give it to him and see if -- at the very least, a

23  six-month period where we can see if they make a difference?

24           MS. PIEMONTE-STACEY:  He had previously filed that

25  motion for pharmacological treatment.  We opposed it, and

1   the motion was denied.

2            THE COURT:  Yes, it was, but let me just say, I

3   can't force you to do it.  I can't force you to do it,

4   but -- but why doesn't it make sense to do it?

5            MS. PIEMONTE-STACEY:  Because for two reasons, as

6   best as I can simplify today.  It's not just a matter of

7   handing him a pill and saying "And there goes your

8   volition," okay?  What the Bureau of Prisons does is,

9   they -- you have to get accepted into the sex offender

10  treatment program, which he would be, but you have to begin

11  sex offender treatment.  And it's both a cognitive and a

12  behavioral modification therapy treatment along with this

13  medication.  It's not just simply a matter of giving him a

14  pill and hoping that his desires go away.  There's a whole

15  treatment protocol that goes along with this.

16           THE COURT:  I see.  Well, that's a good response.

17  But the big issue is, it's not -- that issue, I don't

18  understand why that's medical and not psychological, I guess

19  maybe --

20           MR. MILES:  It's medical because there's a

21  physical cause as opposed to a cause based on a mental

22  condition, which is --

23           THE COURT:  You're talking about like too much

24  hormones or something of that sort?

25           MR. MILES:  Right, correct.

1          THE COURT:  All right, so that's saying you can't

2     get a psychiatrist who's really going to know enough about

3     that because he's thinking more here as opposed to what his

4     hormone levels are.  Is that what the issue is?

5          MR. MILES:  No.  I think a psychiatrist would

6     be --

7          THE COURT:  Why can't I get one psychiatrist who

8     can do them both?  You know what I mean?  You want me to

9     split it into two.

10          MR. MILES:  Right, and the reason I want you to

11     split it into two is because I have a doctor who is an

12     expert in the antiandrogen treatment and therapy, and I've

13     got a psychologist who's an expert in the assessment of

14     volitional --

15          THE COURT:  Why isn't that the remedy phase, if

16     you will, the what happens, what's adequate medical

17     treatment?  That's what stopped me last time.  In other

18     words, if you were to tell me this man, hypothetically, has

19     a brain tumor and that's creating an inability of him to

20     control his impulses, I'd have to say to her, yeah, maybe

21     you deserve two here; and one is psychological and one is

22     he's got a brain tumor, and you can't expect a shrink to

23     know you need a neurosurgeon.

24          MR. MILES:  Right.

25          THE COURT:  But here I don't know why what the

1    treatment is going to be, if she's right that it's part of a

2    treatment regime, why that's relevant to what's happening

3    right now.

4            MR. MILES:  It's relevant, your Honor, because,

5    again, the interpretation of the statute that I would urge

6    upon the Court is that the respondent can't be committed

7    unless there's a current loss of volitional capacity.  If

8    the volitional capacity can be restored or enhanced so that

9    there is no current loss of volitional capacity, then I

10   would submit there's a constitutional imperative not to

11   commit him.

12           THE COURT:  Let me ask you this.  I don't know

13   anything about your case.  Everyone originally urged me to

14   make you the bottom of the barrel in terms of, Wetmore never

15   wanted to go first.  There was apparently a consensus among

16   all these gazillion attorneys that this was going to be the

17   last case.  And I've never looked at it, and I don't know

18   how bad the case is for Mr. Wetmore, okay, because I've

19   never been in the merits of it at all.  But I do wonder

20   whether or not it makes some sense -- I don't know how much

21   worse it can get for him, let me put it this way -- you

22   might know that, I don't, from what they already know -- to

23   have him go through a treatment regime while we're waiting

24   for the Supreme Court, go through having these pills --

25   that's been an ongoing dispute that was raised before -- and

1   see if it makes a difference.

2          MR. MILES:  I would certainly recommend that to

3   him and would urge him to accept that.

4          THE COURT:  Let me ask you this because I really

5   have never gotten into the merits of it, and I have an

6   11:00 o'clock conference, but could you give me a summary of

7   what has he done and what's he been convicted of?

8          MS. PIEMONTE-STACEY:  He has convictions with

9   several minor boys, hands-on offenses.

10         THE COURT:  Like?

11         MS. PIEMONTE-STACEY:  Inappropriate touching.

12         THE COURT:  Like what?

13         MS. PIEMONTE-STACEY:  Fondling the genital area of

14   little boys.

15         THE COURT:  Rapes?

16         MS. PIEMONTE-STACEY:  I don't remember a

17   conviction for rape.  So he has had a history, and he has

18   some probation violations and --

19         THE COURT:  But just give me like --

20         MS. PIEMONTE-STACEY:  The index offense is child

21   porn.

