IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,          )
                                   )
              Petitioner           )
                                   )
       -VS-                        ) Civil No. 07-12058
                                   ) Pages 1 - 28
JOEL WETMORE,                      )
                                   )
              Respondent           )



STATUS CONFERENCE


BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE







United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
January 28, 2010, 11:04 a.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S:

2        EVE A. PIEMONTE-STACEY, ESQ. and RACHAEL S. ROLLINS, ESQ.,
     Assistant United States Attorneys, Office of the United States
3    Attorney, 1 Courthouse Way, Boston, Massachusetts, 02210,
     for the Petitioner.

4
         HARRY L. MILES, ESQ., Green, Miles, Lipton, White &
5    Fitz-Gibbon, 77 Pleasant Street, Northamptom, Massachusetts,
     01061-0210, for the Respondent.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2         THE CLERK:  The case of the United States v. Joel

3    Wetmore, Civil Action No. 07-12058, will now be heard before

4    this Court.  Will counsel please identify themselves for the

5    record.

6         MS. PIEMONTE-STACEY:  Good morning, your Honor.  Eve

7    Piemonte-Stacey for the United States.

8         MS. ROLLINS:  Rachael Rollins for the United States.

9         MR. MILES:  Good morning, your Honor.  Harry Miles for

10   Mr. Wetmore.

11        THE COURT:  Thank you for driving in.  I'm ready to

12   put this case back on track.  The First Circuit has upheld the

13   statute, I've read the colloquy with the Supreme Court; and

14   while Justice Scalia could persuade the whole crew, it looked

15   as if there was a majority for upholding it.  I've been

16   waiting, I mean, years at this point.  This is not the

17   government's fault in that Mr. Wetmore fired his earlier set of

18   lawyers.  We're very lucky to have a new attorney in here.

19   Mr. Wetmore himself has agreed to wait, but at this point there

20   seems to be no reason to.

21        I want to just jump start it because I haven't focused

22   on it.  What's left to be done?  When can we set a trial date?

23   It doesn't have to be tomorrow, but I just want to just get

24   this on track at this point.

25        MS. PIEMONTE-STACEY:  Your Honor, the government has a

1    proposed scheduling order prepared for today, and we've

2    conferred with Attorney Miles outside.

3            THE COURT:  You all agree?

4            MR. MILES:  Yes, your Honor.

5            THE COURT:  All right, so when does it put the trial?

6            MS. PIEMONTE-STACEY:  It puts the trial at July, which

7    is what this Court previously asked, given -- you know, prior

8    to reading this colloquy.

9            THE COURT:  Why?  Why do I need July?

10           MS. PIEMONTE-STACEY:  Well, you had thought that the

11   Supreme Court would make its final decision by --

12           THE COURT:  No, but I don't care about -- at this

13   point, the First Circuit has affirmed the statute.  July puts

14   it at six more months.

15           MS. PIEMONTE-STACEY:  I'm on vacation in August, so I

16   am pleased to move it up.  You know, that's not the issue.

17           THE COURT:  It's just we don't need to.  We've been in

18   discovery.  We now have the independent expert's report, right?

19           MS. PIEMONTE-STACEY:  Yes, your Honor.

20           THE COURT:  And what is his bottom line?

21           MS. PIEMONTE-STACEY:  He finds Mr. Carta sexually

22   dangerous and --

23           THE COURT:  I think Mr. Wetmore?

24           MS. PIEMONTE-STACEY:  Did I just say -- oh, I'm sorry.

25   It's Wetmore.  I apologize.  I'm not feeling well.

1          MR. MILES:  I'm happy with that result, your Honor.

2          MS. PIEMONTE-STACEY:  I'm sorry.

3          THE COURT:  And do you have a second expert?

4          MS. PIEMONTE-STACEY:  We do.  The government has an

5     expert, Dr. Amy Phoenix, who also finds him sexually dangerous.

6          THE COURT:  And do you have your expert all set?

7          MR. MILES:  I have Dr. Winsmann primed to go, I have

8     Dr. Plaud on a potential Daubert motion, and we still have to

9     discuss Dr. Saleh.  The Court denied my motion for --

10         THE COURT:  You're going to have three experts?  Not

11    three experts.  Three experts?

12         MR. MILES:  Two for the trial, one for the Daubert.

13         THE COURT:  Well, let's just start talking because

14    we're not doing this in March.  I mean, I was thinking along

15    the lines of not July, May.  I want to get this done.  It's

16    been too long.  And all the documents have been produced,

17    right?

