```
                IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,          )
                                   )
                Petitioner         )
                                   )
        -VS-                       ) Civil No. 07-12058
                                   ) Pages 1 - 18
JOEL WETMORE,                      )
                                   )
                Respondent         )
```

FINAL PRETRIAL CONFERENCE


BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts  02210
April 27, 2010, 2:15 p.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

854bcb05-d330-4806-a7e1-867d28a10c72

1   A P P E A R A N C E S:

2        EVE A. PIEMONTE-STACEY, ESQ. and RACHAEL S. ROLLINS, ESQ.,
    Assistant United States Attorneys, Office of the United States
3   Attorney, 1 Courthouse Way, Boston, Massachusetts, 02210,
    for the Petitioner.

4
         HARRY L. MILES, ESQ., Green, Miles, Lipton, White &
5   Fitz-Gibbon, 77 Pleasant Street, Northamptom, Massachusetts,
    01061-0210, for the Respondent.

6
    ALSO PRESENT:  Mark Grady, Esq., Assistant United States
7                  Attorney.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

854bcb05-d330-4806-a7e1-867d28a10c72

1          P R O C E E D I N G S

2          THE CLERK:  The case of the United States v. Joel

3   Wetmore, Civil Action No. 07-12058, will now be heard before

4   this Court.  Will counsel please identify themselves for the

5   record.

6          MS. PIEMONTE-STACEY:  Good afternoon, your Honor.  Eve

7   Piemonte-Stacey and Rachael Rollins for the United States.

8          MR. MILES:  Good afternoon, your Honor.  Harry miles

9   for the respondent.

10          THE COURT:  Good afternoon.  So is the government

11   ready for trial?

12          MS. PIEMONTE-STACEY:  Yes, your Honor.

13          THE COURT:  Are you ready for trial?

14          MR. MILES:  Yes, your Honor.  There are three issues

15   that need to be talked about, but they're not going to

16   interfere with trial.

17          THE COURT:  Yes.  So as you know -- maybe you don't --

18   I have a trial that's ongoing, and I think it's likely to bump

19   the May 10 trial.  So the real issue is, what are the -- have

20   you checked out issues with respect to your experts' various

21   availabilities?  I was just asking them that question right

22   here right beforehand, and the reality is that I think it's

23   going to go through that week.  It may not.  You probably can

24   find out more easily than I can.  I can tell you who the

25   defense attorneys are and the prosecutor, but I believe that

1    this case will go through -- this is scheduled for the 10th,

2    right?

3              MR. MILES:  That's correct, your Honor.

4              THE COURT:  But I'm not sure yet.  I'm just not sure.

5    So one thought that I had is that since this is a bench trial,

6    that I could, if there were problems with -- I could do this a

7    little here and a little there, and the only problem with that

8    is you, of course, are coming in from Springfield, as opposed

9    to one fell swoop.  So I wanted to get a sense of how long this

10   trial was likely to take.

11             MS. PIEMONTE-STACEY:  Well, your Honor, there's been

12   some developments since we've last been here.  I'm now

13   informed, and certainly my brother can correct me if I

14   misrepresent anything, but I'm informed that there will no

15   longer be a Daubert challenge to the hebephilia piece of this.

16   That may minimize a little bit of the trial time.  I'm also

17   informed that respondent will not be presenting his own expert.

18   So now we're looking at a significantly shorter -- I mean,

19   that's at least a half day, I would say, of time.

20             THE COURT:  I'm confused.  You're not planning on --

21   is that because the independent expert comes out the defense's

22   way?

23             MS. PIEMONTE-STACEY:  No, your Honor.  Dr. Prentky

24   comes out as sexually dangerous, as does the government's

25   expert.

1          THE COURT:  So let me ask you this question:  Why?

2     There's going to be no expert at all?

3          MR. MILES:  That's correct, your Honor.

4          THE COURT:  So you're going to put in your case

5     through cross basically?

6          MR. MILES:  Yes, reserving the right to change that if

7     I find an expert's opinion that I wish to present.  I doubt it

8     at this late date.

9          MS. PIEMONTE-STACEY:  Right, because we'd then be

10    faced with the issues of, I have no expert disclosures at all,

11    as we're here for that reason because --

12         THE COURT:  Well, let me turn the tide on you.  If in

13    fact he's not putting on anybody and you just have a neutral

14    expert your way, why do you need two, one neutral and one your

15    own?

