IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,          )
                                   )
            Petitioner             )
                                   )
        -VS-                        )   Civil No. 07-12058
                                   )   Pages 1 - 28
JOEL WETMORE,                      )
                                   )
            Respondent             )



**EVIDENTIARY HEARING**


BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES CHIEF DISTRICT JUDGE




                        United States District Court
                        1 Courthouse Way, Courtroom 19
                        Boston, Massachusetts  02210
                        November 29, 2018, 2:45 p.m.




                    LEE A. MARZILLI
                 OFFICIAL COURT REPORTER
              United States District Court
              1 Courthouse Way, Room 3205
                  Boston, MA  02210
                    (617)345-6787

1   A P P E A R A N C E S:

2        JENNIFER A. SERAFYN, ESQ., Assistant United States
    Attorney, Office of the United States Attorney, Room 9200,
3   1 Courthouse Way, Boston, Massachusetts, 02210, for the
    Petitioner.
4
         JAMES B. CRAVEN, III, ESQ., Liberty Market Building,
5   349 West Main Street, P.O. 1366, Durham, North Carolina, 27702,
    for the Respondent.
6
    ALSO PRESENT:  Jeffrey Smith, U.S. Probation Office.
7                  Dr. Fabian Saleh
                   Dr. Joseph J. Plaud
8

9

10                          I N D E X

11  STATEMENT BY:                        PAGE

12  Dr. Fabian Saleh                       6

13  Dr. Joseph J. Plaud                    7

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2          THE CLERK:  Court calls Civil Action 07-12058, United

3   States v. Joel Wetmore.  Will counsel and Probation please

4   identify themselves.

5          MS. SERAFYN:  Good afternoon, your Honor.  Jennifer

6   Serafyn for the United States.

7          MR. SMITH:  Good afternoon, your Honor.  Jeff Smith

8   for Probation.

9          MR. CRAVEN:  Jim Craven for Mr. Wetmore.

10          THE COURT:  Mr. Wetmore is here.  I see Dr. Plaud as

11   well as I think his brother, Mr. Wetmore's brother.

12          MR. CRAVEN:  And Dr. Saleh.

13          THE COURT:  Oh, there you are too.  All right, well --

14          MR. CRAVEN:  And Dr. Plaud just said --

15          THE COURT:  -- thank you both for coming.  I wasn't

16   sure this was necessary because both, I understood -- I think

17   it was an email maybe from the government -- would not be

18   opposing release, but that there would be a number of

19   conditions that were being imposed that would guarantee

20   compliance.

21          MR. CRAVEN:  Yeah, and the Probation Office this

22   morning shared those conditions with me, and we have absolutely

23   no objection.

24          THE COURT:  Let me just also add as a preliminary

25   matter, unfortunately there's a very necessary call for me to

1    take at 3:30, so if we don't finish, I won't rush you; I just

2    need to leave then and come back down again.

3            MR. CRAVEN:  We'll be done before then.

4            THE COURT:  Let me just start from the beginning.  I

5    want to go in the record in a sealed way the medical records,

6    which as I understand it -- I'm so glad Dr. Saleh is here --

7    have rendered his testosterone so low as to functionally --

8    well, I don't know what the right word would be -- eliminating

9    his sexual impulses.

10           Is that the way you both understand it, Ms. Serafyn?

11           MS. SERAFYN:  Yes, your Honor, although I do have some

12   concerns because it seems like there's a little bit of an

13   absence of information, but, yes, I think his most recent

14   testosterone level was 12, which is far below the applicable

15   range.

16           MR. CRAVEN:  It is rock bottom or less.

17           THE COURT:  All right.  Did you want to put either of

18   your experts on the stand?

19           MR. CRAVEN:  I do, very, very briefly.

20           THE COURT:  Well, it's got to be very brief.  At least

21   I want to get them out of here and not hold them here.  They've

22   been, shall I say, troopers in showing up today because I'm not

23   even a hundred percent sure they're needed.

24           What do you think, Ms. Serafyn?

25           MS. SERAFYN:  I don't think they're needed, your

1    Honor.  I mean, the government isn't -- I don't think that --

2            THE COURT:  The government is not opposing release at

3    this point because of those test results, as I understand it.

4            MR. CRAVEN:  Well, all I would ask them really is, "Do

5    you have any reservation at all about releasing him conditionally

6    today?" and both Dr. Plaud and Dr. Saleh would say, "No, I

7    don't."