22         THE COURT:  I understand child pornography is

23   really, really serious, but is it a question of him touching

24   someone's buttocks, or is it a question of rape?  Because

25   Shields was rape.

1    MS. PIEMONTE-STACEY:  He had had anal intercourse,

2  I believe, with some, Shields had.

3        THE COURT:  Right.

4        MS. PIEMONTE-STACEY:  I do not have any memory --

5  it was mostly oral sex and fondling.

6        THE COURT:  Is there oral sex?  Oral sex with a

7  young boy is considered a rape.

8        MS. PIEMONTE-STACEY:  Right, but the way the

9  criminal record reads, it's like indecent assault or

10  something to that effect.  And, I'm sorry, I don't have

11  those records in front of me right now.

12        THE COURT:  So how many?

13        MS. PIEMONTE-STACEY:  I have a memory of three or

14  four of those over the years, and then there is some other

15  ones that were charged but not brought in court, that there

16  was a CWOF or there was something, some other resolution of

17  them.  And then with the index offense where they discovered

18  the child pornography on his computer, that was the result

19  of a younger boy complaining that he had been in appropriate

20  sexual contact, again touching, with Mr. Wetmore; and that

21  resulted in a violation of his probation and the seizure of

22  his computer that they found the child porn.  So there's

23  some uncharged conduct as well.  After --

24        THE COURT:  What did the court-appointed expert

25  say?

1          MS. PIEMONTE-STACEY:   That he is sexually

2     dangerous.

3          THE COURT:   He is.   I mean, I haven't even been

4     brought up to date in any of this.

5          MS. PIEMONTE-STACEY:   Yes.   No, sorry, I had to

6     think, like, what did he say?   But it was sexually

7     dangerous, as did the government's expert found him to be

8     sexually dangerous.

9          THE COURT:   Who's your expert this time?

10         MS. PIEMONTE-STACEY:   Dr. Amy Phenix.

11         THE COURT:   Where is she from?

12         MS. PIEMONTE-STACEY:   She has relocated to

13    Washington, I believe, or Iowa, but she is the one who wrote

14    the coding manual for the Static-99.

15         THE COURT:   And you've personally vetted her

16    and --

17         MS. PIEMONTE-STACEY:   Yes.   We shouldn't have --

18    as far as I know, there are no disciplinary issues.   She

19    should be -- she testified in the Carta case, so I've had

20    some experience with her.   She's yet to be deposed.

21         THE COURT:   Are you going to take her deposition?

22         MR. MILES:   Yes, your Honor.

23         THE COURT:   And document discovery issues have

24    been taken care of, so --

25         MS. PIEMONTE-STACEY:   Well, no, so this is the

1   other problem.  The motion to compel was -- we're now beyond

2   the discovery deadline.  I don't have all the documents, but

3   we agree that we're entitled to them.  Attorney Miles is

4   going to get them and give them to the government.  But the

5   government has not taken discovery simply because until

6   November 8, we didn't even have the name of fact witnesses,

7   and so that was the impetus.

8           THE COURT:  But where are we?  Have you turned

9   over all your documents to him?

10          MS. PIEMONTE-STACEY:  Yes, a long time ago.  And

11  so now as of --

12          THE COURT:  When are you going to turn over all

13  your --

14          MR. MILES:  I've turned over everything in my

15  possession, your Honor.  We may have to depose Pharos House

16  and the Maine Department of Corrections to get the other

17  documents that I think have relevant information.  But I

18  haven't seen them myself, so it's --

19          THE COURT:  How many depositions have you taken?

20          MR. MILES:  We took the deposition of --

21          MS. PIEMONTE-STACEY:  Dr. Prentky on two days.

22          MR. MILES:  -- Dr. Prentky on two days, Dr. Renaud

23  at the facility, one of the guards at the facility.  One of

24  the -- I forget Mr. Quiles' title.

25          THE COURT:  Have I set a discovery cutoff yet?

 1              MS. PIEMONTE-STACEY:  You had, and that was why

 2       the government moved for a motion to extend until

 3       January 14.

 4              THE COURT:  Are you content with that?

 5              MR. MILES:  Yes, your Honor.

 6              THE COURT:  All right, I'll allow that but no

 7       more, it should be done, because the Supreme Court is going

 8       to hear argument in January, and some of those people,

 9       speaking about sitting for a long time, I think Comstock is

10       still in jail.  I think Judge Wolf didn't release his

11       person, right?  Am I wrong about that?

12              MS. PIEMONTE-STACEY:  That's right.

13              THE COURT:  I mean, I think they're all except

14       Tauro -- did Judge Tauro?

15              MS. PIEMONTE-STACEY:  No.  Because of the appeal,

16       Mr. Carta is still incarcerated.

17              THE COURT:  I mean, I've moved two of my three,

18       and I just need -- it's been weighing on me.

19              MR. MILES:  Yes, your Honor.

20              THE COURT:  And I'm worried about just starting in

21       June.  I'll try and get him in as soon as the Supreme Court

22       rules, I'll just get it right in.  But, in any event, we're

23       quite sure that they'll rule by the end of June, so we'll

24       have a July trial.