18         MS. PIEMONTE-STACEY:  Yes.

19         MR. MILES:  Yes, with the exception of expert reports.

20    I don't have those yet.

21         MS. PIEMONTE-STACEY:  And so that's the delay.  The

22    government has had no opportunity to do any expert discovery.

23    We have no expert disclosures from the respondent.

24         THE COURT:  Well, do it.  When can you do the expert

25    disclosures for the ones you have?

1        MR. MILES:  I'm sorry, your Honor?

2        THE COURT:  Have you given them your expert report?

3        MR. MILES:  No, I have not.

4        THE COURT:  When are you going to do it?

5        MR. MILES:  I don't know.  I have to talk to

6   Dr. Winsmann and see when he can --

7        THE COURT:  You know, but you've got to get this

8   going, so, like, within 30 days give me an expert report.  So

9   Winsmann is who?  What does he say?

10        MR. MILES:  He's a psychologist.  He hasn't evaluated

11   Mr. Wetmore yet.

12        THE COURT:  He's got to do it now.

13        MR. MILES:  Yes, I understand, your Honor.

14        THE COURT:  So we don't have a -- I'm assuming,

15   because you've hired him, that you at least think there's some

16   chance he's going to say "not sexually dangerous."

17        MR. MILES:  That's correct.

18        THE COURT:  Okay, so Winsmann, so you'll give me a

19   report within 30 days.  Who's the second expert?

20        MR. MILES:  The second expert at trial would be

21   Dr. Saleh.

22        THE COURT:  Who's Saleh?

23        MR. MILES:  Dr. Saleh would be on the medical side of

24   the equation.

25        THE COURT:  Which means what?  Is he -- I forget.  You

1  had told me, and I don't remember.

2          MR. MILES:  I'm sorry, let me start back.  As I

3  analyze this case, your Honor -- and I'll tell you right up

4  front it's my analysis, so it has no scientific authenticity to

5  it --

6          THE COURT:  Fair enough, but you've done these cases

7  before.

8          MR. MILES:  Yes -- the case really comes down to two

9  very different prongs.  The normal prong, number one, would be

10  the psychological prong:  A psychologist evaluates the

11  respondent and comes to a conclusion as to whether or not the

12  respondent is sexually dangerous under the federal statute.

13  That would be Dr. Winsmann, and that would be a fairly standard

14  evaluation.

15          The second prong in this case arises for two reasons.

16  The second prong is a medical prong, and the medical prong

17  involves the use of drugs to control the respondent's impulses.

18  The reason it arises in this case --

19          THE COURT:  But we've been through this in other

20  cases.  Isn't that for treatment rather than for whether he's

21  mentally ill?  Is that the one I refused to allow an expert on?

22          MR. MILES:  Yes, your Honor.

23          THE COURT:  I'm just going to stay there.  I don't

24  know if the case law has moved in other jurisdictions and you

25  want to bring anything new to my attention, but I'm assuming

1    you're referring to chemical castration?

2           MR. MILES:  That's correct.

3           THE COURT:  And there was actually just something

4    in -- I get the defense lawyers' magazine because I used to be

5    Chair of Defender Services.  I mean, there was something about

6    that as a possible treatment regimen, but it's not whether he's

7    mentally ill.

8           MR. MILES:  Well, the question is whether -- let me go

9    back a step.  Your Honor, as I understand the statute, as in

10   every statute, there are a series of elements that have to be

11   proven.  The government must prove that Mr. Wetmore is not only

12   mentally ill but that there is a causal relationship between

13   the mental illness and the lack of control over sexual

14   impulses.

15          THE COURT:  Right.

16          MR. MILES:  If that is true, then my assertion to the

17   Court is that proof of mental illness and lack of control over

18   sexual impulses is not sufficient.  Therefore, I can attack the

19   causal relationship.  If I am attacking the causal

20   relationship, I can then bring in a doctor to say, if this man

21   is given drugs, there will be no causal relationship between

22   his mental illness and his sexual activity.