16         MS. PIEMONTE-STACEY:  I think it's the full

17    presentation of the evidence requires both, your Honor.  And I

18    have confirmed with both Dr. Prentky and by cc'ing counsel as

19    well as Dr. Phoenix that they are available the week of May 10.

20    I did not anticipate that I needed to look beyond that, so I

21    can't represent --

22         THE COURT:  You're talking about the week we were

23    scheduled for trial, right?

24         MS. PIEMONTE-STACEY:  Yes.  So they're all confirmed.

25         THE COURT:  You must have known we were -- let me ask

854bcb05-d330-4806-a7e1-867d28a10c72

1    you this.

2           Robert, what do we have on the afternoon of May 10?

3           Could I possibly get both experts in in two days,

4    Monday and Tuesday.

5           MS. PIEMONTE-STACEY:  I think so.

6           THE COURT:  If I did them in the afternoon?  In other

7    words, I tried -- if the case was still ongoing, we could move

8    it into the afternoon?

9           MR. MILES:  If I may interrupt for just a moment, your

10   Honor, Mr. Wetmore is having trouble hearing and will need a --

11          THE COURT:  Oh, I'm so sorry.

12          (Discussion off the record.)

13          THE COURT:  So how long a trial?  How many trial hours

14   do you think you'll need to put in your case, direct and cross?

15          MS. PIEMONTE-STACEY:  The experts certainly could be

16   done within the two afternoons, I believe, within those two

17   afternoons.  It's just a question of whether or not there are

18   other minor -- so I think twelve, twelve trial hours.

19          THE COURT:  To put in your whole case, direct and

20   cross?

21          MS. PIEMONTE-STACEY:  I think so, your Honor.

22          THE COURT:  Maybe three to four trial days if it's

23   half days?

24          MS. PIEMONTE-STACEY:  Yes.

25          THE COURT:  Does that sound right to you?

1          MR. MILES:  That would be for the government's case,

2     your Honor.  I would expect to have four witnesses.

3          THE COURT:  Okay, all right, that's good to know.  So

4     one thought I had is, I could get started, but I need to know

5     and I have to talk with Robert and see his calendar as to what

6     can be rescheduled and what can't be because I don't know

7     whether it would be May 10.  Maybe it would be some other

8     afternoons in June.  I just need to figure this out.

9          (Discussion between the Court and Clerk.)

10          THE COURT:  We could probably give you the afternoon

11     of the 10th and the 11th, and then if for some reason the case

12     is over or we don't have a morning trial, we could do it in the

13     mornings.  Could you check with your experts to see if that's

14     feasible?

15          MS. PIEMONTE-STACEY:  Well, I know I checked with -- I

16     asked both Dr. Prentky and Dr. Phenix to keep the entire day

17     open the week of the 10th through the 14th, and they confirmed

18     that they had, so I can reconfirm, but I think that would be

19     fine with them.

20          THE COURT:  Then I can schedule your witnesses around

21     when it makes sense for my schedule and for theirs.

22          MR. MILES:  Yes, your Honor.

23          THE COURT:  And yours.

24          MR. MILES:  That would be fine.  I do have witnesses

25     coming from Maine, and some of them are from pretty far up in

1   Maine, so I'd need some time to get them down here because it's

2   not something where they can drive down and then drive back.

3         THE COURT:  Fair enough.  I'd give you plenty of

4   advanced notice.  And so because it's not jury, I can jump

5   around a little bit.  It's a little easier.  If that's not

6   going to work for me, the one concern I have is what if I send

7   the jury that day -- this is that big Chinese export thing --

8   if I'm sending the -- so I will just know a lot more next week,

9   and I'm sorry about that.  So we will pencil you in for those

10  two dates, but I will get -- as we get a lot closer.

11        What are the three issues that you need to raise?

12        MR. MILES:  I'll need a writ of habeas corpus

13  ad testificandum for two inmates at the treatment center at

14  Fort Devens.

15        THE COURT:  Why?

16        MR. MILES:  There is a factual issue, your Honor, on

17  which Dr. --

18        THE COURT:  Well, you're right, you've told me about

19  this, whether it was planted.