8            MS. SERAFYN:  And they've said that in their written

9    reports, your Honor, which is before you.

10            THE COURT:  Yes, they have.

11            MR. CRAVEN:  So we can do without them, if that would

12    help.

13            THE COURT:  I received this.  I mean, I understand

14    that to some extent this treatment, chemical treatment is -- in

15    fact I've been told by Dr. Plaud he doesn't agree with it.  So

16    it's not uniformly accepted, and neither will I view it as

17    necessarily always the best standard of care for everyone.

18    However, here, given the continual thoughts that Mr. Wetmore

19    continued to have, even as recently as what I heard about in

20    the last hearing where I said to Dr. Plaud, "Please go out

21    there and see if this is a problem," I think it's paramount

22    that he continue on this medication so long as it isn't

23    otherwise hurting him.

24            MR. CRAVEN:  And he agrees completely.

25            THE COURT:  And I didn't -- let me just yield to them.

1    Doctor, did you want to come up and tell us, say anything

2    beyond what you've said in your letter?

3              DR. SALEH:  Yes, if you wish, I'd be happy to.

4              THE COURT:  Do you want to?  Come on up, sir.  I mean,

5    you both stuck with this case.  How many years has it been?

6              MR. CRAVEN:  This case is now in year thirteen.

7              DR. SALEH:  Stay here?

8              THE COURT:  Yes, that's fine.  Introduce your name for

9    the record.

10             DR. SALEH:  Yes.  My name is Fabian Saleh, S-a-l-e-h.

11             THE COURT:  All right, and, sir, you're under oath.

12   So what is it you'd like to say?

13             DR. SALEH:  I actually, I am, I'm of the opinion as

14   expressed in the letter, is that Mr. Wetmore, as you know, was

15   started on the testosterone-lowering agent.  He has shown a

16   very good response to it with regard to testosterone levels,

17   and the decrease in his levels goes hand in hand with a

18   decrease in his sexual thoughts, urges, and behaviors that he

19   has expressed previously via masturbation.  He denies any

20   masturbatory behaviors.  There is no report given to me that

21   would suggest otherwise in terms of masturbation or problematic

22   sexual behaviors.  I spoke both to the medical doctor at the

23   Wyatt and the therapist at the Wyatt.  Both informed me, and

24   consistent with what Mr. Wetmore told me, that he has been

25   treatment-compliant, very moderated, eager to do well, and that

 1    he has insight into his treatment and risk management needs.

 2         THE COURT:  Thank you, sir.  And I'm intending to

 3    continue him on this treatment while in the halfway house and

 4    in home confinement and for an indefinite period of time going

 5    forward.  Would you be willing to continue to serve as an

 6    expert if we have issues with his treatment?

 7         DR. SALEH:  Yes, sure.

 8         THE COURT:  Thank you very much.

 9         Anything either of you want to ask?

10         MR. CRAVEN:  No, your Honor.

11         THE COURT:  Do you have any concerns about releasing

12    him at this point?

13         DR. SALEH:  With the conditions in place, I have no

14    concerns.  Without conditions, I would have concerns.

15         THE COURT:  Thank you so much for helping me.

16         And, Dr. Plaud, would you like to do it?  Just come on

17    up for a second.

18         Oh, did you have anything else?  I didn't even ask.

19         MR. CRAVEN:  No.  No, your Honor.  No, we're...

20         THE COURT:  Once again, welcome back.

21         DR. PLAUD:  Thank you, Judge.  Joseph J. Plaud,

22    P-l-a-u-d.  I have followed the case.  I went back and saw

23    Mr. Wetmore again.  From my perspective -- and I understand the

24    issue with continuing on his medication, that's fine -- I

25    believe, it is my professional judgment at this point that

1    under conditions, he is safe to be released back to the

2    community.  One of the issues that has come up repeatedly is

3    Mr. Wetmore's lack of ability to comply with or continue with

4    the CTP program at FCI Butner.  I was of the opinion --

5              THE COURT:  And just why don't you spell that out.

6              DR. PLAUD:  That's the Commitment and Treatment

7    Program, CTP.  That is the program at the Federal Correctional

8    Institution at Butner, North Carolina.

9              I did believe, given my review and my many interviews

10   and discussions with Mr. Wetmore, and review of his progress

11   and treatment notes, that he did have the ability to effectively

12   participate and benefit from treatment, sex offender treatment.