25              MR. MILES:  Right, our intention has been to get

b96dd756-8da2-44fd-bfdf-76dc5fe5a30b

1   this case tried as soon as the Comstock case comes down,

2   assuming that it upholds the statute.

3         THE COURT:  And I give it up to him to say if at

4   any time -- I mean, it should only be a week-long trial,

5   maybe two, but it's not a big deal.

6         MR. MILES:  Right.

7         THE COURT:  And so I am happy to incur whatever

8   expense to at least have it tried, and then I'd hold writing

9   the opinion just to have it ready to go.  You know, just --

10        MR. MILES:  Yes, your Honor.

11        THE COURT:  He might not want a finding -- neither

12  of you might want a finding one way or another, but we could

13  at least get it tried.

14        MR. MILES:  I'll talk to him about that

15  alternative, your Honor.

16        THE COURT:  And then whatever the Supreme Court

17  does, I just -- you know, it will take me a couple of months

18  to write an opinion.  So, anyway, it's a thought.

19        MR. MILES:  Yes.  My only thought in response to

20  that thought is, again, on the state side, I've been through

21  the segmented trial routine, and I have been through the

22  long periods between the hearing and the ultimate rulings

23  and findings, and I have discomfort with that because, to be

24  very frank about it, I think sometimes judges forget some of

25  the facts or some of the demeanor and other imponderables.

b96dd756-8da2-44fd-bfdf-76dc5fe5a30b

1        THE COURT:  I couldn't agree with you more, so I'd

2   try and do it within three months.  I absolutely agree with

3   that.  But I don't think that happened.  I think both

4   Shields and Peavy I was able to resolve within a few months.

5   And in fact let me mention Shields.  We're up at about a

6   year, aren't we?

7        MS. PIEMONTE-STACEY:  We have a status report due

8   in this court in February, I believe?  Yes, we're up at a

9   year, and the Bureau of Prisons is aware that another status

10  report is due.

11       THE COURT:  I just wanted to make sure because

12  that's part of the importance of these.

13       MS. PIEMONTE-STACEY:  Yes, I have it diaried and

14  have kept in touch.

15       THE COURT:  Okay, and thank you very much.  I

16  really have no problem with a status like this your coming

17  in.  I've authorized the Daubert, and I've authorized your

18  court-designated person, and I am going to think about the

19  hormone issue.

20       MR. MILES:  Thank you, your Honor.

21       THE COURT:  So you can get going on two of them.

22  The discovery deadline is continued till January 15.  And

23  just so you all don't forget, by January 15, write me a

24  letter as to whether or not you really still want to wait.

25       MR. MILES:  Yes, your Honor.

1       THE COURT:  You know, it's the holiday season.  I

2  believe he's been in jail now without a resolution two years

3  anyway, right?

4       MR. MILES:  Yes.

5       MS. PIEMONTE-STACEY:  It's an '07 case, your

6  Honor.

7       THE COURT:  You know, a lot of that has been by --

8  all of it has been by agreement, but from my point of view,

9  at some level -- talk about forgetting -- you forget, okay?

10      MR. MILES:  Yes.

11      MS. PIEMONTE-STACEY:  And, your Honor, I was not

12  clear when I talked about the -- the discovery deadline that

13  the government had requested for January 14 or 15 was fact

14  discovery.  Since I don't even know who the experts are,

15  it's inconceivable that I could get them in.

16      THE COURT:  Well, why don't you sit down right now

17  and talk about the whole thing.  Fact discovery by the 15th,

18  designation by, you know, February 15, depositions by

19  whatever, and build us up to June, subject to, of course, a

20  sooner Supreme Court decision.  Okay?

21      MR. MILES:  Yes, your Honor.

22      THE COURT:  So just sit down right now and

23  negotiate it, send it, and I'll do it, okay?

24      MS. PIEMONTE-STACEY:  Thank you, your Honor.

25      THE COURT:  Okay, good.

1           THE CLERK:   Court is in recess.

2           (Adjourned, 10:48 a.m.)

3                C E R T I F I C A T E

4

5

  UNITED STATES DISTRICT COURT )
6 DISTRICT OF MASSACHUSETTS    ) ss.
  CITY OF BOSTON               )
7

8

9           I, Lee A. Marzilli, Official Federal Court

10 Reporter, do hereby certify that the foregoing transcript,

11 Pages 1 through 33 inclusive, was recorded by me

12 stenographically at the time and place aforesaid in Civil

13 Action No. 07-12058-PBS, United States of America v. Joel

14 Wetmore, and thereafter by me reduced to typewriting and is

15 a true and accurate record of the proceedings.

16           In witness whereof I have hereunto set my hand

17 this 14th day of October, 2011.

18

19

20

21

22           /s/ Lee A. Marzilli
                _____
23              LEE A. MARZILLI, CRR
                OFFICIAL COURT REPORTER
24

25