23          THE COURT:  Well, let me put it this way:  If you want

24   to move for reconsideration, you can do it.  I'm unlikely to

25   grant it unless there's some case law or something that's come

1    out that I don't know about, because I've hit this issue before

2    with this case.  And I may well end up ordering the government

3    to do this on a treatment regimen, but it's not the -- it's

4    whether he without outside intervention -- this issue came up

5    under Shields, which is whether these very excellent conditions

6    of supervised release, you know, where they did cognitive

7    therapy and supervision by a probation officer and the like,

8    whether that was enough.  That's sort of similar to a chemical

9    castration, and it may be enough eventually once he gets out,

10   you know, if I find he's sexually dangerous.

11           MR. MILES:  If I might interject, your Honor.

12           THE COURT:  Yes.

13           MR. MILES:  The question of whether or not he gets out

14   is a question of whether or not he can control his impulses

15   without being confined to a secure facility.  If his impulses

16   can be controlled internally, then the courts generally accept

17   that he's not sexually dangerous.  If his impulses can be

18   controlled, I contend, by the use of some kind of external

19   force -- whether it be probation, whether it be cognitive

20   behavioral therapy, whether it be drugs -- then that eliminates

21   the need for commitment to a secure facility.  If that is true,

22   then I argue it would logically follow that he's not sexually

23   dangerous --

24           THE COURT:  Well, I understand.  If you want to move

25   for reconsideration, you can.  I'm just --

1        MR. MILES:  Sure.

2        THE COURT:  And you can argue for chemical castration.

3   Jeez, I mean, it's just such a -- is that something that -- let

4   me putting it bluntly, is that a resolution that is short of

5   trial, if you will?

6        MS. PIEMONTE-STACEY:  That's exactly where we were at

7   when Mr. Wetmore decided he wanted new counsel.  So we were

8   coming up with -- in other words, you can't just chemically

9   castrate someone.  You can't just give them the pill, and then

10  suddenly they don't have these urges anymore.  It is a whole

11  treatment regimen which includes a psychological evaluation,

12  sex offender treatment program; and then this castration, this

13  chemical piece, is part of the whole regimen.  He is refusing

14  while this is pending to attend sex offender treatment program.

15  And so you can't just treat part of it, the chemical piece, but

16  then not treat the cognitive and the behavioral piece.

17       THE COURT:  Well, have you been settling these cases

18  across the United States?  If someone agreed to cognitive

19  therapy, sex offender treatment kinds of things, and chemical

20  castration, is that, short of incarceration, something you've

21  been settling?

22       MS. PIEMONTE-STACEY:  Well, I don't know of any that

23  have settled under those conditions, but in this --

24       THE COURT:  If "settling" is the right word.  See, I

25  don't think I can order him to take it unless I find that he

1   is --

2          MS. PIEMONTE-STACEY:  Is dangerous.

3          THE COURT:  -- is dangerous.  I mean, that's such an

4   extreme thing for me to do unless there's a finding.

5          MS. PIEMONTE-STACEY:  And that's where we were at

6   prior because --

7          THE COURT:  Yes, we've been here, done that.  So, I

8   mean, the thing is, at the end of the day, I don't know that

9   any court in the country has ever ordered that short of a

10  finding of sexual dangerousness.

11         MR. MILES:  Right.  If I may, your Honor, I have to

12  confess ignorance.  This is my first federal case of this

13  nature.  On the state side, things don't settle.  There is no

14  provision for a settlement short of --

15         THE COURT:  Well, there may not be.  In other words, I

16  can't order sexual castration -- it's such a hard thing for me

17  to get out of my mouth -- unless I find he's sexually

18  dangerous.  We've been through this, although I agree I'd like

19  to experiment with it because it's cheaper for everyone and

20  less restrictive if for the rest of someone's life they got a

21  shot by court order, once a week they come in and no longer has

22  it, but I can't order it.

23         MR. MILES:  Well, if I may, your Honor, it's my

24  understanding from Mr. Wetmore that he would be willing to

25  engage in it.  Now, if it requires a finding of sexually

1   dangerous --

2          THE COURT:  Then that's like a settlement.

3          MR. MILES:  Yes, I could talk to him about --

4          THE COURT:  If there's a settlement, I don't see any

5   reason why this can't settle with the package like he's talking

6   about; but it's not relevant to me because I can't order it

7   unless I find him sexually dangerous, so that's why it's

8   irrelevant to me.  So that's why -- I don't want to keep going

9   around on the same thing -- I don't see why these cases can't

10  settle if basically your expert comes back -- I know nothing

11  about Wetmore.  I mean, really, I've had nothing.  If your guy

12  comes back and says, "Yeah, he's sexually dangerous," maybe

13  you'd want to agree to some sort of "for the rest of his life"

14  kind of thing with chemical castration, cognitive therapy, and

15  sex offender treatment, and we'd work something out.  I don't

16  see why that I have to do something, right?