20        MR. MILES:  Yes, yes.

21        THE COURT:  Yes, yes, okay, absolutely we will do

22  that.  And what's the next one?

23        MR. MILES:  And I don't know if the government will

24  want to bring in some of the investigating officers who

25  participated.  That was the impression I had.

1          THE COURT:  Yes, so that becomes -- I understand.

2    Okay, I forgot that, and you had told me about that, so --

3          MR. MILES:  The second issue is, the government has

4    subpoenaed documents from Dr. Saleh, who was engaged by

5    predecessor counsel and apparently did an evaluation and

6    produced documents in the course of that evaluation.  I intend

7    to file a motion for protective order regarding those documents

8    on the grounds that they're protected by the work product

9    doctrine.

10         THE COURT:  What do you mean, reports or actual

11   documents?

12         MR. MILES:  They would be work notes, evaluations,

13   reports to counsel concerning his findings.

14         THE COURT:  Well, are you looking for those?

15         MS. PIEMONTE-STACEY:  Yes, your Honor.  This is an

16   issue that goes back to his request for pharmacological

17   treatment, and it's an issue that the respondent himself has

18   raised during pretrial proceedings, and I expect him to raise

19   it during trial.  As a result, as you may remember, when we

20   were here last, we had a discussion of respondent signing

21   releases to allow access to that information.  When that didn't

22   happen, I sent out a subpoena just to make sure the discovery

23   was at least requested within the discovery timeline.  And so

24   now, and I spoke with counsel ahead of time, he's saying a

25   motion for a protective order.

1      THE COURT:  Well, it depends what it is.  I mean, if

2  there are actual documents, medical records and the like, you

3  get it.  If it's letters between the expert and counsel on his

4  opinion, that's work product.

5      MS. PIEMONTE-STACEY:  Right, and we're not -- and

6  that's exactly what I had said to counsel.

7      THE COURT:  Yes, so why don't you two just discuss

8  that.  That you should be able to work out.

9      And what's the final thing?

10      MR. MILES:  The last thing, your Honor, is the

11  question of the testimony of the probation officer who would be

12  supervising Mr. Wetmore, should he be released, in terms of the

13  conditions of his supervisory release.

14      THE COURT:  Where would it be?

15      MR. MILES:  He's in Portland, Maine, and I don't know

16  if he's within a 100-mile radius.

17      THE COURT:  I don't know either, but I do know that in

18  that other case, Shields that I had, someone came down.  But he

19  hasn't been assigned someone yet, so it's a little --

20      MR. MILES:  There actually is somebody who's been

21  assigned, your Honor.

22      THE COURT:  Oh, all right.  Well, is it the same

23  person, do you know, as was assigned Shields?

24      MR. MILES:  I don't know who's on Shields, but I

25  believe the person's name is Robert Jeffreys.

1        MS. PIEMONTE-STACEY:  It's not the same person, your

2   Honor.

3        THE COURT:  It is not the same person.  All right, so

4   since it's just me also, one thing you might want to think

5   about is, if we could ever put together the video conferencing

6   capability and some of these people had trouble getting down

7   here, we could try and work it through that as well.

8        MR. MILES:  I'd be happy to cooperate with that, your

9   Honor.

10       THE COURT:  See what makes sense in terms of the

11  conferencing?  Okay, good.

12       Now, the reality is that we of course haven't heard

13  from the Supreme Court yet, and since we're so close, the

14  question really is -- the First Circuit has clearly ruled in

15  favor of the constitutionality, which is why I've moved this

16  ahead, but won't we be hearing from the Supreme Court now by

17  June, end of June?

18       MR. MILES:  I would expect that, your Honor.  And

19  Mr. Wetmore maintains and has maintained that he would like to

20  wait for the Supreme Court decision before he goes to trial.

21       THE COURT:  If he still wants that, I mean, that

22  actually makes -- this is circling back on the scheduling --

23  that's a whole lot easier for me at this point.  It's so close.

24  It's within a month.  I mean, I'm so backed up that if he at

25  this point still wants it --

1          MR. MILES:  I'll talk to him again to make sure, but

2     that was my last communication.