13   I do not believe, and I've testified previously, that CTP would

14   ever be that venue for him.  He's been at Wyatt now, and I see

15   a rather significant change in keeping with what I thought

16   would happen if he received treatment outside of the CTP

17   program.  So I would just like to add for the record that I am

18   pleased that Mr. Wetmore has continued with treatment at Wyatt

19   and he has done as well as he has.

20             THE COURT:  Let me ask you this on the follow-up:

21   First of all, do you feel as if it's safe, subject to these

22   conditions proposed by Probation, to release him to the

23   community?

24             DR. PLAUD:  I do, Judge.

25             THE COURT:  The second question is going to be, I am

1  going to include sex offender treatment as part of that.

2          DR. PLAUD:  Yes, I would.

3          THE COURT:  And is there a particular recommendation

4  as -- I think I've had this with at least one or two other

5  folks who were civilly committed, that I think it's a similar

6  kind of treatment to what he got at Butner.

7          DR. PLAUD:  Yes.

8          THE COURT:  I mean, I don't know the nuances of the

9  different treatments, but I think he's going to have to comply

10  with those treatment --

11          DR. PLAUD:  Right, it will be cognitive behaviorally

12  based treatment program, generally speaking, now called the

13  "Good Lives Model."

14          THE COURT:  Yes, and that's what I've heard about,

15  both at Bridgewater and for this program in Maine.  And do you

16  think that is the appropriate model at this point?

17          DR. PLAUD:  That would be the most appropriate model,

18  Judge.

19          THE COURT:  All right, thank you very much.

20          DR. PLAUD:  Thank you very much.

21          THE COURT:  And thank you for sticking with the case.

22  Especially when I was so concerned after that last hearing, I

23  very much appreciate your going back to the institution.  As

24  you know, this is an extreme form, shall I say, of approach to

25  this.  I'd much rather it be through cognitive behavioral

1  therapy, but it just wasn't working.

2      MR. CRAVEN:  Well, your Honor, you may remember, we've

3  also arranged with Counseling and Therapeutic Centers, Inc.

4  They're headquartered in Needham, Mass., but they have a

5  facility in Bangor.

6      THE COURT:  Well, it may be, but I think Probation has

7  some different ideas, and I know you were emailed them, and I

8  think that's what I'd like to spend the bulk of my --

9      MR. CRAVEN:  I talked to Mr. Smith this morning, and I

10  think we're more or less on the same page here.

11      THE COURT:  All right.  So let me just ask if you

12  wanted any other information.  For example, you put in your

13  proposed order that Mr. Wetmore would have testified.  I'm not

14  sure that that is necessary, but of course he has that right.

15      MR. CRAVEN:  No.  He is certainly willing if your

16  Honor would like to hear from him.  I can tell you that he is

17  very enthusiastic about the changes in his system through the

18  testosterone-lowering medication.  He is delighted, and he --

19      THE COURT:  And does he understand, though -- I mean,

20  let me just say, my concern is, I've got him on this

21  basically -- what do you call it?  I don't want to call it what

22  I think of it as.  I think of it as chemical castration.

23  What's the official name for it?

24      MR. CRAVEN:  Testosterone reducing or something like

25  that.  I don't know.

1          THE COURT:  All right, he's on that.

2          MR. CRAVEN:  Yes.

3          THE COURT:  And I know the theory is that he wouldn't

4    be on it longer than necessary because it does have certain bad

5    health effects, but at this point, unless he gets through to a

6    point where Probation is going to recommend and we're going to

7    think about it, he's likely to be on it for a very long time.

8          MR. CRAVEN:  Well, he understands that, and he's all

9    for that because he likes the way it makes him feel.

10          THE COURT:  All right, well, that's good.  So I want

11   Mr. Smith to now come up with what the proposals are, and then

12   I will -- as I understand, everyone is in agreement with them.

13   Is that right, Ms. Serafyn?

14          MS. SERAFYN:  It is, your Honor, but the government

15   does have some concerns that I would just like to let the Court

16   know about so that the Court has the same information as I do.

17          THE COURT:  Okay.

18          MS. SERAFYN:  The concerns aren't about the conditions.

19          THE COURT:  I see.

20          MS. SERAFYN:  It's just about sort of Mr. Wetmore in

21   the last six months generally.

22          THE COURT:  In Wyatt?

23          MS. SERAFYN:  Yes.

24          THE COURT:  That's why we're here.  I had thought you

25   weren't opposing it.