17         MR. MILES:  Your Honor, a great light just shown upon

18  me.  This is the first time I've ever heard that this was a

19  possibility.  I can certainly talk to Mr. Wetmore about

20  agreeing to a finding of sexual dangerousness with a component

21  that he gets appropriate treatment, some of which may consist

22  of chemical treatment and some of which may consist of

23  cognitive behavioral, and if the government agrees with the

24  package, then the case goes away.

25         THE COURT:  Yes, maybe, but that's why I have deemed

1    it irrelevant because I can't do anything about it.  And so

2    right now we've got -- just because I've had -- Mr. Wetmore has

3    fired his prior attorneys.  He's sort of resisted going to

4    trial.  I mean, I don't know him.  I don't know what his record

5    is.  I know nothing about the man, but I do know one thing:

6    The First Circuit has upheld the constitutionality.  I have

7    personally read the Supreme Court transcript.  I think there's

8    one Justice who has very serious concerns about federalism, but

9    most did not.  And he always writes so well and is so

10   persuasive, maybe he'll persuade the rest, but right now I've

11   got to get to this trial.

12         So you've got the one doctor.  You're going to get the

13   report by the end of the month.

14         MR. MILES:  Right.  I'll file the motion for

15   reconsideration on Dr. Saleh.

16         THE COURT:  But right now I'm not going to grant it

17   because I don't see it as an option unless I can order it.

18   That's the merry-go-round.  And there was a third expert.

19         MR. MILES:  Dr. Plaud.

20         THE COURT:  And what's that on?

21         MR. MILES:  Dr. Plaud would be testifying on a Daubert

22   hearing with respect to the diagnosis that Dr. Prentky and

23   Dr. Phenix gave of essentially hebephilia.  That is, that --

24         THE COURT:  So it's probably something NOS?  I forget,

25   paraphilia NOS, which the First Circuit just said -- the case's

1   name I forget but --

2         MR. MILES:  Carta.

3         MS. PIEMONTE-STACEY:  It was Carta.

4         THE COURT:  Carta, that it came back.  So I suppose I

5   do need to do a Daubert hearing on it, unless there's a record

6   that I can grab from another session.

7         MS. PIEMONTE-STACEY:  Right, but, your Honor, I think

8   the Daubert hearing is something -- I think this is evidence

9   that you can take at trial in terms of the diagnosis where you

10  have two experts testifying.  I mean, the Daubert hearing would

11  be more to the methodology, not a diagnosis.  And so the

12  government has consistently opposed Daubert hearings on the

13  actual -- we're talking about the diagnosis of three doctors or

14  two doctors and whether paraphilia NOS --

15        THE COURT:  Well, since I think I'm going to do this

16  without a jury, we can fold the Daubert hearing into the main

17  trial; but I might hear from Dr. Plaud if he thinks it's not a

18  generally acceptable methodology.  I mean, I might hear from

19  him.  So when can you give that report on that?

20        MR. MILES:  That can come within 30 days.

21        THE COURT:  Okay.  So let me just ask you.  So like

22  with -- is it Shields?

23        MS. PIEMONTE-STACEY:  That we tried here, your Honor?

24        THE COURT:  Hebephilia was part of it, but I didn't

25  need to get to it because he also had pedophilia.

1          MS. PIEMONTE-STACEY:  That's right, your Honor.

2          THE COURT:  So it was a straight-up pedophilia case

3    that got tried to me and the jury.  So what's the issue here?

4    Is Wetmore attracted to little children or adolescents?

5          MS. PIEMONTE-STACEY:  What the court examiner has

6    found is that there's clear evidence of pedophilia in his past,

7    but that his diagnosis most appropriately as he is today would

8    be paraphilia NOS with the descriptor of hebephilia.

9          THE COURT:  So what does that mean?

10         MS. PIEMONTE-STACEY:  You know, twelve-,

11   thirteen-year-old adolescent kids, boys.

12         THE COURT:  And what does he do to them?

13         MS. PIEMONTE-STACEY:  Well, his convictions have been

14   mostly fondling.  There are a number of charges.  His

15   convictions that I think are okay are unlawful sexual contact,

16   touching a male minor, gross sexual misconduct for assaulting a

17   male minor.  It's mostly groping.  I don't know of any

18   intercourse, actual intercourse.