3          MS. PIEMONTE-STACEY:  Your Honor, we have no

4     objection.  We were just moving -- you had read the transcripts

5     and you had --

6          THE COURT:  I moved it up.

7          MS. PIEMONTE-STACEY:  Yes.  So we have no objection to

8     being continued until afterwards.  I guess the other option was

9     that we go to trial, and you held that decision pending

10    Comstock.

11         THE COURT:  But now it's so close.  I mean, I had just

12    assumed, frankly, it would have come down by now, and it

13    hasn't.

14         MS. PIEMONTE-STACEY:  Right.

15         THE COURT:  But it's only another month, and so I'm

16    sort of thinking we may have guidance as to the statute.  I

17    mean, it's something I'd be willing to do if at this point

18    everyone was still interested in it.  It takes some scheduling

19    pressure off of me.

20         MS. PIEMONTE-STACEY:  And the only thing is, the

21    experts I know are usually booked out two and three months, so

22    we'd be talking about a bit of a delay.

23         THE COURT:  Why don't I just schedule them -- at this

24    point I have you in for May, but if we can come up with another

25    week, if you could get in touch with Mr. Alba, I'd be happy to

1  do it the end of July.  We will hear from the Supreme Court by

2  then, the end of July, beginning of August.  I'm usually gone

3  the last couple of weeks of August, but otherwise I'll be here.

4        MS. PIEMONTE-STACEY:  Right, and I'm away from pretty

5  much August 13 on, so --

6        THE COURT:  Would we want to try and do it the first

7  week in August?

8        MR. MILES:  Your Honor, I would have to check with the

9  Superior Court.  I'm on two trial lists, Franklin County and

10  Hampshire County, and I've got a case that might run into

11  August in the Land Court.  So as soon as I can take a look at

12  my full calendar --

13        THE COURT:  Well, one thing we could do is just do the

14  two experts those two afternoons, and then just wait for all

15  the fact witnesses to come down until we hear from the Supreme

16  Court.  Does that make some sense?

17        MR. MILES:  The only reason I hesitate, your Honor, is

18  that, as you can see, all of my gray cells have fled to my

19  hair, so it makes it difficult for me to separate things quite

20  that distance.  My preference would be to do it in one

21  proceeding as much as possible.

22        THE COURT:  Well, why don't we do this:  We're going

23  to get started that day in May, and if you can come up with

24  other dates, I am more than happy to move this into July and

25  August, if you can find -- and I'm happy to do it a couple of

1    days at a time.  I think one day at a time is too much of a

2    hardship for counsel, but if I can do, for example, the experts

3    in a cluster and then the fact witnesses in a cluster, I'm

4    happy to do that.  So we might want to bump all the fact

5    witnesses until sometime in July or August because, I mean,

6    this case isn't going to settle or plead, or whatever the right

7    word is, right?  I mean, these cases never do.

8         MS. PIEMONTE-STACEY:  Well, we've had discussions

9    about it, and I think we got this close, but the reality is, I

10   don't think it's going to happen.

11        THE COURT:  Well, it won't without some --

12        MS. PIEMONTE-STACEY:  I'm sorry.  When you say the

13   afternoon, your Honor, 1:00 to 5:00, 1:00 to 4:00?

14        THE COURT:  No, no, no, no.  I'm only human, and I

15   have all these other cases.

16        MS. PIEMONTE-STACEY:  Well, I just wanted to --

17        THE COURT:  I'm thinking more realistically like 2:00

18   to 4:30 or something like that.

19        MS. PIEMONTE-STACEY:  Oh, of course not 1:00 o'clock.

20   Okay, 2:00 to 4:30, okay.

21        THE COURT:  And if in fact the criminal case is over

22   or the jury is deliberating, I might move it into the mornings,

23   that sort of thing.  I won't expect you to have your fact

24   witnesses there.  I'm only talking about the two experts at

25   that point, and then we'll worry about the fact witnesses

1    later.  Maybe at that point we'll hear from the Supreme Court,

2    okay?  That way it won't tax the gray cells.

3           Let me ask you on a completely different issue,

4    completely different, are you handling the Judge Tauro case?

5           MS. PIEMONTE-STACEY:  I am, your Honor.

6           THE COURT:  How did that get to me?  Was that a random

7    draw?

8           MS. PIEMONTE-STACEY:  I have not the first idea how

9    that got to you.  The First Circuit remanded to Judge Tauro for

10   further findings, and then the next thing I saw --

11          THE COURT:  I have gotten a disproportionate number of

12   these.  Do you know how I got it?