1          MS. SERAFYN:  Well, we're not opposing it, your Honor,

2     because it doesn't seem like there is a basis to.  It's true

3     that his testosterone levels have been reduced to 12, which is

4     very low, but as your Honor probably recalls, Mr. Wetmore was

5     sent to Wyatt in May.  Before that, we had finally gotten

6     Butner to the point where they were doing the testosterone test

7     every month.  They had figured out the appropriate medication,

8     and they were testing that every month.  So from May through

9     the present, this stack here, not even an inch, maybe a half an

10    inch, are all of the records that I have for Mr. Wetmore from

11    Wyatt.  It looks like there were three testosterone tests, one

12    in May when he got there that showed the range was 267, a

13    second one in September which showed that his testosterone was

14    12, and a third one in November which also showed that his

15    testosterone was 12.  So just so the Court is clear, three

16    tests.  The last two have been a testosterone level of 12, but

17    I'm not quite sure why the tests have been apparently every

18    other month or more instead of every month like they were doing

19    at Butner.  But just to be clear, his testosterone levels are

20    essentially --

21         THE COURT:  So you're recommending that the testing be

22    done monthly?

23         MS. SERAFYN:  That's how it was being done at Butner,

24    and it was my understanding from talking with the doctors at

25    Butner that giving him the shot every month and then doing a

1  follow-up test to see where his testosterone level was is

2  what's appropriate.  I mean, perhaps --

3         THE COURT:  All right, well, that's useful

4  information.

5         MS. SERAFYN:  And then the second thing is, I have

6  also spoken with a social worker at Wyatt named Nicole

7  Rodrigues.  She is the individual who has been treating

8  Mr. Wetmore since he's been at Wyatt.  As the Court knows,

9  Wyatt is a pretrial facility, so it's her understanding that

10  Mr. Wetmore is probably the only non-pretrial person in that

11  facility.

12         THE COURT:  That may not be correct, but, in any

13  event --

14         MS. SERAFYN:  Well, what she said was that there may

15  be some sentenced people there, but they're waiting, you know,

16  a few weeks, maybe a month --

17         THE COURT:  Yes, they're waiting to be --

18         MS. SERAFYN:  Exactly, but for this extended period of

19  time, Mr. Wetmore is certainly unique at Wyatt.  So this woman,

20  Nicole Rodrigues, who previously worked in the Mass. Department

21  of Correction, started a sex offender treatment program there

22  so that the pretrial detainees there would have something to do

23  and would be working towards something productive as they were

24  sitting there waiting to have their trials, and Mr. Wetmore has

25  been participating with her every week on Fridays.  He goes to

1    group therapy with her.  She said he's been less willing to do

2    one-on-one treatment, which it seems to her has been okay

3    because he really needs to kind of have the initiative if he

4    wants to do that.  It's not something that's sort of required.

5          So he's been in group therapy every week.  She reports

6    that he's doing well in group therapy, but, you know, we don't

7    have records like we had at Butner because the program isn't

8    set up that way.  So I don't really have records that show what

9    Mr. Wetmore has been doing in treatment.  I just have these

10   phone calls that I've had with Ms. Rodrigues.  So I just wanted

11   to put that out there for the Court.  Also --

12         THE COURT:  In other words, don't put so much weight

13   on that?

14         MS. SERAFYN:  Yes, your Honor.  And also to let the

15   Court know or to remind the Court that this is not the SOTP

16   treatment that's down at Butner, the commitment and treatment

17   plan where it's designed specifically for Adam Walsh Act civil

18   committees.  And, as the Court remembers, there are different

19   phases, right?  And they all start at Phase 1 working up

20   through phase 4 and then being released.  Well, this program is

21   very different.  So, you know, I wonder whether Mr. Wetmore has

22   been succeeding in treatment, partly because everyone else

23   who's in treatment is sort of new to treatment, and he was

24   already in such an advanced stage at Butner that he's sort of

25   doing a more rudimentary treatment model.

 1          THE COURT:  That may well be so.  It just failed at

 2    Butner.  I mean, how long was he there?  You probably know the

 3    number.  When did I put him there?  It was so long ago.