19         THE COURT:  So in some ways it's a less serious record

20   than Shields, who actually raped.

21         MS. PIEMONTE-STACEY:  Yes, Shields did actually rape,

22   and they were younger children.

23         THE COURT:  Has he ever actually raped?

24         MS. PIEMONTE-STACEY:  His governing offense is child

25   pornography, NIC, gross sexual conduct, and unlawful sexual

1    conduct.  Those at least are on the convictions.

2         THE COURT:  Well, maybe the government would be

3    interested in resolving it.  I had been under the impression --

4    is he the one who was drawing penises in the jail cell?

5         MS. PIEMONTE-STACEY:  Yes, your Honor.  I was going to

6    say, in addition, the difference between him and Mr. Shields is

7    that Shields had no disciplinary issues really while

8    incarcerated; and here he had issues with sexual contact with

9    other inmates, and he also has a charge, a disciplinary

10   proceeding for cutting out penises and pasting them onto

11   pictures of young boys.  And so he's got a different kind of

12   record that most --

13        THE COURT:  Well, it's interesting, he's got a more

14   persistent record of, whatever you're going to call it,

15   paraphilia NOS, if it falls within that; but the extreme ends

16   of the conduct are not as severe, is that right?

17        MR. MILES:  If I may, your Honor?

18        THE COURT:  In other words, it's not a rape?  Is

19   that --

20        MR. MILES:  Yes, but the point is that the imagery

21   charge, the disciplinary charge is sharply disputed.  And we

22   just deposed two roommates of his who said that there was

23   enmity between Mr. Wetmore and another roommate, who

24   Mr. Wetmore contends put the stuff there to get him in trouble;

25   and the two deponents both agreed that they'd never seen

1    Mr. Wetmore with inappropriate images of any kind, so --

2           THE COURT:  Who?  The deponents meaning the roommates?

3           MR. MILES:  Yes.  They were roommates of his.

4           THE COURT:  So that they're just basically disclaiming

5    it now?

6           MR. MILES:  That's correct.

7           MS. PIEMONTE-STACEY:  I mean, well, your Honor, what

8    they said is, they don't know whose it was.  They don't know if

9    it was Wetmore's, they don't know if it was planted, but they

10   saw the officer come in, do the search, pull the stuff out from

11   under Mr. Wetmore's bunk, say, you know, "This is what I was

12   looking for," and leave.

13          THE COURT:  Was there a disciplinary hearing?

14          MS. PIEMONTE-STACEY:  There was a disciplinary, he

15   lost good time, and the challenge to that would be under a

16   habeas proceeding.  I mean, at the end of the day, these guys

17   couldn't give the name of anybody during the disciplinary

18   proceeding, or wouldn't.

19          THE COURT:  Were these other guys in there for sex

20   crimes?

21          MS. PIEMONTE-STACEY:  Yes.

22          THE COURT:  So it's a fact dispute, okay.  The other

23   guys are sex offenders too?

24          MS. PIEMONTE-STACEY:  Uhm --

25          THE COURT:  The two roommates?

1        MS. PIEMONTE-STACEY:  There were eight of them in the

2   bunk area.  One I know has a child pornography charge, and,

3   yes, one of them is Mr. Swarm, actually, who's up for civil

4   commitment under the Adam Walsh Act.

5        THE COURT:  Not me, right?

6        MS. PIEMONTE-STACEY:  Not you.

7        THE COURT:  I only have these three, right?

8        MS. PIEMONTE-STACEY:  That's it, your Honor.

9        THE COURT:  Was Judge Tauro's case redrawn?

10       MS. PIEMONTE-STACEY:  No, because the Carta case, you

11  mean the one that the First Circuit -- they sent it back to him

12  for further factual finding on the third prong.  So he didn't

13  reach that finding that we had failed to meet our burden on the

14  second prong, the hebephilia piece.

15       THE COURT:  All right.  All right, well, that's a nice

16  little fact issue, so I'll worry about it then.  So you'll

17  probably have to bring in the guard and the two guys.  So how

18  long a trial is this?

19       MS. PIEMONTE-STACEY:  I would say about the same as

20  Shields.  In ten days we did Shields, but that was with a jury,

21  so I think that can compress.

22       THE COURT:  I'm not going to do a jury.  I'm going to

23  fold the whole Daubert thing into the -- it just seems more

24  efficient at this point.