13          THE CLERK:  I don't, no.

14          THE COURT:  We're going to check that out.  That was

15   not deemed related?

16          MS. PIEMONTE-STACEY:  No.  And, your Honor, frankly,

17   I'm not sure -- what the First Circuit said is, it remanded or

18   conferred the findings on the dangerousness prong, and talks

19   about whether one expert's testimony was more persuasive than

20   the other.  So it presents a difficult situation for the Court

21   as well as for us.

22          THE COURT:  So you don't know how it got to me?

23          MS. PIEMONTE-STACEY:  No, no idea.

24          THE COURT:  I just saw it for the first time, and I --

25   I've had three of these, let's just put it this way.  And it's

1   the end of them, right?  No more are coming here.

2            MS. PIEMONTE-STACEY:  To you?

3            THE COURT:  No, to this court.

4            MS. PIEMONTE-STACEY:  I think there's one more to be

5   tried that's pending, Volungus that's before Judge O'Toole, and

6   AUSA Grady is handling that, and he's in the courtroom.

7            THE COURT:  Do you know, Mr. Grady, how I ended up

8   getting that case?

9            MR. GRADY:  I would think, based on what I quickly

10  looked at, the local rule provides that unless the First

11  Circuit basically refers it back to a judge --

12           THE COURT:  No, no, no, I'm talking about how it came

13  to me.  Was it a random draw?

14           MR. GRADY:  It goes by random assignment.  That would

15  be my understanding of what happens.

16           THE COURT:  All right, we're going to check that out.

17  Okay.

18           MR. GRADY:  I did want to say with respect to the

19  North Carolina cases, there are some 80 cases awaiting trial in

20  North Carolina that may need to be tried on a very quick basis

21  if Comstock goes the government's way, and certainly none of us

22  have any idea how that's going to work out and whether that's

23  going to require those cases --

24           THE COURT:  All right, that's not your problem, but I

25  just recently got another one and --

1      MS. ROLLINS:  Should we ask that the 80 go to you, do

2  you think?

3      THE COURT:  I think the 80 --

4      MS. PIEMONTE-STACEY:  The North Carolina, volunteer?

5  You're experienced.

6      THE COURT:  Thank you very much.  So right now your

7  task is to work out those work product documents, and, two, to

8  come up with another date.  If you could bump the whole thing

9  into July and August without -- you know, like in a realistic,

10  I am more than open to it.  I'm really crunched right now for

11  time.

12      MS. PIEMONTE-STACEY:  So I'll check with the two

13  experts about the July/early August dates?

14      THE COURT:  Yes.  Thank you.

15      MR. MILES:  Actually, if we could focus on July, maybe

16  mid-July, I'm pretty sure I'm clear.

17      THE COURT:  July, what date is good for us, anything

18  that we know of?

19      THE CLERK:  The week of the 12th is bad, so the 19th?

20      MR. MILES:  The week of the 19th, end of July?  I'm

21  sure I can work with that, and I'll finalize that with

22  Attorney Stacey.

23      THE COURT:  If you can.  If not, I've got to get this

24  case sort of moving.

25      MR. MILES:  Right.

1          THE COURT:  It's been around for a long time, so I

2    feel -- it's not our fault, there have been legal challenges

3    and the like, but, you know, he has been incarcerated.  It's

4    civilly, you know.  Just it's still a loss of freedom, so --

5          MR. MILES:  Well, if he were not so firm on awaiting

6    Comstock, your Honor, I'd be more in the Court's corner than

7    opposing it.

8          THE COURT:  Right.  Well, we'll see what happens.  Who

9    knows?  Okay, thank you.

10          MS. STACEY:  Thank you.

11          THE CLERK:  Court is in recess.

12          (Adjourned, 2:32 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 18 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Civil Action No. 07-12058-PBS,

11 United States of America v. Joel Wetmore, and thereafter by me

12 reduced to typewriting and is a true and accurate record of the

13 proceedings.

14     In witness whereof I have hereunto set my hand this 26th

15 day of October, 2011.

16

17

18

19

20          /s/ Lee A. Marzilli

           _____
21          LEE A. MARZILLI, CRR
           OFFICIAL COURT REPORTER
22

23

24

25