 4          MS. SERAFYN:  I think it was 2010.

 5          THE COURT:  Yes, it's been eight years or something.

 6    It's been so long, it just hit a plateau.  So I do get that,

 7    but I will say one thing:  If he doesn't comply with the

 8    treatment regimen in Maine, I get this little petition that

 9    says "revoked," and he's right back at Butner, not Wyatt.  So I

10    take that -- you say take it with a grain of salt.  I will do

11    so.

12          MS. SERAFYN:  And I just wanted to put that out there

13    for the Court, and also to let the Court know that Ms. Rodrigues

14    said -- and I wrote this down as a quote from my conversation

15    with her this morning -- "He's never been disrespectful or rude

16    or crass."  That was an issue at Butner where he was having

17    some anger management issues with others in treatment.  And she

18    also said -- and again I wrote this down as a quote -- "He gets

19    along with everyone just fine."

20          So perhaps he did need a change of scenery.  That

21    could be.  I'm not discounting that, but I just wanted the

22    Court to have the same information that the government has.  We

23    don't feel like we have a legal basis to oppose his release,

24    but there are some of those underlying concerns.

25          THE COURT:  Well, that's very good to put that in the

1    record.  Let me just say this:  I was pleased with the way

2    Mr. Shields was handled by Maine, which is, he did fine for a

3    while and then he didn't.  And then I revoked him, and he went

4    back to Butner.  And then he did well again, and he went back

5    out again.  And I view the intense supervision that Maine gives

6    as a positive thing to not only the safety of the community but

7    hopefully rehabilitating or keeping, I guess, Mr. Wetmore on

8    the good path that apparently he is on at Wyatt, even though I

9    understand it's not as rigorous as it was at Butner.

10            So let's go through the -- Mr. Smith, why don't you

11    just read what it is that Maine wants.

12            MR. SMITH:  Your Honor, we would ask that if he be

13    ordered released, that that be upon availability of a bed at

14    the Pharos House, which is a residential reentry center in

15    Portland, Maine.

16            THE COURT:  Yes.

17            MR. SMITH:  We had hoped that that could happen in the

18    next 30 to 60 days.  No guarantee with that, but we'll do our

19    best to expedite that.

20            THE COURT:  All right, thank you.

21            MR. SMITH:  The conditions that they're recommending

22    are that he comply with the medication program prescribed by a

23    licensed medical practitioner.  As I mentioned, they have found

24    a provider in Augusta, Maine, and they will do their best to

25    facilitate that when he gets out.  I would ask --

```
 1            THE COURT:  Will you communicate that at least Butner
 2       is recommending monthly, but Wyatt was doing it every -- how
 3       often was Wyatt doing it?
 4            MR. CRAVEN:  I think Wyatt was doing it every two
 5       months.
 6            Isn't that right, Joel?
 7            MR. WETMORE:  Well, they were trying to do it every
 8       two months, but --
 9            THE COURT:  Dr. Saleh, what do you recommend?
10            DR. SALEH:  Once a month is fine initially, but
11       typically it's not done as frequently because it's also quite
12       costly.  So in the community we sometimes check in every six
13       months; but given Mr. Wetmore's case, I think once a month may
14       not be a bad idea.
15            THE COURT:  All right, so why don't we do it once a
16       month until the provider decides that it can be done for a more
17       extended period of time.
18            MR. SMITH:  I believe, in my conversation with
19       Attorney Craven this morning, he was last administered a shot
20       on November 14, so we'd ask that maybe as part of the order
21       that he be given one more before he leaves, just in case there
22       is some time required to get it set up in Maine, so we have a
23       little bit of time to work.
24            THE COURT:  Yes.
25            MR. SMITH:  Okay.  The defendant shall reside in a
```

1     community confinement for a period -- we left that blank, your

2     Honor.  I would propose that we say for a term of up to twelve

3     months.  That was the original recommendation, I think.  If

4     he's doing well at six months and he has a release plan, it

5     gives us the discretion to allow him out of the residential

6     reentry center.

7             THE COURT:  Up to twelve months, that's fine.

8             MR. SMITH:  Following his release from that, he'll

9     comply with the conditions of home confinement for a period not

10    to exceed -- again this was left blank by Maine.  We'd say

11    again for a term of up to twelve months and, again, if he's

12    doing well.