25       MS. PIEMONTE-STACEY:  We tried Carta in three or four

1    days, so somewhere between a week?

2          THE COURT:  So, Robert, when can we do a week?

3          MS. PIEMONTE-STACEY:  Would you go on a 9:00-to-1:00

4    schedule, your Honor?

5          THE COURT:  Yes.

6          MR. MILES:  I'd say probably five days would be an

7    estimate.

8          THE COURT:  Sometime in May, we'll do something in

9    May, maybe between the First Circuit Judicial Conference and

10   the Federal Circuit because a bench trial, and then if we don't

11   finish, I can --

12          (Discussion between the Court and Clerk.)

13          THE COURT:  Like May 3?  May 3?

14          MS. PIEMONTE-STACEY:  The government is available,

15   your Honor.

16          MR. MILES:  It's my birthday and anniversary on May 4

17   and 5, your Honor.  I was hoping to go --

18          THE COURT:  Were you planning on being away?

19          MR. MILES:  I was hoping to be, but I can move it, so

20   May 3 is okay.

21          THE COURT:  May 10?

22          MS. PIEMONTE-STACEY:  Your Honor, May 10 is fine.

23   I'll just note that the First Circuit Conference is on May 13

24   and 14.

25          THE COURT:  Right, but when it's bench, I'm just going

1  to jump right over it.  I'll just keep doing it because it may

2  be that it's more truncated.  And one possibility also would be

3  to start it on May 3.  When's your birthday again?

4          MR. MILES:  May 4, and my anniversary is May 5.  We

5  got married on the day after my birthday, so --

6          THE COURT:  If it's bench, we could start on May 6.  I

7  mean, you know, so I don't need to start it on a Monday.

8          MS. PIEMONTE-STACEY:  We're available, your Honor.

9          THE COURT:  May 6 sound okay to you?

10          MR. MILES:  Well, if we were going to go away, we'd go

11  away from the 3rd --

12          THE COURT:  Oh, you're going to go away the whole

13  weekend.

14          MR. MILES:  Yes.

15          THE COURT:  Well, since it's bench, we can do May 10,

16  I'll go a couple of days, we'll jump over the First -- and then

17  I have to be down at the Federal Judge Association Conference

18  in Washington, so it just may be truncated.

19          THE CLERK:  May 10 at 9:00 a.m., final pretrial on

20  May 3 at 2:00 p.m.?

21          MR. MILES:  Again, May 3 is a problem for me.

22          THE COURT:  May 3 is his problem.

23          THE CLERK:  I thought it was the 4th on.

24          MR. MILES:  Well, yes, but if we go away, we'd go

25  away --

1          THE COURT:  For the week.

2          MR. MILES:  -- probably the weekend before too.

3          THE CLERK:  Then the final pretrial would be April 27

4     at 2:00 p.m.

5          THE COURT:  So let's just figure this out.  So I'm

6     going to fold the Daubert hearing into it.  I will have no

7     separate Daubert hearing.  I'm going to give you a pretrial

8     order now so that you can file any motions in limine.  For the

9     bench trial, I don't really need to deal with them so much in

10    advance.  I'll fold them into the discussion of the thing.

11         I'm going to assume that any discovery, your expert

12    will be within 30 days, both expert reports.  So that would be

13    the end of February, so any depositions of them should be the

14    end of -- what do you want to say, April 15 so you have time to

15    prepare for trial?  Does that make sense?

16         MS. PIEMONTE-STACEY:  Yes.  Thank you, your Honor.

17         THE COURT:  Any depositions should be -- all fact

18    discovery should be done April 15.  And I'm assuming all

19    documents have now -- that Judge Dein has taken care of

20    everything, and no more -- we're only talking at this point is

21    expert discovery.  That's the only thing left.  Have you taken

22    their experts' depositions?

23         MR. MILES:  No.  I've taken Dr. Prentky's deposition.

24    I have not taken Dr. Phenix's.

25         THE COURT:  Will you want to?

1      MR. MILES:  I will.

2      THE COURT:  Okay, all expert discovery should be done

3   by April 15.  In fact, all fact discovery should be done by

4   now, and so I'm only opening up expert discovery at this point.