13            THE COURT:  That's fine.

14            MR. SMITH:  That Mr. Wetmore be subject to a search

15    conducted by the Probation Department at a reasonable time;

16    that he'll participate and comply with computer monitoring and

17    Internet monitoring at the discretion of the Probation

18    Department; that he'll comply with all the requirements of the

19    Sex Offender Registration Act; that he'll participate fully in

20    sex offender treatment as directed by Probation; that he'll

21    submit to periodic random polygraph examinations as directed by

22    Probation; that he'll not associate or have verbal, written,

23    telephonic, or electronic communication with any persons under

24    the age of eighteen, except in the presence of a responsible

25    adult who is aware of the nature of the defendant's

```
 1   background --

 2           THE COURT:  Can I stop you there.  I believe that his

 3   brother or he, they're church-going people, and he had wanted

 4   to go to some program, if I'm remembering, I'm not confusing

 5   the cases, to some church program.  So how can he do that and

 6   be compliant here?  Who should he be with --

 7           MR. SMITH:  The Probation Department can advise his

 8   brother or another support person, and that --

 9           THE COURT:  Okay.  Okay, I just want to make sure

10   because I know the brother is here, and that's part of their

11   life, okay.

12           MR. CRAVEN:  We're in complete agreement with

13   Probation.  Mr. Smith shared these with me this morning.  We're

14   in complete agreement with them.

15           THE COURT:  All right, and --

16           MR. SMITH:  That's it, your Honor.  I gave a brief

17   version, but I have provided a full version to Ms. Molloy.

18           THE COURT:  All right, I order those, and I will

19   incorporate them into the order.  And the one question that

20   remains is, at some point -- I forget how this worked -- at

21   some point I view this as going forever, but do I have to -- I

22   don't remember -- do I have to review this again every year?

23           MR. CRAVEN:  I don't think every year, your Honor.  I

24   think, assuming the order is entered that we've just been

25   talking about, he goes to Maine, he does well, I would think
```

1    we'd be back here maybe in a couple of years on a motion to

2    convert the release from conditional to unconditional, as we

3    did with Todd Carta.

4            THE COURT:  Yes, but it was many, many years before we

5    felt comfortable.  Do you remember, am I still technically

6    supervising Mr. Shields, or did we --

7            MR. SMITH:  Mr. Shields is done.

8            THE COURT:  He's done.  How long did that take?  It

9    took --

10           MR. CRAVEN:  Well, Shields is --

11           MR. SMITH:  2011, I think.

12           MR. CRAVEN:  -- unique.

13           THE COURT:  Well, no.  They're all unique.  But how

14   long did I continue to supervise him?

15           MR. SMITH:  I think it was about five years, your

16   Honor.

17           THE COURT:  About five years?  So just understand, it

18   may take a while until there's a level of confidence.  But also

19   understand, as soon as I get that warrant, if I think there's

20   probable cause that you aren't complying with the cognitive

21   behavioral therapy -- that's an important part of this.  This

22   cannot be solved just based on chemicals, so you need to work

23   with us.  And it can't be just, "I don't like this one and I

24   don't like that one."  You know, you liked Ms. Rodrigues

25   apparently, but you didn't like Hernandez.  This is what we've

1   got in Maine, all right?

2          MR. SMITH:  And I think we're required to provide you

3   with an annual report, so I'll make sure that that's part of

4   our record, and you'll get an annual report from Maine.

5          THE COURT:  That's terrific, and so --

6          MR. CRAVEN:  And, your Honor, I too spoke with

7   Ms. Rodrigues on several occasions.  She feels he's done very,

8   very well in that program there at Wyatt.  I honestly think,

9   had he gone to Wyatt initially rather than to Butner, we would

10  have wrapped this up several years ago.  He told me that of the

11  four sex offender treatment programs he's been in at Butner,

12  Devens, the state of Maine, and at Wyatt, that the one at Wyatt

13  is far and away the best of the four.  He said, "Here they want

14  us to succeed.  They want to help us.  They pat us on the back

15  when we do well.  They say 'please' and 'thank you' and 'how

16  are you doing today?'"  And he said, "Jim, the difference

17  between this program and the one at Butner is night and day."

18          THE COURT:  Well, I'm glad to hear that.

19          MR. CRAVEN:  And he's done well there, and I'm,

20  frankly, very proud of him.  He's come an extraordinarily long

21  way.  You may remember, Judge, that the first time Dr. Plaud

22  evaluated Joel, he said, "He's not ready yet."  But he is now.