5      MS. PIEMONTE-STACEY:  Right, your Honor.  The only --

6   as you know, the government has moved more than once for

7   documents from the respondent, and it's my understanding that

8   the respondent is still trying to obtain some documents

9   regarding fact discovery that the government does not have yet,

10  so --

11     THE COURT:  You know, that's why I'm doing this.  When

12  can you introduce it all?

13     MR. MILES:  It's just a question of getting it out of

14  the agencies.  I'm looking for probation records, your Honor.

15     THE COURT:  It's got to be done.  So, like, probation

16  for this guy, for Wetmore?

17     MR. MILES:  Yes.

18     THE COURT:  Or for the --

19     MR. MILES:  Yes, his probation through the -- he was

20  convicted of offenses in the state of Maine and was on

21  probation in Maine.

22     THE COURT:  Why does he have to -- are you planning on

23  using it?

24     MR. MILES:  I'm sorry?

25     THE COURT:  Why does he have to go get them?

1    MS. PIEMONTE-STACEY:  What he did in his automatic

2    disclosure was listed the name of a witness, Rene Moore -- I

3    believe she testified in the Shields case actually -- and

4    indicated she may have records.  I don't have any of those.  I

5    don't have access to her.  I don't have access to his records.

6    They won't produce them to us because many of them are

7    confidential.  So that was one of the issues.

8         THE COURT:  Do you have them in your possession?

9         MR. MILES:  I do not.

10        THE COURT:  So why don't you just sign a waiver of the

11   confidentiality, and then you can try and get them too.

12        MR. MILES:  Fine.

13        THE COURT:  That would be another way of doing it.  If

14   you want them, subpoena them, you waive confidentiality or I'll

15   give a court order, and that's how we can do it, if you really

16   want them.  Of course, if you're going to use them, you have to

17   produce them.

18        MR. MILES:  Right.  Well, Rene Moore is somebody I

19   can't find.  She seems to have disappeared.

20        THE COURT:  Really.

21        MR. MILES:  And she was a therapist at, I think it was

22   Pharos House?

23        MS. PIEMONTE-STACEY:  I gave him all the information I

24   had on her.

25        THE COURT:  This is an up-in-Maine person?

1        MR. MILES:  Yes.

2        THE COURT:  Why aren't these being tried in Maine?

3        MS. PIEMONTE-STACEY:  Well, I think it was here we

4   committed him.  They were in Devens, and then we filed the

5   actions here, I guess.

6        THE COURT:  I know, but --

7        MS. PIEMONTE-STACEY:  And then, of course, the bulk of

8   them, sixty plus, went to North Carolina where they were --

9        THE COURT:  Where hopefully they will stay.

10        MS. PIEMONTE-STACEY:  Which as far as I know, the rest

11   of them are there.

12        THE COURT:  And we're not getting another influx, no

13   matter what, through Devens?

14        MS. PIEMONTE-STACEY:  I'm afraid to say "no matter

15   what," but I don't know of any.  We've checked.

16        THE COURT:  So this should be the last of mine.  For

17   some reason I got the first three.  You do this for a living

18   but --

19        MR. MILES:  No, actually, your Honor, I do it almost

20   pro bono because they don't pay very well on the state side for

21   this stuff.  I just don't like the statute.  I think it's a

22   very bad statute, and I essentially donate my time.

23        THE COURT:  Well, thank you for your time.  The

24   federal government pays pretty well.

25        MR. MILES:  You know, I don't even know what the

1    federal rate is anymore.

2          THE COURT:  It was just upped to $125.

3          MR. MILES:  Oh, because I took my name off the CJA

4    list in Springfield.

5          THE COURT:  They just increased the rate.  Anyway, I

6    think that's a fair living wage, particularly in Springfield, I

7    mean, in terms of attorneys' fees.  Are we all set?

8          MR. MILES:  Oh, that reminds me.  May I submit another

9    interim bill?

10         THE COURT:  How long has it been since you submitted

11   the last one?

12         MR. MILES:  It's been at least six months, if not

13   more.

14         THE COURT:  I think I approved interim billing, didn't

15   I?

16         MR. MILES:  Yes, you did.

17         THE COURT:  Yes, I will.

18         MR. MILES:  Thank you.

19         THE COURT:  And then I think in terms of -- I can't be

20   in the middle of plea negotiations in a criminal case, but this

21   is a civil case, and I think that one creative way of trying to

22   deal with it would be to talk about whether there were

23   conditions of release --

24         MR. MILES:  Would it be appropriate to have a

25   mediation session before a magistrate?