23          THE COURT:  Yes.

24          MR. CRAVEN:  And I'm extremely proud of him.

25          THE COURT:  Thank you.

1          MR. SMITH:  Your Honor, I'm sorry, one more thing.

2    Could we just as part of the order ask that when he's released

3    from Wyatt, that he be provided with at least a 60-day supply

4    of his medications?  Normally when someone comes from the

5    Bureau of Prisons, we have that luxury.  Sometimes at Wyatt,

6    because it's a contract facility, we don't get that.  I think

7    it's important for him to leave with his medications so that he

8    has time to find a primary care physician and get connected

9    with his medications up in Maine.

10         MR. CRAVEN:  And I would imagine that the Needham

11   outfit, Counseling and -- I keep blanking on --

12         THE COURT:  I don't know why you keep saying Needham.

13   He's going straightaway up to Maine.

14         MR. CRAVEN:  No, no, Counseling and Psychotherapy --

15         MR. SMITH:  CPC's headquarters is in Needham, but --

16         MR. CRAVEN:  They're headquartered in Needham, but

17   they have an office in Bangor, and I'm guessing that they may

18   become involved with finding a medical practitioner for him up

19   there.  And they're in Portland also.

20         THE COURT:  Could you just give me -- I don't know

21   what it is -- maybe with Dr. Saleh, just give me exactly what I

22   need to order him to be provided with.  Just get me an order,

23   and I'll sign it.

24         MR. SMITH:  Okay, or we can put it as part of our

25   order.

1          THE COURT:  But I do find -- and I take it Mr. Wetmore

2     didn't want to say anything at this point?

3          MR. CRAVEN:  No, your Honor.

4          THE COURT:  I find, based on the evidence of the two

5     court-appointed experts, Dr. Fabian Saleh and Dr. Joseph J.

6     Plaud, as well as the non-opposition of the government after a

7     very long period of time, I find that Mr. Wetmore is no longer

8     a sexually dangerous person as defined under 18 U.S.C.,

9     Section 4248, subject to release on the very strong conditions

10    that I have just articulated.  And this is a highly unusual

11    case.  I've had several others.  I think I got the first batch

12    that came out after the Adam Walsh Act passed, and one of the

13    things that made this so unusual was how -- I don't know what

14    the right word is -- such strong and deviant sexual thoughts

15    that Mr. Wetmore was having and was unable to control, even as

16    recently as within the last year, at least as I heard it.  And

17    I find that this medication, even though it's a little bit

18    controversial in the field, I totally agree with Dr. Saleh that

19    it was necessary here.  I don't think it should be the first

20    order of treatment for anybody.  It's just what was necessary

21    here.  Thought treatment was not alone going to do it.

22          That said, I didn't find you were always so great,

23    Mr. Wetmore.  I often thought you got too stubborn in your view

24    as to what was and wasn't.  You like Rodrigues but you don't

25    like Hernandez.  You don't have that luxury up in Maine.  You

1   have to work with them.  And I'm glad your brother is here.  It

2   can't just be, "Oh, I think she's doing it wrong.  I'm out of

3   here."  There's no "I'm out of here" because "I'm out of here"

4   means "I'm back in Butner."  All right?  Do you understand

5   that, sir?  You have to work with the treatment providers.  Do

6   you understand?  Mr. Wetmore?

7            MR. WETMORE:  Yes.

8            THE COURT:  Okay, I think there's nothing else I need

9   to do.  I suggest that we put those conditions in the record,

10  and I so order.  And I accept everything that Maine has

11  recommended without opposition.  And I'll get hopefully yearly

12  reports, is that it?

13           MR. SMITH:  Yes.

14           THE COURT:  Yes.

15           MR. CRAVEN:  Dr. Plaud did say a little while ago,

16  Judge, that he thought we should have an annual reunion.

17           THE COURT:  Mr. Craven, I can't in all good conscience

18  leave without referring to the attorneys.  Ms. Serafyn has had

19  the earliest of these cases.  I'm thinking this might be your

20  last?

21           MS. SERAFYN:  There's two more, your Honor.

22           THE COURT:  There's two more?  So I don't know what

23  she did in another life, but she has inherited all of these

24  cases, and I think it's at least the last one with me.

25           MR. CRAVEN:  I have one in North Carolina, and my son

1  Joe --

2        THE COURT:  Let me get to you in a minute, Mr. Craven.

3  I just wanted to thank Ms. Serafyn.  It's been a hard case,

4  harder for sure than the others I've had.  I don't know if

5  they're harder than the other ones you have in the other

6  sessions but certainly the hardest of the ones I've had, and I

7  want to thank you for sticking with it.