1        THE COURT:  No.  I think that this would be beyond.

2   Just talk about what would protect the public safety.  In other

3   words, has it happened that someone's agreed that they're

4   sexually dangerous and agreed to a pattern of cognitive and

5   sexual together with chemical castration?  I mean, that's not a

6   stupid way of approaching these things at all.

7        MS. PIEMONTE-STACEY:  No, and we had the stipulation

8   drafted, your Honor, and, again, it was exactly at that point

9   that Mr. Wetmore then moved to get new counsel.  So I --

10        THE COURT:  We're doing it this time.  If he fires

11   you, he's going by himself because this has already put this

12   thing back by months.

13        MS. PIEMONTE-STACEY:  And that's why I hesitate.  I

14   mean, we were there.  We were discussing would he stipulate to

15   dangerousness, so --

16        THE COURT:  I don't know if it's doable on the state

17   court side because -- but I don't know.  I mean, I don't know

18   who the underlying -- can I ask you this question.  I don't

19   know this question, and you're a civil lawyer, so you may not

20   know either:  Can you give supervised release from a crime for

21   life?

22        MS. PIEMONTE-STACEY:  You know, I think you can, and I

23   say that simply because I believe that under certain crimes

24   now, there is a lifetime supervision.  I don't know what case

25   I've just read --

1          THE COURT:  Well, I'm sort of wondering -- I don't

2     know who the sentencing judge was in Maine -- but if you had

3     lifetime supervision, subject to these treatments, whether that

4     was feasible.  So it's just a thought.  I don't know.  I don't

5     know enough about the case.  Maybe I'll find that he's not

6     sexually dangerous, I mean, so I don't know enough about -- I

7     don't know if the diagnosis sticks.  And, as you say, he didn't

8     rape; he groped.  But at the end of the day, maybe he didn't

9     draw these pictures, maybe the inmate did, but it's at least

10    something that I am bringing to trial enough, so hopefully --

11         So I'm not going to schedule mediation.  It's up to

12    the two of you to speak.  I mean, I'm not getting involved

13    anymore because I'm just going to try it.  It's been sitting

14    here for two or three years, right?  How long has it been?

15         MS. PIEMONTE-STACEY:  It's an '07 case, your Honor.

16         THE COURT:  It's terrible, I mean, in the sense that

17    he could have been going through sex offender treatment this

18    whole time if I did that, and he could be out by now.  So I'm

19    really not ready -- it's not in the interest of justice to wait

20    any longer, okay?

21         MR. MILES:  I have one more question, your Honor.  I

22    don't want things to be delayed, so given my trial schedule,

23    can I substitute one of my partners or an associate for me at

24    depositions, if it's appropriate?

25         THE COURT:  I don't know.  There's someone named Peter

1   Krupp who's the head of the CJA -- are you on the CJA list?

2          MR. MILES:  No.

3          THE COURT:  I designated you outside of it?

4          MR. MILES:  Yes.

5          THE COURT:  I would say not.

6          MR. MILES:  Okay.

7          THE COURT:  He's had such dissatisfaction with his

8   lawyers, unless I got a clearance from him, I'm going to hear

9   him screaming.  You're the expert.  I don't know anything about

10  your associates.  I don't know if they have the level of

11  expertise that you have.

12         MR. MILES:  They don't.

13         THE COURT:  Charlie Rankin I think it was who

14  recommended you as one of the key guys in this field.

15         MR. MILES:  Thank you, your Honor.

16         THE COURT:  And I was reluctant to even name you

17  simply because you had to drive in from Springfield all the

18  time, but he assured me you were one of the key people, and

19  unless I knew somebody else had this level of expertise, I

20  would be reluctant to do that.  I don't care if someone helps

21  you at trial and assists you, I think we pay for that, but I

22  think you need to be there, okay?  All right, thank you.

23         MR. MILES:  Thank you.

24         THE CLERK:  Court is in recess.

25         (Adjourned, 11:33 a.m.)

1                    C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 28 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Civil Action No. 07-12058-PBS,

11 United States of America v. Joel Wetmore, and thereafter by me

12 reduced to typewriting and is a true and accurate record of the

13 proceedings.

14     In witness whereof I have hereunto set my hand this 25th

15 day of October, 2011.

16

17

18

19

20          /s/ Lee A. Marzilli

           _____
21         LEE A. MARZILLI, CRR
           OFFICIAL COURT REPORTER
22

23

24

25