8        I want to thank Probation.  These aren't always the

9  easiest cases, and Mr. Smith has been coordinating well with

10  Maine and all my other cases in Connecticut too, I think it

11  was.

12        Mr. Craven, other than the fact that you bring in the

13  worst snowstorms that I have experienced at every single

14  hearing that we have had, I want to thank you for your

15  persistence.  It takes, I'm told, a very strong person to be

16  able to handle these cases day in and day out.  They're very

17  hard, emotional cases.  I'm told that some people actually

18  themselves need support to get through some of the cases, and

19  Mr. Wetmore did some awful stuff earlier in his life.

20        MR. CRAVEN:  He did.

21        THE COURT:  And it's really awful, but we still need

22  attorneys who are willing to represent them, and thank you for

23  doing it.

24        MR. CRAVEN:  Well, it's become a labor of love, and

25  I'm very fond of him, and I think he's going to do beautifully.

1          THE COURT:  I hope you're right because otherwise I'm

2     going to have a snowstorm up here.

3          MR. CRAVEN:  And I told his brother today, I said,

4     "Neil, if there's any concern in the future, pick up the phone

5     and call me."

6          THE COURT:  Yes.

7          MR. CRAVEN:  He said, "You're going to stay in the

8     case?"  I said, "For the duration, I am."

9          THE COURT:  But can I say one thing to you.  I'm

10    paying your way, right?

11         MR. CRAVEN:  You sure are.

12         THE COURT:  Okay, I know, and I'm paying for the

13    doctors, et cetera.  Let me just say this:  I got into a little

14    bit of trouble with one of the prior counsel in another case

15    completely.  Just it's not like you can be his lawyer for every

16    problem he has with Probation.

17         MR. CRAVEN:  No, I understand.

18         THE COURT:  It's really if there's another report

19    that's being challenged or a revocation.  But I have another

20    attorney -- maybe you know who he is -- who got into it on

21    every single issue with Probation and then wanted to be paid

22    for it.  No.

23         MR. CRAVEN:  No, but -- and I mentioned it to

24    Mr. Smith this morning too -- you know, if they run into any

25    problems with him, I want to know about it, and I'll try to

1  help and --

2      THE COURT:  Yes, communication is the name of the game

3  because Probation is here to protect the safety of the

4  community and to make sure you get better, and disappearing and

5  not communicating is the worst-case scenario.  I remember with

6  this other gentleman, he got very lonely is essentially what

7  happened.  He got very lonely, and he did some stuff that was

8  problematic.  Hanging out at shelters, isn't that right?  I

9  mean, doing stuff that was worrisome and were triggers, I guess

10  is the right word.  If you're feeling bad, you need to

11  communicate, and you'll get help for it, rather than do

12  dangerous behaviors that then get you back in front of me, whom

13  you never want to see again; I guarantee it.

14      MR. CRAVEN:  I think he understands that.

15      THE COURT:  Okay.

16      MR. CRAVEN:  And assuming all goes well, I don't think

17  we'll be reconvening here again until at least several years

18  down the line when we file a motion to convert the discharge to

19  unconditional.

20      THE COURT:  Yes, that's perhaps correct.

21      MR. CRAVEN:  And who knows when that will be?  But I

22  would assume I would be doing that.

23      THE COURT:  Okay, thank you very much to all of you.

24  I hope not to see you again for five years.  All right, thank

25  you.  Dr. Plaud, Dr. Saleh, thank you.

1          MR. CRAVEN:  Judge, thank you so much.

2          MR. WETMORE:  Thank you very much.

3          MR. CRAVEN:  Thank you for your patience.

4          (Adjourned, 3:16 p.m.)

5                    C E R T I F I C A T E

6

7

   UNITED STATES DISTRICT COURT )
8  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
9

10

11         I, Lee A. Marzilli, Official Federal Court Reporter,

12 do hereby certify that the foregoing transcript, Pages 1

13 through 28 inclusive, was recorded by me stenographically at

14 the time and place aforesaid in Civil Action No. 07-12058-PBS,

15 United States of America v. Joel Wetmore, and thereafter by me

16 reduced to typewriting and is a true and accurate record of the

17 proceedings.

18         Dated this 20th day of February, 2019.

19

20

21

22

23         /s/ Lee A. Marzilli
           _____
24         LEE A. MARZILLI, CRR
           OFFICIAL COURT REPORTER
25